C9JUGIL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4         v.                  11 CR 1083 (TPG)

5   JABAR GILLIAM,

6             Defendant.

7   ------------------------------x

8                       New York, N.Y.
                       September 19, 2012
9                       2:30 p.m.

10

11   Before:

12               HON. THOMAS P. GRIESA

                        District Judge
13                     and a Jury

14

15                 APPEARANCES

16

    PREET BHARARA
17      United States Attorney for the
       Southern District of New York
18   BY:  NATALIE LAMARQUE
       KRISTY J. GREENBERG
19      Assistant United States Attorneys

20   JOEL STEIN
      Attorney for Defendant

21

22

23

24

25

C9JUGIL1

1        (Jury selection)

2        (A jury of 12 and 2 alternates was impanelled and

3    sworn)

4        THE COURT:  Let me give you some preliminary

5    instructions.

6        I should have thanked the people who were excused, but

7    I thank the rest of you back there for your help this morning,

8    your help and your patience.  Thank you very much.

9        (Prospective jurors exit)

10        THE COURT:  The order of the case is as follows.

11        The government attorney will deliver an opening

12    statement, obviously, saying what the government's hopes to

13    prove.  After that, the defense attorney has the opportunity to

14    give an opening statement but is not required to do so.  This

15    is consistent with the all important law that the sole burden

16    of proof is on the government.  The defense does not have any

17    burden of proof.

18        But after the opening statements are given, the

19    government's evidence comes in.  And I haven't heard the

20    evidence or seen the evidence, but it will, I am sure, take the

21    form of testimony, obviously, and maybe some exhibits.  We will

22    see about that.

23        The government conducts direct examination.  After the

24    government's direct examination of a witness is finished, the

25    defense lawyer has the opportunity to conduct

1    cross-examination, and that will be the way each witness is

2    handled.

3         When the government has completed its proof, the

4    government does what we say, resting; the government rests.

5         After that, the defense has the right to put on

6    evidence but is not required to do so.  It can happen that the

7    defense case comes in largely through cross-examining the

8    government witnesses, but actually what the government case is

9    and the defense case is, you will observe for the first time

10   just as I will observe.

11        After all of the evidence is in, the lawyers will

12   deliver their summations, their closing arguments to you.  And

13   after that, I will give you instructions on the law, mainly

14   consisting of a description of the issues which are you to

15   concern yourselves with.  And then you go into your

16   deliberations and you reach the decisions that are requested of

17   you on the issues requested.

18        The schedule each day is to start at 10 o'clock in the

19   mornings and, with a short break, to go to 1, and then from

20   2:15 until 4:30 with a short break.  There may be some

21   variation of that, and I will let you know that in advance.

22        If there is anybody who needs to leave earlier than

23   4:30 on next Tuesday, I would like to know of that somewhat in

24   advance, if possible.

25        It is very important that the jury, that you preserve

C9JUGIL1

your integrity.  And what I am referring to is having no

conversation or even exchange of greetings with other people in

the courtroom.  We don't have an elevator system which means

that the jurors will take one elevator and the lawyers take

another elevator.  You may encounter each other in the

building, but the lawyers know that they are not to have even

the merest greeting with the jurors, and you should know that

too.  You won't think somebody is rude to you or that you are

rude to them.

When you are deliberating at the end of the case, you

will be discussing the evidence.  That discussion is the way

you reach your decision.  It is a very good idea to not discuss

the case until you are deliberating.  It can happen that

people, when they have heard only part of the evidence, they

get into discussions and there can be a little discord or

freezing of people's views or something like that.  So it is

better to recognize that your discussion of the case is a very,

very solemn and important thing and it really is a good idea to

leave that entirely to the time when you are deliberating.

Then you have all the tools to work with and you are doing your

job.

I think that's all I have to say, and we will start

with the opening statement.

MS. GREENBERG:  This is a case about a man who brought

a 16-year-old girl from Maryland to New York to sell her for

sex.  This man, the defendant, Jabar Gilliam, brought the minor

victim to New York, told her to walk the streets in the dead of

winter for hours and sold her for sex like a piece of property.

He used fear and threats to maintain his control over her to

get what he wanted -- money.  He took all the money that she

earned and gave her nothing because, to him, she was just a

commodity, someone to be bought, sold and used.

My name is Kristy Greenberg and I represent the United

States in this case.

With me at counsel table is my colleague Natalie

Lamarque, FBI Special Agent Brian Conolly and Paralegal

Specialist Szuwei Co.

I am going to explain to you today what the evidence

will show in this case, what the charges are against the

defendant and how the government will prove its case.

Here is what the evidence will show.

From November of 2011 until his arrest on December 2,

2011, the defendant used various means to maintain control over

the minor victim.  You will learn that the minor victim's name

is Jasmin.  The defendant hit her.  He had sex with her against

her will.  He refused to feed her or give her any money for

food.  He called her vile names, and he made her call him

"daddy."  He gave her a set of handwritten rules laying down

the law, rules that she had to follow to work for him as a

prostitute.

1              But, ladies and gentlemen, that is not how he treated

2     her in the beginning.  In the beginning he took an interest in

3     her.  He gave her attention.  He spent countless hours learning

4     about her.  What did he learn?  Well, the defendant learned

5     that the minor victim was only 16 years old.  Ladies and

6     gentlemen, the defendant was 29.

7              He learned that her father was killed.

8              THE COURT:  Keep your voice up.

9              MS. GREENBERG:  Yes, your Honor.

10             He learned that her father was killed.

11             He learned that her mother had a drug problem and had

12    been a prostitute and had lost custody of the minor victim when

13    she was younger.

14             He learned that she was a runaway.

15             He also learned that she had worked as a prostitute.

16             In this honeymoon stage, the defendant made the minor

17    victim believe that he wanted a relationship with her.  The

18    defendant told Jasmin that he thought she was pretty.  He told

19    her that he wanted her to meet his family.  He wanted her to

20    meet his mother and his brother.  He told the minor victim that

21    he would help reunite her with her mother.  The defendant

22    preyed on the minor victim and on her vulnerabilities.

23             And, ladies and gentlemen, the defendant's deception

24    worked.  You will hear that the defendant asked the victim to

25    work for him as a prostitute in Maryland and, initially, she

1    agreed.

2              You will also learn that she initially agreed to go

3    with him to New York and work for him there, but it was all

4    just a bait and switch.  As soon as the victim let her guard

5    down, the defendant's compliments stopped and the defendant's

6    abuse began.

7              As a result of the defendant's abuse, the victim was

8    scared.  She wanted out.

9              You will learn that the minor victim mustered the

10   courage to tell the defendant that she no longer wanted to go

11   to New York with him and work for him as a prostitute.

12             How did the defendant react to that?  He threatened to

13   prostitute her younger sister if she would not go with him.

14   Because she was afraid for herself and because she was afraid

15   for her younger sister, on December 1, 2011, the victim took

16   the bus with the defendant from Maryland to New York to work

17   for him as a prostitute.

18             The evidence will show that the defendant called all

19   the shots.  He made all of the travel arrangements and he paid

20   for the victim's bus ticket.

21             Once they got to New York, though, things only got

22   worse for the victim.  With the defendant standing just paces

23   behind her, afraid to disobey him, the victim walked the

24   streets at night, selling herself for sex.  With the defendant

25   standing right outside the door to the bedroom of the apartment

1    that he had secured in the Bronx, the victim continued to have

2    sex with more men for money.

3            Ladies and gentlemen, the defendant took every penny.

4            The defendant also gave her drugs.

5            His family that the defendant told the victim that he

6    wanted her to meet, his mother and his brother, he enlisted his

7    mother and his brother to help him prostitute her.

8            As for the reunion that the victim was looking forward

9    to with her own mother, well, the defendant tried to recruit

10   the victim's mother to work for him as a prostitute as well.

11           Now, as I mentioned earlier, the victim's mother had a

12   drug problem and had been a prostitute and lost custody of the

13   victim because of it, and the defendant knew that.

14           And so when the victim found out that the defendant

15   was talking to her mother about prostituting her,

16   understandably, the victim was upset and confronted the

17   defendant about it.  Well, what did the defendant do?  He

18   choked her and he punched her just for daring to question him.

19           The defendant had succeeded in isolating the victim.

20   She didn't know anyone in New York.  She didn't have any money.

21   She didn't even know where she was.

22           On December 2, 2011, after prostituting the victim for

23   two days, the defendant was caught red-handed.  Law enforcement

24   used GPS equipment to track the defendant's cell phone which

25   led them straight to the defendant who was walking with the

1  victim back to the apartment, the very same apartment that he

2  had prostituted her at earlier that day.  The defendant saw

3  police officers and he tried to run, but he was caught and

4  arrested for his crimes.

5          Now, as the judge mentioned earlier today, the

6  defendant has been charged with two counts:  First, with sex

7  trafficking; second, with transporting a minor for

8  prostitution.  The government will prove that the defendant

9  committed both of these crimes beyond a reasonable doubt.

10          Now, I'm going to talk to you about what we will prove

11  in our case.

12          First, you will hear testimony.  You will hear from

13  the arresting officer.  He will tell you about the

14  investigation to find Jasmin and how the defendant tried to run

15  before he was placed under arrest.

16          You will also hear from FBI Special Agent Conolly who

17  will tell you about what law enforcement found on the defendant

18  at the time of his arrest.

19          You will learn that the defendant also spoke to

20  Special Agent Conolly and gave him a statement.  In that

21  statement, the defendant claimed that he met the victim the

22  night before his arrest.  He claimed he didn't even know her

23  name.  Only later did he admit that he took the bus with the

24  victim from Maryland to New York, that he gave her money for

25  her bus ticket and that they stayed together in the same

1   apartment in New York.

2          You will meet the victim in this case, Jasmin.

3          She will tell you about herself and her past.

4          She will tell you that she has had a tough life before

5   this ordeal and after.

6          She will tell you that she has been a victim of

7   molestation, of parental abuse and neglect.

8          She will tell you that for much of her life, she has

9   been in and out of foster homes.

10          She will tell you that as a child she was diagnosed

11   with bipolar disorder.

12          She will tell you about the things that the defendant

13   did to her, that she did not want to go to New York with him,

14   but that she was afraid to disobey him.

15          In addition to testimony, you will see physical

16   evidence.  You will see what the defendant had on him and in

17   his backpack when they found him with the victim.

18          Let's talk about some of that physical evidence.

19          They found on him a bus ticket to New York.

20          They found on him two handwritten notebooks.  The

21   first notebook contained the defendant's rules for prostitutes.

22          Ladies and gentlemen, you are going to see that these

23   are the very same rules that he gave to the minor victim when

24   they first met.

25          The other notebook listed his personal code of how to

1    manipulate and control.  You will see the words in his

2    notebook.

3           Here are just a few examples of what you will see in

4    this evidence:  "Begin to pull thy away from that which thy

5    loves most and, most importantly, that which loves her.  This

6    act will kill her spirit until she feels it's worthless."

7           Another example of what you will see in the notebook:

8    "They are driven by their insecurities.  Find them out and use

9    them against them."

10          You are also going to see that there were condoms and

11   lubricants in the defendant's backpack.

12          You are also going to see the defendant's cell phone

13   and what was contained inside it.  Inside the defendant's cell

14   phone, he had provocative photos of the minor victim, photos

15   that the defendant was going to use to create an online

16   advertisement for the victim's sexual services.

17          You are also going to see text messages about

18   prostituting the minor victim, prostituting the minor victim's

19   mother and prostituting other women.

20          You are even going to see in black and white a text

21   message where the defendant is explicitly told that the minor

22   victim is only 16 years old.

23          That is how the government will prove its case to you.

24          In conclusion, when you ask yourself whether the

25   defendant transported a 16-year-old girl across state lines to

 1   prostitute her or whether he used force against her to get her

 2   to prostitute for him, pay close attention to the testimony and

 3   compare it to the physical evidence like the notebooks, like

 4   his text messages, like the photographs.

 5            It will be clear to you what happened here.

 6            Ladies and gentlemen, if you pay close attention to

 7   the evidence, listen to the judge's instructions on the law and

 8   use your common sense, you will find the defendant, Jabar

 9   Gilliam, guilty on all counts.

10            MR. STEIN:  Thank you, Judge.

11            Judge, is it OK if I stand at the rail and not at the

12   podium?

13            THE COURT:  Anywhere, as long as we can hear you.

14            MR. STEIN:  You will hear me.

15            Good afternoon, ladies and gentlemen, your Honor and

16   members of the prosecution.

17            In case it is not obvious --

18            THE COURT:  Just a tiny bit louder so I can hear you.

19            MR. STEIN:  In case it is not obvious at this point,

20   this is an ugly case.  You are going to hear about a lot of

21   sordid things that are extremely unpleasant, but that's the

22   reality, the nature of this case.

23            Now, before I get into a discussion of the evidence,

24   let me re-introduce myself.  My name is Joel Stein.  I

25   represent Jabar Gilliam.

1     And for everybody in this case, jurors who are hearing

2  this the first time as well as the lawyers, this is a difficult

3  case because of its nature, however, we are not here or you

4  should not be here to make moral judgments, no matter how

5  repugnant or reprehensible or worthy of moral condemnation the

6  conduct you are going to hear about.

7     Now, Ms. Greenberg's admirable opening statement, of

8  course, is not evidence in the case.  That's her statement as

9  to what the government intends to prove and it is, of course,

10  up to you ladies and gentlemen to decide whether that has been

11  proved.  But, as normal human beings, you are going to have an

12  instinctive gut reaction to what Ms. Greenberg has told you the

13  government intends to prove.  This gut reaction may be one of

14  complete revulsion which is, based upon what you have heard,

15  understandable.  But moving beyond the reactions that you are

16  going to have to this case, emotional reactions, it is very

17  explicit what you are going to hear about.

18     It is your job as jurors in this case to objectively

19  evaluate the credible evidence in this case, the lack of

20  credible evidence, apply the judge's instructions on the law

21  which Judge Griesa will give you at the end of the case, and

22  within the framework of the charges and the language in the

23  indictment that the judge will instruct you on -- indeed, I

24  believe at some point you will get a copy of the indictment.

25     This is not CSI.  That's fiction.  This is not Law and

1    Order.  This is reality, and it is not pretty.

2            You have heard Ms. Greenberg tell you about Jasmin,

3    the 16-year-old girl.

4            THE COURT:  I really think we are not going to hear

5    you if you don't stand at the microphone, please.

6            MR. STEIN:  I will try to speak louder, Judge.

7            Undoubtedly, you are going to feel very sympathetic to

8    her, indeed, based on what you have heard, that would be

9    perfectly understandable.  As the judge will instruct you later

10   on during the course of instructions, as unnatural as it may

11   seem at the beginning, sympathy cannot enter into your

12   discussions in evaluating the evidence.

13           There are some things in this case that are not in

14   dispute.

15           Number 1, Jasmin, the young girl who was 16 years old

16   at the time, that is not going to be in dispute.  There is

17   going to be, I think, a birth certificate that the government

18   is going to offer into evidence.

19           Also not in dispute is the fact that Mr. Gilliam

20   accompanied Jasmin to New York from Maryland.

21           Also not in dispute is the fact that my client was in

22   fact having discussions with various adult women about working

23   for him as prostitutes.  There are text message that you will

24   see that are quite clear.  There are photographs that you will

25   see that are quite clear.  He is not here on trial for that

1   conduct.  And, indeed, one of the women in this case, as Ms.

2   Greenberg told you, is, tragically, Jasmin's mother herself.

3              So those thing are not in dispute.

4              What is in dispute is a lot.

5              What is in dispute is the government's argument to you

6   that my client used force, coercion, threats or anything like

7   that.

8              What is in dispute here -- sounds like a legal word --

9   is whether my client caused Jasmin to engage in prostitution.

10             What is in dispute is whether or not he compelled her

11  to act as a prostitute, as tragic as her doing that may be.

12             What is in dispute is why Jasmin came with Mr. Gilliam

13  from Maryland where she was in foster care and where my client

14  resided at the time, why they came to New York.

15             What is also in dispute are the circumstances

16  surrounding Mr. Gilliam's arrest.  You are going to hear

17  testimony quite soon from a New York City detective who

18  arrested my client and in the process of doing so, there was a

19  struggle.  You will hear about that.  More importantly are the

20  circumstances under which this struggle took place.

21             Now, the evidence is going to show, as Ms. Greenberg

22  already told you, that Jasmin was suffering from emotional

23  issues.  She has been diagnosed for quite sometime as manic

24  depressive.  Some of you may be familiar with that term.  She

25  has mood swings from depression to high excitement.  She was on

1    medication.

2          What is important in this case, beyond Jasmin's

3    testimony is what evidence there is to support what she is

4    saying because, I think that you will find, based on her

5    explanations of what happened, that some of it may be troubling

6    to you.  You are going to find that a lot of what she said is

7    completely unsupported by the evidence or, indeed, even

8    contradicted by it.  For example, Ms. Greenberg has told you

9    that my client, in effect, assaulted or beat Jasmin.  She was

10   examined at St. Barnabas Hospital the night that my client was

11   arrested which was approximately 6:30 or so in the evening on

12   December 2, after he had, according to Jasmin, beaten her.  You

13   are going to find that in the very thorough physical

14   examination that took place of Jasmin at St. Barnabas Hospital,

15   there is not one sign whatsoever of any injury of any kind --

16   bruises, cuts -- not a sign of an injury.

17         Ms. Greenberg has told you that my client forced

18   Jasmin to take various drugs.  She had a drug screen conducted

19   while she was at St. Barnabas Hospital.  Her urine was examined

20   and it was completely clean of drugs.

21         Ms. Greenberg has told you that my client took all of

22   the money that Jasmin earned prostituting herself.  There is no

23   money.

24         You are going to find that Jasmin lied about a number

25   of things, falsified them -- not only based on what she has

1    told law enforcement agents, but what she told representatives

2    at St. Barnabas Hospital when she was examined later the same

3    evening that my client was arrested, as I said on December 2.

4    I won't dispute that she was with him at the time.  They took

5    her to St. Barnabas Hospital after she was interviewed, and the

6    physical evidence or lack of physical evidence is quite

7    revealing.

8         That is some of what you will hear about in this case,

9    ladies and gentlemen, but it is not just isolated segments of

10   evidence.  It is the whole picture, what if anything supports

11   what Jasmin says happened, what if anything contradicts

12   directly by indisputable scientific physical evidence what she

13   says happened.  And when you evaluate the entire picture, you

14   will be in a position to be able to decide, based on Judge

15   Griesa's instructions, whether or not the government has proved

16   its case beyond a reasonable doubt.

17        Thank you.

18

19        (Continued on next page)

20

21

22

23

24

25

1            THE COURT:  All right.  The government's evidence.

2            MS. GREENBERG:  The government calls NYPD Detective

3    Sean Ryan.

4            THE DEPUTY CLERK:  Please step all the way into the

5    witness stand and remain standing.

6     SEAN RYAN,

7        called as a witness by the government,

8     having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MS. GREENBERG:

11   Q.  Good afternoon, Detective Ryan.

12   A.  Good afternoon.

13   Q.  Where do you work?

14   A.  I work for the New York City Police Department.

15   Q.  Can you speak into the microphone?

16   A.  Sure.

17          I work for the New York City Police Department.

18   Q.  In what division of the New York city Police Department?

19   A.  The vice enforcement division.

20   Q.  Is the New York City Police Department sometimes

21   abbreviated as NYPD?

22   A.  Yes, it is.

23   Q.  How long have you worked for the NYPD?

24   A.  For 17 years.

25   Q.  What is your current title with the NYPD?

1    A.   Detective.

2    Q.   How long have you been a detective?

3    A.   For 11 years.

4    Q.   What are your duties and responsibilities in your current

5    division as detective?

6    A.   In the current unit that I work in, we handle cases

7    involving the sexual exploitation of children including

8    under-age prostitution and cases of that nature.

9    Q.   What were your duties in December of 2011?

10   A.   Same as I just described.

11   Q.   How long have you been assigned to your current unit?

12   A.   The current unit that I am assigned to is called the vice

13   major case unit which was created in 2006, and I have been a

14   member since then.

15   Q.   To what unit were you assigned prior to vice major case?

16   A.   I was assigned to the vice enforcement sexual exploitation

17   of children squad, which was -- I did the same duties there,

18   but they created the major case unit and expanded the unit and

19   that's when I became a member of that unit.

20   Q.   How long were you in that unit?

21   A.   For three years.

22   Q.   And you did have the same duties and responsibilities

23   there?

24   A.   Yes, I did.

25   Q.   To what unit were you assigned prior to the sexual

1   exploitation of children unit?

2   A.   Manhattan South vice.

3   Q.   How long were you there?

4   A.   For a year and a half.

5   Q.   To what unit were you assigned prior to that?

6   A.   I was assigned to the 17th Precinct patrol duties.

7   Q.   How long were you there?

8   A.   Four or five years.

9   Q.   What did you do prior to that?

10  A.   New York Police Academy for nine months.

11  Q.   How many arrests would you say that you have made

12  approximately?

13  A.   Over 200.

14  Q.   In what area?

15  A.   Mainly in the vice enforcement area.

16  Q.   Now, I want to direct your attention to December 2, 2011.

17  Were you working that day?

18  A.   Yes, I was.

19  Q.   What happened on the afternoon of December 2?

20  A.   I was instructed by my supervisor that we were --

21          MR. STEIN:  Objection, Judge, to what his supervisor

22  told him.

23          THE COURT:  Overruled.

24          He is talking about his instruction.

25          I assume you are going to tell us what you were

1  instructed to do, correct?

2          THE WITNESS:  That's correct.

3          THE COURT:  Go ahead.

4  A.  Myself and other members of my field team were instructed

5  by our supervisor that he was contacted by Maryland state

6  police in regards to a missing female minor who they had

7  information that she was in the Bronx.

8          MR. STEIN:  Objection.

9          THE COURT:  I thought that you were going to tell

10  about instruction not information you got.  What were you

11  instructed to do?

12          THE WITNESS:  To go to the Bronx to look for a missing

13  female.

14          THE COURT:  All right.  Go ahead.  Next question.

15  BY MS. GREENBERG:

16  Q.  Did NYPD receive any assistance from law enforcement

17  agencies?

18  A.  Yes, we did.

19  Q.  Is that unusual?

20  A.  No, it is not --

21          MR. STEIN:  Objection.

22          THE COURT:  Overruled.

23  Q.  What assistance did NYPD receive from other agencies?

24  A.  We received assistance from the Maryland state police as

25  far as they were tracking a cell phone --

1          MR. STEIN:  Objection.

2          THE COURT:  Please.

3          MR. STEIN:  Judge, he is testifying to what some other

4     law enforcement agency was doing.

5          THE COURT:  No, he really is not.  That's what is

6     coming, I believe.

7     A.  Maryland state police was assisting us by tracking a cell

8     phone number that the missing had used.

9          MR. STEIN:  Objection.  Move to strike.

10         THE COURT:  Motion denied.

11         Go ahead.

12         I would go over that again because the objection -- I

13    didn't really get the testimony and maybe the jury didn't

14    either.

15         MS. GREENBERG:  So let me re-ask my question.

16    Q.  What assistance did NYPD receive from Maryland state

17    police?

18    A.  Maryland state police had received a cell phone number that

19    the missing girl had used to call her mother.  Using technology

20    to track the phone, they were tracking the phone and giving us

21    locations of a general area of where the phone was.

22    Q.  Did you have any information as to whose phone was being

23    tracked?

24         MR. STEIN:  Objection, Judge.

25         THE COURT:  Overruled.

1    A.  I did not know whose phone it was.

2    Q.  You mentioned you testified earlier that the phone had been

3    used to call the victim's mother?

4    A.  That's correct.

5    Q.  Was the victim's mother cooperating with law enforcement?

6    A.  Yes, she was.

7    Q.  Other than the victim, the missing child that you were

8    looking for, did you have any information about anyone else in

9    connection with this investigation?

10   A.  Yes.  She was believed to be with a male --

11              MR. STEIN:  Objection, Judge.

12              THE COURT:  We do have a hearsay rule.  I want to

13   allow this witness to testify about what the police did, and if

14   they tracked a phone in some way, that is what they did.

15              We can save ourselves a lot of objections, if you do

16   not ask the witness information he got from other sources.  He

17   can testify about what he did, but not what he was informed

18   from other courses.

19              MS. GREENBERG:  Yes, your Honor.

20   Q.  In the course of your investigation, who were you looking

21   for?

22              MR. STEIN:  Objection, Judge.

23              THE COURT:  Overruled.

24   A.  We were looking for a missing minor from Maryland as well

25   as an individual she would have been with.

1    Q.  What if any physical description of the missing girl did

2    you have?

3    A.  I was supplied with photographs of the missing girl.

4    Q.  I would like to show you what has been marked for

5    identification as Government Exhibits 162A and 162B.

6                MS. GREENBERG:  May I approach?

7                THE COURT:  Sure.

8    Q.  Detective Ryan, do you recognize these photographs?

9    A.  Yes, I do.

10   Q.  What are these photographs of?

11   A.  They are photographs of the missing girl that we were

12   looking for on that day.

13   Q.  Are they a fair and accurate representation of the minor?

14   A.  Yes, they are.

15               MS. GREENBERG:  The government offers Exhibits 162A

16   and B into evidence.

17               THE COURT:  Received.

18               (Government Exhibits 162A, 162B received in evidence)

19               MR. STEIN:  Judge, it is 162A and 162B?

20               THE COURT:  I have down in my notes as 162A and 162B

21   as being offered and received.

22   Q.  Detective Ryan, was there an arrest on December 2, 2011?

23   A.  Yes, there was.

24   Q.  Do you see in the courtroom today the individual who was

25   arrested?

C9JUGIL1                    Ryan - direct

1   A.  Yes, I do.

2   Q.  Could you identify him by describing an article of clothing

3   that he is wearing?

4   A.  It is the gentleman in the middle of the courtroom, not

5   wearing a tie, wearing a dark jacket and white shirt.

6           MS. GREENBERG:  Your Honor, let the record reflect

7   that Detective Ryan has identified the defendant?

8           THE COURT:  Right.

9   Q.  You testified earlier about learning about a potential

10  location for the victim.  What was that location?

11  A.  1140 Jackson Avenue.

12  Q.  When did you learn that information?

13  A.  During the initial time that my supervisor was telling us

14  that we were going up to the Bronx.

15  Q.  And upon learning of the possible location of the minor

16  victim, what did you do?

17  A.  Myself and another detective got into a vehicle and other

18  detectives and members of my field team got into separate

19  vehicles and we went up to the Bronx to look for the girl.

20  Q.  Did you find the victim at 1140 Jackson Avenue?

21  A.  No, we did not.

22  Q.  After you left 1140 Jackson Avenue, what did you do next?

23  A.  Myself and the other female detective that I was with drove

24  around the neighborhood.  We were getting updates from my

25  supervisor as to the whereabouts of the tracking of the phone.

1   And we drove around looking for people, for the girl and the

2   guy she may have been with.

3   Q.  From the paging of the phone did you get any information on

4   a possible location?

5   A.  Yes, we did.

6   Q.  What information did you get?

7   A.  It was in the area of 1140 Jackson Avenue.

8   Q.  So what did you do?

9   A.  We drove around looking for her and anyone she would have

10  been with.  At a point we did find her walking down the street

11  with the defendant.

12  Q.  What did you observe them doing?

13  A.  They walked past our vehicle.  I transmitted over the

14  police radio that we did spot them.  We made a quick U-turn.

15  As we were making the U-turn, I saw them enter an apartment

16  building.  I put over the radio they were entering the

17  apartment building.

18          And myself and my partner for the day did follow them

19  into the building.  We did a quick search of the hallways of

20  the first floor.  We did not see them.  We proceeded to the

21  second floor.  We did a quick search of the second floor.  We

22  did not see them.  When we got to the third floor, they were

23  down at the end of the long hallway where I identified myself

24  as a police officer and told them not to move and they complied

25  at that time.

1    Q.  When you say they complied, can you explain what exactly

2    happened?

3    A.  Again, I identified myself as a police officer, told them

4    not to move.  I told the defendant, put his hand up on the

5    wall, which he put his hands up on an apartment door which was

6    front of him.

7            My partner took the female and took her down the

8    hallway to get her away from the defendant.

9            The defendant had his hands on the door.  I told him

10   not to move.  He said, I'm cool.  I'm cool.  I said, I don't

11   know who you are.  As I reached into my back to get my

12   handcuffs.  He made a quick movement towards the immediate left

13   which was an apartment door, and he was able to gain entrance

14   into that apartment door by his movements.

15           I grabbed him by the shoulder of the jacket as he was

16   going into the apartment.  The jacket literally tore from the

17   seams or just tore and started to shred as he was falling into

18   the apartment.  He was able to push the door shut.

19           And at that time, my foot got lodged underneath the

20   door and the door slammed shut.  I was unable to move my foot

21   from underneath the door.

22           At that time I looked up and there were other members

23   of my field team who were running down the hallway, and I was

24   yelling to them that my foot was stuck, I can't get out, my

25   foot's stuck.  So after several attempts, one of my teammates

1    was able to get the door open by using his shoulder to ram the

2    door open.  At that time I was able to get my foot free and the

3    members entered the apartment.

4    Q.  Detective Ryan, let's just take what you said step by step.

5         You testified that you were approached the defendant?

6    A.  That is correct.

7    Q.  You testified that your partner took the victim elsewhere

8    down the hallway?

9    A.  Correct.

10   Q.  What immediately happened when you approached the

11   defendant?

12   A.  He had his hands up on the doorway which was directly in

13   front, as you entered the hallway was a doorway.  And there was

14   another doorway immediately to the left.  He had his hands up

15   on the door.  I told him not to move.  He said, I'm cool.  I'm

16   cool.  I said, well, I don't know you.

17              (Continued on next page)

18

19

20

21

22

23

24

25

C9JTGIL2                    Ryan - direct

BY MS. GREENBERG:

Q.  Sorry, let me stop you right there.  So you said that he had his hands up against the wall.  How close was the next doorway to where he had his hands up?

A.  He had his hands on the doorway and the next door was immediately to our left.

Q.  And were both his hands up on the door?

A.  Yes.

Q.  And what were you doing at that time?

A.  I had my hand on his back and I was reaching to get my handcuffs.

Q.  As you were reaching to get your handcuffs, what did the defendant do next?

A.  He spun to his left and lunged into that immediate door to our left.

Q.  And when you say "lunged," can you describe what, if any, force the defendant used as he was moving?

A.  He had enough force to back off the door and get into the next doorway.

Q.  Was the next doorway open?

A.  I'm not sure.

Q.  Did the defendant -- was the defendant able to get inside the next doorway?

A.  Yes, he was.

Q.  Now you testified that you grabbed onto the defendant?

1    A.   I grabbed onto him and grabbed his jacket.

2    Q.   And what happened when you grabbed his jacket?

3    A.   The jacket ripped within my hand.  As he was falling into

4    the door, the jacket was tearing off of him.

5    Q.   I would like to show you what has been marked as Government

6    Exhibits 157, 158 and 159.

7              MS. GREENBERG:  May I approach?

8              THE COURT:  Yes.

9    Q.   Detective Ryan, do you recognize these photographs?

10   A.   Yes, I do.

11   Q.   What are they?

12   A.   They are photographs of the defendant's jacket that he was

13   wearing at the time of his arrest that ripped while he was

14   falling into the apartment.

15   Q.   Who took these photographs?

16   A.   I did.

17   Q.   Why did you take them?

18             MR. STEIN:  Objection to why he took them.

19             MS. GREENBERG:  Withdrawn.

20   Q.   When did you take these photographs?

21   A.   After the arrest back at the precinct.

22   Q.   Are these photographs a fair and accurate representation of

23   the jacket that was shredded?

24   A.   Yes, they are.

25             MS. GREENBERG:  The government offers Government

1   Exhibits 157, 158 and 159 into evidence.

2              THE COURT:  Received.

3              (Government's Exhibits 157, 158 and 159 received in

4   evidence)

5   Q.  Now after you grabbed onto the defendant's jacket, did he

6   use force?

7   A.  He was able to force the door shut, and it was -- my foot

8   was in the door and my foot was lodged underneath the door, so

9   there was force used to shut the door, yes.

10  Q.  Did he use any force in getting away from you?

11  A.  Enough to push away and get into the door to his left, yes.

12  Q.  And what happened to you at that point?

13  A.  After I was able to -- after my teammates freed me from the

14  door, I stayed out in the hallway, and a few minutes later

15  myself, the detective I was working with and another female

16  detective, took the victim back to the precinct.  At the

17  precinct I told my supervisor and the arresting officer what

18  had happened, as far as me seeing them and how it came to be

19  that I was hurt underneath the door, and then shortly after

20  that I went to the hospital to be treated for my injuries.

21  Q.  So let's back up.  Let's look at the Government

22  Exhibit 158.  Can you describe to us what we're looking at?

23  A.  It is a picture of -- the style of the jacket I believe to

24  be a Carhartt.  It's not a Carhartt, but that style of work

25  jacket, and that's the jacket on the bench within the precinct

1  of it all ripped up from the incident.

2  Q.  And where exactly was it shredded?

3  A.  The back of it from the top shoulder and then all the way

4  down the back.

5  Q.  Let's look at Government Exhibit 159.  Can you describe

6  this photo?

7  A.  That is a photo of the same jacket, and that's the jacket

8  open and you can see the inside tag.  So that's the shoulder

9  area where it literally ripped from.

10  Q.  And let's look at Government Exhibit 160 -- sorry, 157.

11  A.  That is another photo of the jacket.

12  Q.  Can you describe, as you can see in the photograph, how far

13  down the jacket was shredded?

14          THE COURT:  We're spending a lot of time on a shredded

15  jacket.  Let's get past these things quickly.

16          MS. GREENBERG:  Yes, your Honor.

17  Q.  Now you mentioned that your foot had been wedged underneath

18  the door.  How did your foot come to be wedged underneath the

19  door?

20          THE COURT:  Look, we don't have to have a detail about

21  every -- if we go on at this pace we'll be here a long, long

22  time.  We don't have to have all this detail.  His foot was

23  wedged in the door, that's all we need to know.  He's told

24  about it about three times now.  We have to move along on these

25  things.

C9JTGIL2                    Ryan - direct

1          MS. GREENBERG:  Yes.  One follow-up question.

2     Q.  You testified earlier that the door slammed on your foot.

3     Who slammed the door on your foot?

4     A.  The defendant did.

5     Q.  How long was your foot underneath the door?

6          MR. STEIN:  Objection, asked and answered.

7          THE COURT:  Really, please, he's gone through this at

8     least a couple of times.  Let get past the foot in the door and

9     get to something else.

10    Q.  After your foot was freed from the door, what happened

11    next?

12    A.  Like I said earlier, myself and two female detectives

13    transported the victim.

14         THE COURT:  Yes, as he said earlier.  Please don't

15    have this repetition, and let's get through these facts without

16    a lot of repetition and excessive detail.

17    Q.  Detective Ryan, were you injured as a result?

18    A.  Yes, I was.

19    Q.  What was your injury?

20    A.  I had a torn meniscus in my knee and a foot injury.

21    Q.  After your involvement in finding the defendant and the

22    victim together, did have you any other involvement in this

23    case?

24    A.  No, the immediate two weeks after that I was out of work

25    completely, line duty, sick with my injuries.

1            MS. GREENBERG:  Nothing further.

2            THE COURT:  Cross-examine.

3   CROSS-EXAMINATION

4   BY MR. STEIN:

5   Q.  Detective, can I assume from what you've said that your

6   total involvement in this case was looking for the young girl

7   and participating in the arrest of my client?

8   A.  That's correct.

9   Q.  And that took place in the scope of would you say a couple

10  of hours or less?

11  A.  Probably a couple of hours is accurate.

12  Q.  Now there came a time when you went to the vicinity of 1140

13  Jackson Avenue?

14  A.  Right.

15  Q.  And that was for the purposes of looking for the young girl

16  at that point and whoever was with her, correct?

17  A.  Yes.

18  Q.  Did you go into the building?

19  A.  Yes, I did.

20  Q.  Where did you go in the building?

21  A.  I went to the top floor of the building.

22  Q.  And the information that led to you go to that particular

23  building, 1140 Jackson Avenue, did that information include an

24  apartment?

25  A.  I was just told 1140 Jackson Avenue.

1   Q.   You said you went to the top floor, right?

2   A.   The building was broken up into single-room occupancy, so

3   there was a main area and then there was other areas with other

4   rooms that were rented out in the building.  So myself and

5   members of the team went throughout the whole building.  We

6   were invited in and went throughout the whole building and

7   spoke to the people inside.  So I went to the top floor, but

8   there were other members of the team within the building.

9   Q.   So the only location in the building you went to was on the

10  top floor?

11  A.   Well, and the entry area into the building.

12  Q.   But the other floors you didn't do any investigation or

13  looking around?

14  A.   No, I just walked through them.

15  Q.   So on the top floor did you speak to any of the tenants who

16  lived in that building?

17  A.   Yes.

18  Q.   And did any of those people include an Albert Batts,

19  B-A-T-T-S?

20  A.   I'm not sure of the names of who I spoke to, I don't have

21  it.

22  Q.   Did you go into any of the apartments on the top floor?

23  A.   Not inside, no.

24  Q.   So when you had the occasion to speak to anybody who was on

25  the top floor, was that basically either in the hallway or the

1    doorway?

2    A.   At the doorway, yes.

3    Q.   So you didn't have the occasion to look around inside any

4    of the apartments?

5    A.   The rooms were tiny.  Like I said, they were rooms, not

6    apartments.

7    Q.   Forget the word "apartment," you didn't have occasion to

8    look around inside any of those rooms?

9    A.   No, not the gentlemen that I spoke to.

10   Q.   In any of the rooms on the top floor?

11   A.   No.

12   Q.   So how long were you there, approximately?

13   A.   We were -- I was in and out of the top floor rather

14   quickly, and then I was standing out front with members of my

15   field team as the other members were conducting their

16   interviews inside.

17   Q.   So when you say you were on the top floor quickly, are we

18   talking about minutes or seconds?

19   A.   No, probably five or ten minutes.

20   Q.   And then there came a time when you went downstairs?

21   A.   Right, I'm standing on the front stoop.

22   Q.   And then at some point you saw -- you were cruising around

23   the neighborhood?

24   A.   Right.

25   Q.   And was it light out or dark out at this point?

1    A.   It was getting dark.

2    Q.   And this was on the late afternoon, early evening of

3    December 2nd?

4    A.   Yes.

5    Q.   Around 6:00, 6:30 p.m.?

6    A.   That's fair to say.

7    Q.   And there came a time where you saw the young woman whose

8    picture you had, correct?

9    A.   Right.

10   Q.   And you saw her with my client, correct?

11   A.   That is correct.

12   Q.   What were they doing?

13   A.   They were walking down the street.

14   Q.   And you were in a car when you saw them?

15   A.   Yes.

16   Q.   And was this an unmarked car or a patrol car?

17   A.   Unmarked car.

18   Q.   And they were on the same side of the street you were or

19   were they on the opposite side?

20   A.   We were going -- they were on the opposite side when I

21   initially saw them and then we made a U-turn.

22   Q.   You made a U-turn in order to go around the same side?

23   A.   Correct.

24   Q.   When you made the U-turn, had you pulled away from where

25   they were?

1    A.  Yeah, they passed by us.  We made a U-turn.  As we made the

2    U-turn, I still had them in my sights and saw them enter the

3    building.

4    Q.  Were you driving?

5    A.  No, I was a passenger.

6    Q.  Who was the driver?

7    A.  Detective Rose Muckenthaler.

8    Q.  When you made this U-turn, did you make the U-turn at a

9    particularly high rate of speed or made it at a normal speed?

10   A.  No, normal speed.

11   Q.  Were there other pedestrians on the street?

12   A.  Not where we made the U-turn, no.

13   Q.  Before you made the U-turn when you saw my client and you

14   saw the young girl, did you seem to make eye contact with

15   either one of them?

16   A.  No.

17   Q.  So you made the U-turn, and then what's the next thing you

18   did after you made the U-turn?

19   A.  I transmitted over the radio that they were entering the

20   apartment building, and myself and Detective Muckenthaler

21   exited the vehicle and went in after them.

22   Q.  Is that the apartment building where Mr. Gilliam was later

23   arrested, as you testified?

24   A.  Yes.

25   Q.  And what's the address of that building?

1    A.  I don't have it off the top of my head.

2    Q.  So if you heard the address, would you remember it?

3    A.  Probably.

4    Q.  747 East 168th Street.

5    A.  That sounds about right, yes.

6    Q.  Did you see the young girl and my client enter the

7    building?

8    A.  Yes.

9    Q.  And when you were doing that, were you still seated in your

10   car?

11   A.  Yes.

12   Q.  When you saw them go into the building, that's when you got

13   out of your car and approached the building?

14   A.  Right, as we pulled up to the building.

15   Q.  Did you have a siren on or lights or anything like that?

16   A.  No.

17   Q.  There came a time after you entered the building that you

18   went up to what floor and saw the young girl and Mr. Gilliam?

19   A.  The third floor.

20   Q.  And how many other police officers were with you?

21   A.  At that time just one, my partner I was with that day.

22   Q.  Detective Muckenthaler?

23   A.  Yes.

24   Q.  So you started to walk down the hallway because the area

25   where they were was away from the elevator; is that correct?

1   A.  We walked up the stairs.

2   Q.  They took the elevator?

3   A.  I don't know how they got to the third floor.

4   Q.  You got up and there saw them there?

5   A.  Right.

6   Q.  And the first thing that happened when you got up there is

7   you said words to the effect of "Don't move"?

8   A.  Police, don't move.

9   Q.  Police, don't move?

10  A.  Right.

11  Q.  And did you have -- you said you were a detective.  Did you

12  have your shield out?

13  A.  Yes.

14  Q.  Where was your shield?

15  A.  Around my neck.

16  Q.  So someone could easily see that you looked like a New York

17  police officer?

18  A.  Right.

19  Q.  And you were in plain clothes, correct?

20  A.  That's correct.

21  Q.  And your partner was in plain clothes?

22  A.  That's correct.

23  Q.  Do you know if her shield was out also?

24  A.  I'm not sure.

25  Q.  Did you have your firearm out?

C9JTGIL2                    Ryan - cross

1    A.  No, I did not.

2    Q.  Do you know if your partner did?

3    A.  I don't believe she did.

4           THE COURT:  Let's take a short break, please.  We'll

5    try to have short breaks in the middle of the morning and in

6    the middle of the afternoon.

7           (Recess taken)

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              THE COURT:  John Beale is not here.  What did John

3      report to you and you want to report to the lawyers?

4              LAW CLERK:  So John reported to me that two of the

5      jurors discovered they are cousins I guess back in the jury

6      room.  They didn't notice it.

7              MR. STEIN:  Cousins to each other?

8              LAW CLERK:  Yes, cousins to each other, I imagine.

9      And one of them is acquainted with an AUSA who came in to

10     observe while things were proceeding earlier.  I don't know

11     what follows from that, but they reported it to John.

12              Here's John.

13              THE COURT:  Who came in from your office?

14              MS. LAMARQUE:  A number -- she was giving her opening.

15     Your Honor.  A number of AUSAs came in, I would say about ten

16     or twelve or so.

17              THE COURT:  I don't think there's anything to be done.

18     Any suggestion?

19              MR. STEIN:  Well, the only suggestion is -- I don't

20     know if there's anything to think about the two jurors who are

21     cousins.

22              THE COURT:  What is there to think about?

23              MR. STEIN:  I said I don't know whether there is

24     anything to think about.

25              THE COURT:  I can't think of anything.

1          MR. STEIN:  And as to the juror who knows another

2     prosecutor, maybe you want to make a brief inquiry with her or

3     him.

4          DEPUTY CLERK:  It's a woman, juror number 12, Nnenna

5     Lynch.

6          MR. STEIN:  Whether she will promise not to discuss

7     the case with her.

8          MS. LAMARQUE:  I think, your Honor, it seems to me

9     that your Honor's questioning of the jurors was pretty clear.

10    Maybe I think a general instruction to everyone, don't

11    deliberate until the evidence is in, don't be influenced by

12    anything other than the evidence and what's presented to you in

13    this courtroom.  I think you covered all of this in your

14    preliminary instructions, it seems to me, but I'm happy to --

15         MR. STEIN:  Judge, I just ask that you make a brief

16    inquiry of this juror.

17         THE COURT:  Which one?

18         MR. STEIN:  The one who knew the prosecutor who came

19    into the courtroom, not to discuss the case with her or

20    anything.

21         MS. LAMARQUE:  I think the only question to be asked

22    is whether that will have any influence on the juror at all,

23    their impartiality, but I think you covered that in your

24    catch-all question about is there any reason --

25         THE COURT:  I think will I try to cover it in some

1    general instruction.

2              MR. STEIN:  Judge, the other thing I wanted to bring

3    up while we're here, I know you will give up a cautionary

4    instruction about not discussing the case, et cetera, et

5    cetera, but I also ask that you add to this, and I think it

6    became part of the basic instructions for juries in state and

7    federal court not to do any research on the internet.

8              THE COURT:  Absolutely, and no discussion with friends

9    or family.  Very good point.

10             Let's bring the jury in.

11             MS. LAMARQUE:  Your Honor, on a scheduling note, I

12   wanted to let the Court know, because Jasmine had to be

13   returned to the facility where she is staying because of the

14   one-day adjournment, we weren't able to keep her overnight,

15   she's going to be available for testimony first thing Monday

16   morning.  We had to get permission from the facility to get her

17   out again because she's in a full 24-hour --

18             THE COURT:  She went back?

19             MS. LAMARQUE:  We were not able to keep her overnight.

20             THE COURT:  One of the reasons we started the trial

21   today is to avoid having her have to go back.

22             MS. LAMARQUE:  No, your Honor, the facility said we

23   could not keep her overnight.

24             THE COURT:  I didn't know anything about this.

25             MS. LAMARQUE:  Your Honor, we were told about the

 1  adjournment in court that morning and we learned about it after

 2  court that night while we were trying to change --

 3            THE COURT:  Can you fill the day tomorrow?

 4            MS. LAMARQUE:  We could fill I would say 70 percent of

 5  the day tomorrow with Special Agent Conolly.  I greatly --

 6            THE COURT:  Look, there was a very strong suggestion

 7  from Mr. Stein to have this whole trial put over until a time

 8  when we were clear of me and my travels or Jewish holidays.  I

 9  was told that it would be beneficial to go ahead with the trial

10  so that she would not have to go back and forth to Baltimore.

11  Am I told now she has gone back to Baltimore?

12            MS. LAMARQUE:  Your Honor, I'm sorry if that was a

13  misunderstanding.  I greatly apologize.  We did not mean to

14  represent to you that we could start -- what we represented was

15  if we started right away she didn't have to go back to

16  Baltimore, but due to the one-day adjournment, we had to send

17  her back because --

18            THE COURT:  I didn't know you were sending her back,

19  and you should have told me.

20            MS. LAMARQUE:  Your Honor, I apologize, but we're --

21            THE COURT:  You'll have to fill tomorrow.  Even if you

22  have to get her back -- we have to use these days.  It's a very

23  short trial.  Now if you have to bring her -- she can come up

24  in the morning.  I'm saying you will -- you must fill the day

25  tomorrow.  And if she has to come back, Maryland is a short

C9JTGIL2                    Ryan - cross

1   distance from New York, and she can come up.  And if you need a

2   Court order to that effect, I will do it.

3           MS. LAMARQUE:  I don't think that we need a Court

4   order, your Honor, it's a matter of supervision for her in

5   terms of getting a social worker to be able to travel with her.

6           THE COURT:  Let's not waste any more time.

7           MS. LAMARQUE:  Your Honor, the problem is -- please

8   let the Court give me a moment.  I want you to appreciate our

9   situation here.  If we bring her up for Thursday, she is only

10  going to be on the stand at most for an hour or two, and we

11  have to be liable for her for 72 hours because we're off on

12  Friday.  We're not trying to waste time, but we're in a very

13  difficult situation here we really ask for the Court's

14  indulgence at this point.  We can't be liable for --

15          THE COURT:  OK, let's go.  But those things that came

16  up about cousins and observing, we're not going to spend a lot

17  of time on that.

18          MS. LAMARQUE:  Agreed.

19          MR. STEIN:  I said it should be brief, Judge.

20          (Continued on next page)

21

22

23

24

25

C9JTGIL2                    Ryan - cross

1           (In open court, jury present)

2           THE COURT:  That was a longer recess than I

3    anticipated, but I had to talk to the lawyers.

4           Let me say if someone comes in the courtroom as a

5    spectator that is somebody that you know, I assume that is no

6    problem for the juror.  People do come in, it's open to the

7    public, and we can't ask if the jurors are acquainted with

8    everyone that might come in.  So I assume that somebody who

9    comes in incidentally as a spectator really can have no affect

10   on our jurors.

11          Secondly, if you discover during your time together

12   that you are acquainted or even have some relation to each

13   other, why, you simply have to recognize that you are still --

14   each one of you are independent jurors and you are required to

15   have your independent, individual participation in the case.

16   And that's all I need to say on that.

17          Let's go with the next witness.

18          MS. GREENBERG:  We were still on cross-examination,

19   your Honor.

20          THE COURT:  Oh, of course, we hadn't finished that.

21   I'm sorry.

22   BY MR. STEIN:

23   Q.  Detective Ryan, I think where we left off at the break was

24   you were at the door, so to speak?

25   A.  Right.

1    Q.  So you said words to the effect of "Police, don't move,"

2    correct?

3    A.  Right.

4    Q.  As you were approaching my client, he was, I think to use

5    your word, compliant at that point?

6    A.  Yes.

7    Q.  And he put his hand on the door?

8    A.  Right.

9    Q.  And you started the process of handcuffing him, and there

10   was a struggle?

11   A.  Right.

12   Q.  And you testified as a result of that you were injured and

13   the jacket that Mr. Gilliam was wearing was torn, correct?

14   A.  That's correct.

15   Q.  And approximately how long -- withdrawn.

16           There came a time very soon after that where

17   Mr. Gilliam was actually arrested and placed in handcuffs and

18   in custody, correct?

19   A.  Yes.

20   Q.  And about how long from that point when he was arrested

21   were you at the scene at this building?

22   A.  Could you ask it again?

23   Q.  How long approximately were you there once he had been

24   handcuffed and arrested?

25   A.  Me personally?

1    Q.  Yes.

2    A.  I left with the victim shortly after that, maybe five

3    minutes.

4    Q.  When you left the scene, about how many police officers of

5    any kind were there?

6    A.  At the scene?

7    Q.  Excuse me, law enforcement agents of any kind.

8    A.  I would say probably in the ballpark of twelve.

9    Q.  And were any of them federal agents?

10   A.  Yes.

11   Q.  And was one of them the case agent, Brian Conolly?

12   A.  Yes, it was.

13   Q.  And were all of you up on the floor where this happened?

14   A.  I don't believe every single law enforcement agent was on

15   that floor.  I'm not really sure.  It was hectic when it was

16   happening, so I'm not sure where everyone was.

17   Q.  Did there come a time before you left, within minutes or so

18   to go to the precinct, that you went into the apartment, the

19   door of which there was this struggle?

20   A.  I did not enter the apartment.

21   Q.  Did you see any police offices go into that apartment?

22   A.  Yes.

23   Q.  Who was that?

24   A.  There was members of my field team.  The detective who was

25   able to free the door was Detective Joe Panico (ph), Detective

C9JTGIL2                    Ryan - cross

1    Damian Dragar (ph), and I'm not sure, there was a lot of people

2    and a lot of commotion.

3    Q.  How about Brian Conolly, did you see him go into the

4    apartment?

5    A.  I don't recall seeing him up there.

6    Q.  So you don't have to head count, but could you estimate

7    approximately how many police officers of everybody who was

8    there did you see go into the apartment?

9    A.  I would say four to five.

10   Q.  And do you have any idea how long they were there for, or

11   you left?

12   A.  I left the scene.

13   Q.  And you did not yourself go into the apartment?

14   A.  No.

15   Q.  Was there anybody at the apartment?

16   A.  As far as?

17   Q.  Anybody who had been in the apartment --

18          MS. GREENBERG:  Objection.

19   Q.  -- when this struggle happened?

20   A.  I don't know.

21   Q.  You don't know if there were any of the tenants or

22   residents of that apartment inside the apartment?

23          MS. GREENBERG:  Objection.

24          THE COURT:  Overruled.

25          MS. GREENBERG:  Objection, speculation, calls for

1    speculation.

2             THE COURT:  Please.

3    A.  I don't recall if there was anybody in that apartment or

4    not.  I never made my way into the apartment.  I was on the

5    ground, and when I got freed I stayed out of the apartment,

6    stayed in the hallway.

7    Q.  Did you have a conversation anywhere, inside or in the

8    hallway, with anybody who had been in that apartment?

9             MS. GREENBERG:  Objection, hearsay.

10            THE COURT:  We're just asking if he had the

11   conversation.

12   A.  I don't recall having a conversation with anybody at that

13   apartment, no.  I know after the door in front there was a

14   female that opened the door and asked what was going on, and

15   she was told to just shut the door, but I don't remember

16   anybody else being on the floor at the door.

17   Q.  So you don't know who that person was?

18   A.  No.

19   Q.  And within a few minutes or so you went to the precinct?

20   A.  Right.

21   Q.  That's the 42nd Precinct?

22   A.  That's right.

23   Q.  And the jacket that you have testified about and the

24   pictures, did you take a jacket with you?

25   A.  I did not.

1  Q.  So some other law enforcement agent, as far as you know,

2  took the jacket to the precinct, right?

3  A.  Right.

4  Q.  And there came a time at some point where you took some

5  pictures of the jacket?

6  A.  Right.

7  Q.  With probably your phone?

8  A.  That's correct.

9  Q.  And what is vouchering?

10  A.  Vouchering is when you take an item and you take it into

11  custody, NYPD custody.

12  Q.  For perhaps as evidence?

13  A.  Right.

14  Q.  So to your knowledge, was the jacket vouchered as evidence

15  in this case?

16  A.  I don't believe so.

17  Q.  Do you know what was done with the jacket?

18  A.  I do not.  I went to the hospital.

19  Q.  Did you ever see the jacket again?

20  A.  No.

21  Q.  So you don't know whether the jacket was thrown away or

22  what happened to it?

23  A.  I don't know what happened to the jacket.

24  Q.  There's actually a document that's prepared when property

25  is vouchered for some reason, correct?

C9JTGIL2                    Ryan - cross

1    A.   Right.  A property clerk invoice.

2    Q.   And have you ever seen, in connection with this case, a

3    property clerk's invoice for the jacket?

4    A.   No, I have not.

5              MR. STEIN:  I have no further questions.

6              THE COURT:  Any redirect?

7              MS. GREENBERG:  No, your Honor.

8              THE COURT:  You may step down, thank you.

9              Next witness.

10             MR. STEIN:  Judge, I have an application at this

11   point.

12             THE COURT:  OK.

13             MR. STEIN:  I have a stipulation that's been signed by

14   one of the prosecutors.  I would like to offer it into evidence

15   and read it to the jury.

16             THE COURT:  Fine, go ahead.

17             (Defendant's Exhibit 1 received in evidence)

18             MR. STEIN:  I don't know, Judge, if you want to tell

19   them what a stipulation might be.

20             THE COURT:  A stipulation is an agreement as to what

21   certain evidence is or certain facts are.  That's what that is.

22   All right.

23             MR. STEIN:  This is marked as Defendant's Exhibit 1,

24   Judge.

25             It is hereby agreed between the parties in the above-

C9JTGIL2

captioned matter that if called to testify, a representative of

the state of Maryland Department of Public Safety would state

that:

1. In December of 2011, the defendant, Jabar Gilliam,

was on post-release supervision from an unrelated criminal

conviction in the State of Maryland.

2. Mr. Gilliam was not permitted to leave the State

of Maryland without authorization.

3. Mr. Gilliam did not have authorization to leave

the State of Maryland.

And it's signed by myself and Ms. Greenberg.

THE COURT: Very good.

Is there a next witness?

MS. GREENBERG: Your Honor, we also have two

stipulations to read into evidence.

THE COURT: OK.

MS. GREENBERG: Your Honor, we offer into evidence

Government Exhibit 191, stipulation as to telephone records.

The stipulation reads:

It is hereby stipulated and agreed by and between the

United States of America be Preet Bharara, United States

Attorney for the Southern District of New York, Kristy J.

Greenberg and Natalie LaMarque, Assistant United States

Attorneys, of counsel, and Jabar Gilliam, a/k/a Jabal Gilliam

a/k/a Jamal Gilliam a/k/a JB, the defendant, by and with the

C9JTGIL2

consent of his attorney, Joel M. Stein, Esq., that:

1. If called to testify, a custodian of records from Verizon would testify as follows:

a. He or she is familiar with the record keeping practice of Verizon.

b. Government Exhibit 151 includes true and correct telephone records, including subscriber information and records of incoming and outgoing calls for the land line assigned telephone number 718-617-0614.

c. The information contained in Government Exhibit 151 was recorded by Verizon at or near the time that the telephone activity took place, was kept in the regular course of Verizon's business activity, and was relied on as a regular practice of Verizon.

2. If called to testify, a custodian of records of Sprint would testify as follows:

a. He or she is familiar with the record keeping practices of Sprint.

b. Government Exhibit 147 includes true and correct telephone records, including subscriber information and records of incoming and outgoing calls for the cellular telephone number assigned telephone number 301-992-0685.

C. The information contained in Government Exhibit 147 was recorded by Sprint at or near the time that the telephone activity took place, was kept in the regular course

of Sprint's business activity, and was relied on as a regular practice of Sprint.

d.   Government Exhibit 148 includes true and correct telephone records, including cell site information and records of incoming and outgoing calls for the cellular telephone assigned telephone number 301-992-0685.

E.   The information contained in Government Exhibit 148 was recorded by Sprint at or near the time that the telephone activity took place, and was kept in the regular course of Sprint's business activity and was relied on as a regular practice of Sprint.

f.   Government Exhibit 149 includes true and correct telephone records, including subscriber information and records of incoming and outgoing calls for the cellular telephone assigned telephone number 646-410-8570.

g.   The information contained in Government Exhibit 149 was recorded by Sprint at or near the time that the telephone activity took place, was kept in the regular course of Sprint's business activity, and was relied on as a regular practice of Sprint.

It is further stipulated and agreed that Government Exhibits 147, 148, 149, and 151 and this stipulation may be received in evidence as government exhibits at trial.

It's dated September 11, 2012, New York, New York, signed by myself and by Mr. Stein.

C9JTGIL2

1          The government would offer this exhibit, this

2     stipulation as an exhibit and the other exhibits referenced

3     therein, 147, 148, 149, and 151 into evidence.

4          THE COURT:  Proceed.

5          (Government's Exhibits 147, 148, 149, 151 and 191

6     received in evidence)

7          THE COURT:  What did the jury learn from what you

8     read?

9          MS. GREENBERG:  The jury will learn from what we read

10    in connection with FBI Agent Conolly's testimony.  He will be

11    relying on these documents and explaining their import.

12         THE COURT:  OK.

13         MS. GREENBERG:  The next stipulation --

14         THE COURT:  Please don't read these formal

15    stipulations.  If there's something that tells the jury

16    something in a stipulation, fine, but as far as reading a lot

17    of formality about admissibility of evidence, the jury doesn't

18    have to take time to hear that.

19         Do you have any other evidence this afternoon which

20    the jury will learn something from?

21         MS. GREENBERG:  Your Honor, if you don't -- I'm happy

22    not to read the stipulation, however I offer this next

23    stipulation.  Again it's Government Exhibit 192.

24         THE COURT:  Is it about admissibility of documents?

25         MS. GREENBERG:  Yes.

C9JTGIL2

1          THE COURT:  I will receive it and we don't have to

2     read it to the jury.

3          (Government's Exhibit 192 received in evidence)

4          THE COURT:  Is there another witness?

5          MS. GREENBERG:  Yes, your Honor.

6          MR. STEIN:  Judge, I haven't memorized what 192 is.

7     Could Ms. Greenberg tell us what 192 refers to without reading

8     the stipulation itself?

9          THE COURT:  We'll talk about it later.  Let's start a

10    witness and let's have something that will tell the jury

11    something.

12          Who is the next witness?

13          MS. GREENBERG:  The government calls FBI Special Agent

14    Brian Conolly.

15     BRIAN CONOLLY,

16          called as a witness by the Government,

17          having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MS. GREENBERG:

20    Q.  Good afternoon.  Where do you work?

21    A.  The Federal Bureau of Investigation.

22    Q.  Is the Federal Bureau of Investigation sometime referred to

23    as the FBI?

24    A.  Yes.

25    Q.  How long have you worked with the Federal Bureau of

1   Investigation?

2   A.   Eight years.

3   Q.   What is your current title with the FBI?

4   A.   Special agent.

5   Q.   Are you assigned to a particular unit or group with the

6   FBI?

7   A.   Yes, I work in the Crimes Against Children Unit.

8   Q.   And what are your duties and responsibilities in the Crimes

9   Against Children Unit?

10  A.   As an agent we investigate crimes against children to

11  include abductions, kidnappings and child prostitution.

12  Q.   And what kinds of investigatory work do you do in your role

13  as a special agent?

14  A.   Our investigative tasks include a number of things,

15  subpoenaing records, testifying in court, interviewing subjects

16  and witnesses, obtaining search warrants, evaluating evidence,

17  and reviewing important facts in cases.

18  Q.   Were those your duties in December 2011?

19  A.   Yes.

20  Q.   How long have you been assigned to the Crimes Against

21  Children Unit?

22  A.   One year.

23  Q.   And what did you do prior to your current assignment?

24  A.   I worked in the White Collar Crime Division of the New York

25  Office of the FBI focusing on health care fraud investigations.

C9JTGIL2                    Conolly - direct

1    Q.   How long were you in that unit?

2    A.   Seven years.

3    Q.   How many investigations have you participated in?

4    A.   Maybe 20 or 30 that I have played an active investigative

5    role.

6    Q.   And how many arrests have you made in which you played an

7    active investigative role?

8    A.   15 to 20.

9    Q.   How many other arrests have you participated in?

10   A.   80 plus.

11   Q.   What did you do prior to working for the Health Care Fraud

12   Unit in the FBI?

13   A.   Prior to being in the FBI I was a CPA, Certified Public

14   Accountant.

15   Q.   How long were you a CPA?

16   A.   Six years.

17   Q.   Now turning your attention to December 2nd, 2011, what did

18   you do that day?

19   A.   We assisted -- I obviously got a call from the Maryland

20   State Police in regards to a missing 16-year-old girl.

21              THE COURT:   You have to speak a little louder, if you

22   could.

23              THE WITNESS:   Sure.

24   Q.   What steps did you take to investigate that missing girl?

25   A.   We received a call from the Maryland State Police regarding

1    the girl that was missing.  I then spoke to the trooper there

2    who advised that the identity of the girl.

3              MR. STEIN:  Objection.

4              THE COURT:  Well, I'll tell you what, we had this

5    problem coming up, but really this is all part of his

6    instruction.  And if he can't tell what he was told in the

7    course of his instruction, it's a little bit difficult.  So

8    I'll allow it.

9              Go ahead, what happened?

10             THE WITNESS:  In speaking to the trooper, he provided

11   the identity and photographs of the missing girl, Jasmine, and

12   the identity and information on --

13             MR. STEIN:  Objection as to any other persons, Judge.

14             THE COURT:  Overruled.

15             THE WITNESS:  -- on the defendant who was believed to

16   be with Jasmine at the time.

17   BY MS. GREENBERG:

18   Q.  And what steps did you take to try to find Jasmine and the

19   defendant?

20   A.  I called the NYPD vice unit, who we work with on a regular

21   basis, to request their assistance in going up to the Bronx to

22   look for Jasmine.  The Maryland trooper had information

23   regarding cell phone location that Jasmine had known to be

24   using that belonged to the defendant that was in the Bronx,

25   some specific locations in the Bronx that we went to.

1    Q.  And how were the cell phone -- how was the cell phone

2    information obtained?

3    A.  The Maryland state trooper did a request.  He provided a

4    request to -- I believe it was Sprint.

5    Q.  And what did he obtain as a result of that request?

6    A.  It was for tower locations.  I'm not sure if it was a GPS

7    request, but it was for locations that the cell phone was

8    active in real-time information.

9    Q.  And what cell phone was the Maryland state police tracking

10   and receiving information about at that time?

11   A.  It was the cell phone that belonged to the defendant, I

12   believe the number was 301-992-0685.

13   Q.  I would like to show you what has been admitted into

14   evidence as part of Stipulation 191 as Government Exhibit 147.

15          MS. GREENBERG:  Your Honor, may I approach?

16          THE COURT:  Right.

17   Q.  Special Agent Conolly, do you recognize this document?

18   A.  Yes, this is the records for the cellular telephone that I

19   mentioned regarding the defendant.

20   Q.  How did you come to receive these documents?

21   A.  These were obtained through a subpoena.

22   Q.  Was that a subpoena -- who issued that subpoena?

23   A.  Yeah, I believe I issued it.

24   Q.  Ms. Co, if you could please publish this to the jury.  This

25   is admitted into evidence.

1          THE COURT:  Now what is being published to the jury?

2          MS. GREENBERG:  It's Government Exhibit 147.  These

3    are Sprint records that Special Agent Conolly testified that he

4    subpoenaed for the defendant's cell phone number.

5          THE COURT:  What do they show?

6          What are they supposed to show?

7    BY MS. GREENBERG:

8    Q.  Special Agent Conolly, could you state what information on

9    this document is in the subscriber information?

10   A.  Yes, this document shows that the subscriber for the cell

11   phone that I mentioned is Jabar Gilliam.

12   Q.  Now after the Maryland State Police received the

13   defendant's information from that cell phone number, what

14   happened next?

15   A.  We went to the vicinity of the Bronx where it was being

16   actively --

17         THE COURT:  You went where?

18   A.  We went to the Bronx, New York, the area that the phone was

19   showing the location, and pursuant to further information

20   provided by Maryland State Police, he had information that a

21   specific address was associated with the phone number, and that

22   was the 1140 Jackson Avenue address in the Bronx.

23   Q.  And what did you do upon learning about the location of

24   1140 Jackson Avenue?

25   A.  I went with the NYPD to request access to that residence to

1    look for the missing female.

2    Q.  And did you go to 1140 Jackson Avenue?

3    A.  Yes.

4    Q.  And what happened upon your arriving at 1140 Jackson

5    Avenue?

6    A.  NYPD made initial contact, they knocked on the door.  I

7    don't recall who answered.  I was not at the front, so I didn't

8    interview anyone at the front of the door.  I understand they

9    asked for consent to be let in and spoke to someone to be let

10   inside.

11           THE COURT:  You're really running your words together

12   and it's hard to understand you.  Take it easy.

13           THE WITNESS:  Sure.

14   A.  We went inside.  A number of law enforcement agents went

15   inside and spoke to the individuals that were in the residence,

16   advising them they were looking for Jasmine, a missing

17   16-year-old girl.  And the interior of the residence was --

18   there was access to the stairwell to all three floors.

19   Q.  Did you speak with anyone at 1140 Jackson?

20   A.  Yes.

21   Q.  With whom did you speak?

22   A.  I spoke with a female who identified herself as the

23   defendant's mother.

24   Q.  Now what, if anything, did you find at 1140 Jackson Avenue?

25   A.  In regards to?

C9JTGIL2                    Conolly - direct

Q.   Were you able to locate anyone?

A.   Jasmine was not there and the defendant was not there.

Q.   What happened after you left 1140 Jackson Avenue?

A.   We continued to drive around the area because the phone was

actively being utilized in that area around that residence,

1140 Jackson Avenue.  I was with the police department

detectives.  A call came over the radio that there was a

possible positive ID on --

            MR. STEIN:  Judge, I object to what came over the

radio.

            THE COURT:  Overruled.

A.   A possible positive ID on Jasmine and the defendant several

blocks away from 1140 Jackson Avenue.

Q.   And what was the follow up to that?

A.   We then went to that location.  I went inside with several

detectives that I was with.  We could hear commotion occurring

in the hallways, so we went up the stairs to the third floor,

and when we turned the corner we saw Jasmine was standing close

to the stairwell with Detective Muckenthaler, and at the end of

the hall was Detective Ryan.  His foot was caught in the door

and he was laying on his back clearly in pain, and several

detectives were trying to open the door.

Q.   And what happened after that?

A.   One of the detectives was throwing his shoulder into the

door and was able to open it.  The defendant then, who was on

1    the other side of that door, I was probably --

2                THE COURT:  The defendant then what was?

3                THE WITNESS:  He was on the other side of the door

4    inside the apartment.

5    A.  And there were probably three or four detectives that went

6    in the apartment before I did, the defendant having his way to

7    probably the middle of the living room.

8                THE COURT:  The defendant having what?

9                THE WITNESS:  Ran from the door to the middle of the

10   living room before police put their hands on him and put him in

11   handcuffs.

12   Q.  And did you see inside the apartment?

13   A.  Yes.

14   Q.  Can you describe the apartment?

15   A.  Yes, it was at the end of the hallway on the third floor.

16   It was -- to the left was the entrance.  As you step in, the

17   living room was on the right.  It was an average-sized living

18   room with a kitchen off to the left and there was at least one

19   bedroom in the back.  I did not go back into the bedroom area.

20   Q.  Now you testified -- who did you see in the apartment?

21   A.  The defendant was in handcuffs by NYPD detectives, and

22   there was two other adult males in the apartment.

23   Q.  And do you see the male that was in handcuffs that day in

24   the courtroom today?

25   A.  Yes.

1  Q.  And can you identify him by describing an article of

2  clothing that he is wearing?

3  A.  Yes, he's wearing a dark suit, light shirt unbuttoned at

4  the top with no tie.

5          MS. GREENBERG:  Your Honor, let the record reflect

6  that Special Agent Conolly has identified the defendant.

7          THE COURT:  All right.  We'll recess now until

8  10 o'clock tomorrow.  10 o'clock tomorrow.  And one thing I

9  didn't mention, but I think it's probably obvious, please to

10  not discuss the case with anybody overnight, family, friends.

11  If they ask you about it, just say you're on a case, but have

12  no discussion with anybody to again to preserve jury integrity.

13          MR. STEIN:  Judge, excuse me, I request about the

14  internet.

15          THE COURT:  What?

16          MR. STEIN:  I made a request at side bar about the

17  internet.

18          THE COURT:  Oh, I don't know anything about doing

19  research on the internet, but don't try to -- I'm very backward

20  on technology, but please do not try to do any research or get

21  any information or background or anything by any means

22  whatever, please.

23          All right.  10 o'clock tomorrow.

24          (Adjourned to September 20, 2012 at 10:00 a.m.)

25

1                    INDEX OF EXAMINATION

2    Examination of:                         Page

3    SEAN RYAN

4    Direct By Ms. Greenberg . . . . . . . . . . .18

5    Cross By Mr. Stein . . . . . . . . . . . . . .34

6    BRIAN CONOLLY

7    Direct By Ms. Greenberg . . . . . . . . . . .58

8                    GOVERNMENT EXHIBITS

9    Exhibit No.                          Received

10    162A, 162B . . . . . . . . . . . . . . . . .24

11    157, 158 and 159   . . . . . . . . . . . . .31

12    147, 148, 149, 151 and 191   . . . . . . . .57

13    192   . . . . . . . . . . . . . . . . . . . .58

14                    DEFENDANT EXHIBITS

15    Exhibit No.                          Received

16    1   . . . . . . . . . . . . . . . . . . . . .53

17

18

19

20

21

22

23

24

25