C9OTGIL1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        11 CR 1083 (TPG)

 5   JABAR GILLIAM,

 6              Defendant.

 7   ------------------------------x

 8                                      New York, N.Y.
                                        September 24, 2012
 9                                      10:00 a.m.

10

     Before:
11
                       HON. THOMAS P. GRIESA
12
                                        District Judge
13                                        and a Jury

14                           APPEARANCES

15

     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  NATALIE LAMARQUE
          KRISTY J. GREENBERG
18        Assistant United States Attorneys

19   JOEL STEIN
          Attorney for Defendant
20

21

22

23

24

25
```

C9OTGIL1

1                    (In open court, jury not present)

2             DEPUTY CLERK:  Juror number eleven, Michelle Hopkins,

3    called and left a message, and said she is ill and will not be

4    in today.

5             THE COURT:  Well, I think we can excuse her.

6             Go ahead.  Any objection?

7             MS. GREENBERG:  Yes, your Honor, we agree.

8             MR. STEIN:  I don't think there's any choice, Judge.

9    We could wait indefinitely for her to get healthy.  I don't

10   know what the problem is.

11            THE COURT:  Did you have something?

12            MR. STEIN:  Several things, Judge.

13            THE COURT:  All right, go ahead.

14            MR. STEIN:  First, Judge, over the weekend in

15   reviewing the transcript from Thursday, page 166, line 15 -- I

16   sent the prosecutors a message over the weekend about this -- I

17   believe it's incorrect.  I don't know whether I misspoke or

18   whether the reporter got it incorrect.

19            THE COURT:  Well, what's the page?

20            MR. STEIN:  Page 166, line 15.

21            THE COURT:  Let's look at that.

22            MR. STEIN:  It's from Thursday's transcript.

23            THE COURT:  What's the error?

24            MR. STEIN:  I asked Agent Conolly whether or not my

25   client was in custody from December 2nd up to and including

C9OTGIL1

1    December 6th, and line 15 reads from December 6, which is

2    impossible.

3         THE COURT:  The reporter should correct it.  I'm sure

4    you said December 2nd.

5         MR. STEIN:  I hope I did.

6         THE COURT:  I'm sure you did.

7         MS. GREENBERG:  And we agree, your Honor.

8         THE COURT:  So we'll have the correction made to page

9    166, line 15, December 6 should be changed to December 2.

10        Anything else?

11        MR. STEIN:  Yes, Judge, I thought we should discuss

12   some scheduling.  Apparently, none of the jurors have asked to

13   be off on Wednesday, which is Yom Kippur.  I don't know whether

14   the Court still intend on sitting that day.  So my preference

15   is -- my own preference is whatever time we leave on Tuesday is

16   OK with me, I don't live far from the courthouse, but I prefer

17   not to be here on Wednesday.  I spoke with the government about

18   this on Thursday.

19        MS. GREENBERG:  Your Honor, we don't anticipate -- we

20   didn't anticipate being here on Wednesday.

21        As for the schedule on Tuesday, what we would ask the

22   Court is just that we be permitted to get through the testimony

23   of the minor victim.  We anticipate that she should be through

24   today and possibly into some time on Tuesday, and we don't want

25   to interrupt her testimony.

C9OTGIL1

1          THE COURT:  Look, if anybody, any lawyer or juror

2     requests Wednesday off, we take Wednesday off.

3          MS. GREENBERG:  And we have no -- we all assumed

4     Wednesday would be off.

5          THE COURT:  We'll have Wednesday off.

6          Let's assume Wednesday is off.

7          MS. GREENBERG:  Yes, your Honor.

8          Another question we had was in terms of the schedule

9     for closings.  Do you anticipate taking all the closings and

10    rebuttal together at one time?

11         THE COURT:  Sure.

12         MR. STEIN:  I assume we would start with those on

13    Thursday morning.

14         THE COURT:  I assume so.

15         MR. STEIN:  And at some point we'll have a charge

16    conference, of course.

17         THE COURT:  Certainly.

18         Anything else?

19         Let's bring in the jury.

20         THE DEFENDANT:  Excuse me, your Honor, may I believe

21    address the Court, please?

22         THE COURT:  All right.

23         THE DEFENDANT:  I have a matter that's of great

24    concern, please.

25         THE COURT:  What is that?

C9OTGIL1

1          THE DEFENDANT:  OK.  First off, I would like to say

2     good morning to you.  My -- I'm having an issue with a conflict

3     of interest and an issue with my attorney.  And I'm not sure if

4     this should be spoken to in front of the prosecution, but this

5     needs remedy.  This is too much.

6          THE COURT:  Look, we have a jury sitting here.

7          THE DEFENDANT:  This will only take a moment.

8          THE COURT:  Why don't you and Mr. Stein come up to the

9     side bar.  Come up.

10          MS. LAMARQUE:  Your Honor, we're happy not to be a

11     part of that, but could we put it on the record and seal it for

12     future purposes?

13          THE COURT:  Certainly it will be on the record.

14          (Continued on next page)

15          (Pages 193 through 194 SEALED by Order of the Court)

16

17

18

19

20

21

22

23

24

25

C9OTGIL1

1          (In open court, jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Juror

3    number eleven needs to be excused and alternate number one will

4    become juror number eleven.

5          So if you would take the juror number eleven's place,

6    please.

7          As far as Wednesday is concerned, I haven't taken a

8    poll of who need to have Wednesday off, but certain people

9    connected with the trial do need Wednesday off, and so we will

10   have Wednesday -- we will not sit Wednesday, but we will now

11   commence today's session.

12         MS. GREENBERG:  Your Honor, the government calls

13   Jasmin to the stand.

14    JASMIN,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. GREENBERG:

19   Q.  Good morning, Jasmin.

20   A.  Good morning.

21   Q.  How old are you today?

22   A.  17.

23   Q.  And what month were you born?

24   A.  July.

25   Q.  What year were you born?

C9OTGIL1                          Jasmin - direct

1    A.  1995.

2    Q.  Where were you born?

3    A.  California.

4    Q.  How long did you live in California?

5    A.  For six years, seven years.

6    Q.  And with whom did you live in California?

7    A.  With my biological mother.

8            THE COURT:  Speak up a little bit, if you can.  It's a

9    big room and a lot of people have to hear you.

10   Q.  For how long did you live with your biological mother?

11   A.  For four or five years.

12   Q.  And what is your understanding as to why you stopped living

13   with your biological mother?

14   A.  She was a prostitute and a crack fiend and I couldn't live

15   with her.

16           THE COURT:  A prostitute and what?

17           THE WITNESS:  Crack fiend.

18   Q.  Has your mom lived in California since you were born?

19   A.  Yes.

20   Q.  To your knowledge, does your mom have other kids in

21   California?

22   A.  Yes.

23   Q.  Where did you go after immediately after you left living

24   with your mother?

25   A.  To a foster home.

C9OTGIL1                        Jasmin - direct

```
1    Q.  For how many years were you in foster care in California?

2    A.  For four years.

3    Q.  So now what, if anything, happened to you while you were in

4    foster care?

5    A.  I was physically and sexually abused.

6    Q.  So tell me about the physical abuse that you suffered in

7    foster care.

8    A.  I was beaten by my foster father and my foster mother.

9    Q.  And can you say more about how you were beaten?

10   A.  I was hit with a frying pan and I was like punched in the

11   face.

12   Q.  How many times did that happen?

13   A.  Three times.

14   Q.  And was that the only foster family that you had suffered

15   physical abuse with?

16   A.  No.

17   Q.  Tell me about the other instances.

18   A.  It was the same family, so --

19   Q.  Same family.  And what happened?

20   A.  Their son would hit me, too.

21   Q.  And hit you with anything?

22   A.  Normally with belts, and they had like a boot camp thing

23   they would beat me in.

24   Q.  What do you mean by "boot camp?"

25   A.  They would make me do like exercises, and if I didn't do
```

C9OTGIL1                        Jasmin - direct

1    them -- I would have to get up early in the morning, and if I

2    don't do them, they would hit me with something hard.

3    Q.   How long were with you that family?

4    A.   About a year.

5    Q.   You testified about suffering sexual abuse in foster care

6    in California.  What sexual abuse did you suffer?

7    A.   One of my foster families, their son would have threesomes

8    with me and my little sister, and my foster father would molest

9    me, rape me.

10   Q.   So to go to the first, the threesomes that you mentioned

11   with your sister, how old were you?

12   A.   I was seven, she was six.

13   Q.   And the conduct with -- you said it was your foster father?

14   A.   Yes.

15   Q.   How old were you when he raped you?

16   A.   Through seven to nine.

17   Q.   How many foster families were you with in California?

18   A.   Approximately four.

19   Q.   And did there come a time where you no longer lived in

20   California?

21   A.   Yes.

22   Q.   And where did you live after you left California?

23   A.   With my grandmother in Maryland.

24   Q.   And had you known your grandmother prior to moving in with

25   her?

C9OTGIL1                          Jasmin – direct

1   A.  Yes.

2   Q.  How many times had you met her?

3   A.  Once or twice.

4   Q.  How long did you live in Maryland with your grandmother?

5   A.  Two years.

6   Q.  And where did you live after that?

7   A.  I went to group homes.

8   Q.  How many group homes had you lived in?

9   A.  About eight.

10  Q.  And why have you lived in about eight group homes?

11  A.  I was hitting my family and --

12          THE COURT:  You were what?

13          THE WITNESS:  Hitting my family.

14  A.  And I ran away sometimes.

15  Q.  Why did you run away?

16  A.  Because my mom would hit me -- my grandmother would hit me

17  back.

18  Q.  Was there any other reason?

19  A.  Not at that time.

20  Q.  Did there come a time when your biological mother in

21  California reconnected with you?

22  A.  Yes.

23  Q.  When was that?

24  A.  In January of 2010 -- no, '11.

25  Q.  And how did she reconnect with you?

C9OTGIL1                              Jasmin – direct

1    A.  Facebook with my little sister.

2              THE COURT:  I didn't understand the answer.

3              THE WITNESS:  Facebook with my little sister.

4    Q.  From the time that you left California until now, how many

5    times have you seen your mom, your biological mom in person?

6    A.  Once.

7    Q.  When was that?

8    A.  In June of 2012.

9    Q.  So is that after the conduct that we're here today to

10   discuss?

11   A.  Yes.

12   Q.  In October 2011, where did you live?

13   A.  In a foster home in Hagarstown.

14   Q.  Where is Hagarstown?

15   A.  In Maryland.

16   Q.  And in November of 2011, where did you live?

17   A.  In another foster home in Maryland.

18   Q.  Was that also -- where was that, what town?

19   A.  Hagarstown.

20   Q.  And do you currently live in Maryland?

21   A.  Yes.

22   Q.  Do you go to school?

23   A.  Yes.

24   Q.  What grade are you in?

25   A.  Eleventh.

C9OTGIL1                           Jasmin – direct

1    Q.  What kind of a facility are you in now?

2    A.  I'm in a residential treatment center.

3    Q.  Now have you been diagnosed with any medical conditions?

4    A.  Yes.

5    Q.  What have you been diagnosed with?

6    A.  Bipolar and depression.

7    Q.  When were you diagnosed with bipolar disorder?

8    A.  I was twelve.

9    Q.  And do you take any medication for your bipolar disorder?

10   A.  Yes, I do.

11   Q.  What do you take?

12   A.  Lithium and Abilify.

13   Q.  How often do you take those medications?

14   A.  Every day twice a day.

15   Q.  Are those the only medications you take?

16   A.  No, I also take Zoloft for my depression.

17   Q.  How do you act when you don't take your medications?

18   A.  Impulsive.

19   Q.  When you're off your medication, does that affect your

20   ability to understand what's going on around you?

21   A.  No.

22   Q.  So in November and December of 2011, did you work as a

23   prostitute?

24   A.  Yes.

25   Q.  Who, if anyone, did you work for during that time?

C9OTGIL1                          Jasmin - direct

1   A.  This November?

2   Q.  November, December, 2011.

3   A.  Jabar.

4   Q.  And do you recognize Jabar in the courtroom today?

5   A.  Yes.

6   Q.  Can you please identify Jabar by describing the clothing

7   that he's wearing.

8   A.  He's wearing a white shirt and a black tux.

9           MS. GREENBERG:  Your Honor, let the record reflect

10  that the witness has identified the defendant.

11          THE COURT:  All right.

12  Q.  Now do you know Jabar's full name?

13  A.  Yes.  Not his middle name though.

14  Q.  What's his name?

15  A.  Jabar Gilliam.

16  Q.  As I ask you questions as we move forward, I'm going to

17  refer to Jabar Gilliam as the defendant.

18  A.  OK.

19  Q.  So I direct your attention to the night of Friday,

20  December 2nd, 2011.  Where were you that night?

21  A.  I was walking with Jabar to Lisa's apartment.

22          THE COURT:  You were doing what?

23          THE WITNESS:  I was walking to Lisa's apartment.

24  Q.  And where was Lisa's apartment?

25  A.  In Brooklyn -- Bronx, Bronx.

C9OTGIL1                          Jasmin - direct

1   Q.  How long had you been in New York at that time?

2   A.  For two days.

3   Q.  And so what happened as you and the defendant were walking

4   to Lisa's apartment, what happened after that?

5   A.  We were stopped by the police and Jabar --

6   Q.  What, if anything, did the police say to you?

7   A.  Freeze, this is the police.

8   Q.  How were they dressed?

9   A.  Normally, like I would dress.

10  Q.  Plain clothes?

11  A.  Yes.

12  Q.  Did they have anything on them that suggested to you that

13  they were police?

14  A.  Yes, they had a badge.

15  Q.  Were the police officers holding anything at the time?

16  A.  Yes, their badge.

17  Q.  So where were you when you saw the police officers?

18  A.  I was in front of Lisa's apartment.

19  Q.  And in front of --

20  A.  In front of her door.

21  Q.  Were you able to see the defendant?

22  A.  Yes.

23  Q.  How far away were you from the defendant?

24  A.  About two feet away.

25  Q.  So what did you observe happen?

C9OTGIL1                         Jasmin – direct

1   A.  I saw Jabar try to get into the room, the police stopped

2   him -- well, kind of got his foot caught in the door, and Jabar

3   tried to reach for something.

4   Q.  When you say he was trying to get into a door, what door do

5   you mean?

6   A.  Lisa's apartment.

7   Q.  And who was trying to get into Lisa's apartment?

8   A.  Jabar.

9   Q.  And you mentioned a foot getting stuck in the door, whose

10  foot?

11  A.  One of the police officers.

12  Q.  And at the time that the defendant was trying to get into

13  Lisa's apartment, what had been happening immediately before

14  that?

15  A.  He tried to reach for something.

16  Q.  Even before the defendant tried to reach for something,

17  what was happening with the police officer and the defendant?

18  A.  They were trying to arrest him.

19  Q.  And how did you know they were trying to arrest him?

20  A.  Because they had the handcuffs out.

21  Q.  What, if any, items did you have with you when the police

22  came to get you?

23  A.  I had my book bag.

24          THE COURT:  You had what your what?

25          THE WITNESS:  My backpack.

C9OTGIL1                          Jasmin – direct

1   Q.   Did you have anything on you in any of your pockets or

2   anywhere else on you?

3   A.   Yes, I had condoms and lubricants.

4   Q.   What kind of condoms did you have on you?

5   A.   NYC condoms.

6   Q.   Do you know what happened to them?

7   A.   No.

8   Q.   And then you mentioned your backpack.  What happened to

9   that?

10  A.   I think the police took it from me.

11  Q.   Do you know if they kept it?

12  A.   No, they gave it back to me later.

13  Q.   After the defendant was arrested, where did you go?

14  A.   I went to the police station.

15  Q.   And had you eaten anything at all that day?

16  A.   No.

17  Q.   Why not?

18          MR. STEIN:  Objection.

19          THE COURT:  Overruled.

20  Q.   You can answer.  The question was:  Had you eaten anything

21  that day?

22  A.   Well, I wasn't really -- didn't really ask for it.

23  Q.   Had the defendant eaten any meals that day?

24  A.   Yes.

25  Q.   What did he eat?

C9OTGIL1                        Jasmin - direct

1   A.  He ate breakfast and a fish, like a snapper or something.

2   Q.  Do you -- at the time of his arrest, do you remember what

3   time it was that night?

4   A.  Like 8:30.

5   Q.  Where were you when the defendant had been eating his

6   meals?

7   A.  I was behind him.

8   Q.  You were -- were you in the vicinity?

9   A.  Yes.

10  Q.  At any time when he was eating that day, did you ask him to

11  eat anything?

12          MR. STEIN:  Asked and answered.

13          THE COURT:  Overruled.

14  A.  Yes.

15  Q.  What did you ask him?

16  A.  I asked him can I have some.

17  Q.  What did he say?

18  A.  He gave me some of his eggs and said that's all.

19  Q.  When you said he gave you some, how much did he give you?

20  A.  Like two bites.

21  Q.  And that was all you had eaten that day?

22  A.  Yes.

23  Q.  Did you have any money on you at the time when police came

24  to get you?

25  A.  No.

C9OTGIL1                          Jasmin - direct

1    Q.  Do you remember --

2              MR. STEIN:  Judge, asked and answered.

3              MS. GREENBERG:  I'll move on.

4    Q.  What happened after you left the police precinct?

5    A.  I went to the hospital.

6    Q.  I want to talk to you about the hospital.  Did you speak to

7    anyone at the hospital?

8    A.  Yes.

9    Q.  Were you asked about what had happened to you?

10   A.  Yes.

11   Q.  What did you say at the hospital about what had happened to

12   you?

13   A.  I said that I was visiting my grandmother in Maryland and I

14   actually lived in California, and I was up there for a visit.

15             MR. STEIN:  Judge, could I have that read back,

16   please?

17             (Record read)

18   Q.  Were you visiting your grandmother in Maryland?  Was that

19   true?

20   A.  No.

21   Q.  Why did you lie?

22   A.  Because I wanted to go live with my biological mother.

23             THE COURT:  You wanted to what?

24             THE WITNESS:  Live with my mother.

25   Q.  So when you said that you were living in California with --

C9OTGIL1                        Jasmin – direct

1     that you actually lived in California with your mother, was

2     that true?

3     A.  No.

4     Q.  Again, why did you say that?

5     A.  Because I wanted to live with her in California.

6     Q.  Were you asked any questions about prostitution?

7              THE COURT:  At the hospital?

8              MS. GREENBERG:  Yes, we're still at the hospital.

9              THE WITNESS:  Yes.

10    A.  I don't remember.

11    Q.  Did you talk to anyone at the hospital about what had

12    happened to you regarding prostitution?

13    A.  Yes.

14    Q.  What did you say?

15    A.  I said that I was prostituting.

16    Q.  Did you say anything about whom you had been prostituted

17    by?

18             MR. STEIN:  Judge, objection, what she said to the

19    hospital about that is improper.

20             THE COURT:  Well, she's on the stand, and I will

21    overrule the objection.

22             MS. GREENBERG:  Let me ask the question again.

23             Actually could you read back the question?

24             (Record read)

25    A.  No.

C9OTGIL1                       Jasmin - direct

1    Q.   Did you have any bruises on you when you got to the

2    hospital?

3    A.   No.

4    Q.   Did they give you any medication at the hospital on Friday

5    night?

6    A.   They gave me my medicine.

7    Q.   What medicine was that?

8    A.   My lithium and my Abilify.

9    Q.   In the two days that you were in New York with the

10   defendant, did you ever take your medication for bipolar

11   disorder?

12   A.   No.

13   Q.   Did you bring your medication with you?

14   A.   Yes.

15   Q.   How many days worth of medication did you bring with you?

16   A.   One day.

17   Q.   And that medication for that one day, did you take it at

18   any time?

19   A.   No.

20   Q.   So after you left the hospital, Jasmin, where did you go?

21   A.   I went to ACS shelter.

22   Q.   What happened at the shelter?

23   A.   I ran away with two other girls.

24   Q.   First, how long were you at the shelter before you ran

25   away?

C9OTGIL1                          Jasmin - direct

1     A.  Not even a day.

2     Q.  And when you ran away, where did you go?

3     A.  To Bronx.

4     Q.  Where in the Bronx -- do you know where you went?

5     A.  Yeah, I was on Fourth Avenue.

6     Q.  Did you go to a particular place in the Bronx?

7     A.  I went to her ex-boyfriend's house.

8     Q.  Who's "her?"

9              THE COURT:  You went to what?

10             THE WITNESS:  Ashley's ex-boyfriend's house.

11    Q.  When you ran away from the shelter, did you run away with

12    anyone?

13    A.  Yes, I ran away with Ashley and another girl, I forget her

14    name.

15    Q.  And you said that the place you went was who's apartment?

16    A.  Her ex-boyfriend's.

17    Q.  Ashley's?

18    A.  Yes.

19    Q.  Did you know his name?

20    A.  Yes.

21    Q.  What was his name?

22    A.  Jay.

23    Q.  So what happened once you got to Jay's apartment?

24    A.  I was prostituting inside his house.

25             THE COURT:  You were what?

C9OTGIL1                          Jasmin - direct

1                   THE WITNESS:  Prostituting inside his house.

2                   THE COURT:  At that apartment?

3                   THE WITNESS:  Yes.

4     Q.  How did you come to work as a prostitute for Jay?

5     A.  It was something I wanted to do.

6     Q.  And why did you want to do it?

7     A.  Because I needed a place to stay and I needed money.

8     Q.  Why did you -- why were you looking for money?

9     A.  So I could get money to go to California.

10    Q.  What was in California?

11    A.  My biological mother.

12    Q.  How long did you work for Jay?

13    A.  A night and a half.

14    Q.  And why did you stop working for Jay?

15    A.  I was caught by -- well, I was brought in by the police.

16    Q.  Now I want to back up and I want to talk about how you

17    first met the defendant.  When did you first come into contact

18    with the defendant?

19    A.  On the street.

20    Q.  What happened on the street?

21    A.  He asked me my name, and I told him, and he asked me how to

22    get to somewhere.

23    Q.  Was that it?

24    A.  Yeah.

25    Q.  And so when did you come into contact with the defendant

C9OTGIL1                          Jasmin - direct

1   after that?

2   A.   When I went home to my boss I was on the phone with him.

3   Q.   What time frame was this?

4   A.   Like what time or what date?

5   Q.   What month?

6   A.   This was November.

7   Q.   So I want to back up.  Did you ever talk to the defendant

8   on Facebook?

9           MR. STEIN:  Objection, leading.

10          THE COURT:  Overruled.

11  Q.   You can answer the question.  Did you ever talk to the

12  defendant on Facebook?

13  A.   Yes.

14  Q.   And when did you first begin talking to the defendant on

15  Facebook?

16  A.   Early November, late October.

17  Q.   And who contacted who?

18  A.   He contacted me.

19  Q.   So did the defendant have a Facebook page?

20  A.   He didn't have a picture.

21  Q.   But did he have a page?

22  A.   Yes.

23  Q.   What information did he have on his page?

24  A.   Just his name.

25  Q.   What was his name on his Facebook page?

C9OTGIL1                         Jasmin - direct

1   A.   Dutch Master.

2   Q.   So now at the time, late October, early November, what

3   did -- did you have a Facebook page?

4   A.   Yes.

5   Q.   What did your Facebook page say about you?

6   A.   It said where I worked, my school, my name, my picture, and

7   my interests.

8   Q.   So I want to talk about each of those.  What do you mean by

9   where you worked?

10   A.   I put on the streets of DC.

11   Q.   And did you list a particular location?

12   A.   Yes.

13   Q.   And when did you write that information on your Facebook

14   page?

15   A.   When I first got Facebook back in 2011, like early 2011.

16   Q.   And when you wrote that you worked on the streets of DC,

17   what did you mean?

18   A.   As a prostitute.

19   Q.   Moving on, you said there was information on your Facebook

20   page about your school.  What information did you put on there

21   about your school?

22   A.   I went to Walt Whitman High School.

23   Q.   And what name did you put on there?

24   A.   Jasmin Gregory.

25   Q.   And how many pictures did you have on there?

C9OTGIL1                          Jasmin – direct

1   A.  Like four or five.

2   Q.  Were those photos of you?

3   A.  Some of them.

4   Q.  And you noted that you listed your interests.  What did you

5   list as your interests?

6   A.  Boys with big dicks.

7           THE COURT:  What?

8           THE WITNESS:  Boys with big dicks.

9   Q.  Now during those early conversations that you had with the

10  defendant, what did you tell him, if anything, about yourself?

11  A.  That I was a prostitute for Timmy.

12          THE COURT:  You said what?

13          THE WITNESS:  I was a prostitute for Timmy.

14          THE COURT:  For Phinney?

15          THE WITNESS:  Timmy.

16          THE COURT:  Timmy?

17          THE WITNESS:  Yes.

18  Q.  Who is Timmy?

19  A.  An ex-boyfriend of one of my friends and my pimp.

20  Q.  I just want to talk briefly about Timmy and then we'll come

21  back to what you and the defendant talked about.

22          How long did you work for Timmy?

23  A.  About two, three weeks.

24  Q.  And when was this?

25  A.  In November of 2011.

C9OTGIL1                        Jasmin – direct

1    Q.  Did Timmy ever hit you?

2    A.  No.

3    Q.  Did he ever threaten you?

4    A.  No.

5    Q.  Were you scared of Timmy?

6    A.  No.

7    Q.  Did Timmy ever pay you?

8    A.  Yes.

9    Q.  What was your arrangement with Timmy for payment?

10   A.  50/50.

11   Q.  So going back now to what you and the defendant had

12   discussed, you told him you were a prostitute for Timmy, did

13   you tell him anything else?

14   A.  No.

15   Q.  What, if any, information did you provide to him about

16   school?

17   A.  I told him that I went -- I didn't tell him anything.

18   Q.  Nothing about school or what grade you were in?

19   A.  I said I was in the 12th grade.

20   Q.  Were you in 12th grade?

21   A.  No.

22   Q.  Why did you tell him you were in 12th grade?

23   A.  Because I wanted to seem older.

24   Q.  What, if any, information did you provide to the defendant

25   about where you lived?

C9OTGIL1                          Jasmin - direct

1   A.  I told him I lived with my aunt in Maryland.

2          THE COURT:  I'm a little -- did you tell the defendant

3   that you were prostituting for Timmy?

4          THE WITNESS:  Yes.

5          THE COURT:  OK.

6   Q.  So let's back up for a moment.  What was the first time

7   that you had worked as a prostitute?

8   A.  2009, December.

9   Q.  And how did you come to work as a prostitute then?

10  A.  I was with my friend Justice and she introduced me to it.

11         THE COURT:  You were with your what?

12         THE WITNESS:  My friend Justice.

13  Q.  How old were you at that time?

14  A.  Fourteen.

15  Q.  And at that time, were you working for a pimp or were you

16  working alone?

17  A.  Alone.

18  Q.  And how long did you do that for?

19  A.  About a month.

20  Q.  After that period of time when you were working as a

21  prostitute with your friend Justice, did you work as a

22  prostitute after that?

23  A.  Yes.

24  Q.  What was the next time that you worked as a prostitute?

25  A.  January 2010.

C9OTGIL1                    Jasmin - direct

1    Q.  How old were you at that time?

2    A.  Fourteen.

3    Q.  And how did you come to work as a prostitute at that time?

4    A.  I worked by myself when I was on the run.

5           THE COURT:  I worked by yourself what?

6           THE WITNESS:  When I was on the run.

7    Q.  Where were you on the run from?

8    A.  Arrow Diagnostics Center.

9    Q.  What's that?

10   A.  It's a kind of transitional care home.

11   Q.  Were you working for yourself or were you working for

12   anyone else?

13   A.  I was working for myself.

14   Q.  As a prostitute?

15   A.  Yes.

16   Q.  And after that, was there another -- what was the next time

17   that you worked as a prostitute?

18   A.  I was -- I'm trying to think.  I think this time in 2011,

19   November.

20   Q.  So prior to this occasion -- prior to working for the

21   defendant and working for Timmy, there were two prior times

22   when you worked as a prostitute?

23   A.  I don't remember.

24          THE COURT:  Is that correct?

25          THE WITNESS:  I don't remember.

C9OTGIL1                          Jasmin - direct

1   Q.  Let's return to how you met the defendant.  After you told

2   the defendant that you had worked as a prostitute, what did the

3   defendant say?

4   A.  He said would I like to work for him.

5   Q.  What, if anything, did he tell you about his work?

6   A.  Nothing.

7   Q.  Did he say what he did?

8   A.  Yeah, he said he was a pimp.

9           THE COURT:  He said he was what?

10          THE WITNESS:  A pimp.

11  Q.  Did the defendant tell you how old he was?

12  A.  Yes.

13  Q.  What did he say?

14  A.  He said he was 29.

15  Q.  When he asked you to work for him, what did you say?

16  A.  I said yes.

17  Q.  Did you and the defendant ever discuss meeting in person?

18  A.  Yes.

19  Q.  Why were the two of you going to meet in person?

20  A.  So we could discuss business.

21  Q.  And by business, what do you mean?

22  A.  Me working for him as a prostitute.

23  Q.  And did you talk about exchanging anything at the in-person

24  meeting?

25  A.  Yes, he exchanged his notebook to me.

C9OTGIL1                    Jasmin – direct

1   Q.  How did you feel about meeting the defendant?

2           MR. STEIN:  Judge, objection.

3           THE COURT:  Sustained.

4   Q.  Did there come a time when you met the defendant in person?

5   A.  Yes.

6           MS. GREENBERG:  Your Honor, may we have a side bar?

7           THE COURT:  OK.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C9OTGIL1                        Jasmin - direct

1                    (At Side bar)

2                    MS. GREENBERG:  Your Honor, the reason I'm asking

3        questions about how -- the reason that I need to ask questions

4        about how the victim is feeling at different points --

5                    THE COURT:  I can't hear you.

6                    MS. GREENBERG:  The reason that I wanted to ask

7        questions about how the victim was feeling at various times is

8        it goes directly toward coercion, how she was feeling at any

9        particular time towards the defendant, whether she was feeling

10       coerced, scared.

11                   THE COURT:  I think if you -- I understand.

12                   MS. LAMARQUE:  Your Honor, we just don't want to have

13       to deal with objections every time we ask her how did you feel

14       at that point.  There's no other way to establish coercion.

15       It's a direct element that we have to establish, your Honor.

16                   MR. STEIN:  Judge, what she says now about how she

17       felt is not the way to demonstrate this.  If they want to ask

18       this witness questions about what he said to her or what he did

19       to her then they can argue whatever they want to from there.

20       But for her to ask for the witness to be asked subjectively how

21       she felt about the defendant, that's not the way to do this.

22       What did he say and what did he do?

23                   MS. GREENBERG:  Your Honor, it's a subjective

24       standard.  The standard is:  Would a person in her position

25       feel coerced?

C9OTGIL1                         Jasmin - direct

1              THE COURT:  Somehow I think that the proper question

2      will appear proper, and I can't tell Mr. Stein he can't object,

3      but the question you asked earlier was just sort of out in left

4      field, and obviously if you get to --

5              MS. LAMARQUE:  The abuse.

6              THE COURT:  We just have to take it step by step.

7      Let's go back, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C9OUGIL2                         Jasmin - direct

1           (In open court)

2    BY MS. GREENBERG:

3    Q.  Jasmin, did there come a time when you met the defendant in

4    person?

5    A.  Yes.

6    Q.  Where did you meet him?

7    A.  At the Spanish Bar in Hagerstown.

8    Q.  Was that the first time you met him at the Spanish Bar?

9    A.  Yes.

10          MS. GREENBERG:  I am handing the witness what has been

11   marked as Government Exhibit 143.

12   Q.  Now, is this a fair and accurate representation -- what is

13   this?

14   A.  The Spanish Bar.

15   Q.  Where was the Spanish Bar?

16   A.  In Hagerstown, Maryland.

17   Q.  Is this a fair and accurate representation of the Spanish

18   Bar?

19   A.  Yes.

20          MS. GREENBERG:  I offer Government Exhibit 143 into

21   evidence.

22          THE COURT:  Received.

23          (Government Exhibit 143 received in evidence)

24          MS. GREENBERG:  Ms. Co, if you could please put up the

25   photo.

C9OUGIL2                          Jasmin - direct

1   Q.  Now, did you go to the bar with anyone?

2   A.  Yes.

3   Q.  Who did you go with?

4   A.  Timmy.

5   Q.  Is Timmy the person you told us about before?

6   A.  Yes.

7   Q.  Did Timmy know the defendant?

8   A.  Yes.

9   Q.  How did Timmy know the defendant?

10  A.  They lived around the corner from each other.

11          THE COURT:  They were what?

12          THE WITNESS:  They lived around the corner from each

13  other.

14  Q.  Why did Timmy go to the Spanish Bar with you?

15          MR. STEIN:  Objection.  Relevance.

16          THE COURT:  Overruled.

17  A.  So he knew nothing was going on between like too fishy

18  about us.

19          THE COURT:  I don't understand your answer.

20          THE WITNESS:  Like he didn't want anything going on

21  that shouldn't be going on.

22          THE COURT:  Who?

23          THE WITNESS:  Timmy.

24          MS. GREENBERG:  Like what?

25          MR. STEIN:  Judge, if the witness is testifying about

C9OUGIL2                          Jasmin – direct

1    the state of mind of someone else, I object.

2              MS. GREENBERG:  Not state of mind, if they had a

3    conversation as to why he was coming.

4              THE COURT:  All right.

5              THE WITNESS:  Because he wanted to make sure nothing

6    was going on, like abuse or anything.

7    BY MS. GREENBERG:

8    Q.  What did you think about your relationship with the

9    defendant at this time?

10   A.  I thought we were going to be like together.

11   Q.  Together how?

12             THE COURT:  You thought what?

13             THE WITNESS:  I thought that we were going to be

14   together like girlfriend–boyfriend type stuff.

15   Q.  Did he ever compliment you?

16   A.  Yes.

17   Q.  What did he say?

18   A.  He said I was pretty.

19   Q.  Now, were you and the defendant introduced at the Spanish

20   Bar?

21   A.  Yes.

22   Q.  How did you know who the defendant was?

23   A.  Because Timmy told me that was him.

24   Q.  So what happened when you got to the Spanish Bar?

25   A.  We discussed the book, yeah, the book, and where I was

C9OUGIL2                         Jasmin – direct

1    going to be working in Maryland and New York.

2    Q.  I'm sorry.  I didn't hear the last part of what you said.

3    A.  I said "and New York."

4    Q.  Did the defendant ask you how old you were?

5    A.  Yes.

6    Q.  What did you say?

7    A.  I said that I was 17.

8    Q.  Why did you tell him that you were 17?

9    A.  Because I wanted to seem older.

10   Q.  How old were you at the time?

11   A.  16.

12   Q.  So now you just testified about the book.  So I am going to

13   show you Government Exhibit --

14           MS. GREENBERG:  Ms. Co, if you could take down

15   Government Exhibit 143 and put up Government Exhibit 26.

16   Q.  So I want you to take a look at your screen at Government

17   Exhibit 26 which is already in evidence.

18           I am also going to hand you the book.

19           Now, looking at the hard copy that you have in front

20   of you, what is this?

21   A.  This is the book that Jabar gave you.

22   Q.  How do you know that it is the book at that the defendant

23   gave you?

24   A.  Because it has that orange sticker on it.

25   Q.  Who put the orange sticker on the book?

C9OUGIL2                         Jasmin - direct

1   A.  He did.

2   Q.  Can you hand that up, show that to the jury?

3           Now, when did you give that notebook -- what did you

4   do with that notebook after the defendant gave it to you?

5   A.  I put it in my bag.

6   Q.  After putting it in your bag, did you do something else

7   with it?

8   A.  I wrote in it and I read it.

9   Q.  What did you write in it?

10  A.  My mom's address.

11  Q.  Anything else?

12  A.  That's it.

13  Q.  Did there come a time when you gave that book to law

14  enforcement?

15  A.  Yes.

16  Q.  When was that approximately?

17  A.  In like the middle of December.

18  Q.  Do you remember when it was?

19          MR. STEIN:  Judge, she just answered.

20          THE COURT:  I didn't hear any new question.

21          MR. STEIN:  She just answered the question, so Ms.

22  Greenberg is asking if she remembered it.  She just answered

23  when she gave it to law enforcement.

24          THE COURT:  I didn't hear a new question from Ms.

25  Greenberg, so I don't know what you are objecting to.

C9OUGIL2                        Jasmin - direct

1          MR. STEIN:  I am objecting to her trying to prompt her

2     memory because she said, when she gave it to law enforcement,

3     she didn't say she didn't remember and now Ms. Greenberg is

4     asking here, trying to prompt her memory, frankly.

5          THE COURT:  About what?

6          MR. STEIN:  About when she gave the notebook to law

7     enforcement.

8          MS. GREENBERG:  Your Honor, I will move on.

9          MR. STEIN:  Thank you.

10    BY MS. GREENBERG:

11    Q.  Let's return back to when the defendant gave you this

12    notebook.  What if anything did he tell you when he gave you

13    this notebook?

14    A.  He told me to remember the rules.

15    Q.  What if anything did he say that the rules were for?

16    A.  When I was in the car.

17    Q.  Can you say more of when you were in the car, doing what?

18    A.  Prostituting.

19    Q.  Do you remember what the defendant's rules were?

20    A.  Yes.

21    Q.  What were they?

22    A.  If anything seemed suspicious, don't take time to think,

23    just get out, and don't trust anybody and don't make too much

24    conversation.  And that's it, I think.

25          MS. GREENBERG:  Ms. Co, if you could turn to page 17.

C9OUGIL2                    Jasmin - direct

1   Q.  Who wrote the writing on this page?

2   A.  He did.

3   Q.  When you say he, who do you mean?

4   A.  Jabar.

5   Q.  How do you know that the defendant wrote this on the page?

6   A.  He wrote it in front of me.

7   Q.  Now, if you could look at the first rule and read that

8   aloud?

9   A.  "Don't ask questions."

10  Q.  What if anything did the defendant say about this first

11  rule "don't ask questions"?

12  A.  That I wasn't supposed to make too much conversation with

13  the customer.

14  Q.  Did he say why?

15  A.  No.

16  Q.  Did you have any understanding as to why you wouldn't ask

17  questions or wouldn't have any long conversations?

18  A.  Because it was supposed to be business, it was not supposed

19  to personal.

20  Q.  If you could read the second rule that is listed here?

21  A.  "Don't take an interest in people outside of business.

22  There is no trust."

23  Q.  What if anything did the defendant say about this rule?

24  A.  It is pretty self-explanatory, so he didn't really say

25  anything to me.

C9OUGIL2                         Jasmin - direct

1    Q.  What did you understand "business" to mean?

2    A.  Prostituting.

3    Q.  Now, can you read the third rule?

4    A.  "Erase every trace, leave nothing behind."

5    Q.  What if anything did the defendant say about the third

6    rule?

7    A.  So I don't get caught by the police.

8    Q.  Did he say what he meant by what you shouldn't leave

9    behind?

10   A.  Clothes, shoes -- it doesn't matter, anything.

11   Q.  If you could please read the fourth rule?

12   A.  "Know when to get out.  Just the thought means it's time to

13   get out."

14   Q.  What if anything did the defendant say about the fourth

15   rule?

16   A.  He said that if there was any feelings that I had that were

17   kind of suspicious, that I should get out of the car, even if I

18   don't feel it's a police officer, I have to get out of the car.

19   Q.  Other than the rules that the defendant wrote here on this

20   notebook, did the defendant verbally give you any other rules?

21   A.  No.

22   Q.  What if anything did the defendant tell you to do with

23   these rules?

24   A.  He told me to keep them and memorize them.

25           MS. GREENBERG:  Now, Ms. Co, if you could turn to page

C9OUGIL2                          Jasmin – direct

1   20 of the notebook and if you could zoom in.

2   Q.  Whose handwriting is this?

3   A.  Mine.

4   Q.  And what did you write there?

5   A.  I wrote my mom's apartment number, her address.

6   Q.  Why did you write that?

7   A.  So that we could -- so we could -- I could send her stuff

8   and she could send me stuff, like money.

9   Q.  What were you going to send her?

10  A.  Like money.

11  Q.  What if anything did the defendant say to you about how to

12  get paid?

13  A.  He told me to take the money first.

14  Q.  What if anything did the defendant tell you about where you

15  should stay in relation to him?

16  A.  In his eyesight.

17          THE COURT:  He said what?

18          THE WITNESS:  He said I should stay in his eyesight.

19          THE COURT:  I didn't understand the word?

20          MS. GREENBERG:  Eyesight.

21          THE COURT:  OK.

22  Q.  What if anything did the defendant say about making eye

23  contact?

24  A.  He said not to make eye contact.

25  Q.  With whom?

C9OUGIL2                         Jasmin - direct

1   A.  With anybody.

2   Q.  So turning back now to what is on your screen, you said you

3   wrote the address here so that you could send stuff back and

4   forth.  What stuff was being sent back and forth?

5   A.  Money, stuff like that.

6   Q.  Who sent money to whom?

7   A.  Sometimes -- well, my mom was supposed to send us money and

8   I was supposed to send her money.

9   Q.  By "us," who do you mean?

10  A.  Me and Jabar.

11  Q.  Did your mom ever send you money?

12  A.  No.

13  Q.  Do you know whether she sent Jabar any money?

14  A.  No.

15  Q.  Did you ever send her money?

16  A.  No.

17          MS. GREENBERG:  Ms. Co, if you could please turn to

18  page 23.

19  Q.  Do you recognize this writing?

20  A.  Yes.

21  Q.  What is it?

22  A.  It is Jabar's handwriting.

23  Q.  Do you recognize that phone number?

24  A.  Yes.  That's Jabar's number.

25          THE COURT:  That is what?

C9OUGIL2                         Jasmin - direct

1          THE WITNESS:  Jabar's number.

2    Q.  And above the phone number what does it say?

3    A.  T.

4    Q.  What do you understand that to mean?

5    A.  His nickname.

6    Q.  By "his," you mean the defendant?

7    A.  Yes.

8    Q.  What if anything did the defendant say to you about this

9    page?

10   A.  He said I could call him whenever I needed him.

11   Q.  Turning back to your first meeting with the defendant in

12   the Spanish Bar, other than business, what if anything did you

13   talk to the defendant about?

14   A.  New York.

15   Q.  What did you talk about regarding New York?

16   A.  Meeting his mom and, yeah.

17   Q.  Why did he tell you, you were going to meet his mom?

18   A.  So that his mom could do my hair and stuff.

19          THE COURT:  She could what?

20          THE WITNESS:  Do my hair.

21   Q.  What did you think about meeting his mom?

22   A.  Excited.

23   Q.  Why were you excited?

24   A.  I don't know.  I don't know.  I was just excited.

25   Q.  Did you tell him anything about your family?

1    A.  Yes.

2    Q.  What did you tell him about your family?

3    A.  I told him I had five sisters.

4    Q.  What if anything did you tell him about your mother?

5    A.  I told him that she was a prostitute and a crackhead.

6    Q.  Did you say anything about whether you lived with your

7    mother?

8    A.  I said I didn't live with her.

9    Q.  What if anything did you say about your father?

10   A.  I told him he had died.

11   Q.  Did you say how he had died?

12   A.  In a car accident.

13   Q.  Did you and the defendant discuss your past experiences

14   with men?

15   A.  Somewhat.

16          THE COURT:  What?

17          THE WITNESS:  Somewhat.

18   Q.  What if anything did you tell the defendant about your past

19   experience with men?

20   A.  I told him I had bad vibes with some men because of my

21   foster families.

22   Q.  Did you say anything more about your foster family?

23   A.  No.

24   Q.  Did you tell him at any later point about your foster

25   family?

C9OUGIL2                    Jasmin - direct

1           Let me strike that and rephrase.

2           At any later time did you tell the defendant about the

3  sexual abuse at your foster families?

4  A.  No.

5  Q.  Did you tell him about any sexual abuse?

6  A.  No.

7  Q.  What if anything did you tell the defendant about how you

8  wanted him to treat you?

9  A.  With respect.

10  Q.  When you told him, you testified just now, that you had

11  negative experiences with men, did you say anything more about

12  what those were?

13  A.  No.

14  Q.  Did he ask?

15  A.  No.

16  Q.  After your first meeting with the defendant at the Spanish

17  Bar, did you stay in contact with him?

18  A.  Yes.

19  Q.  How did you and the defendant communicate?

20  A.  Through phone.

21  Q.  Any other way?

22  A.  No.

23  Q.  Did you talk to him on Facebook?

24  A.  No.

25  Q.  How often did you and the defendant communicate?

C9OUGIL2                          Jasmin - direct

1    A.   Almost every night.

2    Q.   What if anything did you and the defendant discuss about

3    business?

4    A.   We discussed what I had to wear and stuff.

5    Q.   What did he say about what you had to wear?

6    A.   I had to wear my purple and gray dress, my fishnets and

7    some heels.

8    Q.   Where did you have to wear those clothes?

9    A.   To New York or in Maryland, doesn't matter.

10   Q.   But those were the clothes that you had to wear to

11   prostitute?

12   A.   Yes, ma'am.

13   Q.   What if anything did the defendant say to you about the

14   rules?

15   A.   That I should bring them with me and memorize them.

16   Q.   Bring them with you where?

17   A.   To New York.

18   Q.   Now, I want to turn your attention to November 15, 2011.

19   Where were you living then?

20   A.   In a foster home.

21   Q.   Did there come a time when you ran away?

22   A.   Yes.

23   Q.   When did you run away from your foster home?

24   A.   On the 15th.

25   Q.   What did you do after you ran away?

1   A.  I went to Jabar and Timmy.

2           THE COURT:  You went where?

3           THE WITNESS:  To Jabar and Timmy.

4   Q.  Where was that?  Where did you see Jabar and Timmy?

5   A.  In the Spanish Bar.

6   Q.  Did there come a time when you went to Timmy's house?

7   A.  Yes.

8   Q.  When you went to Timmy's house, did you see the defendant

9   there?

10  A.  Yes.

11  Q.  Did you see Timmy there?

12  A.  Yes.

13  Q.  What were Timmy and the defendant doing when you saw them

14  at Timmy's house?

15  A.  I don't remember.

16  Q.  Do you remember where you saw them?

17  A.  On the porch.

18          THE COURT:  You saw them where?

19          THE WITNESS:  On the porch.

20  Q.  Were they talking?

21  A.  Yes.

22  Q.  What were they discussing?

23  A.  My age.

24  Q.  Tell me what were they saying about your age.

25  A.  Timmy kept saying that I needed to go to school.

C9OUGIL2                          Jasmin - direct

1   Q.  What did the defendant say in response?

2   A.  I don't know.  I don't remember.

3   Q.  When Timmy said that you needed to go to school, what was

    his tone like?

4

5   A.  Kind of firm.

6   Q.  And how did he seem?  What was his demeanor?

7   A.  He was angry.

8   Q.  Timmy was angry?

9   A.  Yes.

10  Q.  Why was Timmy angry?

11  A.  Because he wanted me to finish high school.

12  Q.  Were they talking about why would they think that you were

13  not going to finish high school?

14  A.  Because I was going to New York.

15  Q.  Did Timmy say that he didn't want you to go to New York?

16          MR. STEIN:  Objection.  Leading.

17          MS. GREENBERG:  I will withdraw.

18  Q.  What did Timmy say about your going to New York, if

19  anything?

20  A.  He said he didn't want me to go.

21  Q.  What did the defendant say?

22  A.  Nothing.

23  Q.  What were the defendant and Timmy doing when they were

24  having -- you said Timmy was yelling?

25  A.  Yes.

C9OUGIL2                         Jasmin - direct

1    Q.  So when Timmy was yelling, what were Timmy and the

2    defendant doing?

3    A.  Jabar was just listening.

4    Q.  How close were they to each other?

5    A.  Like that close.

6    Q.  And you heard that they were talking about you?

7    A.  Yes.

8    Q.  Did the defendant call you and say anything, use your name?

9            MR. STEIN:  Judge, again, I object to the leading.

10           THE COURT:  Overruled.

11   Q.  How did you know that they were talking about you?

12   A.  Because I heard Timmy say "Jasmin."

13   Q.  Did you approach them at any point?

14   A.  No -- I don't know.

15   Q.  Let's take a step back.

16           When you heard this conversation happening, you heard

17   Timmy yelling, where were you?

18   A.  Inside.

19   Q.  Inside the house?

20   A.  Inside the doorway.

21   Q.  So how far away would you say you were?

22   A.  I was like kind of like standing behind the doorway so that

23   they couldn't really see me.

24           THE COURT:  We will take our morning recess.  If the

25   jury would retire, I will speak to the lawyers a few minutes.

C9OUGIL2                          Jasmin – direct

1          (Jury not present)

2          THE COURT:  All right.  Mr. Gilliam, what is it that

3    you wanted to request and why don't you go over to the

4    microphone so that I can hear you?

5          MR. STEIN:  There is a microphone right here.  Over to

6    the podium.  I just want to hear what you say.  Over at the

7    podium, please.  OK.

8          THE DEFENDANT:  My first issue is this.  I've asked my

9    attorney, Mr. Stein, on several occasions about calling certain

10   witnesses.  And the situation has come in me asking him he has

11   not immediate that right.  He has told me there is no relevance

12   in the people that I want to call.

13         THE COURT:  We have to have this outside the hearing

14   of the government, but I don't want to take a lot of time.  We

15   have a jury waiting.

16         MS. LAMARQUE:  Your Honor, as long as it is kept on

17   the record we are happy to step out.

18         THE COURT:  Why don't you step out.

19         It will certainly be on the record.

20         MS. LAMARQUE:  Thank you, your Honor.

21         (Pages 240 through 244 sealed)

22

23         (Continued on next page)

24

25

C9OUGIL4                          Jasmin - direct

 1              (In open court)

 2              (Jury present)

 3              THE COURT:  Go ahead.

 4   BY MS. GREENBERG:

 5   Q.  Jasmin, tell me what happened at Timmy's house.

 6              THE COURT:  At what?

 7   Q.  Tell me what happened at Timmy's house.

 8              THE COURT:  I thought she had told us.

 9              MS. GREENBERG:  She did not, your Honor.  There is

10   more to the story.

11              THE COURT:  You are not asking her to repeat.  What

12   else happened?

13   Q.  What else happened after you saw Timmy yelling at the

14   defendant?

15              MR. STEIN:  Judge, can I just say, I didn't object

16   before.  I don't think that the witness ever used the word

17   "yell."  I think that she said the tone was firm, so I object

18   to the use of the word "yelling" because the witness never used

19   it herself.

20              THE COURT:  I don't really recall.  If she didn't say

21   it, I am sure the jury recalls better than I do.

22              MS. GREENBERG:  I believe at one point she said he was

23   yelling or screaming.

24              THE COURT:  The jury has heard the evidence and they

25   will recall.

C9OUGIL4                         Jasmin - direct

1              Go ahead.

2    BY MS. GREENBERG:

3    Q.  What happened next at Timmy's house, Jasmin?

4    A.  I was standing in the doorway and I tried to separate them

5    and I was hit.

6    Q.  Who hit you?

7    A.  Jabar.

8    Q.  How hard did he hit you?

9    A.  I fell.

10            THE COURT:  What?

11            THE WITNESS:  I fell.

12   Q.  How did you react?

13   A.  I cried.

14   Q.  Did there come a time where he hit you again?

15   A.  Yes.

16   Q.  When was the next time that he hit you?

17   A.  When we were getting ready to go to New York.

18   Q.  Where was that?

19            THE COURT:  Are you saying, was it in New York or --

20            THE WITNESS:  On the way.

21            THE COURT:  On the way to New York.

22   Q.  Where were you?

23   A.  I was near the Spanish Bar.

24   Q.  What happened?

25   A.  He got mad at me because of something -- I forget again.

C9OUGIL4                         Jasmin - direct

1    Q.  Tell us about how he hit you.

2    A.  So he hit me on my face and I had to get like a butterfly

3    stitch on it.

4    Q.  What do you mean by a "butterfly stitch"?

5    A.  A butterfly Band-Aid thing.

6    Q.  Not an actual stitch?

7            MR. STEIN:  Judge, can we have testimony from the

8    witness and not Ms. Greenberg?

9            MS. GREENBERG:  I was just trying to clarify what she

10   had said.

11           MR. STEIN:  That's my point.  Let the witness do it.

12   Q.  Jasmin, you had said -- so there was a Band-Aid you had

13   testified.  Did you at any point receive stitches?

14   A.  No.

15   Q.  How did you react when he hit you at the Spanish Bar?

16   A.  I sat there and cried.

17   Q.  Did there come a time after he hit you at the Spanish Bar

18   when he hit you again?

19   A.  Yes.

20   Q.  When was that?

21   A.  In New York.

22   Q.  Where were you?

23   A.  In the subway station.

24   Q.  What did the defendant do?

25   A.  He hit me in my face, right here.

C9OUGIL4                              Jasmin - direct

1              MS. GREENBERG:  Let the record reflect that the

2     witness appears to have been pointed to her left eyebrow.

3     Q.  Continue.

4     A.  And I sat there for a couple of minutes.

5     Q.  How hard did he hit you?

6     A.  I kind of hit the wall and fell.

7              THE COURT:  Was this in a subway car, the station or

8     what?

9              THE WITNESS:  In the station.

10             THE COURT:  In the station?

11             THE WITNESS:  Yes.

12    Q.  Other than hitting you, did he do anything else at the

13    subway station?

14    A.  No.

15    Q.  Did he use his hands in any other way?

16             MR. STEIN:  Judge, I object.  She said no.  She is

17    trying to prompt her memory again, Judge.

18             THE COURT:  Overruled:

19             Go ahead.

20    A.  Yes.

21    Q.  Jasmin, tell me what he did with his hands.

22    A.  He choked me.

23    Q.  Could you breathe?

24    A.  Yes.

25             THE COURT:  I didn't hear the answer.

C9OUGIL4                         Jasmin - direct

1              THE WITNESS:  He choked me.

2              THE COURT:  He what?

3              THE WITNESS:  Choked me.

4              THE COURT:  I didn't hear the word, that's the

5    problem, but I hear it now.

6              Go ahead.

7    BY MS. GREENBERG:

8    Q.  After he choked and hit you at the subway station, how did

9    you react?

10   A.  I sat there for a while and somebody asked me if I was OK

11   and I said yes.

12   Q.  Jasmin, I want to turn back to the time that you were at

13   Timmy's house.  Around that time you mentioned -- you testified

14   earlier that you had run away on November 15th.  How many days

15   did you run away from your foster home?

16   A.  Five days.

17   Q.  Where were you staying?

18   A.  With Timmy and sometimes Jabar, just one time with Jabar.

19             THE COURT:  Try to keep your voice up.

20             THE WITNESS:  I said at Timmy's house I was staying.

21   Q.  What if anything during those few days did the defendant

22   say about drugs?

23   A.  Like what drugs, like my meds?

24   Q.  No, other than your medications.

25   A.  He said not to take any drugs from anybody.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9OUGIL4                           Jasmin - direct

1          THE COURT:  He said what?

2          THE WITNESS:  Not to take any drugs from anybody.

3   Q.  Did he use drugs in front of you?

4   A.  No.

5   Q.  Did he at any time provide you with anything, any drugs.

6   A.  We got a free, like dime bag.

7   Q.  What was the dime bag of?

8   A.  Weed.

9   Q.  By "weed," do you mean marijuana?

10  A.  Marijuana.

11  Q.  When you said we got it, how did you get it?

12  A.  Jabar got it from some guy.

13  Q.  What did you do with the marijuana?

14  A.  I smoked it.

15  Q.  Who paid for the marijuana?

16  A.  Nobody -- it was for free.

17  Q.  Sorry.

18          How old were you when you first started using

19  marijuana?

20  A.  13.

21  Q.  How many times had you used it before?

22  A.  Like twice a week for a year.

23  Q.  For what year?

24  A.  13 and 14.

25  Q.  During those five days when you ran away from your foster

C9OUGIL4                          Jasmin - direct

1    home, were you working for the defendant as a prostitute in

2    Maryland during that time?

3    A.  Yes.

4    Q.  How did that come about?

5    A.  Well, I walked the North Prospect Street, and there was

6    like a square that you walk.

7    Q.  Before we get to the square -- and we will get there -- you

8    talked earlier about the clothes that Jabar had told you to

9    wear.  Were those clothes that you wore when you prostituted

10   for him in Maryland?

11   A.  Yes.

12   Q.  How did you get the clothes that you wore when you were

13   working for the defendant in Maryland?

14   A.  I brought them from home.

15   Q.  How did you come to get those clothes?

16   A.  I bought them.

17   Q.  Whose money was used to buy the clothes?

18   A.  His.

19   Q.  Did you go to find the clothes on your own or did you go

20   with anyone else?

21   A.  I went with Jabar.

22   Q.  In what stores did you go shopping with the defendant?

23   A.  I don't remember.  I really don't.

24   Q.  What clothes can you get?

25   A.  I got shoes, a dress and, yeah -- I already had stockings.

C9OUGIL4                         Jasmin – direct

1            MR. STEIN:  Judge, I didn't hear the last part.

2            THE WITNESS:  I already had the stocking.

3   Q.  Jasmin, what if anything did the defendant say about the

4   dress and the other items that he purchased?

5   A.  That I should bring them with me.

6   Q.  With you where?

7   A.  To New York.

8   Q.  I would like to show you what has been marked as Government

9   Exhibit 145.

10            Jasmin, what is this map?

11   A.  Hagerstown, the square.

12   Q.  Is that the square that you were testifying about earlier?

13   A.  Yes.

14   Q.  Is this a fair and accurate representation of the square?

15   A.  Yes.

16

17            (Continued on next page)

18

19

20

21

22

23

24

25

C9OTGIL5                         Jasmin – direct

1        MS. GREENBERG:  I offer Government Exhibit 145 into

2   evidence.

3        THE COURT:  Received.

4        (Government's Exhibit 145 received in evidence)

5        MS. GREENBERG:  Ms. Co, if you could put up Government

6   Exhibit 145.

7   BY MS. GREENBERG:

8   Q.  Again, to be clear, what town is this in?

9   A.  Hagarstown.

10  Q.  What did you do with the square?

11  A.  I prostituted.

12  Q.  Was anyone with you when you walked the streets of the

13  square?

14  A.  Yes.

15  Q.  Who was with you?

16  A.  Jabar.

17  Q.  What did you wear when you walked the streets?

18  A.  The dress and the heels.

19  Q.  You testified earlier that this was mid -- strike that.

20       What time was this?  This is mid November when you had

21  run away that you were walking the streets?

22  A.  Yes.

23  Q.  Did you have a coat on when you were walking the streets

24  for the defendant?

25  A.  No.  I chose not to wear it.

C9OTGIL5                         Jasmin - direct

1              THE COURT:  You what?

2              THE WITNESS:  I chose not to wear it.

3              THE COURT:  OK.

4   Q.  Did you have a coat?

5   A.  Yes.

6   Q.  Did you have a coat with you?

7   A.  No.

8   Q.  Were you cold?

9   A.  Yes.

10  Q.  Was the defendant wearing a coat?

11  A.  Yes.

12  Q.  How close was the defendant to you when you were walking

13  the streets of the square?

14  A.  Like a block away.

15  Q.  Was he within eyesight?

16  A.  Yes.

17  Q.  Now while walking the streets of the square, what time did

18  you walk the streets?

19  A.  At like 11 at night.

20  Q.  For how long would you walk the streets?

21  A.  Until like 3 or 4.

22  Q.  3 or 4 in the morning?

23  A.  Mm-hmm, yes.

24  Q.  And while you were walking the streets of the square at

25  night, how did you find customers?

1   A.  Just by walking, they would come pick you up.

2          THE COURT:  Just by what?

3          THE WITNESS:  Walking, and they would come pick you

4   up.

5   Q.  How do they come pick you up?

6   A.  In their car.

7   Q.  And once the customers would stop, what did you tell them?

8   A.  I would tell them that -- I would ask them if they knew I

9   was working, and they would say yes.

10  Q.  What, if anything, would you discuss regarding pricing?

11  A.  Between me and Jabar or between me and the customer?

12  Q.  Let's do between you and the customer first.

13  A.  I would get like -- depending how much they would have, I

14  would have half of it.

15  Q.  Sorry, so --

16  A.  So like if they had 200, I would get 100.

17  Q.  If who had 200?

18  A.  The customer.

19  Q.  At any point did you discuss with them how much would be

20  charged for certain sex acts?

21  A.  Not in Maryland.

22  Q.  So what determined between you and the customer how much it

23  would be for what you would do?

24  A.  Me.

25  Q.  And did you tell them here's what the prices are?

C9OTGIL5                          Jasmin - direct

1    A.   Mm-hmm, yes.

2    Q.   So what prices did you tell them in Maryland?

3    A.   I told them like 70 to 80 for each thing.

4    Q.   When you say each thing --

5    A.   Oral or vaginal sex.

6    Q.   Were there different prices for oral versus vaginal sex?

7    A.   No, same price, 70 to 80.

8    Q.   This is in Maryland?

9    A.   Yes.

10   Q.   Who determined what the prices would be?

11   A.   He did, Jabar did.

12   Q.   Where did you have sex with the men that would come up in

13   their cars?

14   A.   In their car.

15   Q.   After you had sex with the men, what did you do?

16   A.   Go back, tell them to drop me off back where they found me.

17   Q.   After you were done walking the streets, where would you go

18   at night?

19   A.   To Timmy's house.

20   Q.   On average, how many men did you have sex with for money

21   while you were working for the defendant in Maryland?

22   A.   Four or five.

23   Q.   And was it four or five per night?

24   A.   Yes.

25   Q.   And on average, how much money per night would you make

1    working as a prostitute for the defendant?

2    A.   About probably 300.

3    Q.   So when you had that money, what did you do with the money

4    after you made it?

5    A.   Gave it to Jabar.

6    Q.   Did you ever ask him for money?

7    A.   No.

8    Q.   Did he ever give you any money?

9    A.   No.

10   Q.   Why didn't you ask him for any money?

11   A.   Because I was too scared.

12   Q.   Roughly how many nights would you say that you had sex with

13   men in Maryland for the defendant?

14   A.   Huh?

15   Q.   About how much nights would you say that you had sex on the

16   square for the defendant?

17   A.   Oh, almost every night.  So if there was five days, like

18   three days out of the five.

19   Q.   At this time when you ran away the first time, were you

20   having sex with the defendant?

21   A.   Yes.

22   Q.   What was your relationship with the defendant at that time?

23   A.   It was OK.

24   Q.   How did you think of him?

25   A.   I liked him.

C9OTGIL5                          Jasmin - direct

1    Q.  And how did you like him?

2    A.  As more than a friend.

3    Q.  During those several days that you had ran away, who, if

4    anyone, did you contact?

5    A.  My biological mother.

6    Q.  Where was your mother living at that time?

7    A.  California.

8    Q.  How did you contact your mother?

9    A.  I called her on Jabar's cell phone.

10   Q.  Other than calling her, did you have any other way in which

11   you contacted her?

12   A.  I texted her, too.

13   Q.  Using?

14   A.  Jabar's telephone.

15   Q.  Why did you use the defendant's phone?

16   A.  Because I didn't have one.

17   Q.  Did you give the defendant your mother's contact

18   information?

19   A.  Yes.

20   Q.  Why?

21   A.  So if she called, he would know who it was.

22   Q.  Did at any point he ask for that information?

23   A.  No.

24   Q.  Where did you put your mother's contact information?

25   A.  In his cell phone.

C9OTGIL5                         Jasmin - direct

1   Q.   What phone number did you list for your mother in the

2   defendant's cell phone?

3   A.   707-477-9249.

4            MS. GREENBERG:   Ms. Co, if you could put up what has

5   been admitted as Government Exhibit 45.   This is a contact list

6   for the defendant's cell phone.

7            Ms. Co, if you could turn to number 35.   If you could

8   zoom in.

9   Q.   Who put this in the defendant's cell phone?

10  A.   Jabar.

11  Q.   And how do you know that?

12  A.   Because I ain't do it.   Sorry, because I didn't do it.

13  Q.   Now the listing is M Jazz.   Do you know what that means?

14  A.   M is for I guess Michelle or mom, and Jazz is me, Jasmin.

15  Q.   What, if anything -- strike that.

16            What, if any, conversations did you and the defendant

17  have about your mother at this time?   This is mid November, the

18  first time you had run away.

19  A.   Money for a home.

20  Q.   Money for a home for whom?

21  A.   Me and Jabar.

22  Q.   And where were you going to get the money?

23  A.   We were going to get the money from my mom.

24  Q.   And where was this home going to be?

25  A.   In California with my mom.

C9OTGIL5                          Jasmin - direct

1    Q.  And had you talked with your mother about getting that home

2    with the defendant?

3    A.  Yes.

4    Q.  What did you tell her?

5    A.  I told her I needed $2,500 and a house, money for a house.

6    Q.  Who told you to ask -- how did you come to ask your mother

7    for that money?

8    A.  It was Jabar's idea.

9    Q.  Now you testified earlier that you had run away for a few

10   days.  This is -- again we're in mid November.  How did you get

11   back home?

12   A.  I was caught by the police.

13   Q.  Where did the police find you?

14   A.  On Jonathan Street, Hagarstown, Maryland.

15   Q.  Is Jonathan Street a part of that square?

16   A.  Yes.

17   Q.  What time of day were you caught?

18   A.  Like 12-ish, 1-ish.

19   Q.  In the morning or afternoon?

20   A.  In the afternoon.

21   Q.  And do you remember the day that you were found by police?

22   A.  A Sunday.

23   Q.  Where was the defendant at that time?

24   A.  He was going to New York to see his mom.

25   Q.  And so where did you go after the police found you?

C9OTGIL5                          Jasmin – direct

1   A.   To a foster home.

2   Q.   After you returned to your foster home, did you have any

3   other contact with the defendant?

4   A.   Yes, through phone.

5   Q.   When was the next time that you spoke to the defendant over

6   the phone?

7   A.   The next day.

8   Q.   Did the defendant have a phone number for you at the foster

9   home?

10  A.   Yes.

11  Q.   Do you know what that phone number was?

12  A.   I know it started with 301-271.

13           MS. GREENBERG:  Ms. Co, if you could please put back

14  up Government Exhibit 45.  And if you could turn to number 22.

15           THE WITNESS:  Yep, I remember.

16  Q.   Do you recognize that phone number?

17  A.   Yes.

18  Q.   What's that phone number?

19  A.   That is my foster mom's number, her land line.

20  Q.   How did -- do you know how that phone number came to be in

21  the defendant's contact list?

22  A.   He put it there.

23  Q.   And the name Jazzy?

24  A.   That's me, Jasmin.

25  Q.   And if you could look at entry --

C9OTGIL5                        Jasmin - direct

1          MS. GREENBERG:  Ms. Co, if you could turn to number

2     38.

3     Q.  Do you recognize this phone number?

4     A.  Yes.

5     Q.  What phone number is this?

6     A.  That's the phone number I -- cell phone I stole from my

7     foster sister.

8     Q.  Did you give that phone number to the defendant?

9     A.  No, I called him through it.

10    Q.  You mentioned the cell phone, did you have that cell phone

11    with you in New York?

12    A.  Yes -- no, no, I didn't, I left it in the bathroom in

13    Hagarstown.

14    Q.  So let's return now to the call that you had with the

15    defendant the day you got back from the foster home.  What did

16    you and the defendant discuss on that call?

17    A.  What to bring to New York.

18          THE COURT:  Discussed what?  I'm not hearing you.

19          THE WITNESS:  What to bring to New York.

20    Q.  What, if anything, else did you talk about regarding New

21    York?

22    A.  When to bring up situations and -- yeah.

23    Q.  At any time during that time did you talk to him about how

24    you felt about going to New York?

25          Confusing question.

C9OTGIL5                          Jasmin - direct

1    A.  Yeah.

2    Q.  Let me ask it a different way.

3            At any time during that call, did you express any

4    concerns or reservations about going to New York with him?

5    A.  Yes.

6    Q.  What did you say?

7    A.  I told him I didn't want to go.

8    Q.  How did the defendant react when you told him you didn't

9    want to go to New York with him?

10   A.  He got mad.

11   Q.  What made you think he was mad?

12   A.  He started yelling at me.

13   Q.  What was he yelling at you?

14   A.  I don't remember.

15   Q.  Just think for a moment.  You know he was yelling at you.

16   Do you remember what it was he was saying?

17   A.  No.

18   Q.  Did you and the defendant at any point during that call

19   discuss your sister?

20           MR. STEIN:  Judge, I object again to the prompting of

21   her memory.  She said she didn't remember.

22           MS. GREENBERG:  I'm asking about another topic

23   regarding the conversation.

24           MR. STEIN:  Judge, I object, that's exactly the point.

25           THE COURT:  Overruled.

C9OTGIL5                         Jasmin – direct

1          THE WITNESS:  Answer it?

2          MS. GREENBERG:  Can you read back the question,

3   please.

4          (Record read)

5   A.  Yes.

6   Q.  What did you discuss?

7   A.  He asked me what my sister looked like and if she was

8   thick, which meant that did she have a big but.  And he said if

9   I didn't want to go, then he would get my sister to go.

10  Q.  To go where?

11  A.  To New York.

12  Q.  Do you know to which of your sisters the defendant was

13  referring?

14  A.  Yes.

15  Q.  Which one?

16  A.  My little sister, Autumn.

17  Q.  How old was Autumn at the time of this call?

18  A.  Fifteen.

19  Q.  What, if anything, had you told the defendant about your

20  sister's age?

21  A.  That she was 15.

22  Q.  How did you feel when the defendant asked you those

23  questions about your sister?

24          MR. STEIN:  Objection.

25          THE COURT:  Overruled.

1   A.   Uncomfortable.

2   Q.   Did you tell the defendant that you were uncomfortable?

3   A.   Yes.

4   Q.   What happened after the defendant threatened to prostitute

5   your sister?

6   A.   I just ended up packing.

7             THE COURT:  You wanted ended up what?

8             THE WITNESS:  Nothing.

9   Q.   So after that phone call, when did you speak with the

10  defendant again?

11  A.   In November, like late November.

12  Q.   And what did you and the defendant talk about on that next

13  call?

14  A.   We talked about New York and meeting at the Hispanic bar

15  again.

16            THE COURT:  New York and what?

17            THE WITNESS:  Meeting at the Hispanic bar.

18  Q.   And other than packing, did you talk about anything else

19  regarding New York?

20  A.   No.

21  Q.   Now did there come a time when you ran away again?

22  A.   Yes.

23  Q.   When was that, roughly?

24  A.   Like the 30th of November.

25  Q.   Where did you stay when you ran away?

C9OTGIL5                    Jasmin - direct

1    A.  In Timmy's baby's mama's apartment.

2    Q.  Did you stay anywhere else during that time or was that the

3    whole time you stayed with Timmy?

4    A.  The whole time.

5    Q.  And during those few days in late November, at that time

6    were you prostituting for the defendant?

7    A.  Yes.

8    Q.  And where was that?  That was in Maryland?

9    A.  Yes.

10   Q.  Did there come a time where you went to a Motel 6?

11   A.  No.

12           What?

13   Q.  OK.  Do you know of any Motel 6's in Maryland?

14   A.  Yes.

15   Q.  Have you ever been to one?

16   A.  Yes.

17   Q.  Have you ever been to one with the defendant?

18   A.  No.

19   Q.  I will direct your attention to Wednesday, November 30th,

20   2011, the night that you left for New York.  Before you went to

21   the bus station, where did you first meet the defendant that

22   night?

23   A.  At the Hispanic bar.

24           THE COURT:  Met at the Spanish bar?

25           THE WITNESS:  Yes.

C9OTGIL5                    Jasmin – direct

1   Q.  And after you went to the Hispanic bar, where did you go

2   after that?

3   A.  To the 7-Eleven.

4   Q.  Where did you go after the 7-Eleven?

5   A.  To the bus station.  We got a ride to the bus station.

6   Q.  When you say "we," who do you mean?

7   A.  Me and Jabar.

8   Q.  And where was the bus station?

9   A.  In a Wal-Mart.

10  Q.  In what town?

11  A.  Hagarstown.

12  Q.  Now who decided what bus you would be taking?

13  A.  Jabar.

14  Q.  What time did your bus leave?

15  A.  2:15 in the morning.

16  Q.  And where was your bus going to?

17  A.  Canal Street.

18  Q.  In what state?

19  A.  New York.

20  Q.  How did you get your ticket for the bus?

21  A.  Jabar paid for it.

22  Q.  And what did you end upbringing with you to the bus

23  station, what did you pack?

24  A.  My meds, I took one day's worth of meds, and my clothes,

25  the dress and the shoes.

C9OTGIL5                          Jasmin - direct

1   Q.  Did you bring anything else with you other than clothes and

2   your medication?

3   A.  And the notebook.

4   Q.  At any point did you show what you had packed to Jabar, to

5   the defendant?

6   A.  No.

7   Q.  Did he look at any of the items that you had packed?

8   A.  No.

9   Q.  So what happened after you got the ticket?

10  A.  I gave the bus driver the money and I was about to sit down

11  after Jabar and he told me to sit near the window.

12  Q.  What, if anything, did you say to him when you were on the

13  bus?

14  A.  Me?

15  Q.  What did you say to him?

16  A.  I told him that I didn't want to go.

17  Q.  Why did you tell him you didn't want to go?

18  A.  Because I was scared.

19  Q.  What were you scared of?

20  A.  That he would hit me.

21  Q.  What did the defendant do when you told him you didn't want

22  to go to New York anymore?

23  A.  I told me he would get my sister instead.

24  Q.  Your sister instead to do what?

25  A.  To prostitute.

C9OTGIL5                          Jasmin - direct

1   Q.   Where was your sister living at that time?

2   A.   In Frederick.

3   Q.   Where is that?

4   A.   In Maryland.

5   Q.   Did the defendant know where your sister lived?

6   A.   No, I don't think so.

7   Q.   Had you talked to the defendant at all about your sister?

8   A.   Not really.

9   Q.   Did you talk to the defendant about where your sister went

10  to school?

11  A.   Yes.

12  Q.   What did you talk about regarding where your sister went to

13  school?

14  A.   I told him she went to Thomas Johnson High School.

15  Q.   Where is that?

16  A.   In Frederick.

17  Q.   Maryland?

18  A.   Yes.

19  Q.   Did you believe the defendant when he told you that he

20  would prostitute your sister if you didn't go with him to New

21  York?

22          MR. STEIN:  Objection.

23          THE COURT:  Overruled.

24  A.   Yes.

25  Q.   Why did you believe him?

C9OTGIL5                      Jasmin - direct

1    A.   Because if he could get one person, I'm sure he could get

2    some more.

3    Q.   So what happened after you told the defendant that you

4    didn't want to go to New York?  What did he do?

5    A.   He made me sit by the window.

6    Q.   What happened after you were sitting by the window?

7    A.   He put his leg up and put my leg on his.

8    Q.   Could you repeat that last part?

9    A.   He put his leg up and put my leg on his.

10   Q.   So given where his leg was and where your legs were, were

11   you able to get out?

12   A.   No.

13   Q.   What happened on the -- so did you end up going to New York

14   with him on the bus?

15   A.   Yes.

16   Q.   And what happened on that ride to New York?

17   A.   He fell asleep and I went through his phone.

18   Q.   What did you see on the defendant's phone?

19   A.   Pictures of my mom and text messages from my mom.

20   Q.   What kinds of pictures did you see, Jasmin?

21   A.   Nasty ones, pictures of my mom naked and stuff.

22   Q.   And how did you feel when you saw those?

23   A.   Horrified.

24   Q.   Now when you got to New York, did you confront the

25   defendant or did you speak with the defendant about what you

C9OTGIL5                          Jasmin - direct

1    had seen in the cell phone?

2    A.  Yes.

3    Q.  What did you say to him?

4    A.  I told him:  Why is my mom texting you and showing you

5    these nasty pictures?

6    Q.  When you looked at the text messages, what was the content

7    of the text messages that you saw between the defendant and

8    your mother?

9    A.  That he wanted my mom to be his number one girl, and yeah.

10   Q.  What does that term mean, the number one girl?

11   A.  The girl that gets most of the money and does most of the

12   work.

13   Q.  Is there a number two girl?

14   A.  Yes.

15   Q.  What does that mean?

16   A.  That means that I don't get as much as the other girl gets,

17   the first girl gets.

18   Q.  Don't get as much what?

19   A.  Everything, sex, money, all that.

20   Q.  What does it mean -- do you know what it means to be first

21   in line?

22   A.  Yes.

23   Q.  What does that mean?

24   A.  Like the go to girl or the go to guy, doesn't matter.

25   Q.  And go to how?

C9OTGIL5                         Jasmin – direct

1    A.  Like the one that you call if you need money or something.

2    Q.  Do you know what it means to run a train on someone?

3    A.  Yes.

4    Q.  What does that mean?

5    A.  It means that one person has sex with that person then

6    another person has sex with that person then another person has

7    sex with that person nonstop.

8    Q.  Do you know what does the term "daddy" mean?

9    A.  Like your pimp, yeah, or like some people call their

10   boyfriends daddy, but yeah.

11   Q.  So when you got to New York, you mentioned that you had

12   confronted the defendant with these text messages and the

13   photographs of your mother.  What did the defendant do?

14   A.  He got mad that I was going through his phone.

15             THE COURT:  He what?

16             THE WITNESS:  He got mad that I was going through his

17   phone.

18   Q.  What did he say?

19   A.  He told me not to look through his phone anymore.

20   Q.  And how did he say it?  What was his tone?

21   A.  Firm.

22   Q.  Was he speaking, was he screaming, was he yelling?

23   A.  It was just firm.

24   Q.  And this was at the subway station when you confronted him?

25   A.  Yes.

273

C9OTGIL5                       Jasmin - direct

1    Q.   Was this at the same time that he hit you as you testified

2    to earlier?

3    A.   Yes.

4    Q.   And did he hit you before or after you confronted him with

5    these text messages?

6    A.   After.

7    Q.   So where did you go from the subway station?

8    A.   To Brooklyn to meet his aunt and uncle and brother.

9    Q.   What, if anything, did you and the defendant discuss before

10   you arrived in Brooklyn?

11   A.   That I would get my ad.

12   Q.   What ad?

13   A.   My prostitution ad.

14   Q.   What did you understand your ad to be?

15   A.   Like name-wise?

16   Q.   What did you understand about what the ad was that you were

17   going to get?

18   A.   For prostitution.

19   Q.   I show you what has been marked as Government Exhibits 1

20   and 2.

21          Jasmin, looking first at Government Exhibit 1, do you

22   recognize this photograph?

23   A.   Yes.

24   Q.   Who is it a photograph of?

25   A.   His uncle, Jabar's uncle.

C9OTGIL5                       Jasmin - direct

1   Q.  Did you know him by any name?

2   A.  No.

3   Q.  Is that a fair and accurate depiction of Jabar's uncle?

4   A.  Yes.

5   Q.  Looking at Government Exhibit 2, do you recognize this

6   person?

7   A.  Yes.

8   Q.  Who is that?

9   A.  Jabar's brother.

10  Q.  Do you know his name?

11  A.  Harold.

12  Q.  Is this a fair and accurate depiction of Jabar's brother

13  Harold?

14          MS. GREENBERG:  The government offers Government

15  Exhibits 1 and 2 into evidence.

16          THE COURT:  Received.

17          (Government's Exhibits 1 and 2 received in evidence)

18          MS. GREENBERG:  Ms. Co, if could you put up Government

19  Exhibit 1 and Government Exhibit 2.

20  Q.  Just again for the jury, Jasmin, can you identify who is in

21  Exhibit 1 and who is in Exhibit 2?

22  A.  In Exhibit 1 is his uncle and in Exhibit 2 is his brother.

23  Q.  Now you talked about your advertisement, with whom did you

24  discuss your advertisement?

25  A.  With Harold.

275

C9OTGIL5                          Jasmin - direct

1    Q.  And anyone else?

2    A.  And Jabar and his uncle.

3    Q.  What did you discuss about what kind of information would

4    be on your ad?

5    A.  My contact and my name and a picture.

6    Q.  So let's walk through that step by step.  You said contact

7    information.  Whose contact information would be on the ad?

8    A.  Jabar's.

9    Q.  And what kind of contact information?

10   A.  His number.

11   Q.  Anything else?

12   A.  And his email address.

13   Q.  And in your discussions about what would be on your ad,

14   what name did you discuss putting on the ad?

15   A.  Angel Luv.

16   Q.  And did you have any discussions with Harold or the

17   defendant regarding the photograph that would be put on the ad?

18   A.  Yes.

19   Q.  What did you discuss?

20   A.  That my face wouldn't be showing.

21   Q.  Why?

22   A.  So I don't get caught.

23   Q.  And what, if anything, did you discuss about what age would

24   be listed on your ad?

25   A.  I just said that, didn't I?  Angel Luv.

C9OTGIL5                    Jasmin - direct

1    Q.  Sorry, I'm asking about age.  Did you and the defendant or

2    Harry ever discussing anything about your age in --

3    A.  18 or older.

4            MR. STEIN:  Sorry, Judge, didn't hear that.

5            THE WITNESS:  18 or older.

6    Q.  So what, if anything, did the defendant say about where

7    your ad would be posted?

8    A.  On Backpage.

9    Q.  What's Backpage?

10   A.  Really, I don't know.

11   Q.  Did you see if the page for yourself was ever posted on any

12   web site?

13   A.  No.

14   Q.  Now you testified earlier that you had packed one day's

15   worth of medication with you on the trip?

16   A.  Yes.

17   Q.  Did the defendant ever see that medication?

18   A.  No.

19   Q.  Did anyone else?

20   A.  No.

21   Q.  So where did you go after you went to Brooklyn?

22   A.  Bronx.

23   Q.  Where did you go in the Bronx?

24   A.  To Jabar's other uncle and his mom, I think.

25   Q.  Who did you meet in the Bronx?

C9OTGIL5                         Jasmin - direct

1    A.  His uncles and his mom and Lisa.

2    Q.  Who is Lisa?

3    A.  I guess a friend of theirs, family friend or someone.

4    Q.  What, if anything, did the defendant tell you before you

5    met Lisa?

6    A.  Not to tell her my age.

7    Q.  When you met Lisa, did you tell Lisa anything about

8    yourself?

9    A.  Yes.

10   Q.  What did you tell her?

11   A.  My age.

12   Q.  What age did you tell her?

13   A.  Seventeen.

14   Q.  Why did you tell her that you were 17?

15   A.  Because I didn't want her to be like concerned about why

16   are you here, you know.

17   Q.  Was the defendant there when you told Lisa that you were

18   17?

19   A.  No.

20   Q.  How did Lisa react when you told her that you were 17?

21   A.  She just said it was OK, like yeah.

22   Q.  So you mentioned that you also met in the Bronx the

23   defendant's mother?

24   A.  Yes.

25   Q.  I would like to show you what has been marked as Government

278

C9OTGIL5                          Jasmin - direct

1    Exhibit 3.

2              Do you recognize this photo?

3    A.  Yes.

4    Q.  Who is it of?

5    A.  Jabar's mother.

6    Q.  Is it a fair and accurate representation of Jabar's mother?

7    A.  Yes.

8              MS. GREENBERG:  I offer Government Exhibit 3 into

9    evidence.

10             THE COURT:  Received.

11             (Government's Exhibit 3 received in evidence)

12             MS. GREENBERG:  Ms. Co, if you could please put up the

13   photo.

14   Q.  What happened with Lisa and the defendant's mother that

15   day?

16   A.  They gave me drugs.

17   Q.  What drugs did they give you?

18   A.  Like a weed roll up and like some pills.

19   Q.  And did you take the weed roll up?

20   A.  Yes.

21   Q.  How much of it did you smoke?

22   A.  Like one drag.

23   Q.  And the pills, did you take any of those?

24   A.  No.

25   Q.  How did you feel after you took the weed roll up?

C9OTGIL5                          Jasmin - direct

1     A.   Weird.

2     Q.   Was the defendant there when this happened?

3     A.   No.

4     Q.   This is again referring to the weed and the pills.

5     A.   Yes.

6     Q.   What happened after you took these drugs?

7     A.   I fell asleep.

8     Q.   And did you wake up?

9     A.   Yes.

10    Q.   How did you wake up?

11    A.   Half naked.

12    Q.   And who was there?

13    A.   His mom and Jabar.

14    Q.   And what happened at that point?

15    A.   I don't remember.

16    Q.   Did you ask how -- why you were half naked?

17    A.   No.

18    Q.   Do you remember speaking to the defendant or the

19    defendant's mother after you woke up?

20    A.   Not that I remember.

21    Q.   Do you remember what you did next?

22    A.   No.

23    Q.   Let's go back to Lisa and the defendant's mom.  So at any

24    time that day did you go out with them?

25    A.   Oh, yes, I went to prostitute and I used the phone, our

C9OTGIL5                          Jasmin - direct

 1   phone.

 2   Q.  Where did you go to prostitute?

 3   A.  On -- near the deli place.

 4   Q.  And what time of day was this?

 5   A.  Nighttime, like morning, nighttime.

 6          THE COURT:  And where was this, in the Bronx or

 7   Brooklyn?

 8          THE WITNESS:  Yes, it's in the Bronx.

 9   Q.  I want to back up for a second.  I want to talk to you

10   about what happened that afternoon when you got to the Bronx.

11   When you got to the Bronx -- we're talking about Thursday,

12   December 1st.  When you got to the Bronx in the afternoon, you

13   met -- you testified you met Lisa and the met the defendant's

14   mom.  Did you guys go anywhere that afternoon?

15   A.  No.

16   Q.  Where did you go that afternoon?

17          MR. STEIN:  Excuse me, Judge, I thought she just said

18   they didn't go anywhere, the next question is:  Where did you

19   go?  Objection.

20   Q.  Where were you?

21          THE COURT:  Where were you?

22   Q.  Where were you that afternoon?

23   A.  We went to the hair store, and we got hair, then I came

24   back and we went across the street and got my hair done, and

25   yeah.

C9OTGIL5                    Jasmin - direct

1   Q.  At any point that day -- this is Thursday, again, Thursday

2   afternoon, at any point that day did you talk with Lisa about

3   prostitution?

4   A.  No.

5   Q.  Did you ever talk with Lisa about walking the streets?

6           MR. STEIN:  Judge, objection.  This happens where

7   Ms. Greenberg didn't like the answer so she prompts her memory.

8           THE COURT:  No, I don't think --

9           MR. STEIN:  That's what is going on, Judge.

10           MS. GREENBERG:  Your Honor, it's not, it's a very

11   basic question about walking the streets.

12   A.  No.

13   Q.  You mentioned that you made a phone call.

14   A.  Yes.

15   Q.  Tell me whose phone did you use to make a phone call that

16   Thursday.

17   A.  Jabar's mother's.

18   Q.  And was it a cell phone or a land line that you used to

19   make a call?

20   A.  Cell phone.

21   Q.  Who did you call?

22   A.  Ms. Haydee from my last placement.

23   Q.  Who is Ms. Haydee?

24   A.  She is counselor at my school.

25   Q.  And what is Ms. Haydee's cell phone number?  Would you

C9OTGIL5                        Jasmin – direct

1   recognize it if you saw it?

2   A.   I didn't call her cell phone.

3   Q.   What was the phone number that you called Ms. Haydee at?

4   A.   I called her on her office phone.

5   Q.   What's that phone number?

6   A.   240-315-0321.

7   Q.   Why did you call Ms. Haydee?

8   A.   Because I was feeling like unprotected or unsafe or

9   something.  I felt unsafe.

10              THE COURT:  Who was she?

11              THE WITNESS:  A counselor.

12              THE COURT:  In Maryland?

13              THE WITNESS:  Yes.

14              THE COURT:  OK.

15   Q.   What time do you remember on that Thursday, when did you

16   call her?

17   A.   About 4 in the morning.

18   Q.   What did you tell Ms. Haydee when you called her?

19   A.   I asked her if I was in a good part of the Bronx, and she

20   asked me:  Are you near Yankee Stadium?  I said no.  She said

21   you're fine.

22              THE COURT:  She said what?

23              THE WITNESS:  She asked if I was near Yankee Stadium,

24   and I said no, and she said you're fine.  Yeah.

25   Q.   What else did you talk about with Ms. Haydee?

C9OTGIL5                          Jasmin – direct

1   A.  Going back.

2   Q.  Going back where?

3   A.  To my placement.

4           THE COURT:  To Maryland?

5           THE WITNESS:  To Maryland, yes.

6   Q.  What did you tell her about going to your placement in

7   Maryland?

8   A.  I just told her I wanted to go back, and she told me that

9   she couldn't just leave the place and go pick me up, I have to

10  wait.

11  Q.  Did you say anything else to Ms. Haydee?

12  A.  I told her I was scared.

13  Q.  What did she say?

14  A.  She said --

15          MR. STEIN:  Objection.

16          MS. GREENBERG:  Withdrawn.

17  Q.  Did you tell her anything more about why you were scared?

18  A.  Yes.

19  Q.  What did you say?

20  A.  I said that I didn't want to be here and I wanted to go

21  home.

22  Q.  What did you do that Thursday night?

23  A.  I walked in --

24          This was the same Thursday night I called her, right?

25  Q.  Yes.

C9OTGIL5                          Jasmin - direct

```
 1   A.   I continued prostituting and I went back in the house.

 2   Q.   Do you know where you were walking that night?

 3   A.   Boston Road and something else, 165, 168, something like

 4   that.

 5   Q.   Is that in the Bronx or in Brooklyn?

 6   A.   It's in the Bronx.

 7   Q.   Where was the defendant when you were walking the streets

 8   that night?

 9   A.   I don't know.

10   Q.   Did you go to that area with the defendant?

11            MR. STEIN:  Judge, I object again.  The witness just

12   testified she didn't know where he was, now she's asking

13   another question to prompt --

14            MS. GREENBERG:  It's a different question.

15            MR. STEIN:  She's doing the same thing to prompt her,

16   Judge, I object to that.

17            THE COURT:  I really don't agree with you at all.  I

18   don't think she's putting words in the witness's mouth or

19   leading the witness.  She's conducting an interrogation under

20   the circumstances that exist.

21            Go ahead.

22            MS. GREENBERG:  Could you please read back the

23   question.

24            (Record read)

25   A.   No.
```

C9OTGIL5                     Jasmin – direct

1    Q.  How did you get there?

2    A.  Lisa.

3              THE COURT:  I'll tell you, I think we need to take our

4    lunch break now.  It's a little early, but we need to break

5    now.  And we'll resume at 2:15, please.

6              (Luncheon recess taken)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                                              2:20 p.m.

3          (Jury present)

4     JASMIN, resumed.

5     DIRECT EXAMINATION (Continued)

6     BY MS. GREENBERG:

7     Q.  Jasmin, since you met the defendant, at any time have you

8     had sex with the defendant?

9     A.  Yes.

10    Q.  Were any of those encounters against your will?

11    A.  Yes.

12    Q.  Tell me about the first time that you had sex with him

13    against your will.

14    A.  We were at a like a hotel/motel thing.

15            THE COURT:  You were at a what?

16            THE WITNESS:  A motel.

17            And he turned on some type of music and then went in

18    the shower and then he -- I was asleep, half asleep and he

19    started to have sex with me but I kept saying no.  After a

20    little while though, I didn't feel bad so --

21            THE COURT:  Keep your voice up.

22            After a little while what?

23            THE WITNESS:  I was OK, like it was consensual after

24    that.

25    Q.  After what?

C9OUGIL6                           Jasmin – direct

1    A.  After like 10 minutes.

2    Q.  Before that point, for those 10 minutes, what did you say?

3    A.  No.

4    Q.  Now, let's move on to the second encounter.  Tell me about

5    that encounter with the defendant where he had sex with you

6    against your will.

7    A.  I was drugged up, and I took some of the drugs they were

8    giving me because I had a headache.  And I woke up half naked

9    and I had later found out that he had sex with me and I was

10   like knocked out.

11   Q.  When you said that you were drugged up, what do you mean?

12   A.  Too high to function.

13   Q.  Who gave you the drugs?

14   A.  Jabar and his mom.

15   Q.  Do you know what they gave you?

16   A.  No.

17   Q.  You say you were drugged up.  Were you awake at any point

18   when he was having sex with you?

19   A.  Kind of.

20   Q.  Did he know that he was having sex with you, while he was

21   having sex with you?

22   A.  Yes.

23   Q.  Did you want him to have sex with you?

24   A.  No.

25   Q.  Did you say that?

C9OUGIL6                          Jasmin - direct

1   A.  Yes.

2   Q.  Now, I want to turn to December 1, 2011.  This is that

3   Thursday, the night when you were in New York.  Was there any

4   time that you walked the streets in New York with the

5   defendant?

6   A.  Yes.

7   Q.  When was that?

8   A.  Around 1 or 2 in the morning.

9   Q.  What did you do?

10  A.  I prostituted.

11  Q.  Where was the defendant?

12  A.  Behind me.

13  Q.  Was he within eyesight?

14  A.  Yes.

15          MR. STEIN:  Judge, I believe this we went over before

16  the lunch break.

17          MS. GREENBERG:  Your Honor, we didn't cover this.

18          MR. STEIN:  Judge, I could tell you from my notes at

19  the bench at sidebar that this was gone over.

20          MS. GREENBERG:  Your Honor, it wasn't.

21          THE COURT:  I'm sorry.  I just don't recall this

22  particular testimony.  So if it is repetition, I'm sorry.

23          I am going to overrule the objection.  There is

24  nothing wrong with the questioning.

25  Q.  My last question was, was he in your eyesight when you were

C9OUGIL6                          Jasmin – direct

1   walking on the streets in New York?

2   A.  Yes.

3   Q.  And what did you do with the money that you made that

4   night?

5   A.  I gave it to Jabar.

6   Q.  Did he pay you anything with that money?

7   A.  No.

8   Q.  Now, do you recall photos that you testified to earlier

9   that were going to be taken for your ad?

10  A.  Yes.

11  Q.  And you mentioned and you testified earlier that your face

12  wouldn't be on the photo?

13  A.  Yes.

14  Q.  I would like to show you what's been admitted into evidence

15  as Grand Jury Exhibits 40, 41, 42 --

16          MR. STEIN:  Grand jury exhibits?

17          MS. GREENBERG:  I apologize, your Honor, government

18  Exhibits.

19  Q.  -- Government Exhibits 40 through 43.

20          MS. GREENBERG:  Ms. Co, if you could put Government

21  Exhibit 40 up.

22  Q.  Do you recognize this photo?

23  A.  Yes.

24  Q.  What is it?

25  A.  It's me.

C9OUGIL6                         Jasmin - direct

1    Q.  How do you know that it's you?

2    A.  Because I have those items, the dress and the stockings.

3    Q.  Who took this photo?

4    A.  Jabar.

5    Q.  What did he use to take the photo?

6    A.  His phone.

7    Q.  What if anything did the defendant say to you when these

8    photos were being taken?

9    A.  He told me that they were supposed to be for my ad.

10   Q.  Turn to Government Exhibit 41.  What is this photo?

11   A.  Me.

12   Q.  And was this taken at the same time?

13   A.  Yes.

14   Q.  When were these photos taken?

15   A.  On December 1st.

16   Q.  Let me ask this differently.

17          You testified earlier about walking the streets.  Were

18   these photos taken before or after that?

19   A.  Before.

20   Q.  Before you walked the streets that night?

21   A.  Yes.

22          MS. GREENBERG:  Let's turn to Government Exhibit 42.

23   Q.  What is this photo?

24   A.  Me.

25   Q.  And were these taken at the same time?

C9OUGIL6                          Jasmin - direct

1   A.  Yes.

2            MS. GREENBERG:  Let's turn to the next photo.

3   Q.  What is this photo?

4   A.  Me.

5   Q.  And for all of these photos that you have seen, 40 through

6   43, who took these photos?

7   A.  Jabar.

8            MS. GREENBERG:  You can take that down, Ms. Co.

9   Q.  Did there come a time when you saw clients in Lisa's

10  apartment?

11  A.  Yes.

12  Q.  How many men did you see there?

13  A.  About four.

14  Q.  Where in the apartment did you see clients?

15  A.  In the living room area and bedroom.

16  Q.  When you were in the bedroom area seeing clients, where was

17  the defendant?

18  A.  He was in the living room.

19  Q.  And where is the living room in proximity to the bedroom?

20  A.  Right outside the bedroom door.

21  Q.  What did you do with the money that you made?

22  A.  I gave it to Jabar.

23  Q.  And what did the defendant do with the money?

24  A.  I have no idea.

25  Q.  Did he give any of it to you?

1            MR. STEIN:  Objection.

2            THE COURT:  Overruled.

3            MR. STEIN:  Judge, this is what happened this morning.

4    She said, I have no idea, and then she asks a leading question

5    to prompt her.

6            MS. GREENBERG:  Your Honor, these speaking objections

7    are getting ridiculous at this point.  This is new material.

8            THE COURT:  I disagree with the objection.

9            The objection is overruled.

10           Go ahead.

11           MS. GREENBERG:  Would you please repeat the question?

12           (Record read)

13           THE WITNESS:  No.

14   BY MS. GREENBERG:

15   Q.  Did there come a time when you called your mom from the

16   defendant's mother's land line?

17   A.  Yes.

18   Q.  Why did you call your mom?

19   A.  To ask her if she heard anything about the money that she

20   was supposed to give to us.

21           THE COURT:  To ask her what?

22           THE WITNESS:  If she had gotten any of the money that

23   she was supposed to give to us.

24   Q.  At any time when you were working for the defendant as a

25   prostitute, did he call you any names?

C9OUGIL6                          Jasmin - direct

1   A.  Yes.

2   Q.  What did he call you?

3   A.  A bitch.

4   Q.  Any other names?

5   A.  And sometimes he would call me a ho.

6   Q.  You testified earlier to the time when you were drugged up,

7   just to be clear, who was it that gave you those drugs?

8   A.  Jabar and his mother.

9   Q.  You testified earlier today that you are now living at a

10  residential treatment center?

11  A.  Yes.

12  Q.  Since your return to the residential treatment center in

13  Maryland have you worked as a prostitute?

14  A.  No.

15  Q.  Have you been attending classes?

16  A.  Yes.

17  Q.  What kind of grades are you getting?

18  A.  A's --

19          MR. STEIN:  Objection.

20          THE COURT:  Overruled.

21  A.  A's and B's.

22  Q.  Are you on track to graduate from high school on time?

23  A.  Yes.

24          MS. GREENBERG:  No further questions.

25          THE COURT:  Cross-examination.

C9OUGIL6                    Jasmin - direct

1    CROSS-EXAMINATION

2    BY MR. STEIN:

3    Q.  Jasmin, you know that I am Jabar Gilliam's lawyer, correct?

4    A.  Yes.

5    Q.  And we have never met before, correct?

6    A.  Yes.

7    Q.  Before today, you've met often with the prosecutors or

8    Brian Conolly, correct?

9             MS. GREENBERG:  Objection.

10            THE COURT:  Overruled.

11   A.  Yes.

12   Q.  And about how many times do you estimate before today have

13   you met with them?

14   A.  About four times.

15   Q.  Have you talked to them as well on the telephone?

16   A.  Yes.

17   Q.  About how many times can you estimate you have talked to

18   them on the telephone?

19   A.  Once a week.

20   Q.  Since December?

21   A.  Yes.

22   Q.  When you met with them in person, was that here in New York

23   or in Maryland?

24   A.  In Maryland.

25   Q.  You have never met with them here in New York?

C9OUGIL6                         Jasmin - cross

1    A.  I have in New York too.

2    Q.  So is it still your testimony that you met with them in

3    person four times altogether, New York and Maryland?

4    A.  Yes.

5    Q.  Or was it more?

6    A.  Four times.

7    Q.  About four times?

8    A.  Yes.

9    Q.  Can you estimate on each time that you met with them in

10   person, about how many hours you spent with them?

11   A.  About seven.

12   Q.  Each time seven hours?

13   A.  Yes.

14   Q.  So, roughly, 30 hours -- four times seven?

15   A.  Yes.

16   Q.  And during that time, they would go over with you a lot of

17   questions that they proposed to ask you as they did during your

18   testimony here today, correct?

19   A.  Yes.

20   Q.  And did they also suggest to you possible questions that I

21   may be asking you?

22   A.  Yes.

23   Q.  So would it be fair to say that they rehearsed your

24   testimony a number of times?

25           MS. GREENBERG:  Objection.

1           THE COURT:  Well, the word "rehearsed" --

2           MR. STEIN:  Strike the word "rehearsed," prepared.

3   Q.  Would it be fair to say that in discussing your testimony

4   about with you, about 28 hours or more, that they were

5   preparing you to testify, correct?

6   A.  Yes.

7   Q.  And when you had these meetings with them in person, were

8   both Ms. Lamarque present, Ms. Greenberg and Brian Conolly?

9   A.  Yes.

10  Q.  And was anybody else present from the government, other

11  prosecutors?

12  A.  No.

13  Q.  So it was basically the three of them?

14  A.  Yes.

15  Q.  Now, would it be fair to say that a number of times in

16  connection with this case you lied?

17  A.  No.

18  Q.  It would not be fair to say that?

19  A.  No.

20  Q.  Well, did you lie a number of times at the hospital?

21  A.  Yes.

22  Q.  Did you lie a number of times when you met with the

23  prosecutors during these 28 to 30 hours?

24  A.  No.

25  Q.  You never lied?

C9OUGIL6                                    Jasmin - cross

1    A.  No.

2    Q.  During your testimony today, did you lie at all?

3    A.  No.

4    Q.  So when you were asked by Ms. Greenberg earlier today

5    whether you had stayed at a hotel with Mr. Gilliam and you said

6    you had not, was that a lie?

7             MS. GREENBERG:  Objection.  Mischaracterizing my

8    question.

9             THE COURT:  What is the question again?

10            MR. STEIN:  I said, when you had testified earlier

11   today, that she had not stayed at a hotel with Mr. Jabar, was

12   that a lie.

13            MS. GREENBERG:  I don't believe that was the exact

14   question.

15            THE COURT:  I don't remember.

16            MR. STEIN:  She was asked some questions earlier today

17   about Ms. Greenberg about a Motel 8.

18            THE COURT:  That's right.

19            MS. GREENBERG:  Motel 6.

20            THE COURT:  OK.  What's your question?

21   Q.  When you answered those questions earlier today by Ms.

22   Greenberg, was that the truth?

23   A.  I was just very nervous.

24   Q.  I understand you are nervous, but I am just asking you if

25   that was the truth?

C9OUGIL6                          Jasmin - cross

1    A.  No.

2    Q.  So you lied during your testimony earlier today?

3    A.  Yes.

4    Q.  And when you testified that you had your notebook that you

5    have read pages from with you in December of 2011 when all of

6    this happened, was that a lie?

7    A.  No.

8    Q.  So it is your testimony that when you were at the building

9    where Mr. Gilliam was arrested and you were present and you saw

10   the police there, it is your testimony that you had that

11   notebook with you?

12   A.  Yes.

13   Q.  And did you tell any law enforcement agent about the

14   notebook that you had with you at that time?

15   A.  Yes.

16   Q.  Where was it?

17   A.  It was in my book bag.

18   Q.  Isn't it a fact, Jasmin, that sometime in March of 2012,

19   you told the government, Brian Conolly or some law enforcement

20   agent for the first time that you had the notebook -- March of

21   2012?

22   A.  No.  That is when I gave it up.

23   Q.  But it is your testimony that in your belongings, when

24   Mr. Gilliam was arrested, the notebook was with you?

25   A.  Yes.

C9OUGIL6                          Jasmin - cross

1   Q.  Where was it?

2   A.  It was in my book bag.

3   Q.  Was it pink?

4   A.  Yes.

5           MR. STEIN:  I don't know what the exhibit number is.

6           MS. GREENBERG:  Your Honor, I just want to clarify for

7   the record what the last answer was referring to when she said

8   it was pink, whether she was being asked about the backpack or

9   the notebook.

10          MR. STEIN:  The book bag, the backpack.

11          THE COURT:  I thought it was about the book.  You are

12  asking about --

13          MR. STEIN:  Where was the notebook?

14          THE COURT:  You are asking about the pink backpack?

15          MS. GREENBERG:  Her response to the last question was,

16  it was pink, and it wasn't clear whether she was asked about

17  the notebook being pink or the backpack being pink.

18          MR. STEIN:  The backpack.

19          THE COURT:  The backpack was pink, is that right?

20          THE WITNESS:  Yes.

21          THE COURT:  OK.  We have that major problem cleared

22  up.

23          MR. STEIN:  Yes.

24  Q.  And it is your testimony, when Mr. Gilliam was arrested on

25  December 2, that the notebook was in the pink backpack?

C9OUGIL6                         Jasmin - cross

1    A.  Yes.

2              MR. STEIN:  Could I have a moment, Judge?

3              (Discussion off the record between counsel)

4              MR. STEIN:  Could you put up, Ms. Co, Government

5    Exhibits 31 through 35, please.

6    Q.  What is that?

7    A.  My book bag.

8              MR. STEIN:  The next one, please.

9    Q.  Do you see the notebook in the contents of that -- those

10   are the contents of your pink backpack, correct?

11   A.  It was in the black bag.

12   Q.  I am just asking you if you see the notebook?

13   A.  No.

14             MR. STEIN:  Let's go to the next one.

15   Q.  That's also the contents of your backpack, correct?

16   A.  Correct.

17   Q.  Do you see the notebook there?

18   A.  No.

19   Q.  A notebook, I should say?

20   A.  No.

21             MR. STEIN:  Let's go to the next one.

22   Q.  That's also the contents of your backpack?

23   A.  Yes.

24   Q.  Do you see the notebook there?

25   A.  No.

C9OUGIL6                        Jasmin - cross

1           MR. STEIN:  And 35, please.

2  Q.  And that's also the contents of your backpack?

3  A.  Yes.

4  Q.  And do you see the notebook there?

5  A.  No.

6           MR. STEIN:  Thank you.

7           THE COURT:  Where was the notebook?

8           THE WITNESS:  I gave it away to Mr. Brian.  It was a

9  black, like, this handover back, right there with the stuff in

10  it, it was in there.

11           THE COURT:  Was it inside something?

12           THE WITNESS:  It was inside the black little thing

13  here.

14           THE COURT:  Do you want at the left or right or what?

15           THE WITNESS:  Left.

16           MS. GREENBERG:  Your Honor, let the record reflect

17  that the witness was pointing to the black bag on the bottom

18  lefthand corner of Government Exhibit 35.

19  BY MR. STEIN:

20  Q.  Do you see that there is a bag in the lower lefthand

21  corner?

22  A.  Yes.

23  Q.  Can you see that the bag appears to be open in that

24  photograph?

25  A.  Yes.

C9OUGIL6                          Jasmin - cross

1   Q.  And I think Ms. Co has just enlarged it for us.  Can you

2   see the notebook anywhere among the contents of that black bag

3   that was in the lower lefthand corner?

4   A.  There were a lot of pockets in that bag, so no.

5   Q.  I'm just asking if you see the notebook among the contents

6   of the open black bag in the lower lefthand corner of the

7   photograph?

8   A.  No.

9            THE COURT:  Why don't you let her testify.  We spent a

10  lot of time on photographs.  Where was the book?

11           THE WITNESS:  It was in this black bag right here.

12  Q.  Now, you didn't give it to a law enforcement agent until

13  several months or so later?

14  A.  Yes, because Mr. Brian told me he was going to send an

15  agent to my facility to come and pick it up.

16  Q.  So you had it in your possession from sometime in December

17  or November up --

18  A.  Yes.

19  Q.  -- until several months into 2012, correct?

20  A.  Yes.

21  Q.  You had a relationship with your mother that you told us

22  about, correct?

23  A.  Yes.

24  Q.  And her first name is Michelle, correct?

25  A.  Yes.

C9OUGIL6                         Jasmin - cross

1    Q.  Michelle --

2    A.  Reischenbock.

3    Q.  Approximately how long ago was it that you last saw her?

4    A.  June, mid June.

5    Q.  June of this year?

6    A.  Yes.

7    Q.  Before December of 2011, when was the last time you saw

8    her?  Was it about 10 years?

9    A.  Yeah.

10   Q.  And you told us that your father was deceased, correct?

11   A.  Yes.

12   Q.  So you wanted very badly to see your mother, correct?

13   A.  Yes.

14   Q.  And you wanted to reunite with her even though you told us

15   she had a lot of problems, correct?

16   A.  Yes.

17   Q.  After all, she was your mother, correct?

18   A.  Yes.

19   Q.  You believed when you were going to travel with Mr. Gilliam

20   to New York from Maryland that you hoped to reunite with your

21   mother there, correct?

22   A.  Yes.

23   Q.  You actually had some discussions about reuniting with her

24   in New York, right?

25   A.  Yes.

C9OUGIL6                        Jasmin - cross

1   Q.  And that's what you hoped and believed was going to happen

2   when you came to New York, correct?

3   A.  Kind of.

4   Q.  Now, you testified a lot about the sexual activity that you

5   had with various people, correct?

6   A.  Yes.

7   Q.  During that time that you had vaginal sex with anybody, did

8   the man use a condom?

9   A.  Yes.

10  Q.  Always?

11  A.  Always.

12  Q.  It was never protection free, I guess you would call it?

13  A.  No.

14  Q.  Do you have an allergy?

15  A.  Yes.

16  Q.  And do you have an allergy to latex?

17  A.  Yes.

18  Q.  As a matter of fact, isn't it correct that after you were

19  at the shelter for one night or so and you went AWOL with the

20  two girls, one of whom was Ashley --

21  A.  Yes.

22  Q.  -- had sex with a number of individuals at Jay's apartment?

23  A.  Yes.

24  Q.  You had an allergic reaction, correct?

25  A.  Yes.

C9OUGIL6                          Jasmin - cross

1   Q.  As a matter of fact, it was a federal agent who gave you an

2   antihistamine called Benadryl to counteract the allergic

3   reaction, correct?

4   A.  Yes.

5   Q.  The allergic reaction you had to the latex in the condoms

6   or what?

7   A.  The latex.

8   Q.  What physically did you experience by way of an allergic

9   reaction from the latex in the condoms?

10  A.  I had bumps.

11  Q.  Where were the bumps?

12  A.  Like near my thigh area.  It was like a rash.

13  Q.  Like a rash?

14  A.  Yes.

15  Q.  OK.  You testified that among the clothing that you were

16  wearing were some, I think, you said, they are heels?

17  A.  Yes.

18  Q.  And these are high heels?

19  A.  High heels.

20  Q.  Were you wearing the high heels when Mr. Gilliam was

21  arrested and you were with him?

22  A.  Yes.

23  Q.  When were these shoes purchased?

24  A.  Like a couple of months before I came to New York.

25  Q.  A couple of months?

C9OUGIL6                         Jasmin — cross

1    A.  Yes.

2    Q.  So could you estimate what month?  We are talking about,

3    September, October.  You came on November 30.

4    A.  October maybe.

5    Q.  Did you purchase the shoes yourself?

6    A.  I had help, yes.

7    Q.  Excuse me?

8    A.  I had help.

9    Q.  You had help, meaning someone went with you to purchase or

10   someone gave you the money?

11   A.  Both.

12   Q.  Who went with you to purchase the shoes?

13   A.  Jabar did.

14   Q.  Did he use a credit card or did he pay cash?

15   A.  Cash.

16   Q.  When you came to New York, did you purchase another pair of

17   shoes?

18   A.  No.

19   Q.  Well, were another pair of shoes purchased for you?

20   A.  No.

21   Q.  Well, you said you at some point met a woman whose name was

22   Lisa, correct?

23   A.  Yes.

24   Q.  At some point did Lisa purchase a pair of shoes for you?

25   A.  No.  We were going to but we never did.

C9OUGIL6                          Jasmin - cross

1   Q.  You said you spoke with members of the government, the

2   prosecutors and Brian Conolly on a number of times, correct?

3   A.  Yes.

4   Q.  Was one of the occasions that you spoke with them on the

5   date that Mr. Gilliam was arrested which would be December 2,

6   2011?

7   A.  Yes.

8   Q.  Do you remember talking about shoes on that occasion?

9   A.  No.

10  Q.  Well, do you remember telling members of the government,

11  including Brian Conolly, that Lisa had brought you a pair of

12  shoes?

13          MS. GREENBERG:  Objection.

14  Q.  The question is, did you tell members of the government,

15  including FBI Agent Brian Conolly that the woman whose name you

16  learned was Lisa bought you a pair of shoes?

17  A.  No.

18          MR. STEIN:  May I approach the witness, your Honor,

19  with Government Exhibit 3503-14?  Judge, may I approach the

20  witness?

21          THE COURT:  Sure.

22          MS. GREENBERG:  Your Honor, this seems inappropriate.

23  The witness has already said she doesn't recall saying this.

24          MR. STEIN:  That is exactly why it is appropriate.

25          THE COURT:  The objection is overruled.

C9OUGIL6                              Jasmin - cross

1   BY MR. STEIN:

2   Q.  I am going to show you this report.  It is dated December

3   2.  I am going to point to you right here.  Do you see that

4   sentence?

5   A.  She didn't buy me a pair of shoes.

6   Q.  The question is, did you tell Brian Conolly on December 2,

7   2011 that Lisa bought you a pair of shoes?

8   A.  I don't remember.

9   Q.  You don't remember saying that or you don't remember that

10  it happened?

11  A.  I don't remember saying that.

12  Q.  Now, you have testified about some photographs that were

13  taken of you by Mr. Gilliam --

14  A.  Yes.

15  Q.  -- with his phone and you identified some of them today,

16  this afternoon, correct?

17  A.  Yes.

18  Q.  There came a time where you went to Brooklyn, correct?

19  A.  Yes.

20  Q.  And you met Mr. Gilliam's brother Harold or Harry, correct?

21  A.  Yes.

22  Q.  By the way, how did you get to Brooklyn?

23  A.  Train.

24  Q.  Subway?

25  A.  Subway, yeah.

C9OUGIL6                         Jasmin - cross

1    Q.  When did you go to Brooklyn to see Mr. Gilliam's brother

2    Harry or Harold?

3    A.  On the 1st, December 1st.

4    Q.  To put this in time context, you traveled to New York on

5    the early morning hours of November 30th, going into December

6    1st, correct?

7    A.  Yes.

8    Q.  And you arrived at Canal Street, correct?

9    A.  Yes.

10   Q.  And from Canal Street where the bus left you off, you went

11   up to the Bronx, correct?

12   A.  Yes.

13   Q.  How did you get to the Bronx?

14            MS. GREENBERG:  Objection.  I think that is

15   mischaracterizing.  I thought we were talking about Brooklyn.

16   Q.  You went from Canal Street to the Bronx?

17   A.  No.  I went to Brooklyn.

18   Q.  You went to Brooklyn from Canal Street?

19   A.  Yes.

20   Q.  You are sure of that?

21   A.  Yes.

22   Q.  You didn't go to the Bronx first?

23   A.  No.

24   Q.  So you got to Canal Street and there came a time you went

25   to Brooklyn?

C9OUGIL6                          Jasmin - cross

1   A.  Yes.

2   Q.  How did you know it was Brooklyn?

3   A.  Because that's where he said we were going.

4   Q.  "He" meaning Mr. Gilliam?

5   A.  Yes.

6   Q.  And you traveled there by subway?

7   A.  Yes.

8   Q.  The two of you?

9   A.  Yes.

10  Q.  Mr. Gilliam didn't jump over the turnstile, did he?

11  A.  No.

12  Q.  And neither did you, correct?

13  A.  No.

14  Q.  So someone swiped a MetroCard?

15  A.  Yes.

16  Q.  To go through the turnstile, correct?

17  A.  Yes.

18  Q.  And who used the subway card, you or Mr. Gilliam?

19  A.  Mr. Gilliam.

20  Q.  Did he use one subway card for the both of you or what?

21  A.  I don't remember.

22  Q.  But in any event, you went to Brooklyn?

23  A.  Yes.

24  Q.  On the subway, Mr. Gilliam used one or more subway cards in

25  order to enter the subway system, correct?

C9OUGIL6                         Jasmin - cross

1   A.  Yes.

2   Q.  Do you remember about how long it took you to get to

3   Brooklyn on the train?

4   A.  About 30 minutes -- no, not even that.  It was like 15.

5   Q.  So, as I understand what you told us, the first thing you

6   did after arriving in New York City by bus from Maryland was to

7   go on the subway to Brooklyn, correct?

8   A.  Yes.

9   Q.  And how long you went to Harold Gilliam or Harry Gilliam's

10  apartment?

11  A.  Yes.

12  Q.  Who was there?

13  A.  His uncle and his aunt and his brother.

14  Q.  Other than the brother, do you remember the names of any of

15  the two people?

16  A.  No.

17  Q.  Did you have sexual relations with anyone while you were

18  there?

19  A.  No.

20  Q.  You did not?

21  A.  No.

22  Q.  So you didn't have sex with Jabar Gilliam's brother Harry?

23  A.  No.

24  Q.  Nor with the aunt and uncle that you said were there,

25  correct?

C9OUGIL6                          Jasmin - cross

1    A.  Yes.

2    Q.  Now, was it at this apartment where the photographs were

3    taken on Mr. Gilliam's cell phone?

4    A.  Yes.

5    Q.  They were taken previously?

6    A.  Yes.

7              MS. GREENBERG:  Objection.

8    A.  No, after.

9    Q.  When were the photographs taken?

10   A.  They were taken at Lisa's apartment.

11   Q.  So that was after you went to Harry's apartment in

12   Brooklyn?

13   A.  Yes.

14   Q.  While you were at Harry's apartment, about how long were

15   you there?

16   A.  About 10 minutes.

17   Q.  You saw Mr. Gilliam's brother Harry at a computer, correct?

18   A.  Yes.

19   Q.  And did you see Harry Gilliam entering certain information

20   relating to you on his computer?

21   A.  No.

22   Q.  You did not see him doing that?

23   A.  No.

24   Q.  So did you see Mr. Gilliam's brother Harry create an

25   advertisement on the screen of his computer?

1  A.  No.

2  Q.  You did not see -- not only did you not see Harry Gilliam

3  create an advertisement on his computer, you didn't see him

4  post the advertisement on a web page, correct?

5  A.  No.

6  Q.  Did you ever tell the members of the government, the

7  prosecutors and Brian Conolly that you observed Harold, meaning

8  Harold Gilliam, create and post an advertisement using his

9  laptop?

10  A.  What I had said was --

11  Q.  I'm just asking you if you could tell us first --

12          MS. GREENBERG:  Your Honor, she is trying to explain

13  what she said.

14          THE COURT:  She really is, and you are interrupting

15  her.  Just let her finish her answers.

16          MS. GREENBERG:  Thank you.

17  A.  What I said was that I didn't see him put anything down,

18  but I know that they were making one for me.

19  Q.  Do you know what the word "observe" means?

20  A.  Yes.  See.

21  Q.  What you saw, correct?

22  A.  Yes.

23  Q.  So it is your testimony that you never told Brian Conolly

24  or members of the government that you saw or observed Harold

25  create and post an advertisement using his, Harold's laptop?

C9OUGIL6                          Jasmin - cross

1    A.   No.

2              MR. STEIN:   May I approach the witness again with

3    3503-14?

4    Q.   Before I do that, you told us earlier today that you had

5    some discussions about creating an advertisement and the

6    advertisement was going to be under the name Angel Luv,

7    correct?

8    A.   Yes.

9    Q.   And that was a reference to you, correct?

10   A.   Yes.

11   Q.   And it was also going to be a telephone number, correct?

12   A.   Yes.

13   Q.   And the telephone number was an area code 301 which was

14   Mr. Gilliam's phone number, correct?

15   A.   Yes.

16             MR. STEIN:   May I approach now, 3503-14?

17             THE COURT:   Yes.

18   Q.   Could you just look where my thumb is, same report I showed

19   you before but a different part of it starting where it says

20   "Harold Gilliam"?  Could you just read that to yourself.  Did

21   you see that?

22   A.   Yeah.

23   Q.   Having looked at this document, does that make you change

24   your testimony at all as to whether or not you told Agent

25   Conolly and members of the government that you had observed

1    Harold create and post an advertisement under the name Angel

2    Luv with Mr. Gilliam's phone number on Harold Gilliam's laptop?

3    A.  I must gotten my words confused because I did not mean to

4    say observed.

5    Q.  You will acknowledge that that's what the report says,

6    right?

7    A.  Yes.

8    Q.  Now, besides Brooklyn, you have testified about three

9    different location in the Bronx, correct, besides the streets

10   themselves?

11   A.  I think I only said two.

12   Q.  Fair enough.

13          Did there come a time during the period that you were

14   in New York that you went to three different locations in the

15   Bronx?

16   A.  No.

17   Q.  Well, one was the location -- did you go to the location at

18   some point where Mr. Gilliam was arrested?

19   A.  Yes.

20   Q.  Was that the first time that you were there or was there

21   more than once?

22   A.  That was more than once.

23   Q.  How many times did you go there during the two days or so

24   that you were here?

25   A.  Two times.

C9OUGIL6                          Jasmin - cross

1   Q.  So the second time was when Mr. Gilliam got arrested and

2   you were with him?

3   A.  Yes.

4   Q.  When was the other time?

5   A.  When we were -- when we were coming from Brooklyn, we went

6   straight to her house.

7   Q.  What you say "her," who is her?

8   A.  Lisa.

9   Q.  Did you have sexual relations with anybody while you were

10  there?

11  A.  Yes.

12  Q.  The first time?

13  A.  No.  The first time, no.

14  Q.  You did not?

15  A.  No.

16  Q.  So it is your testimony that you had no sexual relations

17  with anybody when you went to Lisa's apartment the first time?

18  A.  I had sex with Jabar.

19  Q.  Well, that's somebody, right?

20  A.  Yeah.

21  Q.  Where did you have sex with him?

22  A.  In the couch area, the living room area.

23  Q.  You had sex with him on the couch?

24  A.  Yes.

25  Q.  And this was vaginal sex, correct?

317

1    A.  Yes.

2    Q.  Did Mr. Gilliam wear a condom?

3    A.  I don't remember.

4    Q.  Well, you testified before when I asked you, when you had

5    sexual relations with anyone in the context that you were

6    testifying about, whether that male always used a condom.

7            MS. GREENBERG:  Objection.  That wasn't the prior

8    testimony.  He is mischaracterizing it.  She was being asked

9    the question in the context of prostitution.

10           THE WITNESS:  Yes.

11   Q.  Did Mr. Gilliam wear a condom when you say he had sexual

12   relations with you in Lisa's apartment?

13   A.  I don't know.

14           MS. GREENBERG:  Objection.  Asked and answered.

15           THE COURT:  Please.

16           Go ahead.

17   A.  I don't know.

18   Q.  So while you were at Lisa's apartment, it is your testimony

19   that the only person that you had sexual relations with was

20   Jabar Gilliam?

21   A.  No.

22   Q.  Who else did you have sexual relations with at that

23   apartment, Lisa's apartment?

24   A.  You asked me the first time, so that's what I am talking

25   about the first time, right.

C9OUGIL6                          Jasmin - cross

 1   Q.  I'm sorry, your voice --

 2   A.  The first time, the only person I had sex with was Jabar,

 3   but the second time I had sex with more people.

 4               THE COURT:  With what?

 5               MR. STEIN:  With "more people," I think she said,

 6   Judge.

 7               THE WITNESS:  Yes.

 8               THE COURT:  Did you name somebody?

 9               THE WITNESS:  No.  She just said with more people, I

10   believe.

11               THE COURT:  I didn't hear.

12   Q.  Which day was that, the first or the second when you had

13   sexual relations with more people?

14   A.  It was the second day, but the morning time.

15   Q.  Again, that was at the apartment where Mr. Gilliam was

16   arrested and you were with him?

17   A.  Yes.

18   Q.  How many people did you have sex with in that apartment on

19   that occasion?

20   A.  Four or five.

21   Q.  And these were customers or johns?

22   A.  Yes.

23   Q.  And did each of them wear a condom?

24   A.  Yes.

25   Q.  This was within what period of time did you have sex with

C9OUGIL6                          Jasmin - cross

1    four people?

2    A.  From probably 10 o'clock to 1 o'clock, probably.

3    Q.  So from about 10 a.m. to approximately 1 p.m.?

4    A.  Yes.

5    Q.  Were you paid?  Were you given money on each those

6    occasions?

7    A.  I wasn't given any of the money.

8    Q.  Did you see Mr. Gilliam be given money?

9    A.  Yes.  I saw him get money from one person.

10   Q.  So the other three men who you had sex with, you didn't see

11   money being transferred?

12   A.  No.

13   Q.  Do you know how much money was given to Mr. Gilliam?

14   A.  No.

15   Q.  Did you have some understanding as to how much money you

16   were supposed to have each time you had sex with somebody?

17   A.  I was supposed to get $100 for vaginal sex and 150 for oral

18   sex.

19   Q.  And the one person that you saw give money to Mr. Gilliam

20   that was after what kind of sex?

21   A.  Vaginal.

22   Q.  And what did you see Mr. Gilliam do with the money when you

23   say you saw it handed to him?

24   A.  He put it in his pocket.

25   Q.  His pants pocket?

C9OUGIL6                         Jasmin - cross

1   A.  His pants pocket.

2   Q.  His --

3   A.  -- his back pocket.

4   Q.  Was it just money that was folded up --

5   A.  Yes, just folded up.

6   Q.  -- or put into a wallet?

7   A.  It was folded up.

8   Q.  Do you know whether it was a $100 bill or 20s or what?

9   A.  I have no idea.

10  Q.  Were you able to see that there were multiple bills?

11  A.  No.

12  Q.  The other three times that you had sex with someone, you

13  didn't see money being transferred, correct?

14  A.  No.

15  Q.  This was on the 1st, correct?

16  A.  Yes.

17  Q.  And this was in the bedroom, right?

18  A.  No.  This is the second.

19  Q.  Whatever day it was, this was the sex took place --

20  A.  -- in the morning, yes.

21  Q.  Did you see what each man did with the used condom after he

22  had sex with you?

23  A.  Yes.

24  Q.  What did each man do with it?

25  A.  Threw it away.

C9OUGIL6                          Jasmin — cross

1  Q.  Where?

2  A.  In the trash can.

3  Q.  Where was the trash can?

4  A.  Outside the area in the kitchen.  There's a bedroom area,

5  then there is a kitchen over here.

6  Q.  So you saw each of the man throw a used condom into a

7  garbage pail that was somewhere in the apartment, correct?

8  A.  Yes.

9  Q.  And this was on which day?

10  A.  The second.

11  Q.  And in the morning?

12  A.  Yes.

13  Q.  When you had sex with each of these four men in the

14  bedroom, was it on a bed?

15  A.  Yes.

16  Q.  Underneath you or the man was there a blanket, a sheet, a

17  bed cover, a blanket or what?

18  A.  No.

19  Q.  What was there?

20  A.  Just the mattress.

21  Q.  So it was a bare mattress?

22  A.  Yes.

23  Q.  Other than those four occasions where you had sex with four

24  men and having sex with Mr. Gilliam, did you have sexual

25  relations with anybody else in that particular apartment?

1  A.  No.

2  Q.  Do you remember the address of the apartment?

3  A.  No.

4  Q.  So if you heard the address would that help you remember?

5  A.  Yes.

6  Q.  747 East 168th Street?

7  A.  Yes.

8  Q.  When you were going back to that apartment, when

9  Mr. Gilliam was arrested in the hallway and you were with him,

10  were you going back to that apartment to have sex with somebody

11  else?

12  A.  Yes.

13  Q.  Who were you going to have sex with then?

14  A.  One of Lisa's friends.

15  Q.  And do you know that person's name?

16  A.  No.  I just know he was wearing an orange shirt.

17  Q.  If you heard a name, would that help you remember?

18  A.  I didn't really hear a name.

19  Q.  If I told you a name, it wouldn't help you remember?

20  A.  No.

21  Q.  Now, at some point you went to Mr. Gilliam's mother's

22  apartment, correct?

23  A.  Yes.

24  Q.  And that's where you say you used the phone, correct?

25  A.  Yes.

C9OUGIL6                         Jasmin - cross

1    Q.  Did you have sexual relations with anybody in that

2    apartment?

3    A.  No.

4    Q.  You did not?

5    A.  No.

6    Q.  There came a time where after Mr. Gilliam had been arrested

7    that you went to a shelter, correct?

8    A.  Yes.

9    Q.  You absconded or went AWOL from the shelter with two girls,

10   one of whom was Ashley, correct?

11   A.  Yes.

12   Q.  At that point, as far as you knew, Mr. Gilliam was under

13   arrest, correct?

14   A.  Yes.

15   Q.  As far as you know, he was in custody, correct?

16   A.  Yes.

17   Q.  You went to this apartment -- how did you get there?

18   A.  We jumped the subway.

19   Q.  You meaning you jumped over the turnstile, you didn't pay a

20   fare?

21   A.  Yes.

22   Q.  OK.

23   A.  And we took the train.

24   Q.  Who is "we," you and Ashley?

25   A.  Me, Ashley and the other girl.

1   Q.  The third girl, you don't remember her name?

2   A.  Correct.

3   Q.  You went to this apartment, correct?

4   A.  Yes.

5   Q.  You had sex with how many people when you were there?

6   A.  About five.

7   Q.  It wasn't nine?

8           MS. GREENBERG:  Objection.  She just said it was five.

9           THE WITNESS:  Yes.

10  Q.  Was it nine?

11  A.  No.

12  Q.  So you had sex with about five people there, correct?

13  A.  Yes.

14  Q.  Did each one of the men use a condom?

15  A.  Yes.

16  Q.  After each man had sex with you, do you know what was done

17  with the condom?

18  A.  They just put them on the floor.

19  Q.  On the floor of the room that you were in?

20  A.  Yes.

21  Q.  Not into a garbage appeal or the toilet or anything?

22  A.  They put some in the garbage can, but some of them were all

23  over the floor.

24  Q.  Where exactly in the apartment did you have sex with four

25  or five people?

C9OUGIL6                         Jasmin - cross

1   A.  In his cousin's bedroom.

2   Q.  And this was the person you referred to as Jay, correct?

3   A.  Yes.

4   Q.  And how much money did you earn from having sex with four

5   or five other people at this apartment?

6   A.  About 80, because I only got half of it.

7   Q.  So when you say you got 80, that's the total amount that

8   you received from your customers, correct?

9        MS. GREENBERG:  Objection.  The question is unclear.

10   Does he mean per customer or total?

11        THE WITNESS:  Yeah.

12   Q.  Total.

13   A.  I don't know how much I got total because I only got half

14   of what I was getting.

15   Q.  Well, did you get paid upfront, so to speak, before you had

16   sex or when?

17   A.  I got paid, well they lived in the house too, so I just got

18   paid with --

19   Q.  So who did you have sex with there?  Was one of them Jay?

20   A.  Yes.

21   Q.  Do you know who the other person were that you had sex

22   with?

23   A.  No.  I just know that one of them was a girl.

24   Q.  You had sex with -- one of the other individuals was a

25   girl?

C9OUGIL6                          Jasmin - cross

1   A.  Yeah.  It was his other girl, his other prostitute.

2   Q.  I am talking about just men that you had sex with?

3   A.  OK.

4   Q.  How much money did you get from those individuals?

5   A.  I don't know, because I only got half of what I was going

6   to get.

7   Q.  Could you tell us approximately how much money you got?

8   A.  Over 200.

9   Q.  What happened to the money?

10  A.  I ended up leaving it there on accident because when the

11  police came and got me, I left it under the pillow.

12  Q.  So the money was left in the apartment?

13  A.  Yeah.

14  Q.  You didn't have the money with you?

15  A.  No.

16  Q.  When Mr. Gilliam was arrested, did you have any money with

17  you on December 2nd?

18  A.  No.

19  Q.  You had no money?

20  A.  No.

21  Q.  So you saw the pictures of the contents of your pink

22  backpack?

23  A.  Yes.

24  Q.  It looked like there was a couple of dollar bills?

25  A.  Yes.  That was from Jabar's pocket.  They gave it to me.

C9OUGIL6                              Jasmin – cross

1  Q.  That was from Jabar's pocket, they gave it to you?

2  A.  Yes.

3  Q.  It looked like four one dollar bills?

4  A.  Yes.

5  Q.  Do you know what happened to the four one dollar bills?

6  A.  They had given it to me but I don't know what I spent it on

7  or anything.

8  Q.  When you say "they," who is they?

9  A.  The law enforcement.

10  Q.  When you went into that building at 730 East 166th Street

11  about how long did you stay there?

12  A.  Just a couple of hours.  I was getting my hair done.

13  Q.  Excuse me?

14  A.  I was getting my hair done.

15  Q.  At the last apartment where you got picked up on December

16  6th?

17  A.  On December 6th, no.

18

19              (Continued on next page)

20

21

22

23

24

25

C9OTGIL7                         Jasmin - cross

1    BY MR. STEIN:

2    Q.  After you left without permission the shelter?

3    A.  Oh, no, I went to -- didn't you already ask me that, the

4    substation stuff?

5    Q.  Could you tell us about how long you were at that

6    apartment?

7    A.  About two days.

8    Q.  Maybe I'm not making myself clear, the apartment you went

9    to on December 6 after leaving the shelter with Ashley and the

10   other girl, how long were you at that apartment?

11   A.  Like a couple of hours.

12   Q.  Did you notice when you went into that building whether

13   there were my surveillance cameras outside the building?

14   A.  Yes.

15   Q.  You did?

16   A.  Yes, they're all over the place in New York.

17   Q.  And when you went to Jabar Gilliam's mother's house, did

18   you notice whether there were surveillance cameras outside of

19   that building?

20   A.  No, I didn't notice.

21   Q.  When you went to 747 East 168th Street, you told us you

22   were there twice?

23   A.  Yes.

24   Q.  And did you notice whether there were surveillance cameras

25   outside of that building?

C9OTGIL7                         Jasmin - cross

1   A.  I didn't notice.

2   Q.  Now you told us you had been suffering from bipolar and

3   depression for a number of years, correct?

4   A.  Yes.

5   Q.  And you have been taking medication for this, two kinds of

6   medication, correct?

7   A.  Three.

8   Q.  Three?

9   A.  Yes.

10  Q.  Zoloft?

11  A.  Yes.

12  Q.  Abilify?

13  A.  Abilify.

14  Q.  And lithium?

15  A.  Yes.

16  Q.  And before you went to New York on the night of

17  November 30th, going into the morning of December 1st, when was

18  the last time you had medication?

19  A.  November 28th.

20  Q.  So it had been a couple of days since you had medication?

21  A.  Yes.

22  Q.  And can you tell the jury what happened when you don't

23  have -- what happens to you in term of your behavior when you

24  don't have medication for a couple of days?

25  A.  I become very impulsive and depressed.

C9OTGIL7                       Jasmin - cross

1   Q.  Did you receive -- when you went to St. Barnabas Hospital,

2   did you receive any medication there?

3   A.  Yes.

4   Q.  And that would have been on December 2nd or December 3rd,

5   correct?

6   A.  December 3rd, yeah, early morning.

7   Q.  And when you went to St. Barnabas Hospital, did you have to

8   give a urine specimen?

9   A.  Yes.

10  Q.  And you told us before that at some point you took some

11  kind of drug, correct?

12  A.  Yes.

13  Q.  You took what you thought was a weed roll, was the term you

14  used?

15  A.  Yes.

16  Q.  What's a weed roll?

17  A.  It's a blunt with weed in it like a Cigarillo wrapper.

18  Q.  So you pull the tobacco out and put marijuana in, right?

19  A.  Yes.

20  Q.  And you took one or more tugs on that?

21  A.  Yes.

22          MS. GREENBERG:  Objection, I don't think that was the

23  testimony from earlier today.  Mischaracterizes the testimony.

24          THE COURT:  He can certainly ask questions on cross,

25  if it's different or the same.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9OTGIL7                          Jasmin - cross

1           THE WITNESS:  I said one drag.

2    Q.  You inhaled?

3    A.  Yes.

4    Q.  And you took some kind of pill or something?

5    A.  Yes.

6           MS. GREENBERG:  Objection again, mischaracterizing the

7    testimony.

8           THE COURT:  He's asking a question.  He doesn't have

9    to characterize testimony, he's asking a question.

10          What is your question?

11   Q.  In addition to the marijuana roll, did you also take some

12   other kind of drug?

13   A.  Yes.

14   Q.  And what form was the drug?

15   A.  In pills.

16   Q.  And how many pills did you take?

17   A.  Two.  They said it was good for a headache.

18   Q.  And as a result of that, you fell asleep, correct?

19   A.  Yes.

20   Q.  So you told us -- I started to ask you if you took -- you

21   gave a urine specimen at St. Barnabas Hospital?

22   A.  Yes.

23   Q.  And as you understood it, the urine specimen was to see if

24   there were any drug in your system, correct?

25   A.  Yes.

C9OTGIL7                          Jasmin - cross

1   Q.  You told us a number of times that you had been struck by

2   Mr. Gilliam, correct?

3   A.  Yes.

4   Q.  And approximately when is it your testimony that you were

5   struck by him for the first time?

6   A.  At Timmy's house.

7   Q.  When was that in relation to when you went to New York?

8   A.  Like November 19th or something.

9   Q.  And you were struck how?

10  A.  I was hit in the face with closed fist.

11  Q.  More than once?

12  A.  No, once.

13  Q.  Is that the occasion when you had the Band-Aid?

14  A.  Yes.

15  Q.  And then there came another time when you were struck also?

16  A.  Yes.

17  Q.  When was that?

18  A.  When we were outside the Hispanic bar.

19  Q.  That was November 30th?

20  A.  Yes.

21  Q.  How many times were you struck?

22  A.  Once.

23  Q.  Where.

24  A.  On my face, like near my eyes.

25  Q.  I think earlier today when Ms. Greenberg asked you, you

C9OTGIL7                          Jasmin – cross

1    pointed to a location?

2    A.   That was the third time.

3    Q.   The second time you were struck somewhere in the face,

4    correct?

5    A.   Right.

6    Q.   With what?

7    A.   An open hand.

8    Q.   And there was a third time when you were struck, correct?

9    A.   Yes.

10   Q.   Where was that?

11   A.   Punched right here in the eyebrow.

12        MR. STEIN:   Indicating, Judge, for the record over the

13   left eyebrow.

14   Q.   What were you struck with?

15   A.   His fist.

16   Q.   How many times?

17   A.   Once.

18   Q.   When you went to St. Barnabas Hospital, you didn't have any

19   injuries, did you?

20   A.   No.

21   Q.   And did you feel any pain?

22   A.   My head hurt.

23   Q.   And your head hurt from having been struck or you just had

24   a headache?

25   A.   It was kind of in between.  I felt -- it felt like a

C9OTGIL7                        Jasmin - cross

1   headache, but I knew what it was for.

2   Q.  Did you tell them at St. Barnabas Hospital that you didn't

3   feel any pain?

4   A.  No.

5   Q.  You did not?

6   A.  No, because I told them I felt pain.

7   Q.  And where is it that you told them you felt pain at the

8   hospital?

9   A.  In my head.

10  Q.  Not in your back?

11  A.  Right here.  And my back.

12          MR. STEIN:  Indicating the back of the head, Judge.

13  A.  And my back.

14  Q.  And also in your back?

15  A.  Yes.

16  Q.  And pain in your back was what?

17  A.  Probably from having sex so much.

18          THE COURT:  Was what?

19          MR. STEIN:  Having sex so much.

20  Q.  But it's your testimony that you told someone, some medical

21  personnel at St. Barnabas Hospital, that you were having some

22  kind of pain, correct?

23  A.  Yes.

24  Q.  There came a time when you used Mr. Gilliam's phone,

25  correct?

C9OTGIL7                         Jasmin - cross

 1    A.  Yes.

 2    Q.  And you used the phone in order to call your mother,

 3    correct?

 4    A.  Yes.

 5    Q.  And you had a verbal conversation with her or you had text

 6    messages back and forth her or what?

 7    A.  I had both.

 8    Q.  And were the text messages that you had with her, were they

 9    sometime the morning of December 1st, the late morning going

10    into the afternoon of December 1st?

11    A.  Yes.

12    Q.  And did you have conversations with her about, among other

13    things, an advertisement on Backpage?

14    A.  Yes.

15    Q.  And at one point did your mother, who you testified had

16    been a prostitute, did at some point she tell you she wanted to

17    put her picture on your advertisement?

18    A.  Yes.

19    Q.  When you went to St. Barnabas Hospital, you had had sexual

20    relations at that point with a number of people, correct?

21    A.  Yes, sir.

22    Q.  And a number of them had been wearing condoms, correct?

23    A.  Yes, sir.

24    Q.  And when you went to St. Barnabas Hospital, isn't it true

25    that you did not have any allergic reaction to latex?

C9OTGIL7                          Jasmin - cross

1    A.  Yes.

2    Q.  Even though you had sex with men wearing condoms on a

3    number of occasions before you went to the hospital, correct?

4    A.  Yes.

5    Q.  Now you said at one point you had been communicating with

6    Mr. Gilliam on Facebook, correct?

7    A.  Yes.

8    Q.  That was before you came to New York, correct?

9    A.  Yes.

10   Q.  And he had your Facebook information, correct?

11   A.  He should, yes.

12   Q.  Excuse me?

13   A.  I don't know.

14   Q.  Well, you sent him information on his Facebook page,

15   correct?

16   A.  Yes.

17   Q.  And he had given you his -- you had become I think the term

18   is friends with each other on Facebook, correct?

19   A.  You can delete friends, but yes.

20   Q.  And you received information from him on your Facebook

21   page?

22   A.  No.

23   Q.  He never sent you a message on your Facebook page?

24   A.  Oh, yes, yes.

25   Q.  And you did the reverse, you sent information to him on

C9OTGIL7                          Jasmin - cross

1    his -- excuse me, he sent you information to you on your

2    Facebook page, correct?

3    A.   Yes.

4    Q.   Have you had any occasion to look through your Facebook

5    page from that period of time from sometime in the middle or

6    late November up until the beginning of December?

7    A.   No.

8             THE COURT:   Let's take an afternoon break.

9             (Recess taken)

10   BY MR. STEIN:

11   Q.   Jasmin, I started to ask you some questions about your

12   Facebook.

13   A.   Oh, yes.

14   Q.   And I believe you testified there were some occasions where

15   you went on Facebook, you friended with Mr. Gilliam, correct?

16   A.   Yes.

17   Q.   And there was information that Mr. Gilliam sent you on your

18   Facebook page, correct?

19   A.   Yes.

20   Q.   And there was information that you sent him on his Facebook

21   page, correct?

22   A.   Yes.

23   Q.   And have you seen the information that was available on

24   your Facebook page from November of 2011?

25   A.   Yes.

1    Q.  And when did you see that?

2    A.  August of 2012.

3    Q.  So a month or two ago?

4    A.  Yeah.

5    Q.  And I assume someone from the government showed it to you?

6    A.  Yes.

7    Q.  And so you saw -- you actually went on your Facebook page

8    or you looked at a printed print out?

9    A.  I went on my Facebook page.

10   Q.  And would it be correct that when you went on your Facebook

11   page you saw no information, if that's the right word, that

12   came from Mr. Jabar on your Facebook?

13   A.  Yes.

14   Q.  Have you seen Mr. Jabar's Facebook -- Mr. Gilliam's

15   Facebook page?

16   A.  Yes.

17   Q.  And would it be correct to say that on his Facebook page

18   there's no information from your Facebook, correct?

19   A.  Yes.

20   Q.  Now it's your testimony that you went to Brooklyn on one

21   occasion, correct, while you were here in New York?

22   A.  Yes.

23   Q.  And that was the occasion when you went to Brooklyn to

24   Mr. Gilliam's brother's apartment?

25   A.  Yes.

C9OTGIL7                          Jasmin - cross

1   Q.  And that's when you saw his computer, correct?

2   A.  Yes.

3   Q.  And was there another occasion when you went there while

4   you were here in New York for those couple of days?

5   A.  No.

6   Q.  Well, was there an occasion on December 2nd when you went

7   to Brooklyn to have sex with somebody and you had oral sex with

8   that person for $20?

9   A.  That was in Bronx, I think.

10  Q.  Well, I'm asking you whether or not there was an occasion

11  when you went to Brooklyn.

12  A.  Oh, no.

13  Q.  That's not correct.

14          So did there come a time when you were being

15  interviewed by Brian Conolly and members of the government that

16  you told them you went to Brooklyn on December 2nd and had oral

17  sex with somebody for $20?

18  A.  No.

19          MR. STEIN:  I would like to approach the witness with

20  the same document, 3503-14, the second page.

21  Q.  I'm going to direct your attention again -- by the way you

22  know where it's blacked out that's your name.  Starting with

23  where my finger is, could you read that to yourself.

24  A.  Yeah.

25  Q.  When you say yeah, does that mean you did go to Brooklyn to

340

C9OTGIL7                           Jasmin - cross

1   give oral sex to somebody for $20?

2   A.  Yes.

3   Q.  So when you just testified that you did not, that was

4   incorrect?

5   A.  Yes.

6   Q.  So you went to Brooklyn twice?

7   A.  Yes.

8   Q.  Once to Harry Gilliam's apartment and once to give someone

9   oral sex for $20?

10  A.  Yes.

11  Q.  Did Mr. Gilliam go with you on that occasion?

12  A.  Yes.

13  Q.  So how much time did you spend going back and forth to

14  Brooklyn when you went to give someone oral sex for $20?

15  A.  About an hour or so, two hours maybe.

16  Q.  Sorry?

17  A.  Two hours.

18  Q.  Two hours all together meaning the travel to and from,

19  correct?

20  A.  Oh, no, that's like two and a half hours, because I did

21  half an hour of oral sex.

22  Q.  So you spent part of the time traveling on the subway

23  again?

24  A.  Yes.

25  Q.  You didn't jump the turnstile?

C9OTGIL7                          Jasmin - cross

1   A.  No.

2   Q.  Mr. Gilliam went with you and swiped a subway card?

3   A.  Yes.

4            MS. GREENBERG:  Objection.

5            THE COURT:  Overruled.

6   Q.  And you went all the way there to have oral sex with

7   somebody just for $20, correct, for several hours?

8   A.  Yes.

9   Q.  Now before you met Mr. Gilliam in the -- approximately

10  would it be the middle of November or so of 2011?

11  A.  Yes.

12  Q.  And during that -- before that time, you had acted as a

13  prostitute off and on for several years, correct?

14  A.  Yes.

15  Q.  And you did that on your own, correct?

16  A.  Yes.

17  Q.  Mr. Gilliam had nothing to do with that, correct?

18  A.  No.

19  Q.  You didn't even know him?

20  A.  No.

21  Q.  And over what course of time was that?

22  A.  About three years.

23  Q.  And were there occasions during that time when you were

24  working on your own?

25  A.  Yes.

C9OTGIL7                    Jasmin – cross

1   Q.  And there were times during that time when you were working

2   with a pimp, correct?

3   A.  Yes.

4   Q.  And that was Timmy?

5   A.  Yes.

6   Q.  And what did you do with the money over the course of time

7   that you had sex as a prostitute before you ever met

8   Mr. Gilliam?

9   A.  I spent it on stuff I needed, like food.

10              THE COURT:  You what?

11              THE WITNESS:  I spent it on stuff I needed, like food.

12              THE COURT:  I can't hear you.

13              THE WITNESS:  I spent it on stuff I needed.

14  Q.  When you were at Harry Gilliam's apartment and you were on

15  his computer, did you see on his computer screen an

16  advertisement?

17  A.  No.

18  Q.  You did not see it?

19  A.  No.

20  Q.  Even though you acknowledged you told Brian Conolly and

21  others that you had observed it on his screen, correct?

22              MS. GREENBERG:  Objection, asked and answered.  We

23  have been over this.

24              THE COURT:  Look, I think both of the attorneys may be

25  returning to subjects, but they have got reasons, and let's let

1     it go.

2     Q.   To this day, would it be correct, Jasmin, that you have

3     never seen an advertisement with the name Angel Luv and Jabar

4     Gilliam's phone number, correct?

5     A.   Correct.

6     Q.   And you didn't have any injuries at all, any visible

7     injuries from any of the occasions when you say he struck you,

8     correct?

9     A.   No.

10    Q.   And as far as you know, there was no money that was

11    recovered, is that correct?

12    A.   Yes.

13    Q.   And you had no allergic reaction after having sex with

14    multiple men using condoms before Mr. Gilliam was arrested,

15    correct?

16    A.   I actually did have an allergic reaction.  My reactions --

17    or possibly some people's reactions come a little later than

18    others.

19    Q.   You never told anybody -- are you finished?

20    A.   And I got a Benadryl for it.

21    Q.   OK, but you got a Benadryl after you had sex with multiple

22    people on December 6 after you left the shelter, correct?

23    A.   Yes.

24    Q.   And you had no allergic reaction when you went to

25    St. Barnabas Hospital after Mr. Gilliam had been arrested,

344

C9OTGIL7                           Jasmin - cross

1    correct?

2    A.  I had already been taking the Benadryl, so it should have

3    helped it.

4    Q.  You had no Benadryl at St. Barnabas Hospital?

5    A.  No, I had it before I went to St. Barnabas.

6    Q.  Who gave you Benadryl before you went to St. Barnabas

7    Hospital?

8    A.  Ms. Rose had bought me some Benadryl.

9    Q.  You're talking about a federal agent?

10   A.  Yes.

11   Q.  Isn't it correct that what you're talking about is after

12   December 6 or on December 6 when you went to Jay's apartment

13   that she gave you Benadryl, correct?

14   A.  No, she gave me Benadryl both times because she knew I was

15   allergic to latex.

16   Q.  Did you ever tell anybody at St. Barnabas Hospital that you

17   had an allergic reaction to latex?

18   A.  Yes.

19   Q.  You told them that you had an allergic reaction to men

20   using condom when you went to St. Barnabas Hospital?

21   A.  Yes.

22           MR. STEIN:  I have no further questions, Judge.

23           THE COURT:  Is there any redirect?

24           MS. GREENBERG:  Yes, your Honor.

25           (Continued on next page)

C9OTGIL7                        Jasmin - redirect

1   REDIRECT EXAMINATION

2   BY MS. GREENBERG:

3   Q.  Jasmin?

4   A.  Yes.

5   Q.  When you testified earlier today to being raped in

6   Maryland, was that at a Motel 6?

7   A.  Yes.

8   Q.  Now Mr. Stein showed you a document that was marked as

9   3503-13.  That document he showed you, had you seen that

10  before?

11  A.  No.

12  Q.  Had you ever reviewed any notes or reports that Special

13  Agent Conolly had done from speaking with you?

14  A.  No.

15  Q.  Did you ever see what the defendant did with any money that

16  he received from you prostituting?

17  A.  I have seen him give money to his uncles.

18  Q.  Anyone else?

19  A.  Lisa.

20  Q.  Now when you were at the hospital, did you tell anyone at

21  the hospital about being hit on the face?

22  A.  No.

23  Q.  And the defendant's Facebook page, had you ever seen a

24  Facebook page in the defendant's name?

25  A.  No.

C9OTGIL7                          Jasmin - redirect

1              MS. GREENBERG:  Nothing further.

2              THE COURT:  All right.  You may step down.

3              MR. STEIN:  Judge, just briefly.

4              THE COURT:  Oh, sure.

5     RECROSS EXAMINATION

6     BY MR. STEIN:

7     Q.  You just testified in response to some questions from

8     Ms. Greenberg about having sex at the Motel 6?

9     A.  Yes.

10    Q.  And when you testified this morning, you testified that you

11    had not gone to a hotel with Mr. Gilliam, correct?

12    A.  Yes.

13    Q.  And did you speak with a prosecutors and Brian Conolly over

14    lunch?

15    A.  Yes, but not about the case.

16    Q.  You did not talk at all specifically about going to a hotel

17    where you had sexual intercourse with Jabar Gilliam?

18    A.  No.

19    Q.  So you had been asked some questions about it in the

20    morning before the lunch break, and then you were asked some

21    further questions about the same subject after lunch break,

22    correct?

23    A.  Yes.

24              MR. STEIN:  I have no further questions, Judge.

25              THE COURT:  You may step down.  Thank you.

C9OTGIL7

1              Who's next?

2              MS. GREENBERG:  The government rests, your Honor.

3              THE COURT:  Can everyone come up?

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

348

C9OTGIL7

1          (At sidebar)

2          THE COURT:  Well, what is our schedule now?

3          MR. STEIN:  Judge, I'm probably going to have to

4   discuss this with Ms. Lamarque and Ms. Greenberg.  We had some

5   lengthy discussions before the trial started about the hospital

6   record from St. Barnabas Hospital, so I told the prosecutors

7   that I would show them the pages of the hospital record that I

8   wanted to move into evidence.  So I just wanted to reserve my

9   right do at that at some point.  I will discuss it with them

10  today or tomorrow.

11         THE COURT:  Well, we have got --

12         MR. STEIN:  I'm not calling a witness, it's a question

13  of excerpts from the hospital record.

14         THE COURT:  Well, we'll have summations tomorrow,

15  won't we?

16         MS. GREENBERG:  Yes, your Honor.

17         MS. LAMARQUE:  Yes, your Honor.

18         MR. STEIN:  Judge, at this time, also, since we're on

19  the record, obviously, I'm moving pursuant to Rule 29(a) of the

20  Federal Rules of Criminal Procedure on the ground that the

21  government has failed to make out a prima facie case.

22         THE COURT:  Motion denied.

23         I think we'll let the jury go and then we'll confer.

24         MS. GREENBERG:  Yes, your Honor.

25         (Continued on next page)

C9OTGIL7

1          (In open court)

2          THE COURT:  We will adjourn now and there will be some

3    evidence tomorrow, but mainly tomorrow the lawyers will sum up.

4    And so the case is moving along, obviously.  So if the jury

5    would recess now until 10 o'clock tomorrow and I can confer

6    with the lawyers.

7          (Jury not present)

8          THE COURT:  Let's discuss the charge --

9          THE DEFENDANT:  Excuse me, your Honor, during last

10   recess I spoke with my attorney and where I just want to let

11   the record know we're still having conflict of issues.

12         Matter of fact, can this be amongst us?

13         THE COURT:  We had a conference earlier.  Now we have

14   work to do.

15         THE DEFENDANT:  This is not pertaining to that issue.

16         THE COURT:  We have work to do and I have got -- we

17   have conducted a trial, the government has rested.

18         THE DEFENDANT:  Matter of fact --

19         THE COURT:  We have our work to do it and we'll do it

20   now, and I want to discuss with the lawyers the issues about

21   the instructions to the jury, and we need to do that now before

22   we break for the day.  So please, please, why don't you resume

23   your seat.  Thank you very much.

24         All right.

25         MR. STEIN:  Judge, I would like to speak to the Court

C9OTGIL7

1      about the situation without the prosecutors here.

2                  THE COURT:  Why don't the prosecutors step out.

3                  (Continued on next page)

4                  (Pages 351 through 355 SEALED by Order of the Court)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C9OUGIL8

1              (All parties present)

2              THE COURT:  Now we will proceed.

3         I don't think that you have given me any requests to

4    charge, have you, Mr. Stein?

5              MR. STEIN:  That is not quite correct, Judge.

6         In the letter that I wrote to the Court on September

7    6th, I included in that a request to charge as a lesser

8    included offense -- I believe it is Section 18, U.S.C., Section

9    2421, although I am not exactly clear of the section.  As a

10   lesser included of Count 1 and as a lesser included of Count 2.

11        As I recall the government had agreed during the

12   various discussions that it was a lesser included as to Count

13   2, but they disagreed as to Count 1.

14        Judge, 2421 is the general transportation section that

15   it is unlawful to transport someone across state lines for the

16   purposes of commercial sex.  There is no element in it as to

17   force, coercion.  And there is no element in it as to the age

18   of the person.

19        So the two counts in the indictment, Count 1, as I

20   understand it, has two theories.  One is that it is based on

21   force, coercion, threats of force, and the other is that Jasmin

22   was 16 years old, irrespective of force.

23        And Count 2 is a transportation of a minor across

24   state lines for purposes of commercial sex.

25        So the lesser included that I'm asking for would be

C9OUGIL8

under Count 1 as well as Count 2 which is crossing state lines

for the purposes of commercial sex, irrespective of force and

irrespective of the age of the victim.

THE COURT:  What does the government say on all of

that.

MS. GREENBERG:  Your Honor, with respect to Count 2,

there are three elements in Count 2 that we have charged.  It

is transportation of a minor to engage in prostitution.  The

only difference between the transportation charged that defense

counsel is raising and what we have charged is the element of

that it is a minor that is being transported.  And the defense

says that that's not in dispute, so there would be no way --

effectively they would be the same thing.

MR. STEIN:  It is not correct that it is not in

dispute, Judge.  We are disputing that Mr. Gilliam transported

Jasmin across state lines for the purposes of commercial sex

and specifically denying that he did so with use of force or

threats of force.

THE COURT:  Your voice is a little soft.  It would be

a lot better if you spoke from the microphone.  I am not

getting the point.

MS. GREENBERG:  With respect to Count 2 --

THE COURT:  Let's start with Count 1.

MS. GREENBERG:  Your Honor, transportation is not a

lesser included offense of the sex trafficking.  There are two

C9OUGIL8

<br>

 1    different statutes.  It is just not a lesser included offense.

 2    You can meet all of the elements of Count 1 without having

 3    transported.  Therefore, it is not a lesser included offense.

 4            THE COURT:  I am not very familiar with the idea of

 5    lesser included offense.  What is a lesser included offense?

 6            MS. GREENBERG:  An offense is lesser included of a

 7    greater offense if all of the elements must be met in order to

 8    then be part of the greater offense.

 9            THE COURT:  I am not understanding what you are

10    saying.  What is a lesser included offense, where it is still a

11    crime but you don't have to prove all of the elements in the

12    greater offense?

13            MS. GREENBERG:  Correct.  But by the same token, the

14    greater offense, all of the elements of the lesser included

15    must be met in order to meet the greater offense.

16            THE COURT:  I have no idea of what you are talking

17    about.  I am just not familiar with the subject.

18            MS. LAMARQUE:  Your Honor, if you have three elements,

19    let's say four elements to the greater offense.  Element 1, 2,

20    3, 4.  For it to be a lesser included offense, basically,

21    element 1, element 2, element 3 have to be the same and you

22    have one extra element for the greater offense, but everything

23    else has to be the mirror image for it to be considered a

24    lesser included offense.

25            THE COURT:  If you have four elements for the

C9OUGIL8

1    greater --

2              MS. LAMARQUE:  Yes.

3              THE COURT:  -- three of those elements, if proven

4    would be a crime, and if they are exactly the same as in the

5    greater, then that is a lesser included offense.

6              MS. LAMARQUE:  Got it.  Which is why we are saying

7    that --

8              THE COURT:  In Count 1, is there here an issue about a

9    lesser included offense?

10             MS. LAMARQUE:  Our point as to Count 1 is,

11   transportation is not a lesser included offense because, with

12   Count 1 which is the force, fraud or coercion --

13             THE COURT:  -- or the alternative.

14             MS. LAMARQUE:  -- or the alternatives, those are not

15   elements, your Honor, of the transportation charge.

16             Let me explain that differently, OK?

17             THE COURT:  Yes.

18             MS. LAMARQUE:  Let's go backwards because it is a

19   little too confusing to start with the greater.

20             Here, the lesser included offense is the first three

21   elements, right, that he transported the minor --

22             THE COURT:  His proposed lesser included?

23             MS. GREENBERG:  Exactly.

24             THE COURT:  Where do I find that?

25             MS. LAMARQUE:  He has not given it to you.  But the

C9OUGIL8

1   statute that he cited correctly -- I think the easiest way to

2   do this, your Honor, if you turn to page 5 of our requests to

3   charge --

4               THE COURT:  I am on page 5, yes.

5               MS. LAMARQUE:  Excellent.

6               Those are the elements that we have to prove for Count

7   1, right and I think that you are in agreement that those are

8   the elements for Count 1.

9               Am I correct on that point, your Honor?

10              THE COURT:  Yes.  I hope I don't have to word things

11  quite this way, but you have taken the statutory language.

12              MS. LAMARQUE:  We have.  This is from Sand's and from

13  very uncontroversial literature.

14              Here, your Honor, what we are basically saying is,

15  transportation, if you look at the first element --

16              THE COURT:  Right.

17              MS. LAMARQUE:  -- this element can be found by either

18  recruiting, enticing, harboring, transporting, providing, etc.,

19  or the benefiting financially from the venture, right,

20  benefiting financially from this.  None of those elements, your

21  Honor, are exactly the same as the basic transportation that

22  Mr. Stein wants charged as a lesser included of Count 1.

23              When you go to the second element, your Honor --

24              THE COURT:  Yes.

25              MS. LAMARQUE:  -- where it says that force, fraud or

C9OUGIL8

```
 1    coercion would be used, that is not an element of the basic

 2    transportation that he wants charged as a lesser included, so

 3    the elements are different.  So for Count 1, basic

 4    transportation is not a lesser included offense.

 5              THE COURT:  Let me just look at that.

 6              MS. LAMARQUE:  If you could just indulge me one more

 7    moment when you are done, your Honor.

 8              THE COURT:  Mr. Stein, I think that the government is

 9    right about Count 1, but you agree it is lesser included to

10    Count 2?

11              MS. LAMARQUE:  If I could turn to that, your Honor, if

12    I may, page 24 of your requests to charge.

13              THE COURT:  Yes.

14              MS. LAMARQUE:  Just let me know when you are there.

15              THE COURT:  I'm there.

16              MS. LAMARQUE:  We do agree that, as a technical

17    matter, the basic transportation is a lesser included because

18    basically here you have the first element, the second element

19    and the third element, right, and for the lesser included

20    basically it is the first and second element.

21              THE COURT:  Right.

22              MS. LAMARQUE:  But our point was, your Honor, under

23    the facts of this case as the defense conceded in his opening,

24    Jasmin was 16 years old at the time of the offense.  She was a

25    minor.
```

C9OUGIL8

1          And for this charge, your Honor, the defendant doesn't

2     have to know she was a minor.  It is the basic fact of her

3     being a minor at the time of the conduct.  So while as a matter

4     of legality, the basic transportation charge is a lesser

5     included, under the facts of this case and as the defense has

6     already conceded in its opening, there is absolutely no way the

7     jury could find the lesser included and not find the count that

8     we charged because, remember, your Honor, here, for this count

9     the fact that the minor consented is irrelevant to this

10    determination.  It doesn't come into play.  And the fact that

11    whether the defendant knew her age or not doesn't come into

12    play.  So for this count, it is just the fact that she is the

13    age -- at what age she is at the time of the conduct.

14          THE COURT:  I don't understand your point.

15          MS. LAMARQUE:  Here is the distinction.  Jasmin is the

16    only victim we have alleged.

17          THE COURT:  Right.

18          MS. LAMARQUE:  Jasmin was 16 years old at the time of

19    the conduct.

20          THE COURT:  Yes, she was.

21          MS. LAMARQUE:  The defendant has conceded that point

22    in opening argument.  There is no set of facts where the jury

23    could find basic transportation and not find that Jasmin was 16

24    years old at the time the conduct occurred.  There is no

25    factual situation here where they could find basic

C9OUGIL8

1    transportation but not be finding Count 2 as charged.

2              THE COURT:  What I don't quite understand with what

3    you are saying is, in other words, you would object to a lesser

4    included charge even on Count 2.

5              MS. LAMARQUE:  Right, because of the fact that defense

6    has conceded and we have established through the clear evidence

7    with the birth certificate that Jasmin was 16 at the time of

8    the offense.  In essence, your Honor, there is no way under the

9    facts of this case, as your Honor --

10             THE COURT:  See, I don't know the law on it.

11             MS. LAMARQUE:  My understanding is, you have

12   discretion on whether to charge a lesser included offense --

13             THE COURT:  It is a matter of discretion?

14             MS. LAMARQUE:  You do.

15             MR. STEIN:  Judge, I don't agree with that particular

16   point.  You either have to or you don't have to.  I don't think

17   it is a matter of discretion and Ms. Lamarque is overlooking

18   something.

19             THE COURT:  What is she overlooking?

20             MR. STEIN:  It is true that I admitted in my opening

21   statement, and certainly is not an issue here that Jasmin was

22   16 years old.  What Ms. Lamarque is overlooking is that the

23   jury could choose to discredit Jasmin's testimony as coming to

24   New York either being compelled, caused --

25             THE COURT:  We are talking about Count 2 --

C9OUGIL8

1          MR. STEIN:  I understand that.  What the government is

2     overlooking at is, that they could discredit her testimony but

3     credit other evidence in the case concerning.

4          THE COURT:  About her age?

5          MR. STEIN:  No, about his conversations concerning

6     prostitution which the government introduced with women who

7     were clearly adults and who lived in another state because

8     their area codes were from other states.  There is Toni who has

9     an area code of 301, resides in Maryland, and the mother --

10         THE COURT:  I don't understand how your remark are

11    relating to the lesser included offense issue.  I just don't

12    understand that.

13         MR. STEIN:  Because the jury could find that my client

14    was having these conversations with adult women who lived in

15    other states, based on the government's own evidence of the

16    conversations and text messages between him and Jasmin's mother

17    and between him and a woman identified only as Toni for which

18    there are various text messages and photographs.

19         MS. LAMARQUE:  Your Honor, in this indictment --

20         THE COURT:  Wait a minute.  Please, please.

21         What are the elements on your lesser included offense,

22    Mr. Stein, for Count 2?

23         MR. STEIN:  The elements are that he knowingly

24    transported or attempted to do so.  It is in the statutory

25    language, Title 18, Section 2421, he knowingly transported any

C9OUGIL8

1    individual in interstate commerce --

2              THE COURT:  It is 18, U.S.C., what?  What is the

3    statute?

4              MR. STEIN:  2421 of Title 18.

5              THE COURT:  Let's look at the statute.  I have 2421.

6              MR. STEIN:  It is much more simple than Count 1 and

7    certainly in Count 2.  It is very straightforward.  It is

8    transporting an individual.  It doesn't say anything about age

9    or attempt to do so across state lines for purposes of

10   prostitution or engaging in any sexual activity which can be

11   charged as a criminal offense.  So my point is --

12             THE COURT:  What do you want me to charge as the

13   elements?  You have quotations from the statutory language.

14   What are the elements?

15             MR. STEIN:  It is the same elements.  I didn't submit

16   a specific request to charge because it is the same element of

17   Count 2 but you leave out any reference to age.

18             THE COURT:  Just a minute.

19             MS. LAMARQUE:  Page 24.

20             THE COURT:  So you agree, you say that the elements

21   for the lesser included offense would be the first two elements

22   that the government has given for Count 2, is that right?

23             MR. STEIN:  I believe that is correct.  You just omit

24   the element of age, otherwise, it is the same definition.

25             THE COURT:  The defendant knowingly transported Jasmin

C9OUGIL8

 1    in interstate or foreign commerce as alleged in the indictment.

 2    In other words, that is an element of 2421, right?

 3              MR. STEIN:  Except I am not referring to Jasmin,

 4    Judge, because I can't, because there is no dispute as to her

 5    age.

 6              MS. LAMARQUE:  If I may, your Honor.

 7              THE COURT:  Just a minute.

 8              MR. STEIN:  I am referring --

 9              THE COURT:  I wish you had given me a statement of the

10    elements that you believe should be proven for this lesser

11    included offense.  Can you state it now and I will take it

12    down?  Tell me what are the elements.  What are they?

13              MR. STEIN:  If you go to the government's request to

14    charge --

15              THE COURT:  Page 24.

16              MR. STEIN:  -- it starts on page 23.  They lay out the

17    elements, starting on that page.  And what I am asking --

18              THE COURT:  Wait a minute.  They just quote the

19    language on 23, the elements on 23.

20              MR. STEIN:  On the next page.

21              THE COURT:  I'm asking you what you say that the

22    elements should be for the lesser included offense.

23              MR. STEIN:  Number 1, the defendant knowingly

24    transported.

25              THE COURT:  Go ahead.  Knowingly transported --

C9OUGIL8

1          MR. STEIN:  -- an individual in interstate commerce

2     with the intent that such person engage in prostitution.

3          THE COURT:  Just a minute.

4          That such person engage --

5          MR. STEIN:  -- in prostitution.

6          THE COURT:  Is there a second element?

7          MR. STEIN:  -- in prostitution or any sexual activity

8     for which any person --

9          THE COURT:  Let's say prostitution.

10          MR. STEIN:  -- or attempts to do so which is important

11     because there is no evidence that it was actually done with the

12     other two adult women that I am referring to.  There were

13     discussions about it.

14          THE COURT:  The first element is, the defendant

15     knowingly transported an individual in interstate commerce with

16     the intent that such person engage in prostitution --

17          MR. STEIN:  -- or any sexual activity for which any

18     person can be charged with a crime or attempted to do so.

19          THE COURT:  I am going to leave out the crime thing --

20     or attempted to do so.

21          MR. STEIN:  Correct.  The rest of the section has to

22     do with punishment.

23          THE COURT:  Is there a second element?

24          MR. STEIN:  That is it, Judge.  It is very simple.

25          THE COURT:  Just one element.

C9OUGIL8

1          MS. LAMARQUE:  What he just did was collapse both

2     elements into one.  If you stop at transportation, that's

3     element 1 of what you just wrote down.

4          THE COURT:  He has collapsed it, but that's OK.

5          MS. LAMARQUE:  Your Honor, can I just be briefly heard

6     on this point?  It is very important.

7          Your Honor, we did not charge Toni.  We only charged

8     here Victim 1 in our indictment, which is Jasmin.  We did not

9     go to the grand jury, and this indictment is not about Toni or

10    Jasmin's mother.  That is not what the grand jury found.

11          In this case we explicitly stated in Count 2 that the

12    transportation is Victim 1, which is Jasmin -- as we must --

13    because as your Honor knows, the unit of prosecution for the

14    transportation is the victim.  We didn't charge those other

15    individuals, adult individuals because they were not

16    transported, your Honor.  And we didn't present any evidence

17    about that.

18          We presented evidence about the adult women as 404(b)

19    to show the defendant's intent to engage in prostitution.  We

20    would and could not because we have no jurisdiction over that

21    conduct.  He never crossed state lines with them.  The only

22    person that he crossed state lines with is Jasmin, who, by the

23    defendant's own concession is a minor.

24          What defense counsel is trying to do here is, in

25    essence, insure some sort of nullification of some sort

C9OUGIL8

because, again, your Honor, we don't have federal jurisdiction

over the conduct of Toni.  I have no evidence that he

transported her.

        With the mother we have elicited time and again -- the

mother was in California the entire time.  So it is non

sequitur from the perspective of the evidence that was

presented in this case.

        More importantly, your Honor, if you were to charge

this it would be at variance.  It is not what the grand jury

has permitted us to present here.  We have no evidence.  We

have no jurisdiction over that conduct.  We only have

jurisdiction over the conduct vis-a-vis Jasmin because he

crossed state lines.  That's why we are in federal court.  So

to give a lesser included offense here about the adult women, I

don't think we can do, under the circumstances of this case.

        MR. STEIN:  Judge, what is being overlooked, the

statute says not only transported or attempts to do so and

there are very explicit conversations with Jasmin's mother who

is in California and Toni who appears to be an adult from the

pictures of her that were introduced as government exhibits,

and the area code of her phone is 301 which is Maryland.  So

the fact that he did not actually transport them is not

responsive to my point because the statute literally says

and/or attempts to do so.

        THE COURT:  Let me just think.

C9OUGIL8

 1           MR. STEIN:  Judge, I would also say, I don't have the

 2    government's in limine request to charge in front of me, but I

 3    believe they offered this evidence about Jasmin's mother and

 4    the woman Toni not just as 404(b) but as substantive evidence

 5    of a crime.  As I say I don't have it in front of me, but they

 6    argued in the alternative that is it was admissible either as

 7    part of the narrative or part of the substantive evidence of

 8    the crime or, alternatively, as 404(b).  It is all within the

 9    same time frame, Judge.

10           MS. LAMARQUE:  May I, your Honor?

11           THE COURT:  Just a minute.

12           Who has the burden of proof on lesser included

13    offense.

14           MS. LAMARQUE:  The government.  It would be charged

15    basically as another count almost.

16           THE COURT:  What?

17           MS. LAMARQUE:  The way it would read is, if you didn't

18    find one, two or three -- it is still the government's burden

19    to prove beyond a reasonable doubt.  It is not an affirmative

20    defense.

21           My concern, if you look at the indictment on page 3 --

22    we have been talking so much about to wit clauses and the

23    defense has been very focused on to wit clauses, well, our to

24    wit clause just says Victim 1.  We have not alleged anything

25    else.  That is simply not the allegation in this case, your

C9OUGIL8

Honor.

THE COURT:  I don't claim to be a scholar on the issue of lesser included offenses, but I have presided at a trial, but it would be, in my view, completely anomalous to say that there is a lesser included offense given to the jury on which the government has the burden of proof and say that the government should prove that there was an attempt to have the mother transported or an attempt to have this Toni transported because the indictment does not cover any such thing.

I won't say that I have a command of the evidence complete, but I believe that this issue was never developed in any way or to any degree so that the government should be required to suddenly be talking about an attempt with regard to the mother and Toni and anything that opens up that issue.  We will stick to the indictment.

Now, the question remains whether there is a lesser included offense respect to Count 2, assuming that Count 2 relates to the only victim mentioned in the indictment and that is Jasmin and let's get back to that.

I want to go back and hear from the government again.

Is it appropriate or required or whatever you want to call it for me to give a lesser included offense charge as I now define it?

MS. LAMARQUE:  You mean with regard to Jasmin?

THE COURT:  Yes.

C9OUGIL8

1          MS. LAMARQUE:  I don't think it is appropriate,

2     because if you look at page 24 again.  The only difference as

3     we discussed is the third element.  Do you see that?

4          THE COURT:  Yes.

5          MS. LAMARQUE:  And the third element is that Jasmin

6     was less than 18 years old at the time of the alleged acts in

7     Count 2.  That point has been conceded.  So to charge a lesser

8     included with regard to Jasmin --

9          THE COURT:  Again, I suppose that the government could

10    charge in an indictment the first two elements and, just as a

11    matter of prosecutorial discretion, not charge the third

12    element.

13         MS. LAMARQUE:  Yes, your Honor.

14         THE COURT:  You could do that.

15         MS. LAMARQUE:  Yes, your Honor.

16         THE COURT:  You haven't done it here, but you could do

17    it.

18         MS. LAMARQUE:  Yes, your Honor.

19         THE COURT:  What goes through my mind is that a jury

20    could conceivably choose to convict on the lesser included

21    offense simply because jury's can -- they have a wide ranging

22    ability to choose what they do.  You know what I'm talking

23    about?

24         MS. LAMARQUE:  Yes.

25         THE COURT:  If the circumstances are what you say they

C9OUGIL8

1    are, as a matter of law, am I barred from giving a lesser

2    included offense charge or not?

3          MS. LAMARQUE:  You are no the barred.  As we stated in

4    the beginning, you have discretion.  In this case, my point

5    solely to you was --

6          THE COURT:  What Mr. Stein says, it is not a matter of

7    discretion.  You have to know what we are going to do

8    tonight --

9          MS. LAMARQUE:  From our research, it is a matter of

10   discretion on this particular point.

11         THE COURT:  Have you researched the point?

12         MS. LAMARQUE:  Yes, your Honor.  I not sure where

13   Mr. Stein is saying you don't have discretion on that point.

14         THE COURT:  But you believe there would be case law

15   saying that I have discretion?

16         MS. LAMARQUE:  Yes, your Honor.  We did submit a very

17   brief letter on the matter citing cases on this, but we would

18   be happy to send something up to chambers later tonight on this

19   point if you are concerned with it.

20         THE COURT:  The thing is, if I have discretion, I

21   would not include the lesser included offense because I think

22   it would be confusing to the jury to instruct them to leave out

23   an element which they know is either conceded or proven beyond

24   a reasonable doubt.

25         MS. LAMARQUE:  I think in this case it has been

C9OUGIL8

conceded rather than proven --

        THE COURT:  To ask the jury to return a verdict on something which leaves out something which is either conceded or they could easily find proven beyond a reasonable doubt I believe would be anomalous, so I will look the cases.  And if you could furnish my law clerk, but I will assume I have discretion, and I am exercising the discretion not to instruct on a lesser included offense in Count 2.  And I have already said that I will not instruct them on lesser included offense on Count 1.

        MS. LAMARQUE:  We will get those cases to you.

        THE COURT:  It seems to me that the government has stated the elements in a satisfactory way.

        I want to tell you right now that I will not use the exact words and I will not use all of the words.  The government has defined the elements.

        MR. STEIN:  Judge, I don't agree with that, to some extent.

        THE COURT:  What do you disagree with?

        MR. STEIN:  What I disagree with, and this gets back to the discussion that we had before the trial started about the indictment, there are three groups of words that are used in defining these crimes.  The first group of words are contained in the language on the first page of the first count of the indictment which is that the means used were force,

C9OUGIL8

threats of force -- I don't know if fraud is involved here --

and coercion or any combination of such means.  That is the

first group of words.

        The second, it is not really a group of words, but the

second word that is important in here is the word "cause."  And

I submit, Judge, that because the word "cause" is undefined

anywhere that I could see, either in the statute or in the

government's request to charge, that the words "cause" have to

be modified by the language earlier in that count which is the

force, threats of force, coercion or any combination of such

means.

        Because I couldn't find anything in my research about

what the word "cause" means that is actually a term of

statutory -- somewhat obscure, but I think it applies in this

case and without sounding pompous, it is a Latin phrase which I

am not sure how to pronounce, but I will spell it for the

record, E-J-U-S-D-E-M, and the second word is generis.  And

basically what this means is when there is a term which is

undefined, the word "cause" in the indictment and in the

government's request to charge is undefined that the

explanation for the word "cause" is --

        THE COURT:  I am going to interrupt you.  I think you

are overcomplicating this.  "Cause" means "cause."  I don't see

the complication.

        Since we have a break, I want to go through -- I am

C9OUGIL8

```
 1    not going to give a whole lot of alternative language.   I want
 2    to go to page 5 of the government's request to charge.  I will
 3    not give all that language -- recruited enticed, harbored,
 4    transported, provided, obtained or maintained.  And then an
 5    alternative, benefited financially, participating in a venture
 6    that recruited enticed, transported, provided -- that is just
 7    one way that you could really have the eyes of the jury glaze
 8    over, and that is for me to read to them all of that statutory
 9    language.  And we have got to figure out -- and if you won't
10    help me, I will do it myself -- a simplification.
11            But what does the government say out of all of that
12    you have proved?
13            MS. GREENBERG:  Your Honor, with respect to this first
14    element, we would say that we have proved, basically, those
15    first four verbs that you have there.  The defendant recruited,
16    that he enticed, that he harbored and transported --
17            THE COURT:  I am not going to give all of those words,
18    select one.
19            MS. GREENBERG:  Transported.
20            THE COURT:  All right.
21            MS. GREENBERG:  The second way we would also prove
22    that he was benefiting financially from participation in a
23    venture.  We do intend to show the jury that we have proved
24    that way of violating element 1 as well.
25            THE COURT:  As an alternative?
```

C9OUGIL8

1           MS. GREENBERG:  Yes.  There are two different ways of

2      proving that first element, so yes.

3           Your Honor, if I could just ask that we get more verb

4      in there to harbor on that first element?

5           THE COURT:  No.  You've got a jury.  The more words

6      you put in, the more questions you possibly raise.

7           MS. GREENBERG:  I understand what you are saying, but

8      he didn't just transport her and that was the end of the story.

9           THE COURT:  What does "harbor" mean?

10          MS. GREENBERG:  Meaning that they were staying

11     together in New York.  She was harbored.  He was staying with

12     her in New York.  It means to house, essentially.  And it

13     covers the conduct when they arrived in New York.

14          THE COURT:  It is an alternative to transport?

15          MS. GREENBERG:  Yes.

16          THE COURT:  I am not going to do that.  I am not going

17     to have a whole bunch of alternatives, I am sorry to tell you.

18     I am willing to say harbored and transported.

19          MS. GREENBERG:  That's fine, your Honor.

20          THE COURT:  And I am willing to say that he benefited

21     financially, OK?

22          MS. GREENBERG:  Your Honor, for that there, the

23     venture is "or."  The benefiting financially would be or.  Just

24     knowingly transporting or harbor, you would not have to benefit

25     financially.

C9OUGIL8

1          THE COURT:  Then I will leave out benefiting

2     financially.

3          MS. GREENBERG:  Your Honor, again, it is a way in

4     which he violated the statute.  It is what we charged.

5          Your Honor, we understand in terms of cutting for that

6     second element, if you just want to say that he benefited

7     financially from participating in a venture and leave out the

8     rest, that would cut some language there.

9          THE COURT:  If the jury doesn't find that he

10    transported, they are not going to convict.  That is the thing

11    that has been emphasized, emphasized, emphasized.

12          And I really do have an objection to presenting a jury

13    with a lot of complicated alternatives.  And I try to avoid

14    that.  Obviously, there is a basic alternative here between the

15    two segments of the statute.  The first about force and so

16    forth and the second about 18 years old.  That has to be given

17    to the jury.

18          But I am telling you right now, on the first element,

19    I will talk about harbored and transported.  And I am not going

20    to talk, since you don't agree with me putting it in the

21    conjunctive, I am not going to talk about the second.  I am

22    sorry.  I am not going to do it.

23          You are going to argue to the jury the facts, so you

24    could do that.

25          On the second, it is a very odd statutory language

C9OUGIL8

```
1    because what the government says here is that he used force,
2    fraud and coercion, not that he knew or recklessly disregarded.
3    You are going to argue that he used it, right?  That is what
4    you are going to stand up and argue, right?
5              MS. GREENBERG:  Yes, your Honor.
6              THE COURT:  Not that he knew that somebody else was
7    doing it?
8              MS. GREENBERG:  No, that's correct.
9              THE COURT:  But I don't want to depart from the
10   statute, so I think that we need to say that the second element
11   is that he knew that force -- are you arguing fraud?
12             MS. GREENBERG:  If you are going to say a new part of
13   the standard is knew or reckless disregard?
14             THE COURT:  I will not do that.
15             MS. GREENBERG:  It is the language that is in the
16   statute.
17             THE COURT:  I'm sorry.  I would much prefer to say
18   that the second element is that he used force and so forth, but
19   that departs from the statutory language.  But this recklessly
20   disregard, it has no meaning in the context of this case.
21             MS. LAMARQUE:  Your Honor, it is really important for
22   the purposes of appeal that the scienter requirement not be
23   omitted.  If the jury is not charged with the scienter
24   requirement, then there might be a frailty in their conviction.
25   So we agree with you that the knew absolutely has to be there,
```

C9OUGIL8

1    the knowing portion of that element.

2               THE COURT:  About how about the recklessly

3    disregarded?

4               MS. LAMARQUE:  It is a different scienter requirement.

5    My concern is this.  I know am that you want to make this as

6    digestible as possible and we couldn't agree more, because he

7    want them to get it.  Here is my worry.  When you start taking

8    out scienter requirements, then we have issues on appeal.

9               THE COURT:  The knew is more strict.

10              MS. LAMARQUE:  That's true, your Honor.

11              THE COURT:  Agree.  Which is why the knew has to be

12   there.

13              MS. LAMARQUE:  At the same time, your Honor, we have

14   the burden in this case.

15              THE COURT:  Are you going to stand up there and talk

16   about -- in your summation are you going to talk about reckless

17   disregard, what you believe you proved?  Are you going to even

18   talk about it?

19              MS. LAMARQUE:  We are definitely going to talk to the

20   jury, obviously based on this charge conference, on the

21   standard of law that they have to apply.

22              THE COURT:  I am asking you, in your summation, are

23   you going to talk about reckless disregard?

24              MS. LAMARQUE:  For the fact that fraud would be used,

25   yes.  For the fact that coercion would be used, yes.  Maybe not

C9OUGIL8

1    for force -- you are right, the force is that he hit her.

2              THE COURT:  I have no concept of what you would be

3    talking about.  Reckless disregard?  How did he recklessly

4    disregard anything?

5              MS. LAMARQUE:  Here?  That the fraud would be used

6    against her.

7              THE COURT:  What fraud are you talking about?

8              MS. LAMARQUE:  We are talking about the fact that he

9    lured her in with promises of reuniting her with her mother,

10   with a lot of promises about what the two of them would do

11   together when, in reality, as soon as she was comfortable with

12   him, he began hitting her and stopped all of the --

13             THE COURT:  You haven't mentioned reckless disregard

14   once in what you have just talked to me about.

15             MS. LAMARQUE:  Well, I didn't say those words, your

16   Honor.

17             THE COURT:  To me what you have talked about is making

18   some assurances which he knew were false.

19             MS. LAMARQUE:  Yes, your Honor, that's true.

20             THE COURT:  I am sorry.  I am not going to talk about

21   reckless disregard.

22             MS. LAMARQUE:  Your Honor, we do have the burden of

23   proof in this case.  I would just love for it not to be --

24             THE COURT:  If I hear in your summation a discussion

25   of reckless disregard, I will put it in.

C9OUGIL8

1            MS. LAMARQUE:  Fair enough, your Honor.

2            THE COURT:  But if you don't, I won't.

3            It is getting pretty late.

4            Is there anything else that needs to be discussed?

5            MS. LAMARQUE:  Just very briefly, we were going to

6    supply the Court and defense counsel, of course, with a special

7    verdict form because we have to have one based on the penalties

8    in this case.  We will get that to you later tonight, to both

9    parties.

10           THE COURT:  We are adjourned.

11           We had better get together at 9:30 and talk about any

12   last-minute problems.

13           MS. LAMARQUE:  Just quickly and I will not be long.

14           On the second element, if you could go back to page 5

15   again, sorry.

16           THE COURT:  Yes.

17           MS. LAMARQUE:  The first way that we could prove the

18   second element, I get your concern about reckless disregard,

19   but on the age prong -- do you have a second prong, your Honor

20   where it says defendant knew or recklessly disregarded that the

21   victim had not reached 18, I would argue that we will

22   absolutely be discussing reckless disregard on that prong, your

23   Honor.  So, please, we just want to make sure that we have

24   fronted that for the Court.

25           That's all for the government, your Honor.

C9OUGIL8

1       MR. STEIN:  Judge, I just want to make sure about one

2  thing, since I assume that at some point the indictment is

3  going to be read to the jury.

4       THE COURT:  I never read the indictment to the jury.

5       MR. STEIN:  A copy of the indictment?

6       THE COURT:  I don't give the jury a copy of the

7  indictment.

8       MR. STEIN:  Here is my problem with that, Judge,

9  because this gets back to what the government just referred to

10  now and what we had discussions about which is the to wit

11  language.  So if they don't have the to wit language during the

12  Court's instructions, they are not going to have the language

13  in which, number 1, caused victim number, that is Jasmin, to

14  travel from Maryland to New York City and compelled her to

15  engage in commercial sexual acts that benefited Mr. Gilliam

16  financially.

17       Judge, the other thing --

18       THE COURT:  Wait a minute.

19       MR. STEIN:  This came up a number of times.

20       THE COURT:  What my intention is, is to charge the

21  necessary language that the jury would not be aided by getting

22  a copy of this indictment.  What will aid the jury is for the

23  Court and the lawyers in their arguments to argue and specify

24  the necessary language, meaning what they have to find.

25       Have you got the government's request to charge,

C9OUGIL8

1      Mr. Stein?

2                  MR. STEIN:  I do.

3                  THE COURT:  Look at page 5.

4                  MR. STEIN:  I have it.

5                  THE COURT:  What the government, I believe, has done,

6      the government has taken this rather complicated statutory

7      language -- and I've got the statute now and I am going to omit

8      certain words to cover, I believe, the second alternative in

9      the indictment, knowing or in disregard of the fact that the

10     person has not attained the age of 18 years and will be caused

11     to engage in a commercial sex act.  And that's what the

12     government has as this element at the bottom of page 5, and

13     that tracks the statutory language exactly now.

14                 If there was a definition of "cause," I don't think it

15     needs much definition.  The word is there, but if there is a

16     definition that you would like to propose, I would like to

17     consider it.

18                 MR. STEIN:  That's the problem I started to raise

19     before, Judge.

20                 THE COURT:  But it is not going to help to give them a

21     copy of the indictment.  The question is, do you want a

22     definition of "cause."

23                 MR. STEIN:  I am not aware of any definition.

24                 THE COURT:  You're a lawyer.  If you feel that it

25     should be defined, you are capable of giving me a proposed

C9OUGIL8

definition.

              MR. STEIN:  What I believe the word "cause" means in

the context of this case is that cause --

              THE COURT:  In the context of what?

              MR. STEIN:  This case.

              THE COURT:  Yes.

              MR. STEIN:  What it means is the force or threats of

force or coercion that the government has alleged in this case,

that since there is no definition that I am aware of what

"cause" means which, obviously, is a crucial word in the

statute and in the government's request to charge, that there

has to be some definition of that.  And I think the definition,

in the absence -- the explanation of what cause means in the

absence of any definition is the language that precedes it

which is the language of force, threats of force, coercion,

fraud -- whatever it is.


              (Continued on next page)

C9OTGIL9                          Charge conference

1           THE COURT:  I completely disagree.  That's a complete

2     misreading of the statute.

3           MR. STEIN:  The problem is there is no language that

4     explains what "cause" means.

5           THE COURT:  Well, I don't really think there needs to

6     be any.  If you want to propose some language, give me some

7     language, but it's not going to be incorporating another branch

8     of the statute.  I don't accept that at all.

9           So let's adjourn until 9:30 tomorrow.

10          (Adjourned to September 25, 2012 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   JASMIN

 4   Direct By Ms. Greenberg  . . . . . . . . . . 195

 5   Cross By Mr. Stein . . . . . . . . . . . . . 294

 6   Redirect By Ms. Greenberg  . . . . . . . . . 345

 7   Recross By Mr. Stein . . . . . . . . . . . . 346

 8                     GOVERNMENT EXHIBITS

 9   Exhibit No.                           Received

10    143   . . . . . . . . . . . . . . . . . . . 222

11    145   . . . . . . . . . . . . . . . . . . . 253

12    1 and 2  . . . . . . . . . . . . . . . . . . 274

13    3  . . . . . . . . . . . . . . . . . . . . . 278

14

15

16

17

18

19

20

21

22

23

24

25
```