C9PTGIL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           11 CR 1083 (TPG)

5    JABAR GILLIAM,

6              Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       September 25, 2012
9                                      9:30 a.m.

10

     Before:
11
                     HON. THOMAS P. GRIESA
12
                                       District Judge
13                                       and a Jury

14                    APPEARANCES

15

     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  NATALIE LAMARQUE
          KRISTY J. GREENBERG
18          Assistant United States Attorneys

19   JOEL STEIN
          Attorney for Defendant
20

21

22

23

24

25

C9PTGIL1

1          (In open court, jury not present)

2          THE COURT:  Good morning.  Let me explain about what

3    my law clerk has given you.  I do not have a written

4    instruction which I read from, and therefore I do not have a

5    written instructions to give to the jury.  Some judges do what

6    I'm talking about.  I don't do that.  I instruct the jury

7    orally, and obviously the court reporter is taking the

8    instruction down, and if the deliberation goes on long enough

9    and the jury wants a copy of the minutes, they certainly can

10   have that.

11         But what I do very often is give the jury a list in

12   writing of the elements because they will hear that, but it's

13   hard to remember.  And therefore, I have given both sides the

14   list of the elements as I intend to announce them, and I think

15   I will just read these unless there's something more urgent to

16   take care of before 10 o'clock.  Is there anything?

17         MS. LAMARQUE:  A quick point on the elements, your

18   Honor.  The first sentence is that the defendant knowingly

19   harbored -- it should be "or transported," not "and."

20         THE COURT:  We agreed last night to say "and."

21         MS. LAMARQUE:  Your Honor, that means we have to prove

22   both things, and that's simply not the law, it's not.

23         THE COURT:  We agreed to have it in the conjunctive.

24         MS. LAMARQUE:  Your Honor, the conjunctive increases

25   the burden here and makes us prove both.  I'm sorry if that's

C9PTGIL1

1    what the Court's understanding was, but --

2              THE COURT:  That's what you said.

3              MS. LAMARQUE:  I apologize if I misspoke, but your

4    Honor --

5              THE COURT:  I tell you this, I said this last night, I

6    avoid alternatives as much as possible.

7              Listen to me.  I avoid alternative as much as

8    possible, because every time you have an alternative, it is not

9    necessarily so, but there's the potential of having to instruct

10   the jury that they cannot find six find harbored and six find

11   transported, they have to be unanimous on one.  Now obviously

12   that has to be done on the alternative basic charges, but so

13   what do you suggest that I should instruct the jury?

14             MS. LAMARQUE:  All I'm asking, your Honor, is

15   literally one change.

16             THE COURT:  How about what follow-up instruction?

17             MS. LAMARQUE:  There is no necessary follow-up

18   instruction on that, your Honor, because it's just the first

19   element that the defendant knowingly harbored or transported

20   Jasmin.  That's it.  That's all I'm asking for.

21             THE COURT:  And you don't think there's any need for

22   some explanatory instruction?

23             MS. LAMARQUE:  I do not, your Honor.

24             THE COURT:  OK.  Mr. Stein, any comment?

25             MR. STEIN:  I'm just looking at the statute, Judge.

C9PTGIL1

1          THE COURT:  Well, the government is certainly right as

2     far as how the statute reads, but the government is worried

3     about this huge increase in their burden of proof.

4          MR. STEIN:  I understand.

5          THE COURT:  And the idea that their burden of proof

6     has that increased because they will have to prove that both

7     the defendant kept her in New York and transported her.  My

8     goodness.  I wouldn't want to impose on the government in that

9     way.  But this is a ridiculous point.  But if you want to

10    change it in accordance with the statute, I will change it, but

11    I will not give an instruction about they have to be unanimous

12    on harbored or they have to be unanimous on transported, they

13    can't be six for harbored and six for transported.  I will not

14    go into that.

15         MS. LAMARQUE:  Yes, your Honor.

16         THE COURT:  We'll make the change.

17         MS. LAMARQUE:  Thank you.

18         THE COURT:  Anything else?

19         MR. STEIN:  Judge, just one substantive matter, I

20    guess I call it housekeeping matter.

21         THE COURT:  OK.

22         MR. STEIN:  The one substantive matter is what I

23    marked for identification as Defendant's Exhibit 2, which are

24    excerpts from the St. Barnabas Hospital records that have been

25    referred to during the trial.  So I think we have some

1    agreement as to what is going to be allowed into evidence.  And

2    what I propose to do, if it's OK with the Court, is to read the

3    parts of the hospital records that we agreed to, and the jury

4    will understand that these are excerpts and not the entire

5    record.  And then later on, if the jury requests to see these

6    sections of the records, I'll redact by blacking out the part

7    of that particular page that we have agreed is not appropriate

8    for the jury.

9              THE COURT:  Or the transcript could be given, but the

10   mechanics we'll work out.

11             MR. STEIN:  That's the one point of substance.

12             The other point, Judge, of more housekeeping which is

13   a personal presence on my part.  I know your Honor likes to

14   keep the shades open.  I prefer -- and I will try and keep my

15   voice up -- to be standing in front of the jury, and when this

16   happened during my opening statement there's a glare from the

17   windows and the jury -- I can't really make contact with them.

18   So I would ask that we just pull the shades down at some point.

19             THE COURT:  We'll do that.

20             MR. STEIN:  Thank you.

21             THE COURT:  A very good point.  I think pulling the

22   shades is OK without the drapes.

23             MR. STEIN:  Yes.  I don't want it dark, I just don't

24   want a glare.

25             THE COURT:  We'll close them before the jury comes in.

1    Good point.

2              MS. LAMARQUE:  Your Honor, one point, I know it's not

3    your practice to provide us with a copy of the charge, I just

4    wanted to make sure that -- I wasn't clear, other than the

5    elements, what sort of areas the Court was going to go into.

6    Just so I sort of follow along with our charge.  I'm assuming

7    at the end of the charge you will ask the parties if there is

8    any objections or anything that needs to be added or what have

9    you.  If you could maybe -- because we don't have Live Note, so

10   it's a little harder for us to follow where you're going, if

11   that's OK.

12             THE COURT:  OK, I get your point.  The thing is you

13   have got a lot of definitions in there that I think are

14   unnecessary.

15             MS. LAMARQUE:  Definitely operate under the more is

16   more philosophy, which is not always the best one.

17             THE COURT:  Well, I would intend to define what I

18   think need to be defined, and I think there's very little that

19   needs to be defined here.  Force is force.  Coercion is he

20   coercion.

21             MS. LAMARQUE:  I think coercion is one of the points,

22   your Honor, for us that I think might need some definition.

23             THE COURT:  Where do you find the definition of

24   coercion?

25             MS. LAMARQUE:  First it's defined in the statute, but

C9PTGIL1

1     we also defined it in the charge as well, and that's on page --

2                THE COURT:  Wait, let's get the statute open.

3                MS. LAMARQUE:  1591.

4                MR. STEIN:  1591(e)(2).

5                MS. LAMARQUE:  1591(e)(2) defines coercion.

6                THE COURT:  Where in the statute?

7                MS. LAMARQUE:  It's (e)(2), your Honor.  Just because

8     there is some stuff in there that is not fully obvious to

9     everyone, I think, especially the point about threats of harm.

10    I think of all the definitions in this statute, that's probably

11    the only good one, to be quite frank.  It helps, I believe.

12               THE COURT:  You mean (A), (2)(A)?

13               MR. STEIN:  (e)(2)(A).

14               MS. LAMARQUE:  Yes, your Honor.

15               This is exactly what we have quoted on page 11 of our

16    request to charge.  We tried to take out all of the excess,

17    like your Honor does.

18               THE COURT:  Well, it's certainly reasonable to ask the

19    definition of coercion in terms of (2)(A), and that's what

20    you're asking.

21               MS. LAMARQUE:  Yes, your Honor.

22               THE COURT:  Very good, I will do that.

23               MS. LAMARQUE:  One last point, with regard to Count

24    Two, the transportation count, I just wanted to make sure that

25    the jury was going to be instructed that consent wasn't a

C9PTGIL1

1  defense to the transportation count, that consent was not

2  relevant as the case law and the statute.

3          THE COURT:  I will so instruct the jury.

4          MS. LAMARQUE:  Thank you so much.

5          THE COURT:  So is the last point is consent is not a

6  defense?

7          MR. STEIN:  Judge, if we're talking about the

8  transportation under Count Two.

9          THE COURT:  We're talking about Count Two, yeah.

10          MR. STEIN:  18 USC 2423.  I don't see anything in the

11  statute about consent not being a defense.

12          MS. LAMARQUE:  It's not statutorily explicitly stated,

13  it's the case law that analyzed it, your Honor.  It says in

14  essence for the transportation count -- I can cite you the law,

15  your Honor.

16          MR. STEIN:  Judge, frankly, I think this issue is kind

17  of a red herring, because no one -- this is not a statutory

18  rape case, this is a transportation case.  So whether or not

19  somebody consented to go to New York, whatever that means, is

20  not part of what I understand the elements of this offense to

21  be.

22          MS. LAMARQUE:  If you go to page 27 of our charge,

23  your Honor.

24          THE COURT:  I just don't see any issue.  It seems to

25  me that consent could not be a defense because the crime is

C9PTGIL1

 1   committed if someone knowingly transports.  That's the crime.

 2            MS. LAMARQUE:  I agree, your Honor.

 3            THE COURT:  It seems to me the government is entitled

 4   to a clarifying instruction, which is consistent with the

 5   statute, that consent is not a defense.

 6            MR. STEIN:  Judge, I object to that because I don't

 7   think it's relevant to this particular charge.

 8            THE COURT:  Why not?

 9            MR. STEIN:  Because it's not part of the statutory

10   scheme.  I think it's just irrelevant.  To say that it's not a

11   defense I think misses my point.  My point is that it's not

12   relevant to what the statute requires.  And there's nothing in

13   the 2423 which says anything one way or another about consent.

14   He transported her for the purposes of commercial sex activity,

15   and she was --

16            THE COURT:  Well, listen I hear your objection.  The

17   objection is overruled and I will give that instruction.

18            Are we ready for the jury?

19            MR. STEIN:  Could I just step out?

20            THE COURT:  As soon as you're all ready --

21            MS. LAMARQUE:  We're ready, your Honor.

22            THE COURT:  I understand.

23            MR. STEIN:  Can I assume after Ms. Greenberg is

24   finished we'll take a recess?

25            THE COURT:  Of course.

C9PTGIL1

1      My law clerk is handing out the revised list of

2   elements which has the alternative language requested by the

3   government, and that's certainly fine.

4           MR. STEIN:  Sorry, Judge, I didn't hear what you said.

5           THE COURT:  My law clerk has handed out the revised

6   list of elements which has the alternative language requested

7   by the government.

8           These will be given to the jury before I instruct the

9   jury but not earlier than that.

10          MR. STEIN:  Judge, I'm sorry, there's one other

11  matter.  It's probably not an issue, but I want to make sure.

12  At one point there was a meeting of various a/k/as in the

13  caption in the time.  I would ask that that not be done at all

14  during the course of these proceedings, just Jabar Gilliam, not

15  a/k/a this, this and that.

16          THE COURT:  No reference to aliases.  That's a good

17  point.

18          MS. LAMARQUE:  Agreed, your Honor.

19          THE COURT:  And you understand I'm not going to read

20  the indictment to the jury or give the indictment to the jury.

21          MR. STEIN:  Yes, you said that yesterday.

22          THE COURT:  All right.

23          Everyone is here, we'll bring in the jury and started.

24          You have your remaining proof, Mr. Stein?

25          MR. STEIN:  Yes.

C9PTGIL1

1          THE COURT:  Do you have your verdict sheet with you?

2          MS. LAMARQUE:  Yes, sir.

3          THE COURT:  We've got it.

4          MS. LAMARQUE:  And the a/k/as were removed from the

5     caption.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C9PTGIL1

1        (Jury present)

2        THE COURT:  Good morning, ladies and gentlemen.  The

3  defense has certain proof, and we'll proceed, Mr. Stein.

4        MR. STEIN:  Judge, as part of Defendant's Exhibit 2,

5  I'm going to read to the jury excerpts from the medical records

6  from St. Barnabas Hospital from December -- starting from

7  December 2nd when Jasmin was taken there.  So these are

8  excerpts and not the complete record, of course.

9        "No bruises found during PE," which I believe means

10  physical examination.

11        A drug screen was performed on Jasmin based on a urine

12  specimen, and the following results were provided:  Cocaine,

13  negative; opiates, negative; benzodiazepine, negative; THC,

14  negative; barbiturates, negative.

15        A pain assessment was conducted, and among the

16  observations were the pain location in the back and feet.  The

17  pain was observed to be acute.  The pain was constant, it was

18  described as stabbing.

19        THE COURT:  I didn't hear, as what?

20        MR. STEIN:  A stabbing-type pain.

21        And finally, the pain was precipitated by a factor

22  referred to as "activity."

23        THE COURT:  You said this, but again what's the date

24  of these notes?

25        MR. STEIN:  They began sometime in the evening of

1   December 2nd and carried into December 3rd, 2011.

2              That's it, Judge.  The defendant rests.

3              THE COURT:  Now we'll have the summations.  We have

4   drawn the blind so that the lawyers can see you and you can see

5   them without blinding glare.  The government will proceed

6   first.

7              MS. GREENBERG:  This man, the defendant, Jabar

8   Gilliam, trafficked a 16-year-old girl by bringing her from

9   Maryland to New York to sell her for sex.  The defendant preyed

10  on a young girl with a profoundly sad past, a young girl who

11  was the victim of molestation, parental abuse and neglect.  A

12  young girl who was diagnosed at a young age with bipolar

13  disorder.  A young girl who was for most of her life in and out

14  of foster homes.

15             That is why the defendant chose her, because he knew

16  that she was vulnerable.  He was violent toward her.  He was

17  manipulative towards her.  He was calculated in how he abused

18  her.  He saw her as his own personal property to use for one

19  reason and one reason alone:  To make money.  And now you have

20  the opportunity to hold him responsible for what he has done.

21             Now you heard the victim testify about how the

22  defendant contacted the victim on Facebook knowing that she was

23  in high school.  He contacted her to work as a prostitute for

24  him.  She told the defendant about the negative experiences

25  that she had had with men, and the defendant told the victim he

1    was taking her home to meet his mother.  He complimented her,

2    told her she was pretty.  He had sex with her.

3         And he took a page out of his very own play book, as

4    you see right here.  Now this was under the page titled

5    "Knocking."  Defendant's own words, ladies and gentlemen:  Sell

6    to thy thy fantasy, for thy must feel that the best and only

7    way is through you.  The pitch equals the charm.

8         He sold her a fantasy that he was going to be her

9    boyfriend and treat her with respect.

10        She also and wanted, as you heard, to be reunited with

11   her mother in California.  The defendant knew that the victim's

12   mother had a drug problem and that she was a prostitute, and

13   that Jasmin was living in Maryland and the victim's mother was

14   living in California.  He sold the victim a fantasy of a family

15   reunion, that they were going to get a house together in

16   California, and that he would reunite the victim with her

17   mother there.

18        Ladies and gentlemen, it worked.  The defendant lured

19   the victim in, and she agreed to go to New York to prostitute

20   with him.

21        But the defendant was not the victim's boyfriend.  The

22   defendant was not her Prince Charming.  The defendant was a

23   pimp.  The defendant did not take the victim home to meet his

24   mother for Sunday dinner, he took the victim to meet his mother

25   so he could prostitute her.  The defendant get a beautiful home

1    out in California for the three of them.  Where did he bring

2    the victim?  He brought her to an apartment in the Bronx where

3    he had a line up of men going into her bedroom to have sex with

4    her.

5              He hit her.  You heard that he had sex with her

6    against her will.  He threatened her and he threatened her

7    younger sister.  She believed his threats and she was scared of

8    him.  Ladies and gentlemen, this was no fairy tale.  This was

9    no fantasy.  This was a nightmare.

10             And that is why we are here today.  Defendant is

11   charged with two counts.  The first count is for trafficking

12   Jasmin for prostitution by force, fraud or coercion, or knowing

13   that she was under the age of 18.  Count Two charges the

14   defendant with transporting Jasmin across state lines for

15   purpose of prostitution.

16             Now let's get to the evidence.  There are three things

17   that are not in dispute in this case, three things that the

18   parties are not arguing about.  First, it is not in dispute

19   that the victim was 16 years old when the defendant -- at the

20   time of the offense.  Defense counsel told you that she was 16

21   in his opening.  And you saw Government Exhibit 161, the

22   victim's birth certificate shows that she was born in July of

23   1995 and she was 16 at the time the defendant was prostituting

24   her.

25             Second, what's not in dispute is that the defendant

1    and the victim traveled by bus from Maryland to New York on

2    December 1st, 2011.  Defense counsel told you that in his

3    opening, and the defendant admitted that in his post-arrest

4    statement.  Now if you look at Government Exhibit 15, you even

5    saw the bus ticket to New York that the defendant had on him

6    when he was arrested.

7            Third, the third thing that's not in dispute was the

8    defendant was involved in selling women for sex.  Defense

9    counsel admitted this at the outset.  He said the defendant was

10   having conversations with various adult women about working for

11   him as prostitutes.  And ladies and gentlemen, he had to make

12   that admission.  He couldn't get away from the overwhelming

13   evidence in this case that the defendant was a pimp.  He

14   couldn't get away from the text messages, he wouldn't get away

15   from the photographs of provocatively dressed women in his cell

16   phone, he couldn't get away from the rules, he couldn't get

17   away from the handwritten notebook, his own play book.

18           So what is in dispute?

19           Let's start with Count Two.  In order to prove the

20   defendant guilty of Count Two, the government must establish

21   three things:  First, that the defendant knowingly transported

22   the victim in interstate commerce.  Now all that means is the

23   defendant was crossing state lines with the victim.

24           The second thing we have to establish is that he did

25   so with the intent that the victim would engage in

1    prostitution.  All that means is he's crossing state lines to

2    prostitute her.

3            And third, that the victim was under the age of 18 at

4    the time.  And as we stated, Jasmin was 16.

5            Now for Count Two and only for Count Two, the

6    government does not have to prove that the defendant knew that

7    the victim was under age 18.  And whether or not the victim

8    consented to being transported is irrelevant to this count.

9            So for Count Two, the only question that you have to

10   answer is:  Why?  Why did the defendant and the victim get on

11   that bus from Maryland to New York?  Why?

12           The defendant didn't bring the victim to New York to

13   have her see the sights of New York and take her to a Broadway

14   show.  You know why they got on that bus.  They got on the bus

15   so the victim could work as a prostitute for the defendant in

16   New York and make him money.  And you know that from the

17   victim's testimony.  You know that from the condoms and the

18   lubricants.  You know that from the rules.  You know that from

19   the photographs on his cell phone.  You know that from the text

20   messages.  Ladies and gentlemen, the evidence is overwhelming.

21           Let's go through it now.  So the victim in this case

22   told you what happened.  The defendant asked her to go to New

23   York with him to work for him as a prostitute.  They talked

24   business.  By "business," they meant prostitution.  They talked

25   about that for weeks leading up to their trip to New York.

1    They prepared for this trip.  He gave her rules for

2    prostituting in New York.  He bought her clothes, clothes that

3    she would wear to prostitute in New York.  He made the travel

4    arrangements.  He paid for her bus ticket.  She and the

5    defendant took the bus from Maryland to New York so she could

6    work for him there.  And the victim worked for him there.  She

7    worked for him in New York as a prostitute for two full days

8    before she was recovered and he was arrested.

9           Now you could rely on the victim's testimony alone and

10   find the defendant guilty.  But there is so much more here.

11   Everything the victim told you about the defendant's intention

12   to prostitute her is supported by the physical evidence, by the

13   defendant's own words, and by the defendant's actions after he

14   was arrested.

15          Where were the victim and the defendant found when the

16   defendant was arrested?  They were outside the very apartment

17   where the defendant had been prostituting the victim earlier

18   that day.  And in that apartment, what did law enforcement

19   find?  They found the defendant's backpack and the victim's

20   backpack loaded with evidence that she was prostituting.

21          Now looking at Government Exhibit 12, in the

22   defendant's backpack, there were six condoms and lubricant.

23   Looking at Government Exhibits 28 and 29, in the minor victim's

24   pocket, law enforcement found the same thing, eight condoms and

25   14 lubricant packets.

1          MS. GREENBERG:  How else do you know that the

2     defendant was prostituting the victim?

3          Let's look at Government Exhibit 26.  These are the

4     rules, the booklet that the defendant gave to the minor victim

5     which she then later gave to law enforcement.

6          He told her to memorize these four rules -- and she

7     did.  You heard her on the stand without this book in front of

8     her tell you what those rules were.  He told her to bring these

9     rules with her to New York.

10          You have seen these rules in black and white.  What

11     are the rules?  The victim explained to you what they are, and

12     your common sense tells you what they are.  These are rules to

13     avoid getting caught by law enforcement for prostitution.

14          Now, there is not a serious question as to where these

15     rules came from.  You saw Government Exhibit 14.  And this is

16     the small booklet that was found in the defendant's pocket at

17     the time of his arrest.  You saw that exhibit and you saw

18     Government Exhibit 26.  This was the booklet that the defendant

19     gave to the minor victim that she then gave to law enforcement.

20          Look at these pages of the rules in each of these

21     booklets side by side.  Can you tell the difference between the

22     booklet that was on the defendant and the booklet that the

23     defendant gave to Jasmin and that she gave to law enforcement?

24     You see in these two slides, the words are the same.  The

25     handwriting appears to be the same.  And you can even see

1    misspellings that are the same in both of these booklets.

2    These rules are clear evidence that the defendant intended to

3    prostitute the victim in New York.

4         How else do you know that the defendant was

5    prostituting the victim?  The victim told you that the

6    defendant bought her sexy clothes and shoes to prostitute her

7    with in New York.

8         How do you know that is true?  Let's look at

9    Government Exhibit 35.  Now, you saw this photograph with these

10   clothes.  You saw the purple and gray dress -- you cannot see

11   it laid out here, but I am pointing to it.  You saw the black

12   high heeled, strappy shoes and you saw the pink bra.

13        Now, ladies and gentlemen, that's all she had.

14   Remember, she was traveling with the defendant on December 1,

15   2011.  Where are her sweaters?  Where are her sweatshirts?  She

16   didn't pack those things because she packed her clothes to go

17   prostitute for the defendant.  That's what she was going to New

18   York to do.

19        Now, another piece of physical evidence that the

20   defendant simply cannot explain away are the sexual photographs

21   of the defendant on the defendant's cell phone.  How did these

22   photographs get there?  The victim told you that the defendant

23   took those photographs of her on his cell phone.

24        And look at these photographs.  Let's talk about these

25   photographs.  In these photographs she is wearing a purple and

1    green dress.  She is wearing fishnet stockings and revealing

2    her legs.  In one of the photographs Government Exhibit 42, you

3    see she is lying down.

4          The victim described these photographs to you, and the

5    victim told you that these photographs were taken over the

6    weekend that she was in New York with the defendant.  And

7    Special Agent Conolly told you that when he went through the

8    phone dump on the defendant's phone, that these photographs

9    were taken over that same weekend on December 2.

10         Also, you have seen this purple and gray dress, once

11   again, in the defendant's belongings.  Purple and gray dress

12   that she is wearing in the photographs was in her belongings,

13   as you can see from Government Exhibits 35 and 42.

14         And more importantly, why did the defendant have these

15   photographs in his cell phone?  Why didn't the defendant

16   photograph the victim's face?  The victim told you why, because

17   the defendant and his brother Harry were going to post these

18   photos on Backpage.  They were going to put these photos on an

19   advertisement for her sexual services.  And the reason they

20   didn't put her face on the photos was that they didn't want the

21   victim to be identified.

22         Where have you seen a reference to Backpage in this

23   case?  Well, you have seen it from the defendant's own

24   notebook.  Look at Government Exhibit 13 and Government Exhibit

25   14, the defendant's own notebook and the booklet found on him.

1    In both of those he references backpage.com.

2         Look at Government Exhibit 76, and these are the text

3    messages between the defendant and the victim's mother.  Look

4    down to line 162, and this is a message from the defendant to

5    the victim's mother on December 2nd:  Your profile info is on

6    what page?  I need to copy it down so that I can put it on

7    Backpage.

8         Now, you saw again, what is he doing?  When he wants

9    to advertise the victim's mother for prostitution, he wants to

10   do it on Backpage.  This is, again, consistent with Jasmin's

11   testimony.

12        You also see Government Exhibit 77.  These are text

13   messages between the defendant and Toni.  If you look at line

14   56, defendant tells Toni that, I'm about to set things up for

15   you.  I need a few sexy lingerie pics to get started.

16        You can see line 104, he is asking her for the

17   photographs:  I can't complete your page without them.

18        Again, what is he saying here?  The defendant is

19   saying to Toni, send me these sexy lingerie pics.  I need them

20   so I can make a page for you, I can make an advertisement for

21   your sexual services.

22        Now, as the defendant conceded, he prostitutes adult

23   women, but the evidence shows that he prostituted the minor

24   victim too.  When you look at these conversations between the

25   defendant and adult women, the clear purpose of them is to

1  prostitute them.  So when you see and hear the defendant having

2  the same kind of discussions about the minor victim, what

3  conclusion must you draw?  You must conclude that he did so for

4  the same purpose, to prostitute her.

5       Let's look at Government Exhibit 85.  Look at this

6  message from the defendant to the victim's mother.  Are you

7  going to send the pics?  I want to have the both you when it's

8  all said and done as my luv.

9       Who does he mean by both?  He means the victim and her

10  mother.

11       What does he want them for?  He wants them both to be

12  prostitutes for him.

13       Now, the defendant and the victim's mother continued

14  their conversation.  So what else did the defendant say to the

15  victim's mother?

16       Looking still on Government Exhibit 76, he tells her

17  in line 159:  Your daughter wants to be first in line, but you

18  know as well as I that can't happen.

19       Now, this message is important because it reveals that

20  the defendant and the victim had a conversation about Jasmin

21  being a prostitute.  They discussed her being first in line.

22  She wanted to be first in line.  He didn't want her to.  Why?

23       Look at the next message at 160.  The defendant tells

24  the victim's mother:  I want you as my number 1.  That position

25  belongs to the one who is experienced and capable of leading

1    the flock.

2            Let's focus on the last word, "flock."  What is a

3    flock?  A flock is a group, more than one person.  The

4    defendant wanted as many prostitutes as he could get so that he

5    could make as much money as he could, and he clearly wanted

6    Jasmin as one of his prostitutes.

7            The defendant has conceded that these discussions with

8    the victim's mother and Toni were about prostitution.  He can't

9    get away from the clear meaning of these text messages about

10   prostitution of the minor victim too.

11           In addition to testimony and physical evidence, the

12   defendant's behavior at the time of his arrest shows you his

13   intent to prostitute the victim.  When he was caught red-handed

14   by law enforcement with a 16-year-old girl in front of the very

15   apartment where he was prostituting her, what does he do?  He

16   runs.

17           You heard from NYPD Detective Sean Ryan that he was

18   trying to handcuff the defendant when the defendant lunged into

19   another apartment, and he hurt Detective Ryan's foot which got

20   caught underneath the door.  Defendant ran from police and he

21   injured a police officer in the process.  Why did he run?

22           Well, the defendant told Special Agent Conolly that it

23   was just instinct.  But is that true?  Is that what happened?

24   He didn't run as soon as police announced themselves.  No, he

25   waited.  He waited until he realized the police were on to him.

1    He saw the police take the 16-year-old girl down the hall,

2    pulling her away from him.  He knew that they were on to him at

3    that point for prostituting her, and so he ran because he knew

4    he had gotten caught for bringing the victim across state lines

5    to prostitute her.

6           How else do you know the defendant's intent?  Special

7    Agent Conolly testified about the defendant's post arrest

8    statement.  And now you have seen the evidence to know that his

9    statement was full of lies.

10          What was the first thing the defendant stated to

11   Special Agent Conolly in his post arrest statement?  I didn't

12   cross state lines with her.  Why did he begin there?  Because

13   he knew he was cooked.  He knew that once he crossed state

14   lines with a minor, that made his crime a federal crime, and

15   the defendant then desperately tried to cover his tracks.

16          First, he said he didn't know the victim's name.  Of

17   course, you know that's not true.  He knew her name.  The

18   victim told you so.  And you have seen it in the evidence.

19   Look at Government Exhibit 45.  This is the contact list from

20   the defendant's cell phone.  You can see two entries there

21   under the name Jazzy.  Jasmin told you they were for her.  One

22   was for her foster home, one was for her cell phone for her

23   foster home.

24          You can also see in the defendant's text message, he

25   explicitly refers to Jasmin by her name.  This is a text

1    message from the defendant to the victim's mother:  I just

2    spoke to your child Jasmin.

3         Next, the defendant said that he met the victim the

4    night before his arrest out on the street in New York.  Of

5    course we know that to be false.  The defendant has now

6    admitted that he traveled from Maryland to New York with the

7    victim and that they were staying together in the very

8    apartment where she was being prostituted.

9         Ladies and gentlemen, the evidence is clear.  It is

10   uncontroverted and it is devastating.  It is crystal clear that

11   the defendant is guilty of bringing Jasmin to New York for the

12   purpose of prostituting her which makes him guilty of Count 2.

13        Now, let's turn to Count 1.  For Count 1, the

14   government has to prove three elements beyond a reasonable

15   doubt.  The first element requires us to show that the

16   defendant knowingly harbored or transported the victim in or

17   affecting interstate commerce.  So all harbored means is, he

18   gave her a place to stay, and all transported means is

19   defendant crossed state lines with her.

20        Now, for the second element, there are two alternative

21   ways in which you can prove this element.  The first way is if

22   the defendant knew or recklessly disregarded Jasmin was under

23   18 years old and that she would be caused to prostitute.  So

24   all that means is the defendant knew or he had enough facts to

25   make obvious and just chose to ignore Jasmin was under 18 when

1    he prostituted her.

2            The second way is for us to show that the defendant

3    knew that force, fraud or coercion would be used to cause

4    Jasmin to prostitute.

5            Now, the third element of Count 1 is for the

6    government to prove that the defendant's actions were in or

7    affecting interstate commerce.  And here you know the defendant

8    crossed state lines.

9            So for Count 1, there are really two issues that are

10   in dispute and those are as to the second element:  First,

11   whether the defendant knew or ignored facts that clearly showed

12   that the victim was under age 18; and, second, whether the

13   defendant knew that force, fraud or coercion would be used to

14   cause the victim to prostitute.

15           So let's start with the first regarding her age.

16           Ladies and gentlemen, you have seen in black and white

17   that the defendant was explicitly told Jasmin's age.  Look at

18   Government Exhibit 76, line 57.  This is a text message from

19   the victim's mother to the defendant:  She is 16.

20           Now, I want you to note a few things about this.  The

21   date, November 30, 2011.  The time was 3:35.  They had not

22   gotten on the bus yet.  The message indicates that it was read.

23   And you will see the next message, line 58 shows you that soon

24   after, within seconds -- I'm sorry -- line 59, within a few

25   minutes, the defendant then responded to the victim's mother's

1   message.  So he read the message that she was 16 and he

2   responded to it.  And all of this happened before he got on

3   that bus with her.

4          In addition, there are still other text messages from

5   the defendant to the victim's mother in which the defendant

6   refers to the victim as child or young un.

7          Beyond the physical evidence, you have the victim's

8   testimony.  The victim testified that she initially told the

9   defendant that she was 17 and that she was in high school.

10  Well, ladies and gentlemen, 17 is still under 18.

11         And if you recall, the defendant began communicating

12  with the victim on Facebook, and on Facebook it said that she

13  was in high school.  She was actually enrolled at Walt Whitman

14  High School.  That is what was on her Facebook.  That is more

15  clear evidence that the defendant was fully aware the victim

16  was a minor.

17         Turning to the next point in dispute, was fraud used

18  to get the victim to prostitute?  Was the minor victim forced

19  to prostitute for the defendant, or was she coerced into

20  prostituting for the defendant?

21         We don't have to prove all three -- any of those

22  methods.  If you find evidence of any of those methods, you can

23  find him guilty of this element.

24         Now, ladies and gentlemen, you saw Government Exhibit

25  13.  This is the defendant's handwritten playbook.  We went

1    through this together.  You heard the defendant's words loud

2    and clear.  You heard his code.  And you know from the evidence

3    in this case that he followed his code to the letter.

4            First, the defendant used fraud to get the victim to

5    prostitute for him.

6            Let's look back at the slide we looked at earlier

7    entitled "knocking."  Sell to thy fantasy for thy must feel

8    that the best and only way is through you.  The pitch equals

9    the charm.

10            That's exactly how the defendant used fraud to get the

11    victim to prostitute for him by selling her a fantasy.  As I

12    discussed earlier, the defendant sold the victim a fantasy of

13    reuniting with her mother in California, that they were all

14    getting a house together.  The defendant sold the idea of a

15    family reunion when in fact he was trying to prostitute her

16    mother.  Ladies and gentlemen, that is fraud.

17            Second, the defendant used force to prostitute the

18    victim.  In the defendant's own words from his playbook,

19    looking at the title of his playbook listed "Leash:"  Thy self

20    hate is the leash around thy neck and thy insecurities are like

21    handcuffs.  You must find thy leash and yank to your leisure,

22    to your benefit.  Find the keys to unlock the handcuffs when

23    thy is in your presence and lock them back when thy leaves.

24    The subconscious message to thy brain should be, he has the

25    power to bring pain and pleasure when you please.

1      Ladies and gentlemen, the defendant's own words talk

2  about inflicting pain.  The defendant inflicted pain in a

3  variety of ways in order to keep her weak, to keep her afraid

4  and to keep her working for him.

5      The victim told you about three incidents where the

6  defendant hit her.

7      Ladies and gentlemen, you saw the victim's demeanor

8  when she testified about these incidents.  Talking about those

9  incidents was not easy for her, but she did it.  And she

10  provided you with the details each time, where the defendant

11  hit her, how hard he hit her, how she reacted.

12      The first time the defendant hit her was in Maryland

13  at Timmy's house.  She told you that she got into the middle of

14  an argument between the defendant and Timmy about her going to

15  school, and she said that the defendant got angry and he hit

16  her.

17      The second time the defendant hit the victim was in

18  the face.  This happened also in Maryland outside the Spanish

19  Bar.  She told you that she had to get a Band-Aid for her face

20  after he hit her.

21      The third time that the defendant hit the victim was

22  at the subway station, the morning that they arrived in New

23  York.  She told you about how she confronted the defendant with

24  text messages and photographs which she had found in his phone

25  when she was looking though his phone on the bus ride up to New

1  York.

2      These text messages and these photographs were of her

3  mother.  The photographs were provocatively dressed women,

4  including her mother, and the text messages were about the

5  defendant prostituting the victim's mother.

6      When the victim confronted the defendant with those

7  text messages and with those photographs, what did he do?  She

8  told you he choked her and he punched her.  She told you that

9  she fell to the ground and that people walking by reacted and

10  asked her if she was OK.

11      Ladies and gentlemen, these are clear examples of the

12  defendant's use of force against the victim.

13      In addition to being hit, the victim also testified

14  about two incidents where she had been forced to have sex with

15  the defendant.

16      Now, you heard the victim has been a victim of past

17  sexual abuse at a very young age.  And once again you saw how

18  difficult it was for her to testify about those incidents, but

19  she did it because she wanted to tell you what the defendant

20  did to her.  She wanted you to understand how afraid she was of

21  him.

22      During the first sexual assault that happened in

23  Maryland, the victim told you about the motel.  She told you

24  that the music was playing, that the defendant had sex with her

25  and she kept saying no.

1        During the second sexual assault that happened in New

2   York, the victim told you that the defendant and his mother had

3   given her drugs.  The defendant had sex with her and, again,

4   she told him no.  The defendant called the victim a bitch.  He

5   called her a whore.

6        Again, those sexual assaults are clear examples of the

7   defendant using force against the victim to get her to

8   prostitute for him.

9        Finally, the defendant used coercion in the form of

10  threats and intimidation to cause the victim to prostitute for

11  him.

12       Now, let's look back at the defendant's playbook.

13  This is the page entitled "Leash."  They are driven by their

14  insecurities.  Find them out and use them against them.

15       Now, again, you have heard about the victim's own

16  insecurities and vulnerabilities.

17       You have heard about her victimization in the past.

18       You have heard she has been in and out of foster care

19  and has bipolar disorder.

20       You have heard she ran away, and you have heard she

21  worked as a prostitute.

22       The victim's vulnerability made her the perfect victim

23  for this defendant.  The defendant wasn't targeting the high

24  school student on her way to an ivy league school; he was

25  targeting the girl who had a troubled life.

1      The defendant used the victim's insecurities to keep

2   control of her, just as his playbook said.

3      Now, the victim told you that the defendant threatened

4   to prostitute her younger sister if she would not prostitute

5   for him.  Her younger sister also lived in Maryland.

6      The victim told you that once the defendant started

7   abusing her, she became afraid and she didn't want to live in

8   New York with him anymore.  The first time that the victim told

9   the defendant that she didn't want to go to New York anymore

10   was over the phone.  The second time, the victim tried to get

11   out was when she was on the bus before it got to New York,

12   before it started going.  The victim told you that when she was

13   on the bus, she felt nervous about what was going to happen in

14   New York.  She told the defendant she wanted to leave.  Both

15   times, the defendant threatened her younger sister.  He told

16   her, if she didn't go to New York with him, that he would

17   prostitute her younger sister instead.

18      When he was on the bus, what did he do?  He made her

19   sit on the inside of the bus and he put his leg up over her leg

20   so she couldn't get out.

21      Now, why did the defendant's threats work on the

22   victim?  You heard that the victim doesn't have a father and

23   that her mother lost custody of her.  So when the defendant

24   threatened her younger sister, that meant something to the

25   victim.  Just as the code says to do, the defendant used the

1    victim's feelings for her sister like handcuffs.  Ladies and

2    gentlemen, this is coercion.

3           Ladies and gentlemen, the defendant didn't use locks

4    and he didn't use chains, but make no mistake, he kept the

5    victim in a virtual prison.  When the defendant hit her, when

6    he had sex with her against her will, when he threatened her

7    and her younger sister and when he called her vile names, all

8    of those incidents left the victim too afraid to disobey the

9    defendant.

10          And so the victim followed the defendant's rules and

11   the defendant continued to follow his playbook.  For example,

12   looking at the paper entitled "M Will" in the defendant's

13   playbook:  Never let thy touch, kiss or ask questions, most

14   importantly, allow thy to ever make eye contact.

15          The victim testified that the defendant told her not

16   to make eye contact with others.  The defendant was always

17   close by and within eyesight when she was walking on the

18   street.

19          The defendant's actions were calculated to keep her,

20   as he said in his playbook, completely dependent and obedient.

21   Thy's now the body and you the oxygen and the lifeline.

22          Ladies and gentlemen, these rules are clear and

23   further evidence of coercion.

24          Finally, the defendant's code called for isolating the

25   victim.  He talked about beginning to pull thy away from that

1   which thy loves and, most importantly, that which loves her.

2   This act will kill her spirit until she feels it's worthless.

3           "Break."  What does he mean by break?  He means

4   breaking her.  Once that is done, he will gain sole control

5   over her and she will become his property.

6           Ladies and gentlemen, that is exactly what the

7   defendant set out to do here.

8           Ladies and gentlemen, at the beginning of this trial I

9   asked you to use your common sense.  And now as you get ready

10  to listen to defense counsel, I ask you again to do the same

11  thing.  If you do that, you will return the only verdict that

12  is consistent with the evidence and that is consistent with the

13  truth, that the defendant is guilty of both counts.

14          Thank you.

15          THE COURT:  Are you ready to go, Mr. Stein, or would

16  you like a break?

17          MR. STEIN:  I would like a brief break.

18          THE COURT:  We will take a short recess.

19          (Recess)

20          MR. STEIN:  Judge, before we proceed, could we have a

21  sidebar?

22          THE COURT:  Sure.

23          (At the sidebar)

24          MR. STEIN:  Judge, I don't like to interrupt my

25  adversary's summation, so I wanted to put something on the

1   record.

2           During Ms. Greenberg's summation, I don't remember it

3   specifically what she was referring to, but she made a

4   reference to the uncontroverted evidence.  I object to that

5   because it suggests in some way that there is some burden that

6   I have to disprove or controvert some evidence of the

7   government, so I object to her use of that term and I ask that

8   you give a curative instruction to the jury to that effect.

9           MS. GREENBERG:  Your Honor, by saying that it is

10  uncontroverted doesn't mean that the defense has not objected

11  to it or doesn't have a defense; it means that the evidence

12  speaks for itself, that it is clear.

13          MR. STEIN:  That is nice to know, but that is not what

14  you said.

15          THE COURT:  It isn't that you sat silent.  You

16  cross-examined, and you have introduced documents.  The jury

17  will be instructed on the burden of proof, but I think it is

18  perfectly proper to say uncontroverted.

19          MR. STEIN:  I disagree.

20          THE COURT:  You disagree.

21          MR. STEIN:  That often happens.

22          I just ask that you make a curative instruction to

23  that effect.

24          THE COURT:  I will certainly talk to them about the

25  burden of proof, but not specifically on that point.  OK.

1        (In open court)

2        MR. STEIN:  May I proceed, your Honor?

3        THE COURT:  Please do.

4        MR. STEIN:  Members of the jury, Judge Griesa and

5   members of the prosecution team --

6        THE COURT:  Since you are not speaking into a

7   microphone, please keep your voice up.  I want to hear you.

8        MR. STEIN:  OK.  I appreciate that.  I will take it as

9   a compliment.

10        Sometime last week -- which doesn't seem like a long

11   time ago -- but sometime last week during the course of my

12   opening statement to you, I made certain comments.  And it is

13   not that that part of the process was some abstract statement

14   at that time, but it was intended as a table of contents to

15   tell you, ladies and gentlemen, what I expect the evidence in

16   this case will show.

17        And I made some comments about what kind of case this

18   is.  I told you that this was going to be an ugly case.  It is

19   an ugly case no matter how you define that term.  This is it.

20        But in spite of that, it is my privilege to represent

21   Jabar Gilliam because, in the context of a criminal proceeding,

22   which this obviously is, it is especially important in

23   difficult cases such as this to be able to represent someone as

24   effectively as I can when the United States Government is

25   making charges against an individual, my client Jabar Gilliam.

1          Now, I don't say this as some abstract concept in a

2    civics class and, indeed, this is not TV.  It is not CSI.  It

3    is not Law & Order where everything is neatly wrapped into 50

4    minutes of programming.  This is a real case involving real

5    people.

6          I also said to you in my opening statement that there

7    is really only one thing that you have to do in the performance

8    of your duties as jurors in this case, and that is, to

9    objectively evaluate the credible evidence or the lack of

10   credible evidence.

11         And Ms. Greenberg is correct that in my opening

12   statement, I did say that there were certain things that would

13   not be in dispute, and I stand by those concessions.

14         I am not disputing that Jasmin is 16 years old.

15         I am not disputing that she traveled with my client

16   from Maryland to New York.

17         And I am not disputing that he had very explicit

18   conversations, text messages, photographs, which demonstrated

19   that he was involved with adult women as prostitutes.

20         But what I do dispute, as I said to you in my opening

21   statement, is whether or not Mr. Gilliam caused Jasmin to do

22   this.  And what I finally said to you in my opening statement

23   is that, much of what she said, if not all of it, is either

24   unsupported by other proof or, indeed, contradicted by the lack

25   of proof.

1        Now, you may sit here, ladies and gentlemen, and after

2   having listened to the evidence in this case, morally condemn

3   Jabar Gilliam for who he is.  I could understand that, and I

4   can accept that, but what I cannot accept is that you convict

5   him based upon the credible evidence or lack of credible

6   evidence which does not prove him guilty beyond a reasonable

7   doubt.

8        I listened to Ms. Greenberg's excellent summation.  I

9   don't remember her using that term "beyond a reasonable doubt."

10  I am sure Judge Griesa will instruct you on that and explain to

11  you what those terms mean.

12       Now, as Mr. Gilliam sits here, right now, no matter

13  what you thought about the evidence in this case, he is

14  presumed innocent.  That is not an abstract concept.  And he is

15  presumed innocent unless and until the government has proved

16  him beyond a reasonable doubt, based on your unanimous

17  determination.

18       When you go into the jury room, you are going to get a

19  sheet of paper.  It is called a verdict sheet.  There is

20  nothing magical about it.  It says on it, "guilty" or "not

21  guilty."  It doesn't say "guilty" or "innocent."  And that is

22  not a semantic distinction.  It is not lawyer speak.  It

23  captures what the issue is in any criminal trial in this

24  country, and that is whether or not the government has proved

25  the charges against a defendant based on proof beyond a

1    reasonable doubt.

2            Ms. Greenberg refers not by name, mostly, to Jasmin as

3    the victim in this case.  Now, I would agree that in a lot of

4    ways she is a victim.  She is a victim of her own life, and it

5    was sad to listen to what has happened to such a young woman,

6    but that's her life.  And she certainly has been victimized in

7    any meaningful way by her personal experiences leading up to

8    December of 2011.

9            The question is whether or not she was victimized by

10   my client.  It is not a label, victim.  It is not some way to

11   somehow not recognize who she is.

12           And I'm not here to condemn her for what her past life

13   was.  I am here to try to discredit her.

14           And the judge will tell you, no matter how sympathetic

15   you may be as fellow human beings to listening to her life

16   story and as difficult as this may be, it is not mental

17   gymnastics.  You have to try to put aside sympathy for her,

18   which is understandable, to say the least, and decide this case

19   objectively based upon the evidence or the lack of evidence.

20           I suggest to you, ladies and gentlemen, that although

21   Judge Griesa's instructions are extremely important because he

22   is going to tell you what the law is that you must apply in

23   deciding this case, you can ask yourselves a very simple

24   question.  And that is, if this was a very important decision

25   in your own personal lives, would you rely on Jasmin's word in

1  making that decision for yourselves?  My client is entitled to

2  the same consideration.  Would you rely on her word if this was

3  an important personal decision in your own lives?

4          Ladies and gentlemen, based on what you have heard, to

5  ask the question is to answer it.

6          Now, I didn't hear Ms. Greenberg refer -- and I was

7  trying to pay close attention -- to anything about her

8  activities as a prostitute.  She is going to have a rebuttal or

9  an opportunity to address you further after I finish with my

10  comments -- maybe she is saving it for then, but I certainly

11  didn't hear any reference to her previous activities as a

12  prostitute, previous before she met my client, or afterwards.

13          Now, the significance of that is, you are going to

14  hear, through Judge Griesa's instructions -- I don't mean to

15  de-emphasize everything else that he is going to tell you

16  because it is all important -- but he is going to tell you

17  that, in order to find my client guilty, you have to find

18  beyond a reasonable doubt that he, Mr. Gilliam, caused her to

19  do this.  He caused her to do it, according to the government,

20  by force, threats, coercion, or fraud.

21          Now, you have to put her testimony about what happened

22  on December 1st and December 2nd in context of everything else

23  that she told you she did, which I don't believe Ms. Greenberg

24  discussed in any way.  She, unfortunately, as sad as it is, was

25  a prostitute from the time that she was 14 years old.  She was

1    a prostitute on her own, as she told you, in Hagerstown,

2    Maryland.  At times before she met my client, she was a

3    prostitute working for a pimp named Timothy.

4         She met my client.  I will get into the evidence about

5    what happened after that.  But after he was arrested on the

6    evening of December 2nd at about 6:30 p.m., when he was in

7    custody as Agent Brian Conolly told you, he was in custody from

8    December 2nd in the evening afterwards and was certainly in

9    custody on December 6th.

10        Jasmin went to a shelter where she met two other

11   girls, one of whom was named Ashley.  She left the shelter

12   without permission, went to another location in the Bronx and

13   had sexual relations with roughly half a dozen men.

14        Did my client cause her to do that?

15        Did he cause her to do that before he ever met her?

16        You have to put her life story in context in

17   evaluating what happened on December 1st and December 2nd.

18        Maybe, ladies and gentlemen -- and it is up to you to

19   decide this -- maybe she just did all of this because, as she

20   told you, when she doesn't have her medication for her bipolar

21   illness, she is impulsive.

22        Now, why did my client come to New York from Maryland

23   with Jasmin?  It is a fair question.  Ms. Greenberg discussed

24   it with you herself.  She told you, she came to see her mother.

25        Now, that may be a total fantasy on her part, a total

 1   illusion, one that is not based in any reality whatsoever

 2   because of their previous history, but she didn't come with him

 3   for him to prostitute her.  It may be an illusion on her part.

 4   That is understandable, given the nature of her history with

 5   her mother, but that's what she said.

 6       Now, I would like to talk to you about the evidence in

 7   this case because, after all, that is what is important.

 8       You have Jasmin's testimony, and then as I said to you

 9   in my opening statement, that you have to consider her

10   testimony and whether it is supported or contradicted by other

11   evidence in this case or the lack of evidence.

12       Now, I'm talking about physical evidence.  Physical

13   evidence doesn't have a bias.  It doesn't have a motive.  It is

14   not subject to human frailty that we all have and, boy, does

15   Jasmin have them.  Physical evidence.

16       Now, the government -- and Ms. Greenberg may talk

17   about this in her next part of her summation -- cannot attempt

18   to explain away the absence of this important evidence because

19   nobody in the police department or the FBI made any attempt to

20   look for it.  And for you to accept that, ladies and gentlemen,

21   is for the government to put blinders on you so you can't see

22   the rest of the picture in this case.

23       Now, it is correct that the government doesn't have to

24   use any particular investigative technique to try to look for

25   or to locate evidence, but they have to prove my client is

1   guilty beyond a reasonable doubt.

2            Where is the objective, reliable physical or

3   scientific evidence in this case to support Jasmin's testimony?

4            It contradicts her in many respects.

5            You heard some testimony from Jasmin, during the

6   course of these events, she consumed some drugs.  You heard her

7   say that she took a puff or a tug on a marijuana weed or a

8   marijuana roll, I think she called it.  And you heard her say

9   at some point that she took some pills as a result of which she

10  fell asleep and, according to her, while she was asleep my

11  client was having sexual intercourse with her.

12           This morning, I read to you an excerpt from the St.

13  Barnabas Hospital records where the hospital administered a

14  drug screen to the urine specimen that Jasmin had provided.

15  What did it find?  Nothing, not a drug in her system, in spite

16  of the fact that, according to her, she had consumed what,

17  presumably, are illegal substances -- no drugs in her system.

18  Nothing to support her testimony that she was given drugs,

19  indeed, the hospital record objectively contradicts her

20  testimony.

21           There were no injuries in this case.

22           You heard Brian Conolly testify -- and I am not

23  suggesting to you that he intentionally embellished his

24  testimony about injuries or lack of injuries, but at one point

25  he said there weren't any significant injuries.  There were no

1   injuries.  The hospital records, which I read to you from this

2   morning said that she had no visible bruises.

3         There is a photo of Jasmin -- not the ones obviously

4   where you can only see her from the neck down, I am not

5   disputing that those are photographs of her, but there is a

6   photograph of her.  And a few days or a day or so before she

7   left to go to New York from Maryland, she had been struck above

8   her left eye.  She indicated where it was that she was struck.

9   There is just simply no evidence whatsoever that she was ever

10  beaten or struck in the hospital records, in the photograph.

11        Brian Conolly's testimony, he admitted that there were

12  no injuries -- not that there were no significant injuries, but

13  there were no injuries.

14        There is no biological evidence whatsoever to support

15  Jasmin's testimony.

16        You heard that she had sexual relations with a number

17  of people over the course of several days.  And what proof is

18  there to support scientifically that she had sexual relations

19  with these men?  You heard that she had sexual relations with

20  four or five men on a bare mattress in the apartment at 747

21  East 168th Street.

22        Presumably, if that were true, there would be

23  uncontrovertible physical and scientific evidence of that fact.

24        There would be, presumably, some evidence of semen

25  stains in the mattress or on the mattress from which you could

1    scientifically analyze for DNA.

2            No used condoms.

3            No pubic hairs.

4            Nothing that, from our own experiences, we would know

5    that there would be or could be such evidence, but they didn't

6    bother looking for it.

7            You heard that when my client was arrested and Jasmin

8    was there -- and there's a lot of testimony about her clothing

9    and her belongings -- did they take her underwear?  She had had

10   sexual relations over the course of several days, which we may

11   know that there would be or could be some biological evidence

12   of her sexual activity.

13

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. STEIN:  She testified that my client had sexual

2     relations with her on I believe two occasions.  Did they take

3     his underwear to see whether there was any semen stain from any

4     discharge that happens after a male has had sexual

5     relationships?  There's none of that, ladies and gentlemen,

6     evidence, if anybody bothered to look for it.  The whole police

7     department, there's ten or twelve cops up there when my client

8     was arrested, nobody bothered to look.

9          You heard a lot of testimony about an advertisement,

10    and I suggest to you that Jasmin tried to fudge this during her

11    testimony, but when she was confronted about what she

12    previously told the FBI about the advertisement, she was

13    confronted with what she had said back on December 2nd or

14    December 3rd when she was first interviewed by the police

15    department and the FBI.  There is no advertisement.  There's

16    nothing to prove that this was ever done at all.

17         And what proof would there be?  You heard Jasmin

18    testify there would be an advertisement under the name Angel

19    Luv.  Do you remember I asked Brian Conolly some questions

20    about that when he attempted to find any evidence of any

21    advertisement at Backpage?  No Angel Luv, no photographs from

22    the head down from Backpage, no telephone number attributed to

23    my client.  I admit that it's his phone number beginning with

24    the area code 301.  There's none of that, nothing to support

25    her testimony about an advertisement.

1      They went to Harry Gilliam's apartment in Brooklyn,

2   and Jasmin testified that this advertisement for her services

3   was going to be -- an advertisement was going to be created and

4   a web page posted on Backstage.  Now she tried to say -- and

5   this is where I suggest that she fudged it -- she tried to say

6   there really wasn't any advertisement, there was some

7   discussion about it.  But you heard her testify when she was

8   confronted with her previous statement to the government that

9   she observed -- it's not a complicated word -- observed the

10   advertisement being posted on a web page for Backpage.

11      Did they go to Harry Gilliam's apartment with a search

12   warrant -- they certainly know how to get search warrants, they

13   have done it in this case -- to see his computer to see whether

14   any of this was even stored in his computer, even if it was

15   never actually posted on Backpage's web site?  There's none of

16   that, nothing to support her testimony about this.

17      This was all for money.  This was all for money.

18   Where's the money?  To paraphrase a very old cliché, which

19   lawyers should probably not do but it's sort of irresistible:

20   Where's the proof?  There's no money in this case, ladies and

21   gentlemen.  From what she testified to, there was several

22   hundred dollars or so that was generated.  No money.

23      Two MetroCards that you heard testimony about, and you

24   all know, from those of you who use the subway system, you saw

25   it on the screen, the MetroCards.  She said that she went to

1   Brooklyn with my client twice on the subway card and he swiped

2   a MetroCard each time.  And you heard Brian Conolly testify --

3   he wasn't that knowledgeable about it, but I suggest to you

4   that black strip has computerized information on it which would

5   tell whether or not someone went somewhere on the subway

6   system.  They can download his phone and they can download the

7   information, if there is any, on the MetroCard black strips.

8   So there's no analysis from those two items, the two

9   MetroCards, to support her testimony.

10          Now you heard a lot of testimony about Jasmin's

11  allergy to latex, and you know that the condoms -- I think

12  Brian Conolly testified at one point that the condoms are made

13  of latex.  Now an allergy is not something that you can turn on

14  and off like a switch.  It just happens.  Your body reacts if

15  you're exposed to something that you're allergic to.

16          At one point Jasmin was asked on cross-examination the

17  following questions:

18  "Q.  Do you have an allergy?

19          That's page 304, starting at line 14.

20  "Q.  Do you have an allergy?

21  "A.  Yes.

22  "Q.  And do you have an allergy to latex?

23  "A.  Yes.

24  "Q.  As a matter of fact, isn't it correct that after you were

25  at the shelter for one night or so and you went AWOL with the

1    two girls, one of whom was Ashley --

2    "A.   Yes.

3    "Q.   -- and had sex with a number of individuals at Jay's

4    apartment --

5    "A.   Yes.

6    "Q.   -- you had an allergic reaction?

7    "A.   Yes.

8    "Q.   As a matter of fact, it was a federal agent who gave you

9    an antihistamine called Benadryl to counteract an allergic

10   reaction, correct?

11   "A.   Yes.

12   "Q.   And the allergic reaction you had to the latex and the

13   condoms or what?

14   "A.   Latex.

15   "Q.   What physically did you experience by way of an allergic

16   reaction from the latex in the condoms?

17   "A.   I had bumps.

18   "Q.   Where were the bumps?

19   "A.   Like near my thigh area, it was like a rash.

20   "Q.   Like a rash?

21   "A.   Yes."

22          So that's what she testified to that she had as a

23   result of having multiple sexual encounters with various men

24   when my client was in custody on December 6 after Jasmin went

25   AWOL from the shelter where she had been staying with these two

1    other girls.

2              Then at page 335, line 19:

3    "Q.  When you went to St. Barnabas Hospital, you had had sexual

4    relations at that point with a number of people, correct?

5    "A.  Yes, sir.

6    "Q.  And a number of them had been wearing condoms, correct?

7    "A.  Yes, sir.

8    "Q.  And when you went to St. Barnabas Hospital, isn't it true

9    that you did not have any allergic reaction to latex?

10   "A.  Yes.

11   "Q.  Even though you had had sex with men wearing condoms on a

12   number of occasions before you went to the hospital, correct?

13   "A.  Yes."

14             Then she backtracked when she was asked later on at

15   page 343.  And ladies and gentlemen, as Judge Griesa will tell

16   you, you can have any of this read back to you at any course

17   during your deliberations.  When she was asked about this

18   further on cross-examination, she changed what she had

19   testified to under oath in response to questions that I suggest

20   to you were pretty clear, and she gave categorical answers,

21   which is that she had no allergic reaction when -- she had had

22   no allergic reaction when she went to St. Barnabas Hospital

23   after my client was arrested.

24             And she testified, when she was asked further about

25   this, yes, she did have an allergic reaction, and the agent

1    gave her Benadryl on that occasion also.  That's at page 343 of

2    the transcript.

3           So she contradicted herself about having an allergic

4    reaction.  The point is this is not something like a light

5    switch that you turn on and off.  You react or you don't.  She

6    testified unequivocally when she was first asked about this

7    before the lunch break that she did not have an allergic

8    reaction after having sex with multiple men using latex

9    condoms, and then after lunch when she was asked again, she

10   flip-flopped.

11          Now you heard testimony about Facebook, and you heard

12   Jasmin describe her Facebook.  I won't repeat what she said her

13   interests were, I'm sure that those words resonated with you,

14   ladies and gentlemen, resonated.

15          But when she was asked about having reviewed her

16   Facebook page after she had had, according to her, various

17   Facebook exchanges, if that's the right term, with my client

18   before she went to New York from Maryland, she testified that

19   after having looked at her Facebook page, there was nothing on

20   there about -- there were no conversations back and forth on

21   Facebook with Jabar Gilliam before they went to New York on the

22   early morning hours of December 1st.

23          Jasmin was asked -- wasn't a big point, but it did

24   come up -- about surveillance camera.  And she said in New York

25   there's surveillance cameras everywhere.  That's a fact of life

1   today.  And she testified on at least one occasion or one of

2   the buildings she actually did see surveillance cameras.  If my

3   client was going into the building on East 168th Street over

4   the course of time with various customers of Jasmin, those

5   would have been recorded on surveillance cameras that are ever

6   present in New York City.  Did anybody bother looking for this

7   to find objective inconvertible proof?  No.

8           I suggest to you you should take this in

9   consideration, ladies and gentlemen, in deciding whether or not

10  you can find my client guilty beyond a reasonable doubt based

11  on Jasmin's testimony.  And you have to ask yourself, as I ask

12  you to do, again, would you trust her word if there was an

13  important personal decision in your lives that affected you

14  seriously?  Would you trust her word in making a judgment about

15  something that is important to you?  Again, to ask the question

16  is to answer it.

17          Now there's a lot of testimony about the notebooks,

18  there's a lot of testimony about the text messages.  I don't

19  dispute that those were his notebooks, those were his text

20  messages, but it proves who he is.  He's a pimp.  There's no

21  getting away from it.  There's no denying it.  It's an ugly

22  word, but sometime it's an ugly world.  And he had very

23  explicit conversations with Jasmin's mother and with a woman

24  named Toni, and you saw the pictures as well.

25          There was also a lot of testimony or some testimony

 1    about my client's contact list, and there was several phone

 2    numbers for Jasmin under the name Jazzy in his phone contact

 3    list.  I don't dispute that.  They did come to know each other.

 4    They talked with each other.  They went to New York together.

 5          And you heard some testimony which Ms. Greenberg

 6    referred to in her summation about my client's statements to

 7    the police -- to the FBI, rather, when he got arrested.  He did

 8    equivocate, if I could use that word.  If you want to say that

 9    he lied, OK.  He equivocated initially.  But when it came down

10    to the magic question, "Did Jasmin prostitute for you," he

11    didn't equivocate, he said no.

12          Lastly, ladies and gentlemen, you heard testimony

13    about a struggle when Mr. Gilliam was being arrested and Jasmin

14    was there, and you heard agent Conolly testify that when he was

15    asked -- when he asked Mr. Gilliam why did you struggle or flee

16    or try to run away, his answer was:  Instinct.  You may not

17    remember this, but after Detective Ryan's testimony, a

18    stipulation was read to you, ladies and gentlemen, that my

19    client was on post-release supervision from the State of

20    Maryland, a conviction totally unrelated to this case.  He was

21    not allowed to leave Maryland without authorization, and in

22    fact he did not have authorization.  So I suggest to you his

23    instinct in struggling, which was wrong, was because he knew he

24    was in violation of the conditions of his release.

25          So at some point I think this afternoon, after

1   Ms. Greenberg addresses you again and after Judge Griesa gives

2   instructions, the ball is going to be in your court, and you're

3   going to have to decide the only question in the case:  Has the

4   government proved Jabar Gilliam guilty beyond a reasonable

5   doubt?  And I suggest to you that they have not, and that you

6   should find him not guilty of both counts in the indictment.

7          Thank you.

8          THE COURT:  All right.  Does the government have a

9   rebuttal?

10          MS. GREENBERG:  Yes, your Honor.

11          Ladies and gentlemen, Mr. Stein is a very good lawyer,

12   and he worked hard up there just now to defend his client, as

13   any good lawyer should.  But I submit to you that you just

14   heard from Mr. Stein was nothing more than a diversion.  It was

15   a distraction from the overwhelming evidence that you have

16   heard in this case.

17          Let's walk through it once again.  You know that the

18   defendant is a pimp.  He's admitted that.  He pimped with adult

19   women.  You've seen the defendant's own words.  You've seen

20   them in his notebooks, you have seen them in his play book, his

21   rules for prostitutes, his code for how to go about

22   prostituting women.  You have seen word like kill her spirit,

23   make her feel worthless.  You know the defendant's code from

24   his own words.

25          You don't just have his word, though, you also have

1    physical evidence:  The condoms, the lubricant that was found

2    in the defendant's backpack in the apartment where he was

3    prostituting the victim, and also the condoms and the

4    lubricants that were found on the victim herself.  All the

5    information from his phone, the sexual photographs, the text

6    messages, all of these things show you what his intent was.

7    You had testimony from law enforcement.  You have phone

8    records, phone records which place the victim in certain places

9    with the defendant, with the defendant's mother.  You have his

10   lies to law enforcement after he was caught.

11           Now the defense has no burden, that's correct.  The

12   government has the burden to prove its case beyond a reasonable

13   doubt, and we embrace that burden.  And that's why we get a

14   chance to rebut and why we get a chance to speak last.  But the

15   defendant has made some arguments when he's cross-examined

16   witnesses, and he's made arguments here to you today.  So it's

17   fair to look and examine those arguments and see if they hold

18   any water.

19           So what is he trying to distract you with?  Let's talk

20   first about the victim's prior prostitution.  Of course she was

21   a prostitute before.  If she weren't a prostitute when he found

22   her, we wouldn't be here today.  She told him that she was a

23   prostitute.  And we know the reasons why she was a prostitute.

24   Because she had been a victim of abuse, of molestation.  She

25   has a mental condition with bipolar.  You heard this before.

1    He knew that she was vulnerable.  She was vulnerable to the

2    defendant.  The defendant was going to follow his code to the

3    letter to enlist her to work for him.  Now that's why.  Her

4    vulnerabilities, that's why he chose her.  And the tricks in

5    his play book, that's what he used to control her and to get

6    her to work for him.

7         Now the defense counsel also points to the victim's

8    prostitution after this incident when she ran away from the

9    shelter.  Ladies and gentlemen, do not reward the defendant for

10   being a successful predator.  He found a vulnerable minor

11   victim who was 16 years old and he exploited her.  She was in

12   high school, not even at her senior prom yet.  You cannot

13   reward a predator for being successful in training a minor to

14   do the wrong thing.  She was in New York, and she left the

15   shelter to do what he had told her to do, what his code book

16   showed her to do.  Don't reward him for that.

17        Why is the defense trying to distract you from the

18   evidence?  They're trying to distract you from the evidence

19   because the evidence clearly shows the defendant is guilty

20   beyond a reasonable doubt.  Don't forget about the photographs,

21   the text messages, the condoms that were found, his own

22   admissions.

23        This evidence is overwhelming and it shows you that he

24   is guilty of both counts.  This is not a close case, not at

25   all.  It's a serious one, but it's not close.  There are

1    multiple layers of evidence.  Defense counsel asks you if you

2    can rely -- if you would rely on the defendant's own words.  We

3    submit to you that yes, you could prove the defendant is

4    guilty --

5              THE COURT:  You mean victim's own words.

6              MS. GREENBERG:  Pardon me, could you rely on victim's

7    own words?  We submit, yes, you can.  She was clear with

8    details.  She told you where things happened, why they

9    happened.  She walked you through it.  But putting that aside,

10   you're not being asked here today to just look at her own

11   words, because there is so much more here, there is evidence

12   here that corroborates what she is saying.  Physical evidence.

13   The defendant's own words.  Please don't forget about that.

14   This is not just a:  He said, she said.  We have a lot of

15   evidence here that corroborates the victim.  It's consistent

16   and it make sense.  It establishes every element of the crime

17   beyond a reasonable doubt.

18             Now Mr. Stein focused a large part of his closing

19   statement into focusing on places where he felt that the

20   victim's statements were unsupported or contradicted.  So let's

21   talk about some of those.  Let's talk first about the bruises.

22   Jasmin told you about three incidents where she had been hurt.

23   Two of those incidents were in Maryland, one of which she's

24   talking about a Band-Aid, that was well before she got to New

25   York.

1          So Jasmin told you she didn't have any bruises when

2     she got to the hospital.  The medical records showing that she

3     had no bruises are consistent with Jasmin's own testimony.

4     They're not contradictory.  She didn't say she was bloodied and

5     bruised when she got to the hospital.  She told you the

6     opposite, that she didn't have any bruises.

7          What she told you is once he was in New York, the

8     defendant hit her twice.  He actually choked her.  So it would

9     be completely consistent with her testimony that she wouldn't

10    have any bruises.  And that was two full days before -- when

11    she was hit in the subway station, that happened on the morning

12    she arrived in New York.  She wasn't recovered and brought to

13    the hospital until two full days later that night.  So would it

14    make sense that she didn't have any bruises on her like she

15    said she didn't?  Sure it does.  And does it comport with your

16    common sense?  Particularly every time that someone is hit,

17    particularly if you have any pigment or color in your skin,

18    that you would have a dark bruise?  Not necessarily.

19         So let's talk also about the allergy to latex.  Now

20    this point Jasmin also explained to you Jasmin has an allergy

21    to latex.  And before she got -- on December 2nd when she was

22    brought to the hospital, she -- before she was brought to the

23    hospital she told one of the detectives that she had this

24    allergy to latex and she was having an allergic reaction, and

25    that detective gave her Benadryl.  Same thing happened on

1   December 6, detective gave her Benadryl.  It's consistent for

2   both times that she said that she had an allergic reaction.

3          And let's just take a step back.  What is Mr. Stein

4   trying to show with this, that she wasn't having sex?  Do you

5   any of you honestly believe that she wasn't having sex during

6   this trip?  Of course she was.  And you don't know what condoms

7   that many people that were coming in to have sex with her had,

8   were they latex or not.  She didn't testify she knew one way or

9   the other.  You don't know.  So I think that point is a

10  non-starter.  It's clear here that she was on this trip and

11  that she was having sex with men.

12         Now let's talk about the drugs.  So Mr. Stein submits

13  to you that you can't believe what the victim says because her

14  toxicology was clean, and she had mentioned the defendant had

15  given her drugs and therefore there should have been some

16  result in the toxicology report.

17         But let's think about what Jasmin actually testified

18  to.  What she said was the victim and the victim's mother --

19  sorry, the defendant and the defendant's mother had given her

20  marijuana, and that she had taken just a drag of it.  She said

21  she didn't take very much of it.  It's completely consistent

22  that that wouldn't show up on a toxicology report.

23         And the pills.  Jasmin said the defendant's mother had

24  given her pills because she complained of having a headache.

25  That's what she testified to.  She never said what those pills

1    were.  The defendant's mother could have given her Tylenol,

2    aspirin, anything for a headache.  You don't know that those

3    were narcotics.  We don't know what they are.  We don't know

4    that they should have showed up on a toxicology report.  We

5    just don't know the answers to that.

6          Now there's a lot of talk about the lack of evidence

7    in this case, the lack of laboratory evidence, DNA, biological

8    evidence.  As the defendant told you -- defense counsel told

9    you both in his opening and his closing this is not CSI.  And

10   again, the point about the DNA or lack thereof is a point to

11   make you believe that she wasn't prostituting on this trip?

12         Ladies and gentlemen, you have seen overwhelming

13   evidence.  What was she doing with all those condoms and

14   lubricants if she wasn't going there to have sex?  Why did the

15   defendant have so many condoms and lubricants on him?  Why was

16   he sending text messages about prostitution?  He's a pimp.

17         And as the defendant pointed -- defense counsel

18   pointed out, she was a prostitute.  What do you think was

19   happening on this trip?  The lack of DNA evidence of going

20   through a trash can and trying to find unused condoms -- first

21   of all, when they got to Lisa's apartment at the time of the

22   arrest, Special Agent Conolly told you they didn't have a

23   search warrant to search the apartment for prostitution.  What

24   were they doing there?  They were there to locate the minor

25   victim.  They didn't have a search warrant.  They didn't have

1   authorization to conduct a search.  They hadn't even

2   interviewed her yet to know that she was being prostituted

3   there.  All they were there to do was locate the victim, which

4   they did.  Again, these comments, these focusing -- this is

5   just a distraction, a distraction from the evidence, which is

6   clear.

7              Another red herring, the MetroCard.  So you're to

8   believe they weren't traveling around -- you know they got to

9   New York, but you're to believe that they weren't traveling

10  around because we didn't try to swipe the card to find out

11  exactly where they were?  We told you that they were tracking

12  the defendant's cell phone.  They knew where he was.  They knew

13  that he was at the defendant's mother's home at 1140 Jackson

14  Avenue in the Bronx.  They tracked the phone to Lisa's

15  apartment.  Why did they have to go to the MetroCard?  They

16  tracked his cell phone.

17             They are also ignoring the phone records.  There were

18  phone records where the victim called Ms. Haydee, her guidance

19  counselor.  She made that call about the wee hours of the

20  morning, 5:00, 6:00 in the morning early on that Friday.  And

21  she called Ms. Haydee from whose phone?  The defendant's

22  mother's cell phone at 6:00 in the morning.  She called her

23  guidance counselor.

24             Jasmin also told you that on December 2nd, the day the

25  defendant was arrested, just hours before his arrest, she

1   placed a call.  Where did she place that call from?  She placed

2   the call from the defendant's mother's land line at 1140

3   Jackson Avenue.  She placed two calls to her mother.  We don't

4   need to track a MetroCard, we know where she was, she was with

5   the defendant.  She was with the defendant's mother.  The phone

6   records are clear.

7         Finally, one last point, defense counsel talked to you

8   about the fact that his client didn't cause the minor victim to

9   engage in a commercial sex act.  He didn't cause her to

10  prostitute.  And he said -- I believe he said that he didn't --

11  the way you know he didn't cause her is he didn't use force,

12  fraud or coercion.

13        Now if you remember, I told you there were two ways in

14  which -- this is for Count One -- there are two ways in which

15  you could look at the second element of Count One.  One is:

16  Was force, fraud or coercion used to cause the victim to engage

17  in prostitution?  The other way of proving it is simply:  Did

18  the defendant know that Jasmin was not 18 and cause her to

19  engage in a commercial sex act?  Not with force, not with

20  fraud, not with coercion.  That's not part of that element.

21  Was she under 18, did he know it, or did he recklessly

22  disregard it?  So when you go back -- and the judge will

23  instruct you on the law -- pay close attention to those

24  instructions on the law.

25        And along with that point, although it's clear that

1  Jasmin did actually prostitute in New York, ladies and

2  gentlemen, when you listen to the judge's instructions on the

3  law, the government doesn't actually have to prove that Jasmin

4  had sex with anyone.  Remember, the charge was:  Did he

5  knowingly transport her -- for Count Two, did he knowingly

6  transport her for the purpose of prostitution?  And for the

7  second, for the Count One:  Did he knowingly transport her or

8  cause her to do so?

9        In conclusion, I would say to you use your common

10  sense, focus on the judge's instructions on the law, and if you

11  do those things, you will find that the defendant is guilty on

12  both counts.  Thank you.

13        THE COURT:  I'm going to go right into my instructions

14  for you, which will not be lengthy, and it will be possible, I

15  know, to conclude those before your lunch so that you'll have

16  the maximum amount of time to deliberate.  I would like for my

17  law clerk pass you a sheet which I will describe to you in a

18  minute after you have that sheet.

19        Does everybody in the jury box have one of these

20  sheets?

21        Put those down for the moment.  We'll come back to

22  them, and I will give you some instructions on some other

23  matters before we get to that sheet.

24        Now I want to start by reminding you what I said when

25  you were being selected and I defined to you what it meant to

be a fair and impartial juror.  A fair and impartial juror is

someone who is willing to recognize that the case has to be

decided solely on the basis of the evidence, and, of course,

instructions on the law that I give to you.  But I am

emphasizing the evidence because that's what you have heard and

seen and that's what the trial has really been about.  And so

it is very important that you make the decision solely on the

basis of the evidence, not on some bias or preconceived notion

or emotional reaction or anything like that.  That's what is

meant by a fair and impartial juror.  That's what it is, it's

your sworn duty to decide the case in that fashion.

Now you as the jury and I as the judge have different

roles in this case, obviously.  It's been my responsibility to

preside at the trial, and occasionally there have been issues

come up which required the application of the rules of

evidence.  And you heard once in a while an objection, and I

ruled on the objection and that kind of thing.  But you and you

alone decide the case.  You and you alone consider what

evidence you consider to be credible.  You decide what

conclusions are to be drawn from the evidence, and you and you

alone render the verdict in accordance with the issues put to

you.

It is not my decision.  It is not my burden.  And just

as I know you have no intention to intentionally disregard what

I am about to instruct you about, I want you to understand I

1    have no intention at all of treading on your responsibility.

2    Nothing that I have said at the trial, nothing that I say now

3    is intended to signal you or indicate to you in any degree what

4    your verdict should be.  It's your verdict and not my verdict.

5         Now I want to come to something which is very, very

6    important, and that's what we call the burden of proof.  As you

7    have heard, and as I said at the beginning of the trial when

8    you were being chosen, the defendant has pleaded not guilty.

9    And that means that in order to obtain a conviction or a guilty

10   verdict, the government must prove the defendant's guilt on the

11   particular count you're considering by proof beyond a

12   reasonable doubt.

13        Now there's another very closely related aspect to

14   that, and that is this, it's called a presumption of innocence.

15   A defendant who pleads not guilty is presumed innocent, he's

16   presumed innocent at the beginning of the trial, he's presumed

17   innocent during the trial, and he still is presumed innocent

18   until and unless you find on the particular count you're

19   considering that the government has proved its case by proof

20   beyond a reasonable doubt.

21        Now what do we mean by proof beyond a reasonable

22   doubt?  Well, they're pretty good words, they probably don't

23   need much definition, but here's a little definition.  Perhaps

24   the key word is "reasonable."  And let's talk about what a

25   reasonable doubt would be.  It would be a doubt that would

1    appeal to your good judgment, your common sense.  It's a doubt

2    that you would have after considering the evidence or if you

3    consider there's a lack of evidence, after you consider that.

4    It's a reasonable doubt we're talking about.  That is in

5    contrast to mere speculation, guesswork, a desire to avoid an

6    unpleasant duty or something like that.  We're talking about

7    proof beyond a reasonable doubt, a doubt which arises, if it

8    does arise, after a consideration of evidence, a doubt which

9    would appeal to your reason, not to your emotion or to your

10   likes or dislikes.

11        Now let me say this, if you find that the government

12   has proved its case on the count you're considering to an

13   extent that you would be willing to act on matters of

14   importance in your own lives in accordance with that proof,

15   that kind of proof, then you will say you have no reasonable

16   doubt and then it is your duty to convict.  If, however, you

17   find after considering the record here that you have the kind

18   of doubt which would cause you to hesitate in acting on

19   important matters in your own lives, then you will say that you

20   have a reasonable doubt, and in that event it is your duty to

21   acquit or find a verdict of not guilty.

22        When we say proof beyond a reasonable doubt we're not

23   talking about proof to an absolute certainty.  It is not a

24   mathematician's work table, it's not the inside of a computer

25   or something like that.  This is a trial, and the evidence

1    before you is the kind of evidence that you have heard.  So it

2    is not required that the government prove its case to an

3    absolute certainty or beyond all possible doubt.  I go back to

4    the rule we have, and that is the government must prove its

5    case beyond a reasonable doubt.  And that's the extent of the

6    government's proof and that's it.

7         Now I would like you to take up the sheets that you

8    have.  In every criminal case tried in court, the prosecutor

9    must prove certain elements, and these elements are defined

10   according to the law.  And I have given you this sheet because

11   I believe, although I will certainly tell you about the

12   elements, it might not be the easiest thing in the world to

13   remember them, so I am giving you this sheet as an aid to your

14   memory.

15        But I want to start by reading the elements that

16   relate to Count One.  In order to find the defendant guilty on

17   Count One, you must find that the government has proved each of

18   the following elements by proof beyond a reasonable doubt:

19        One, that the defendant knowingly harbored or

20   transported Jasmin;

21        Two, that the defendant knew that force, fraud, or

22   coercion or any combination of such means would be used to

23   cause Jasmin to engage in a commercial sex act;

24        Three, that the defendant's acts were in or were

25   affecting interstate commerce.

1          Now as you have been told, the government charges two

2     alternative types of criminal acts in connection with Count

3     One.  This is pursuant to this statute.  The statute passed by

4     Congress makes it a crime under this particular provision to do

5     one kind of act or another kind of act closely related,

6     obviously, but somewhat different.  And I'm going to go on and

7     read to you and you will follow along with me the alternative

8     charge regarding Count One.  And again I say this is presented

9     to you pursuant to the statute that is relevant.

10         Now the alternative charge is as follows -- or I'm

11    going to read to you the elements that you must find in order

12    to find guilt on that alternative charge.  In order to find the

13    defendant guilty on Count One, you must find on this

14    alternative charge, you must find that the government has

15    proved each of the following elements by proof beyond a

16    reasonable doubt:

17         One, that the defendant knowingly harbored or

18    transported Jasmin;

19         Two, that the defendant knew or recklessly disregarded

20    the fact that Jasmin had not attained the age of 18 years and

21    would be caused to engage in a commercial sex act;

22         Three, that the defendant's acts were in or were

23    affecting interstate commerce.

24         Now I want to talk to you about the first alternative

25    which you find at the top of the page and see if there's

1  anything there that needs defining.  That first element that

2  must be proven is that the defendant knowingly harbored or

3  transported Jasmin.  "Transported" certainly does not need any

4  definition.  "Harbored" could be keeping in a person's dwelling

5  or a related dwelling, that kind of thing.  Harboring.  I don't

6  even think that needs that much definition.

7          Now I want to talk about the second element.

8  Generally a criminal statute makes it a crime to do something

9  and to do it knowingly.  But as I say, generally a criminal

10  statute makes it a crime to do something.  And there must be a

11  criminal state of mind, and it's almost always knowingly, and

12  so it is usually a crime to do something knowingly.

13          Congress phrased the statute here in a somewhat

14  broader fashion.  And I think that Congress wanted to make it a

15  crime not only to do something knowingly, but to be guilty of a

16  crime if the person knew that a certain type of criminal

17  activity was going on or would take place.  So Congress

18  broadened out the definition of the criminal act beyond what is

19  usual, but still embraced within that somewhat broader

20  definition would be doing something knowingly.

21          What I'm talking about is that second element, and I

22  will read it to you again:  That the defendant knew that force,

23  fraud or coercion or any combination of such means would be

24  used to cause Jasmin to engage in a commercial sex act.

25          Let me read it again, it's a mouthful.  That the

1   defendant knew that force, fraud, or coercion or any

2   combination of such means would be used to cause Jasmin to

3   engage in a commercial sex act.

4           Now under the statute, a defendant can be guilty of

5   violation here if he knew that somebody else was causing the

6   victim to engage in a commercial sex act.  Here the government

7   charges that the defendant himself used those means to cause

8   Jasmin to engage in a commercial he sex act and did so

9   knowingly.  And, of course, that would be within the meaning of

10  the statute even as somewhat broadly drawn here.

11          Now is there anything here that needs definition?  A

12  few things do.

13          "Force" means force.  I'm not going to have to define

14  that.

15          "Fraud" means and includes making a promise that

16  someone knows will not be kept, making a promise to induce

17  somebody to do something which the person knows will not be

18  kept.

19          "Coercion" means any threat of serious harm or threat

20  of physical restraint.  But again, coercion -- these are pretty

21  plain meaning words, but I added that little definition of

22  coercion because that's in the statute.

23          "Commercial sex act" of course includes prostitution.

24          Now let's go down to the third -- these statutes are

25  passed pursuant -- the statute involved in Count One and the

1    statute involved in Count Two, these are -- I'm sorry.  I

2    didn't say this right.  Yes, I did.

3           The statutes involved here are passed pursuant to the

4    commerce clause of the Constitution, and that's why there is

5    reference to the interstate commerce.  Interstate commerce here

6    is simply transporting someone or carrying someone or something

7    across a state line, state lines.

8           Now let's come to the alternative.  I'll read it

9    again.  In order to find the defendant guilty on Count One, you

10   must find -- in this alternative, you must find the government

11   has proven each of the following elements by proof beyond a

12   reasonable doubt:

13          One, that the defendant knowingly harbored or

14   transported Jasmin;

15          Two, that the defendant knew or recklessly disregarded

16   the fact that Jasmin had not attained the age of 18 years and

17   would be caused to engage in a commercial sex act;

18          Three, that the defendant's sex acts were in or

19   affecting interstate commerce.

20          Now we already talked about harbored or transported.

21   Now here in the second element, as it says, in order to convict

22   you must find that the defendant knew or recklessly disregarded

23   the fact that Jasmin had not attained the age of 18 years and

24   would be caused to engage in a commercial sex act.

25          There is this concept there of recklessly disregarding

1    something.  Under the criminal law, the criminal state of mind

2    certainly can exist if someone knows that a criminal act is

3    being committed, but also here where you've got the issue of

4    knowledge of age, Congress has put in as an alternative

5    reckless disregard.  Reckless disregard is just simply shutting

6    your eyes to something which -- if you're deliberately shutting

7    your eyes to some circumstance, to some situation where the

8    fact would be obvious if someone did not deliberately shut it

9    out.

10           You have this concept of causing Jasmin to engage in a

11   commercial sex act.  That concept is both in the first

12   alternative up at the top of the page and here.  And I don't

13   think there's anything to really define about cause.  "Cause"

14   means cause.

15           But I want to say, however, that the elements that are

16   stated here, if the defendant did what is charged, and if the

17   government has proved these elements, it is no defense that

18   Jasmin had engaged previously in prostitution or engaged in

19   prostitution after the defendant was arrested.  In other words,

20   if someone takes a hardened prostitute and by force transports

21   her and causes her to engage in more prostitution, that is a

22   crime in violation of the statute.  Now the issue about her

23   prior prostitution is certainly something you will consider on

24   the issues of credibility and so forth, but I just want to make

25   it clear that her other prostitution is not in and of itself a

1    defense.  In other words, if the acts are proven that are

2    listed here, then there's guilt regardless of that circumstance

3    if those things are proven.

4              Now you'll receive -- maybe I should have given this

5    to you before, but you will receive a verdict form for you to

6    fill out, and it will ask you whether you find the defendant

7    guilty or not guilty on Count One.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Now, in order to find a verdict of guilty

2     on Count 1, you must find the government has proven at least

3     one of the alternatives -- at least one of the alternatives.

4     The government contends they have proved both, but you must

5     find that the government has proven at least one of the

6     alternatives, the one at the top of the page and the one I have

7     labeled "alternative."

8          If you are finding only one, you must be unanimous on

9     that one.  You cannot have a verdict of guilty on Count 1 if

10    six of you find that the government proved the first

11    alternative and six of you find that the government has proved

12    the second alternative.  If you find only one, you must be

13    unanimous on that one.  Now, if you find that the government

14    has proven both, then you find that the government has proven

15    both.

16         You will be asked in the verdict form, first of all,

17    whether you find the defendant guilty on Count 1, and you will

18    be asked which of the alternatives or both, whether you find

19    one alternative or another alternative or both alternatives.

20    You will be asked to specify that.

21         So we know the grounds for your verdict, if you find a

22    verdict of guilty.

23         Now, let's come to Count 2.  Count 2 is under another

24    statute, again, passed pursuant to the Commerce Clause of the

25    Constitution.  And I will read the elements that have to be

1    proven.

2         Count 2.  In order to find the defendant guilty on

3    Count 2, you must find that the government has proved each of

4    the following elements by proof beyond a reasonable doubt:

5         1.  That the defendant knowingly transported Jasmin in

6    interstate commerce;

7         2.  That the defendant did this with the intent that

8    Jasmin would engage in prostitution;

9         3.  That Jasmin was less than 18 years old at this

10   time.

11        So this is, really, what I think we might call the

12   transportation count.  And the elements, I don't think need

13   much definition, except that I should tell you that, for the

14   sake of this count, even if Jasmin consented to be transported,

15   that would not be a defense, if the defendant knowingly

16   transported Jasmin and if he did this with intent that Jasmin

17   would engage in prostitution.

18        Also, the government does not have to prove that the

19   defendant knew Jasmin was less than 18 years old.  On this

20   Count 2, all the government has to prove is that she was in

21   fact less than 18 years old at the time.

22        So if you keep hold of this list of elements and you

23   follow this carefully, you will be obeying the law, and you

24   will be complying with the instructions that are given you.

25        Now, certain other things need to be discussed with

1    you.

2          First of all, it is perfectly fair to argue that

3    certain investigative techniques were not used and, therefore,

4    the government has not met its burden of proof, but there is no

5    legal requirement that particular investigative techniques be

6    used, and there is no legal requirement that the government

7    prove any particular set of investigative techniques.

8          The issue for you is whether the proof that is before

9    you does or does not prove the government's case by proof

10   beyond a reasonable doubt.  If you find that the government has

11   proved its case by proof beyond a reasonable doubt by virtue of

12   the evidence that is before you, then that is the basis for

13   finding a verdict of guilty, even though the government or the

14   police or the FBI did not use particular investigative

15   techniques.  So the issue goes back to the issue which has been

16   specified to you over and over, has the government proven its

17   case by proof beyond a reasonable doubt.

18          I hope I said this before, but if I didn't, I want to

19   say it.  The defendant has no burden of proof.  The entire

20   burden of proof is on the government.  And I think that is

21   consistent with everything I have said to you, but I wanted to

22   make sure that I had given you that specific instruction.

23          Now, let me talk about the issue of credibility.  How

24   do you determine credibility?

25          Well, you've heard the witnesses.  You have seen the

1    witnesses.  And it is a matter of good judgment, common sense.

2    Probably you don't realize it, but you encounter issues of

3    credibility in your lives and in your businesses.

4              Is somebody telling you the truth or aren't they?

5              Is somebody exaggerating or aren't they?

6              Is somebody holding something back?

7              A courtroom is a different arena, but the same kind of

8    judgment applies.

9              Now, how does a witness impress you?  Does the witness

10   impress you as basically telling the truth to the best of their

11   ability or otherwise?  And there's not a lot more to be said.

12             There are certain law enforcement officers who

13   testified and their testimony needs to be judged as to

14   credibility to the same degree that any other testimony would

15   be judged.

16             It can happen that there are contradictions between

17   what a witness says one time in court and another time in

18   court.  There can be that there are contradictions between what

19   a witness testifies in court and between a record and a

20   statement.  And those matters, of course, can be considered by

21   you on the issue of credibility.  But the question is, is the

22   contradiction so fundamental as to undermine all of the

23   testimony or is it a matter that is not so fundamental?

24             You are free, according to your judgment, to credit

25   all the testimony of a witness, reject all of the testimony of

1    a witness or credit parts of the testimony that you believe are

2    useful and credible to you and reject parts.  That is all up to

3    you.

4           The defendant did not testify.  Under our

5    Constitution, he had a right to go through this trial and not

6    testify.  And in order to give that important constitutional

7    right full effect, I am instructing you that when you are

8    deliberating, you are to draw no adverse inference against the

9    defendant because of the fact that he did not testify.

10          Now, I am ready to conclude.

11          When you go into the jury room, you will be

12   deliberating.  You will obviously voice your own views on the

13   issues and as to the evidence, and you will listen

14   considerately to the views of your fellow jurors.  And by that

15   process, I am sure you will come to the verdicts in the case.

16          Any verdict of guilty or not guilty must be the

17   unanimous decision of all 12 jurors.  Any answer to any

18   specific question -- and there will be two of those on the

19   form -- must be the unanimous verdict of all 12 jurors.

20          Now, if you find that the government has proved its

21   case by proof beyond a reasonable doubt on the particular count

22   you are considering, then it is your duty to return a verdict

23   of guilty and nothing should dissuade you from performing that

24   duty.  If on the other hand, you find that the government has

25   not proved its case by proof beyond a reasonable doubt on the

1    count you are considering, then it is your duty to find a

2    verdict of not guilty and nothing should dissuade you from

3    performing that duty.

4         Do not in any way let any consideration of possible

5    sentence enter into your deliberation or your consideration.

6         The issues before you are exactly what I have

7    specified.  If this is a conviction, the issue of sentence will

8    involve considerations which are not in any way before you.  So

9    under no circumstances consider or discuss or deliberate about

10   a possible sentence.  That issue is simply not before you.

11        When you have reached your decision or decisions, then

12   please send the form out.  You will have the verdict form.

13   Send it out so that it comes to me, and then we will assemble

14   in open court and the jury will announce the verdict in open

15   court.

16        Juror Number 1 will be your foreman, unless you

17   decline to serve, and if that is the case, then the jury will

18   elect another member as foreman or forelady.

19        There will be a United States marshal at the jury room

20   door to protect your privacy and also to convey any messages to

21   the Court, including conveying your final verdict, your final

22   decision.

23        If you have questions, if you need to have anything in

24   the way of the evidence repeated to you, there's a record of

25   all the testimony.  And if you have questions about something

1    you want repeated, the foreman or forelady should write a note

2    specifying those questions, and we can either furnish you the

3    transcript or have the testimony reread to you in court,

4    whichever is most expeditious.

5            As far as my instructions to you, if there is anything

6    that is unclear or anything you want repeated, do not hesitate

7    for a minute to send out a note asking what it is that is of

8    concern to you because I will do my best to clear any issues up

9    for you.

10           Right now, I am going to ask you to retire.  I want to

11   see if the lawyers have any suggestions about my instructions

12   that would necessitate some amendment, and please do not start

13   deliberating until you have been told that we are finished, but

14   we are not quite finished until I hear from the lawyers.  So if

15   you will retire now, and I will call you back in a very few

16   minutes.

17

18           (Continued on next page)

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Any exceptions from the government?

3          MS. LAMARQUE:  Yes, your Honor.

4          First, I do think that they need to be charged on

5    venue, although I think it is obvious in this case.

6          THE COURT:  Is venue an issue?

7          MS. LAMARQUE:  It is an issue insofar as it was not

8    conceded by the defendant.  I do think that they need to be

9    made aware that they have to find venue on each count by a

10   preponderance.

11         THE COURT:  I will give an instruction on venue if

12   anyone wants an instruction on venue.

13         MS. LAMARQUE:  Yes.  I think it would be appropriate.

14         The other instruction would be, nothing was mentioned,

15   your Honor, about the time of the offense because there was no

16   narrative about when we allege the offenses took place.

17         THE COURT:  What needs to be said about time?

18         MS. LAMARQUE:  Just that we allege that the offenses

19   took place --

20         THE COURT:  They don't even have the indictment.

21         MS. LAMARQUE:  I understand that, your Honor.

22         THE COURT:  I don't see anything to be said about

23   time.

24         MS. LAMARQUE:  All right, your Honor.

25         THE COURT:  Anything else?

 1              MS. LAMARQUE:  Two more points.

 2              One is, we just want to note our objection for the

 3     record.  In terms of the alternative basis for the sex

 4     trafficking charge, Count 1, the government just objects to the

 5     instruction that they have to be unanimous on which method that

 6     they choose in order to find him guilty.  The statute lists

 7     both alternatives with an "or" in the disjunctive, and you

 8     instructed them that they have to be unanimous in order to find

 9     him guilty, so we just lodge our objection to that.  I

10     understand the Court disagrees with that perspective.  My

11     understanding from the charge conference --

12              THE COURT:  I don't think we discussed it.  I'm sorry

13     we didn't.  I will not tell them.  They have to be unanimous on

14     a crime, period.

15              MS. LAMARQUE:  Your Honor, I don't want to frustrate

16     you.  All I am saying is, to find him guilty of Count 1, they

17     do not, as a matter of the statutory language, have to be

18     unanimous concerning the age prong or the fraud prong, as long

19     as they find one.  The statute states --

20              THE COURT:  The statute does not talk about unanimity.

21              MS. LAMARQUE:  I understand that, but it says "or," it

22     says "either or."

23              THE COURT:  I note your objection.

24              MS. LAMARQUE:  Thank you.

25              The next point is, just to preserve the record, I do

1    think some sort of limiting instruction on similar act evidence

2    is warranted in this case.  There is a lot of evidence that

3    came in about Toni, that doesn't go directly to the charges,

4    vis-a-vis Jasmin as alleged in the indictment.  I just think to

5    preserve the record, there should be some instruction on

6    similar act evidence.

7               THE COURT:  What instruction would you recommend?

8               MS. LAMARQUE:  On page 51.

9               THE COURT:  Let's look at that.

10              MS. LAMARQUE:  It doesn't have to be as verbose as

11   this, your Honor, I think that just some mention of the first

12   full paragraph:  Let me remind you that the defendant is not on

13   trial, is only on trial for the acts alleged in the indictment.

14   You may not consider similar acts as a substitute for proof

15   that, if any committed, the crime charge nor may you consider

16   as evidence proof that a defendant has a criminal personality

17   or bad character.  The evidence of other similar acts was

18   admitted for the limited purpose and you may only consider it

19   for that limited purpose.

20              I think that is sufficient, your Honor, that second

21   full paragraph.  I just want that in their mind at one point.

22   During the case, they were not instructed when the evidence

23   came in on this point and usually there is some limiting

24   instruction given when such evidence comes in.

25              THE COURT:  Well, I don't particularly mind reading

1    it.

2             MS. LAMARQUE:  I think that you can change it to make

3    it more understandable.

4             THE COURT:  The point is, they have been instructed

5    very thoroughly on what is necessary to be proven for

6    conviction here, and neither your summation nor Mr. Stein's

7    made any suggestion that what was involved in the charges here

8    had anything to do with Toni or the mother, except as really

9    relevant to this case.  And this case has been defined for

10   them.

11            MS. LAMARQUE:  I agree, your Honor.

12            THE COURT:  You are asking me to read a lot of

13   language which to me is quite irrelevant because you want to

14   have a record.  Well, OK, I'll do it, but all you are doing

15   really is injecting something that may cause a little

16   confusion -- probably won't -- but that's your problem.

17            MS. LAMARQUE:  Your Honor, if the defense is willing

18   to waive, they state that they don't want that to be read to

19   the jury, then I am happy not to have it read.

20            THE COURT:  Do you have any view.

21            MR. STEIN:  Yes, Judge.  I think that this particular

22   point is the classic dancing on the head of a pin argument.  I

23   told the jury in my opening statement.  I said it in my

24   summation, I even called my client a pimp, that he was involved

25   with adult women.

1           THE COURT:  Do you want this paragraph read?

2           MR. STEIN:  I think it is irrelevant, Judge.

3           THE COURT:  I won't read it.

4           MS. LAMARQUE:  No problem.

5           THE COURT:  Exceptions from the defense?

6           MR. STEIN:  Yes, Judge.

7           In the government's request to charge which I think I

8    would join in this and I believe that you did not refer to

9    this, and I talked about this somewhat in my summation,

10   sympathy should not enter into their deliberations, sympathy

11   for Jasmin, sympathy in any respect.

12          THE COURT:  A very good point.

13          MS. LAMARQUE:  Your Honor, I think you explicitly

14   mentioned that when you first started charging them.  I

15   literally wrote it down.  Focus on the evidence and the law,

16   sympathy is not to --

17          THE COURT:  I think Mr. Stein has a good point.

18          MR. STEIN:  Judge, of much more substance, I was very

19   troubled by your instructions concerning the words "cause" or

20   "caused" which I had argued about in the charge conference

21   yesterday.  What I particularly object to is your instruction

22   to the jury that Jasmin's being a prostitute before she met my

23   client or afterwards when Jasmin left the shelter and my client

24   was already in custody and went to some location and had sexual

25   relations with some men, you told the jury that that is not a

1    defense and they should consider it only for credibility.  I

2    strongly disagree with that because, putting this in the

3    context of what was testified to here, that Jasmin --

4              THE COURT:  I think I agree with you.  Here's my

5    point.  To be frank with you, the summations put that issue in

6    a somewhat awkward posture.  The government in its opening

7    summation never referred to her prior prostitution or other

8    prostitution, astoundingly.  Now, of course, Mr. Stein did in

9    perfectly proper ways.  And, of course, there was some mention

10   in the rebuttal from the government.

11             What I was intending to say is -- and I think it was

12   correct, and I'm talking about one issue which I stated and

13   this is the only issue I really raised -- I thought that it

14   could confuse the jury, particularly the fact that the

15   government didn't even discuss it in the opening summation and

16   deal with it.  I thought the jury might think, well, there is a

17   defense -- as a defense, that she was a prostitute, and I

18   wanted to eliminate that possible confusion.

19             I will get back to you, but I think what you are

20   saying is, her activities as a prostitute are relevant to the

21   question of whether the defendant did the things with which he

22   is charged.

23             MR. STEIN:  That is not quite.

24             THE COURT:  Well, you state it.

25             MR. STEIN:  What I believe you said, which is the

1   problem, is that it is not a defense and they should consider

2   it only for credibility, that is, her prior prostitution and

3   here subsequent prostitution.

4          My point --

5          THE COURT:  What is your point?

6          MR. STEIN:  My point is that the jury is entitled to

7   consider her prior and subsequent prostitution on the question

8   of whether my client caused her to commit prostitution during

9   the period of time of December 1st and December 2nd.  And

10  Jasmin even testified, when she doesn't have her medication,

11  she acts impulsively and there is testimony here that she

12  hadn't taken her medication.

13         THE COURT:  I think you are right, and I will give an

14  instruction now exactly in terms of what you said.

15         MR. STEIN:  Thank you, Judge.

16         MS. LAMARQUE:  Your Honor, we object.

17         What you said to the jury was, if you find the

18  elements of the crime and you specifically stated, they need to

19  find the elements of the crime, then it is no defense that

20  Jasmin previously engaged in prostitution.

21         THE COURT:  See, I went on and said it is only

22  relevant on the question of credibility and that is too narrow.

23         MS. LAMARQUE:  Here is my problem, your Honor.  Now

24  you are going to give a specific instruction on this point and

25  this point alone, giving it a level of import that is improper,

1    especially after you have already instructed the jury on the

2    particular elements of the crime.  To highlight that now and to

3    be quite frank, to say that they are allowed to consider it on

4    whether the defendant caused her to engage specifically is

5    challenging the actual element and how they are assessing the

6    element.

7              THE COURT:  No, it isn't.

8              MS. LAMARQUE:  Your Honor, giving the instruction in

9    this particular manner is more prejudicial and confusing and

10   will lead to more of the concern that I am assuming you had

11   when you crafted this language --

12             THE COURT:  Crafted what language?

13             MS. LAMARQUE:  When you instructed them about the

14   prior prostitution and post prostitution.  I am assuming there

15   was a concern about confusion and how that should be assessed.

16             THE COURT:  I think I created some confusion of my

17   own.  That's the problem.

18             I want to say this.  That is not a small issue here.

19   Her prior prostitution and the prostitution she engaged in

20   after the arrest of the defendant, that is not a small issue

21   here, and it should have been addressed in the main summation

22   by the government and then it would have been really addressed.

23             And then, of course, Mr. Stein stands up and argues

24   properly -- he argued perfectly properly -- and you had

25   something to say in the rebuttal, but this should have been

1    really dealt with from the very beginning in the summations.

2          And I think Mr. Stein is right, part of what I said is

3    correct.  Part of what I said is incorrect.  It is not only

4    relevant on the issue of credibility, and I am going to correct

5    it.

6          MS. LAMARQUE:  How are you going to correct it, your

7    Honor?

8          THE COURT:  I will say they can consider the evidence

9    about her earlier prostitution and her prostitution after the

10   arrest of the defendant.  They can consider it on the issue of

11   whether the defendant, through his acts, caused her to --

12   whatever that language is --

13         MR. STEIN:  -- engage in prostitution.

14         MS. LAMARQUE:  -- engage in a commercial sex act.

15         THE COURT:  -- engage in prostitution.

16         I am not attempting to emphasize or take out of

17   context one particular part of the evidence.  They will

18   consider all of the evidence.  And I go back to the fact that

19   if they believe that the defendant did, through his acts, cause

20   her then to engage -- it is not a defense in and of itself that

21   she had engaged in prostitution.

22         MS. LAMARQUE:  If you are going to strike that

23   balance, your Honor, where you say then it is not a defense

24   after you make that statement then --

25         THE COURT:  I think I have to do something.

1              MS. LAMARQUE:  If you are going to strike that

2      balance, that is preferred to making --

3              THE COURT:  Anything else, Mr. Stein?

4              MR. STEIN:  Judge, you are going to say, in substance,

5      so that we are clear about this -- I am paraphrasing --

6      although it may not be a defense, you can consider the prior

7      and subsequent prostitution by Jasmin on the question of

8      whether or not my client caused her to engage in prostitution?

9              THE COURT:  That's right.

10             MR. STEIN:  Thank you.

11             THE COURT:  Let's bring the jury back.

12

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  A couple of additional points.

3    Something in the law called venue, prosecution must

4    relate to acts committed at least whole or in part within this

5    judicial district.  This judicial district includes the Bronx.

6    And so you don't have to make a specific finding, but if you

7    find criminal acts committed, you must find that they were

8    committed within this judicial district, and this judicial

9    district includes the Bronx.

10    Now, a couple of other points.

11    I spoke in a general way about the verdict not being

12    based on sympathy, and I just want to repeat that.  As far as

13    the evidence is concerned, obviously, the issue about the

14    testimony of anyone is not whether you sympathize or not

15    sympathize, it is whether you credit the testimony or don't

16    credit the testimony as to the facts.

17    Now, you heard evidence and you heard some discussion

18    in the summations about the fact that Jasmin had engaged in

19    prostitution at times before she met the defendant and engaged

20    in some prostitution after the defendant was arrested.

21    Now, I just want to correct something.  I am not

22    trying to single out some piece of proof and so forth to give

23    it any kind of highlighting or emphasis, but I wanted to make

24    sure I didn't give you some incorrect instruction earlier.

25    You are entitled to consider the evidence about

1    prostitution prior and prostitution after.  And you know what I

2    am talking about, on the question of whether the defendant

3    caused her to engage in prostitution.  However, the mere fact

4    that she had engaged and subsequently engaged in additional

5    prostitution is not in and of itself a defense.  It can be

6    considered by you on the issue of causation, but it is not in

7    and of itself a defense.

8             What I am trying to get at and make clear is that --

9    and I said this earlier -- if someone takes a hardened

10   prostitute and commits the acts that are charged here and

11   violates the law, then it is not a defense that the person was

12   a hardened prostitute.  In other words, it is perfectly

13   possible and the law recognized that a prostitute can be taken

14   and compelled to engage in additional prostitution and caused

15   to do that.

16            So the issue here is, you can consider prostitution on

17   the issue of causation, but if you find that there was

18   causation, then her prior and subsequent prosecution is not a

19   defense.

20            With that I will excuse you to go to your

21   deliberations.

22            I will excuse the alternate.

23            Thank you very much.  If you could let Mr. Beale know

24   your whereabouts, and we will swear the marshal.

25            (Marshal sworn)

C9PUGIL4                    Charge

1          THE COURT:  Do you all have verdict forms?

2          JURORS:  No, we don't.

3          THE COURT:  As they are going out, let's give them

4     verdict forms.

5          And go to your deliberations, please.

6          (At 1:10 p.m., the jury retired to commence their

7     deliberations)

8

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  (Time noted:  2:30 p.m., jury present)

3                  THE COURT:  Has the jury reached its decisions?

4                  THE FOREPERSON:  Yes, sir.

5                  THE COURT:  Would you stand.

6                  And the deputy clerk will call out the questions and

7       please read the answer.

8                  THE DEPUTY CLERK:  In the case of United States of

9       America v. Jabar Gilliam, S1 11 CR 1083 (TPG), Count 1, sex

10      trafficking?

11                 THE FOREPERSON:  Guilty.

12                 THE DEPUTY CLERK:  If you find the defendant guilty,

13      please answer the following two question:

14                 1.  Do you find, unanimously, that the offense was

15      effected by means of force, threats of force, fraud or

16      coercion, or by any combination of such means?

17                 THE FOREPERSON:  Yes.

18                 THE DEPUTY CLERK:  2.  Do you find, unanimously, that

19      the person that was harbored or transported, and caused to

20      engage in a sex act, Jasmin, was over 14 years old but under

21      the age of 18?

22                 THE FOREPERSON:  Yes.

23                 THE COURT:  Count 2, transportation of a minor to

24      engage in prostitution?

25                 THE FOREPERSON:  Guilty.

C9PUGIL5

1          THE DEPUTY CLERK:  Thank you.

2          You may be seated.

3          THE COURT:  Would the defendant like to have the jury

4    polled?

5          MR. STEIN:  He would.

6          THE DEPUTY CLERK:  Members of the jury, listen to your

7    verdict as it now stands recorded in the case of United States

8    of America v. Jabar Gilliam, S1 11 CR 1083(TPG):

9          Count 1, sex trafficking?

10         Guilty.

11         1.  Do you find, unanimously, that the offense was

12   effected by means of force, threats of force, fraud or

13   coercion, or by any combination of such means?

14         Yes.

15         2.  Do you find, unanimously, that the person that was

16   harbored or transported, and caused to engage in a sex act,

17   Jasmin, was over 14 years old but under the age of 18?

18         Yes.

19         Count 2, transportation of a minor to engage in

20   prostitution?

21         Guilty.

22         (Jury polled; each juror answered in the affirmative)

23         THE DEPUTY CLERK:  Jury polled, verdict unanimous.

24         THE COURT:  Thank you very much for your service.

25         You were prompt.  You were attentive.

1          Your verdict is amply supported by the evidence, and

2     thank you for doing your duty so well.

3          You are now excused from the case.

4          (Jury discharged)

5          THE COURT:  Let me just say, that I want to compliment

6     the lawyers on both sides.

7          I made some comment about the summation, that was just

8     a matter of what priority you gave what subject.

9          And I want to particularly address the defense because

10    there's been some comment by the defendant.

11         That was an excellent summation.  You really,

12    Mr. Stein, did all you could with what was available, and it

13    was very, very good.  The evidence is something that you can't

14    create, but with what there was to deal with, it was excellent.

15         Now, what do we need to do?

16         Do we have a sentencing?

17         MR. STEIN:  Judge, I have an application.

18         THE COURT:  Please.

19         MR. STEIN:  I am sure it has been obvious to the Court

20    and especially during the proceedings when the prosecution was

21    not present, that my client and I have had a lot of

22    difficulties, to say the least.  And, frankly, I don't think it

23    would be right if I were to proceed further as Mr. Gilliam's

24    counsel, so I am requesting to be relieved.  I am guessing that

25    he would join in this request.  I think that he should have a

1  new face representing him for purposes of sentencing and after

2  that.  I just don't think this is a good situation at all.  I

3  don't make this application, lightly.  Frankly, I am rather

4  uncomfortable doing it, but I am very comfortable with the fact

5  that it is the right thing to do.

6         THE COURT:  What was the last thing you said?

7         MR. STEIN:  I said I am not very comfortable making

8  this application.  I have been a lawyer for a while, and I

9  don't like doing that, but I think, under the circumstances, it

10  is the right thing to do.

11         THE COURT:  Obviously, to say the least, I am going to

12  take your application very seriously, but does the

13  government -- do you either recall or do you have some record

14  close at hand of how many lawyers there were for the defense

15  through the history of this case?

16         MS. GREENBERG:  Your Honor, just one prior to Mr.

17  Stein, and that was Mr. Gombiner of the Federal Defenders.

18         THE COURT:  I had remembered more, but I think Mr.

19  Gombiner actually requested to be relieved?

20         MS. GREENBERG:  I believe that's correct.  Mr.

21  Gombiner was also working with a colleague, Mr. Statsinger,

22  from Federal Defenders as well.

23         THE COURT:  Were they working together on this case?

24         MS. GREENBERG:  They were.

25         THE DEFENDANT:  Your Honor, he was assisting.  He

1    wasn't my attorney.  Mr. Gombiner was my attorney.  I had one

2    attorney.

3         THE COURT:  Well, I had remembered things a little

4    differently.

5         In any event, I certainly take your word, Mr. Stein,

6    that you have had difficulties and they were manifested a

7    little bit in court, probably not as much as existed in the

8    work and preparation and so forth.

9         The only reason I am sitting here hesitating is, you

10   did a whale of a good job on this case and somehow -- I mean

11   Mr. Gombiner, who is a very fine lawyer, he really couldn't get

12   along well enough with your client to carry the case to trial,

13   and you managed to do that, which is greatly to your credit.

14        To have somebody else come in and go through the same

15   thing that you and Mr. Gombiner went through -- I guess it has

16   to be done.  But I would like to say, Mr. Stein, I am

17   ultimately going to grant your request, but I want to have a

18   new lawyer selected in a way that needs to be done, and I want

19   to have a conference where you are both there.  I think the new

20   lawyer should know the full story, and I am sure there can be a

21   new lawyer.  There can be a new lawyer, but I would ask you to

22   stay in just for the moment until we get this thing settled,

23   OK?

24        MR. STEIN:  That's fine, Judge.

25        THE COURT:  We need to set a sentence date.

C9PUGIL5

1          THE DEPUTY CLERK:  The sentence date shall be

2    Thursday, January 3rd at 4:30.

3          THE DEFENDANT:  Your Honor, one thing, please.

4          Mr. Stein, I do give him credit in becoming my lawyer

5    after Mr. Gombiner, but I had several issues that I brought to

6    your attention.

7          THE COURT:  The trial is over with.  The jury has

8    rendered a verdict and we are going to recess.

9          Thank you very much.

10

11                         o    0    o

12

13

14

15

16

17

18

19

20

21

22

23

24

25