UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA            :

   -v.-                              :        S1 11 Cr. 1083-01 (TPG)

JABAR GILLIAM,                      :
  a/k/a "Jabal Gilliam;"
  a/k/a "Jamal Gilliam;"           :
  a/k/a/ "JB,"
         Defendant.        :
-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Kristy J. Greenberg
Natalie Lamarque
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA          :

    -v.-                             :       S1 11 Cr. 1083-01 (TPG)

JABAR GILLIAM,                 :
  a/k/a "Jabal Gilliam;"
  a/k/a "Jamal Gilliam;"          :
  a/k/a/ "JB,"
              Defendant.        :
-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

      The defendant is scheduled to be sentenced in this matter on December 3, 2013, at 2:30 p.m.  The Government respectfully submits this memorandum in advance of the sentencing, and in response to the Defendant Jabar Gilliam's Sentencing Memorandum dated November 19, 2013 ("Def. Mem."), in which the defendant asks the Court to impose a mandatory minimum sentence of fifteen years' imprisonment.  (Def. Mem. at 2.)  The United States Probation Office (the "Probation Office") recommends a sentence of 300 months' imprisonment.  (Probation Office's Presentence Investigation Report ("PSR") at 21.)  The Government respectfully requests that the Court impose a sentence within the stipulated Guidelines range of 360 months' to life imprisonment, which would reflect the seriousness of the defendant's sex trafficking offenses, the defendant's extensive criminal history and characteristics,  serve the purpose of deterrence, and provide just punishment for the significant harm that the defendant has imposed on his victim.

## BACKGROUND

### A.    The Indictment

A superseding two-count Indictment (the "Indictment") was filed against Jabar Gilliam (the "defendant") charging him with one count of sex trafficking and one count of transportation of a minor across state lines with the intent to engage in sexual activity (PSR ¶¶ 1-3.)  Count One of the Indictment charged that from November 2011 through December 2, 2011, the defendant recruited, enticed, transported, provided, and maintained a minor ("Victim-1"), causing Victim-1 to travel from in or around Maryland to New York City, and compelling Victim-1 to engage in commercial sex acts that benefitted the defendant financially, in violation of  Title 18, United States Code, Section 1591(a), (b)(1), and (b)(2).  (PSR ¶ 2.)  Count Two of the Indictment charged that from November 2011 through December 2, 2011, the defendant traveled with Victim-1 from in our around Maryland to New York City, with the intent that Victim-1 engage in prostitution, in violation of Title 18, United States Code, Section 2423(a).  (PSR ¶ 3.)  On September 25, 2012, following a jury trial, the defendant was found guilty on both counts.  (PSR ¶ 6.)

### B.    The Offense

On November 30, 2011, law enforcement officers were alerted that a 16-year-old female ("Victim-1") had been reported missing in Maryland.  (PSR ¶ 9.)  On December 2, 2011, NYPD detectives observed Victim-1 and the defendant entering an apartment building in the Bronx, New York.  (PSR ¶ 10).  After the detectives approached the defendant and Victim-1 and identified themselves as law enforcement, the defendant attempted to flee into an apartment in the building.  The detectives chased the defendant, who was ultimately apprehended inside the apartment and placed under arrest.  (PSR ¶ 10.)

Following his arrest, police recovered from inside the apartment backpacks belonging to Victim-1 and the defendant. (PSR ¶ 11.) The defendant's backpack contained, among other things, six condoms and a notebook containing his own handwritten notes regarding prostitution. (PSR ¶ 11.) Victim-1's backpack contained, among other things, a short purple and grey dress, fishnet stockings, a pink bra, and black high heels. In the defendant's pocket, police recovered a booklet containing rules for prostitutes and his cell phone, which contained sexual photographs of Victim-1 in the short purple and grey dress, and text messages with Victim-1's mother. (PSR ¶ 11.) In those text messages, the defendant discusses having both Victim-1 and Victim-1's mother work for him as prostitutes. In a text message on November 30, 2011, Victim-1's mother told the defendant that Victim-1 was 16 years-old. (PSR ¶ 11.) The police also recovered eight condoms and fourteen personal lubricant packets from Victim-1's pockets. Victim-1 later provided the FBI with another booklet that the defendant had given her containing defendant's handwritten rules for prostitutes. (PSR ¶ 11.)

The defendant initially contacted Victim-1 on Facebook. (PSR ¶ 12.) Victim-1 told the defendant that she worked as a prostitute, and the defendant told her he was a pimp and asked her to work for him. Victim-1 initially agreed and they discussed meeting in person to discuss Victim-1 working for the defendant as a prostitute. (PSR ¶ 12.) During their first meeting, the defendant gave Victim-1 a set of handwritten rules that she had to follow while working as a prostitute for him. (PSR ¶ 12.) After Victim-1 and the defendant's initial meeting, Victim-1 worked for him as a prostitute in Maryland. (PSR ¶ 13.) Victim-1 engaged in multiple sex acts with various individuals in Maryland at the defendant's direction. (PSR ¶ 13.) According to Victim-1, the defendant set the prices for the sex acts and, after Victim-1 was paid, she turned

the cash over to the defendant. On two separate occasions in Maryland, the defendant struck Victim-1. (PSR ¶ 13.)

At some point, prior to December 1, 2011, Victim-1 agreed to travel to New York City with the defendant and work for him as a prostitute. (PSR ¶ 14.) However, Victim-1 later told the defendant that she had changed her mind. In response, the defendant threatened to prostitute Victim-1's younger sister if she did not travel with him to New York. (PSR ¶ 14.) On December 1, 2011, the defendant and Victim-1 traveled by bus from Maryland to New York City so that Victim-1 could work as a prostitute. (PSR ¶ 15.) While on the bus, Victim-1 learned from text messages on the defendant's cell phone that the defendant had asked Victim-1's mother to work for him as a prostitute. When they arrived in New York, Victim-1 confronted him about the text messages. In response, the defendant choked and punched Victim-1. (PSR ¶ 15.) While in New York, the defendant took provocative photographs with his cell phone of Victim-1's body in a short purple and grey dress. The defendant told Victim-1 that he planned to use those photos in an online classified ad in an effort to obtain customers for Victim-1's prostitution services. (PSR ¶ 15.)

During the evening of December 1, 2011, Victim-1 walked the streets in New York, and remained within the defendant's eyesight. (PSR ¶ 16.) Victim-1 engaged in prostitution and turned the money she earned over to the defendant, who did not pay her anything. Victim-1 also engaged in prostitution with several clients in the bedroom of an unidentified co-conspirator's apartment while the defendant was in the apartment's living room. (PSR ¶ 16.) This is the same apartment where the police discovered the defendant and Victim-1 on December 2, 2011. (PSR ¶ 16.)

After the defendant's arrest, the defendant provided a post-arrest statement to the FBI case agent. (PSR ¶ 18.) The defendant stated that he met Victim-1 the night before in New York when she asked to borrow $40 from him, which he paid her and she paid him back. The defendant also said that he did not know Victim-1's name and that he only called her Shorty. (PSR ¶ 18.) The defendant told the agent that he was from Maryland, he had come to New York from Maryland on December 1, 2011, and he had come alone. When the agent advised the defendant that the FBI knew he was lying about coming to New York alone and that the FBI knew he had brought Victim-1 with him, the defendant then admitted that he had brought Victim-1 to New York, but he said he was just trying to help her get to New York to see her mother and that he did not force her to get on the bus. (PSR ¶ 18.)

The agent then asked what the defendant knew about Victim-1's mother. (PSR ¶ 19.) The defendant stated that he had spoken to Victim-1's mother about bringing Victim-1 to New York and that Victim-1's mother had sent explicit and naked pictures of herself to the defendant's cell phone. When the agent asked why Victim-1's mother would send those pictures, the defendant said he did not know. (PSR ¶ 19.) The agent then asked the defendant why he was with Victim-1 when he was arrested by police, and the defendant said they were going to an unidentified co-conspirator's apartment. The defendant said he stayed in that

apartment the night before, and that his backpack was in the apartment. He further stated that he and Victim-1 stayed there on December 1, 2011, when they got to New York. The defendant claimed that Victim-1 was not prostituting for him in New York. (PSR ¶ 19.) The defendant also denied giving Victim-1 drugs. (PSR ¶ 20.) Finally, when the agent asked the defendant why he ran from the police when they announced themselves, the defendant responded that it was just instinct. (PSR ¶ 20.)

## C.   The Defendant's Criminal History

The defendant has fifteen criminal history points, calculated as follows:

1.    The defendant pleaded guilty on or about October 31, 2006, in Maryland Circuit Court, Washington County, to the manufacture and distribution of cocaine, which resulted in 12 years' imprisonment, all but 6 years of which were suspended, and 3 years' unsupervised probation. On or about October 14, 2010, the defendant's parole was revoked and he was sentenced to 1 year of imprisonment. The defendant sold a quantity of cocaine in Washington County, Maryland. Pursuant to U.S.S.G. §§ 4A1.1(a), 4A1.2(a)(2), and 4A1.2(e)(1), this sentence results in three criminal history points. (PSR ¶¶ 60-61.)

2.    The defendant pleaded guilty on or about October 31, 2006, in Maryland Circuit Court, Washington County, to the manufacture and distribution of cocaine, which resulted in 12 years' imprisonment, all but 6 years of which were suspended, and unsupervised probation. On or about October 14, 2010, the defendant's parole was revoked and he was sentenced to 1 year of imprisonment. The defendant sold a quantity of crack to a confidential informant, who was working with police, in Hagerstown, Maryland. Pursuant to U.S.S.G. §§ 4A1.1(a), 4A1.2(a)(2), and 4A1.2(e)(1), this sentence results in three criminal history points. (PSR ¶¶ 58-59.)

3.    The defendant pleaded guilty on or about November 29, 2005, in Maryland District Court, Washington County, to possession of marijuana, which resulted in 365 days' imprisonment (all but 62 days suspended), 2 years' probation, $5,035 total forfeiture, and $40 monthly supervision fee. Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2), this sentence results in two criminal history points. (PSR ¶¶ 56-57.)

4.    The defendant pleaded guilty on or about November 29, 2005, in Maryland District Court, Washington County, to possession of marijuana, which resulted in 12 months' imprisonment (all of which was suspended but for one day), 2 years'

probation, $5,035 total forfeiture, and $40 monthly supervision fee. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), this sentence results in one criminal history point. (PSR ¶¶ 54-55.)

5.       The defendant pleaded guilty on or about May 22, 2002, in the Supreme Court of New York, New York County, to criminal possession of a narcotic drug in the fourth degree, which resulted in 6 months' imprisonment and 5 years' probation. The defendant possessed 28 clear ziplock bags containing crack in Manhattan. Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2), this sentence results in two criminal history points. (PSR ¶¶ 51-52.)

6.       The defendant pleaded guilty on or about December 11, 2001, in New York Criminal Court, Bronx County, to criminal possession of a controlled substance in the seventh degree, in violation of New York Penal Law Section 220.03, which resulted in 5 days' imprisonment. The defendant possessed four vials containing crack in the Bronx. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), this sentence results in one criminal history point. (PSR ¶¶ 49-50.)

7.       The defendant pleaded guilty on or about December 11, 2001, in New York Criminal Court, Bronx County, to criminal possession of a controlled substance in the seventh degree, in violation of New York Penal Law Section 220.03, which resulted in time served. The defendant sold a quantity of crack to another individual in the Bronx. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), this sentence results in one criminal history point. (PSR ¶¶ 47-48.)

8.       The defendant pleaded guilty on or about February 14, 2001, in New York Criminal Court, Bronx County, to criminal possession of a weapon in the fourth degree, which resulted in time served. As detailed in court and police records, the defendant possessed an anti-gravity knife with a four-inch blade in the Bronx. Pursuant to U.S.S.G. § 4A1.2(e)(3), this sentence results in no criminal history points. (PSR ¶¶ 45-46.)

9.       The defendant pleaded guilty on or about February 20, 2000, in Manhattan Criminal Court, to assault in the third degree, which resulted in 7 days' imprisonment. As detailed in the arrest report, the defendant struck a victim with a closed fist during an argument. Pursuant to U.S.S.G. § 4A1.2(e)(3), this sentence results in no criminal history points. (PSR ¶¶ 43-44.)

10.     The defendant was adjudicated as a youthful offender after a plea of guilty on or about October 21, 1999, in Mamaroneck Village Court, of unauthorized use of a vehicle, which resulted in 3 years' probation. However, on May 8, 2003, the defendant was later resentenced to 60 days' imprisonment after his probation was revoked. Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(d)(A), this sentence results in no criminal history points. (PSR ¶¶ 41-42.)

11.      The defendant was adjudicated as a youthful offender after a plea of guilty on or about November 24, 1998, in New York Criminal Court, Bronx County, of petit larceny, which resulted in 3 years' probation. Pursuant to U.S.S.G. § 4A1.2(e)(3), this sentence results in no criminal history points. (PSR ¶¶ 39-40.)

12.      The criminal convictions above result in a subtotal of thirteen criminal history points. At the time of the instant offense, the defendant was on probation. Pursuant to U.S.S.G. § 4A1.1(d), this results in two additional criminal history points. (PSR ¶ 62.)

Thus, the defendant has fifteen criminal history points. In accordance with the foregoing, the defendant's Criminal History Category is VI. Notwithstanding, and as discussed below, pursuant to U.S.S.G. § 4B1.1, the defendant's Criminal History Category must be VI because he meets the criteria as a Career Offender. (PSR ¶ 63.)

**D.     The Defendant's Objections to the Factual Assertions in the Presentence Report Should Be Rejected.**

The defendant objects to this statement in the PSR: "the following investigation was conducted by FBI agents, with assistance from the NYPD and Maryland State Police." (PSR ¶ 8.) The defendant also objects to the statement that "NYPD detectives located Victim-1 and the defendant in the Bronx." (PSR ¶ 10.) The defendant does not dispute the factual accuracy of either statement; rather, he states his intention to dispute the legality of the investigation on appeal. (Def. Mem. 2.) The only inquiry at sentencing regarding these statements in the PSR is whether they are factually accurate. Because it is undisputed that both statements in the PSR are factually accurate, the defendant's objections to these statements in the PSR should be dismissed.

**E.     The Enhancement for the Defendant's Undue Influence on Victim-1 Pursuant to U.S.S.G. § 2G1.3(b)(2)(B) Should be Applied.**

The defendant objects to the enhancement for undue influence, pursuant to U.S.S.G. § 2G1.3(b)(2)(B). This section provides for a two-level upward adjustment if a participant unduly

influenced a minor to engage in prohibited sexual conduct. Application Note 3(B) of U.S.S.G. § 2G1.3(b)(2) provides that:

> in determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior….In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor.

In this case, the defendant is 13 years older than Victim-1. Therefore, there is a rebuttable presumption that the defendant "unduly influenced" Victim-1 to engage in prohibited sexual conduct on the basis of their substantial age difference. Further, the defendant failed to offer any evidence rebutting the presumption on the basis of their age difference. Therefore, this Court is free to make its finding of "undue influence" on the basis of the unrebutted presumption alone. See United States v. Sanderson, Nos. 11-2488-cr, 2013 WL 1150491 (2d Cir. March 21, 2013) (defendant, who pled guilty to offenses involving the sex trafficking of a minor, failed to rebut the sentencing guidelines' rebuttable presumption that the two-level offense level enhancement under U.S.S.G. § 2G1.3(b)(2)(B) for unduly influencing a minor to engage in prohibited sexual conduct was applicable if the defendant was at least ten years older than the minor, and thus, the enhancement was warranted, where defendant did not dispute that he was at least ten years older than the minor).

The defendant argues that this two-level increase for undue influence under § 2G1.3(b)(2)(B) was impermissible double-counting because the court calculated a base offense level of 34 under § 2G1.3(a)(1) for his violation of 18 U.S.C. § 1591(b)(1), which has as an element that the defendant used "force, fraud, or coercion" to cause Victim-1 to engage in a commercial sex act. Because a person using "force, fraud, or coercion" against a minor would

necessarily have "unduly influenced" the minor, the defendant asserts, the § 2G1.3(b)(2)(B) enhancement impermissibly punishes him for conduct already included in the base offense level. (Def. Mem. 3). However, "because having 'undue influence' on a victim under § 2G1.3(b)(2)(B) may involve acts that do not constitute "force, fraud, or coercion" encompassed in § 2G1.3(a)(1), the two provisions serve unique purposes under the Guidelines and may both be applied to the same conduct." United States v. Smith, 719 F.3d 1120, 1123-1125 (9th Cir. 2013) (rejecting defendant's claim that the district court engaged in impermissible double counting, where district court applied an enhancement under § 2G1.3(b)(2)(B) for defendant's undue influence on a victim to the offense level where a defendant had been found guilty of sex trafficking through the use of force, fraud or coercion under 18 U.S.C. § 1591(b)(1)).

In Smith, the Ninth Circuit found that the district court could reasonably determine that Smith "unduly influenced a minor to engage in prohibited sexual conduct by preying on the minor's vulnerability and taking steps aimed at making the minor dependent on him." Id. The Ninth Circuit cited various "predatory acts [that] compromised the voluntariness of [the victim's] ability to resist [the defendant's] demands that she work as a prostitute for him," such as the defendant's invitation for the minor to move in with him, offering her a job, and engaging in a sexual relationship with her, all the while knowing that she was homeless and lacking family support or financial resources. Id. The Ninth Circuit further noted that because those acts do not amount to force, fraud or coercion, the district court did not err in applying the two-point enhancement for "undue influence" under § 2G1.3(b)(2) when calculating the defendant's Guidelines range. Id.[1]

---

[1] The term "coercion" means any threat of serious harm to or physical restraint against any person; or any scheme, plan or pattern intended to cause a person to believe that failure to

Similarly, <u>United States v. Watkins</u>, 667 F.3d 254, 264-265 (2d Cir. 2012) is instructive. In <u>Watkins</u>, the Second Circuit held that the evidence of record supported a finding of "undue influence," given Watkins's numerous instances of "manipulative behavior." <u>Id.</u> Specifically, the Second Circuit determined that Watkins's manipulative behavior, such as his providing the minor victim with clothes, meals, gifts, and picking her up at home, as part of his initial seduction of the minor victim, supported a finding of undue influence. <u>Id.</u> The Second Circuit further found that the district court did not err in finding that the rebuttable presumption was not overcome by any alleged evidence of the minor victim's interest in pursuing a relationship with Watkins or her "eagerness" to participate in Watkins's offense. <u>Id.</u> at 265.

In addition to the degree of undue influence that can be presumed given the substantial age disparity between the defendant and Victim-1, in this case, just as in <u>Smith</u> and <u>Watkins</u>, there is ample evidence in the record of the defendant's manipulative behavior to support a finding that the defendant unduly influenced Victim-1. The defendant learned of Victim-1's vulnerability: he knew that Victim-1's father was deceased and that her mother was a prostitute and had a drug problem, and had lost custody of Victim-1 when she was younger. (PSR ¶ 12). The defendant preyed on her vulnerability by telling her she was pretty and that he wanted her to meet his mother in New York. (PSR ¶ 12). These acts unduly influenced Victim-1 to work for the defendant as a prostitute, and thereby support an enhancement under § 2G1.3(b)(2)(B) for the defendant's having an undue influence on a victim. Because these acts do not constitute force,

---

perform an act would result in serious harm to or physical restraint against any person; or any abuse or threatened abuse of law or the legal process. <u>See</u> 18 U.S.C. § 1591(e)(2) (defining coercion).

fraud or coercion, there is no impermissible double counting for applying the undue influence enhancement under U.S.S.G. § 2G1.3(b)(2)(B).[2]

**F.      The Enhancement for the Defendant's Use of a Computer Pursuant to U.S.S.G. § 2G1.3(b)(3) Should be Applied.**

The defendant also challenges the application of a two-level enhancement "if the offense involved the use of a computer or an interactive computer service to ... persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct...."  U.S.S.G. § 2G1.3(b)(3)(A).  According to Application Note 4 of U.S.S.G. § 2G1.3, "[s]ubsection (b)(3) is intended to apply only to the use of a computer or an interactive computer service to communicate directly with a minor or with a person who exercises custody, care or supervisory control of the minor."  The defendant argues that this enhancement should not apply because there is no evidence that the defendant actually used a computer.  (Def. Mem. 4).  However, there is evidence that the defendant used an interactive computer service, which is defined to include a service or system that provides access to the Internet.  See § 2G1.3, cmt 1; 47 U.S.C. § 230(f)(2).  Specifically, the defendant used Facebook, which is accessed via the Internet, to

---

[2]  The defendant's argument that the undue influence enhancement should not apply because the jury did not specify whether it believed that the defendant engaged in force, fraud or coercion to cause Victim-1 to engage in sexual conduct is misplaced, as the enhancement is based on evidence in the record of the defendant's acts that had an undue influence on Victim-1, but did not constitute force, fraud or coercion.  (Def. Mem. 3).  Furthermore, with respect to any fact-finding at a sentencing proceeding, the standard of proof is a preponderance of the evidence. United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005); United States v. Gaskin, 364 F.3d 438, 464 (2d Cir. 2004).  "When making sentencing determinations, a district court may rely on any facts available to it, including information contained in the Pre-Sentence Report. Further, a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom."  Gaskin, 364 F.3d at 464 (citations omitted).  In making its factual findings, a "sentencing court remains entitled to rely on any type of information known to it." United States v. Concepcion, 983 F.2d 369, 388 (2d Cir. 1992).  As such, in rendering sentence, a district court may rely upon information gleaned from the evidence adduced at trial.  See United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996).

entice and induce Victim-1 to engage in prohibited sexual contact. At trial, Victim-1 testified that the defendant initially contacted Victim-1 on Facebook. (PSR ¶ 12). Victim-1 told the defendant that she worked as a prostitute, and the defendant said that he was a pimp and asked her to work for him. (PSR ¶ 12). They discussed meeting in person so they could talk about Victim-1 working for the defendant as a prostitute, and that meeting happened at the Spanish bar in Hagerstown. (PSR ¶ 12). Accordingly, the imposition of a two-level enhancement for the use of an interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct is appropriate.[3]

## G. The Enhancement for the Defendant's Commission of a Sex Act or Sexual Contact Pursuant to U.S.S.G. § 2G1.3(b)(4)(A) Should Not Be Applied.

The defendant challenges the application of a sentencing enhancement pursuant to U.S.S.G. § 2G1.3(b)(4)(A). This subsection of the Guidelines provides for a two level increase in a defendant's offense level if "the offense involved the commission of a sex act or sexual contact." The defendant argues that the enhancement constitutes impermissible double counting. (Def. Mem. 4). "Impermissible double counting occurs when one part of the

---

[3] Alternatively, this enhancement also could apply because "the defendant used a cellular telephone to threaten Victim-1 that if she did not travel to New York to work as a prostitute for him, the defendant would prostitute her younger sister." (PSR ¶¶ 14, 28). A "computer" as defined in 18 U.S.C. 1030(e)(1) includes electronic or other high speed data processing devices performing logical, arithmetic, or storage functions. "The language of 18 U.S.C. 1030(e)(1) is exceedingly broad," and the term "computer" has been interpreted by at least one appellate court to include cell phones. See United States v. Kramer, 631 F.3d 900 (8th Cir. 2011) (affirming district court's decision that the defendant's cellular telephone, which was used only to make voice calls and text messages to a victim, was a computer, thereby supporting the imposition of a two-level enhancement pursuant to U.S.S.G. § 2G1.3(b)(3)(A) for the use of a computer to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct). Accordingly, since the defendant's Blackberry cell phone can be interpreted to meet the definition of a computer, the imposition of a two-level enhancement for the use of the defendant's cell phone to persuade and coerce Victim-1 to engage in prohibited sexual conduct could apply.

[G]uidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the [G]uidelines. However, when the challenged part of the Guidelines 'aim[s] at different harms emanating from the same conduct,' there is no impermissible double counting. Enhancements are not duplicative when they reflect different facets of the defendant's conduct...." Watkins, 667 F.3d at 260-261.

Here, the defendant's base offense level is set at 34 because of his violation of 18 U.S.C. § 1591(b)(1), which prohibits sex trafficking where the defendant knew, or recklessly disregarded the fact, that force, fraud or coercion, or any combination of such means, would be used to cause the person to engage in a commercial sex act. "Every conviction under 18 U.S.C. § 1591 necessarily involves a commercial sex act." 2007 Amendment to U.S.S.G. § 2G1.3. The 2007 Amendment clarifies that "§ 2G1.3(b)(4)(B), which provides a two-level enhancement if the offense involved a commercial sex act, does not apply if the defendant is convicted under 18 U.S.C. § 1591." Id. The base offense level provided by § 2G1.3 takes into account limitations on the application of subsection (b)(4)(B) of § 2G1.3 to avoid unwarranted double counting. Id. However, the amendment does not similarly say that § 2G1.3(b)(4)(A), which provides a two-level enhancement if the offense involved a sex act or sexual contact, does not apply if the defendant is convicted under 18 U.S.C. § 1591. In fact, an enhancement for an offense involving a non-commercial sex act would reflect different facets of the defendant's conduct, and thereby not constitute impermissible double-counting. For example, the § 2G1.3(b)(4)(A) enhancement could apply to the defendant's non-commercial sex acts, ███ ████████████████████████████████████████████████████████████ while the offense conduct in 18 U.S.C. § 1591 applies to commercial sex acts, such as Victim-1's

sexual acts with customers for money which she paid to the defendant.  Without taking a position on whether or not the enhancement pursuant to U.S.S.G. § 2G1.3(b)(4)(A) could apply in this case as described, the Government does not seek to apply this enhancement in this case.

## H.      The Defendant Qualifies as a Career Offender under U.S.S.G. § 4B1.1.

A defendant is a career offender because he (1) was at least eighteen years-old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.  See U.S.S.G. § 4B1.1(a).  The defendant does not dispute that he was at least eighteen years-old at the time of the instant offense conduct, nor does he dispute that he has at least two prior felony convictions of either a crime of violence or a controlled substance offense.  (Def. Mem. 5.)  The defendant argues that the Career Offender Guideline does not apply to him because neither the instant sex trafficking or transportation of a minor for prostitution offenses is a felony that is neither a crime of violence nor a controlled substance offense.  (Def. Mem. 5.) Because both the defendant's instant offenses of sex trafficking and the transportation of a minor for the purpose of prostitution are crimes of violence, the defendant is a career offender.

The term "crime of violence" means any offense under federal or state law, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves the use of explosives or otherwise involves conduct that presents a serious potential risk of physical injury to another. See U.S.S.G. § 4B1.2(a).  In determining whether an offense is a crime of violence, we evaluate the statutory definition of the crime without considering the particular facts underlying the

15

defendant's conviction. <u>United States v. Curtis</u>, 481 F.3d 836 (D.C. Cir. 2007). The defendant's

offenses of sex trafficking and transportation of a minor for the purpose of prostitution involve

conduct that qualifies as a crime of violence because it presents a serious potential risk of

physical injury to another. <u>See</u> <u>e.g.</u>, <u>United States v. Patterson</u>, 576 F.3d 431, 442 (7th Cir. 2009)

(holding that because a violator of 18 U.S.C. § 2423(a) engages in purposeful conduct that

exposes the crime's victim to a foreseeable risk of violence, physical injury, and disease, 18

U.S.C. § 2423(a) is "similar in kind" to the enumerated crimes in U.S.S.G. § 4B1.2(2) and is a

crime of violence for purposes of the Sentencing Guidelines); <u>United States v. Williams</u>, 529

F.3d 1, 7 (1st Cir. 2008) (holding that the transportation of a minor with the intent that the minor

engage in prostitution, in violation of 18 U.S.C. § 2423(a), is a crime of violence because

indecent sexual contact crimes perpetrated by adults against children categorically present a

serious risk of physical injury, and the commercial aspect of this crime increased the level of risk

to the minor because it increased the risk of physical abuse from multiple partners and the risk of

contracting a sexually transmitted disease.); <u>United States v. Carter</u>, 266 F.3d 1089, 1091 (9th

Cir. 2001) (holding that the transportation of a minor with the intent that the minor engage in

prostitution, in violation of 18 U.S.C. § 2423(a), is a crime of violence); <u>Curtis</u>, 481 F.3d at 838-

839 (holding that the district court correctly treated the defendant as a career offender because a

New Jersey offense of promoting prostitution constituted a crime of violence). "[P]rostitutes risk

serious physical harm from customers and from their pimps. A child prostitute is particularly

vulnerable to such violence. In addition, a pimp is complicit in the sex offense of the customer,

and courts have universally recognized that sex offenses against minors are crimes of violence

under the career offender provision because of the substantial likelihood that the perpetrator will

use physical force to ensure the child's compliance." Curtis, 481 F.3d at 838-839.  Accordingly, the defendant's offenses constitute crimes of violence, and the defendant is a career offender.

The defendant's offense level is 37 for a career offender, pursuant to U.S.S.G. § 4B1.1(b)(1), and because it is not greater than the offense level of 38 that is otherwise applicable, pursuant to U.S.S.G. § 2G1.3, the offense level from the career offender table does not apply. See U.S.S.G. § 4B1.1(b).[4]  The defendant's criminal history category is Category VI because he has fifteen criminal history points.  However, regardless of the defendant's criminal history points, because the defendant is a career offender, his criminal history category is Criminal History Category VI.  See U.S.S.G. § 4B1.1(b).

## I.  The Guidelines Calculation

As discussed above, the defendant was found guilty of sex trafficking and transportation of a minor to engage in sexual activity, in violation of Title 18, United States Code, Sections 1591(a),(b)(1) and (b)(2), and 2423(a).  The offense of Sex Trafficking carries a maximum sentence of life imprisonment, and a mandatory minimum sentence of fifteen years' imprisonment.  (PSR ¶ 92.)  The offense of Transportation of a Minor to Engage in Sexual Activity carries a maximum sentence of life imprisonment, and a mandatory minimum sentence of ten years' imprisonment.  (PSR ¶ 92.)

Pursuant to § 3D1.2(b), Counts One and Two are grouped together because they involve the same victim and two or more acts connected by a common criminal objective.  (PSR ¶ 25.)

---

[4]  Should the Court find that either or both of the enhancements under § 2G1.3(b)(2)(B) or  § 2G1.3(b)(3)(A) do not apply, then the defendant's offense level would be 37 because the offense level from the career offender table would be greater than the offense level that is otherwise applicable.  With an offense level of 37 and a Criminal History Category VI, the defendant's Guidelines range would remain at 360 months' to life imprisonment.

For Count One, under Guidelines Section 2G1.3(a)(1), the charge has a base offense level of 34. (PSR ¶ 26.)  Pursuant to § 2G1.3(b)(2)(B), two levels are added because the defendant unduly influenced Victim-1 to engage in prohibited sexual conduct.  (PSR ¶ 27.)  Pursuant to § 2G1.3(b)(3)(A), two levels are added because the offense involved a "computer," as defined by 18 U.S.C. § 1030(e)(1), to persuade, induce, entice, coerce, or facilitate the travel of Victim-1 to engage in prohibited sexual conduct.  (PSR ¶ 28.)  According to the PSR, pursuant to § 2G1.3(b)(4)(A), two levels are added because the offense involved the commission of a sex act or sexual contact.  (PSR ¶ 29.).  The Government does not believe that this enhancement should apply because it would constitute impressible double-counting.

According to the PSR, the total offense level is 40.  (PSR ¶ 36.)  Without applying the enhancement pursuant to § 2G1.3(b)(4)(A), the Government calculates that the total offense level is 38.  Since the defendant put the Government to its burden of proving his guilt at trial, no acceptance reduction is warranted, pursuant to § 3E1.1.  (PSR ¶ 34.)  The PSR calculates that based on a total offense level of 40 and a Criminal History Category of VI, the defendant's Guidelines range is 360 months to life imprisonment.  (PSR ¶ 93.)  The Government's calculation based on a total offense level of 38 and a Criminal History Category of VI also results in the defendant's Guidelines range as 360 months' to life imprisonment.

## ARGUMENT

### A. The Serious Nature of the Defendant's Sex Trafficking Offenses Warrants a Guidelines Sentence

The serious nature of the defendant's offenses warrant the substantial sentence requested by the Government.  The jury convicted the defendant of sex trafficking of a minor by force, fraud, or coercion, and transporting a minor for the purpose of engaging in prostitution.  The

evidence at trial demonstrated that the defendant was a greedy, manipulative, and violent pimp who took advantage of Victim-1, a vulnerable, desperate minor.

The defendant's handwritten playbook demonstrates the cold and calculating manner in which the defendant approached his criminal conduct. <u>See</u> GX 13, attached hereto as Exhibit A. In the defendant's playbook, the defendant describes in lurid detail his dark and sinister methods for luring prostitutes to work for him, and then tearing them down by preying on their insecurities and employing a combination of intimidation and violence to render them submissive to him. It is not enough for the defendant to own and control a prostitute's body for his own monetary gain; the defendant seeks to own and control her mind, body and soul. For example, the defendant writes to "take thy sense of self value" and "begin to pull thy away from that which thy loves and most importantly, that which loves her. This act will kill her spirit until she feels it's worthless." <u>See</u> Ex. A at 22, 23. The defendant further writes that "thy'll then give thy soul to you in order to receive the love from you that thy now needs. (sole control) = (Property)." <u>See</u> Ex. A at 24. The defendant describes exercising control over his prostitutes in a page of his handbook that he titled "Leash." The defendant writes:

- They are driven by their insecurities, find them out and use them against them.
- Find out what brings thy Pleasure, use this knowledge to keep thy weak, humble and working.
- Thy self-hate is the leash around thy neck and they insecurities are like hand cuffs.
- You must find thy leash and yank to your leisure, to your benefit.
- Find the keys to unlock the handcuffs when thy is in your presence and lock them back when thy leaves. The subconscious message to thy brain should be he has the Power to bring Pain and Please when you Please.
- Do things to constantly remind thy who is in control of thy destiny. Keep thy drawn to the light which is thy's Power source: you.

Ex. A at 25.  The defendant's references to a "leash" and "handcuffs" powerfully illustrate his desire to enslaving his prostitutes.  Moreover, the defendant's writing of yanking the leash (a victim's self-hate) to his leisure and benefit underscores the depraved pleasure that the defendant derives from inflicting pain on others.

As the evidence at trial showed, the defendant followed his playbook to the letter, luring Victim-1 to work for him, and then hurting and manipulating Victim-1 to keep her weak, afraid and under his control.  The defendant inflicted physical pain on Victim-1 when he beat her on multiple occasions. ████████████████████████████████████████████████
████████████████  The defendant used Victim-1's love for her younger sister against her when he threatened on more than one occasion to prostitute Victim-1's younger sister if Victim-1 did not travel to New York and work for him as a prostitute.  When Victim-1 arrived in New York, she was in a city where she did not know anyone other than the defendant, and remained isolated from her support system of her sister, teachers and counselors back in Maryland.  The defendant preyed on another of Victim-1's vulnerabilities: her desire to be reunited with her mother.  Although the defendant told Victim-1 that he planned for them to move to California to live near Victim-1's mother, in reality, the defendant sought to have both Victim-1 and her mother work for him as prostitutes.  (PSR ¶ 15).  The defendant communicated with Victim-1's mother about working for him as a prostitute without Victim-1's knowledge, until Victim-1 discovered the text messages between her mother and the defendant on the defendant's cell phone and confronted him about them.  The defendant's response was to choke and hit Victim-1 across the face, causing her to hit the wall and fall.  (PSR ¶ 15).  The premeditated and cruel nature of the defendant's abuse of Victim-1 makes the defendant's sex trafficking crimes even more reprehensible.

The serious nature and circumstances of the defendant's conduct is aggravated by the fact that the defendant knowingly inflicted such intense pain and suffering on a 16 year-old girl with a tragic history.  At the age of 16, Victim-1 was impressionable and susceptible to the defendant's manipulation.  Furthermore, Victim-1 has her own vulnerabilities.  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Victim-1 is a girl is need of support and care, but to the defendant, she was the perfect victim.  Victim-1 wrote a poem that describes her despondent feelings as a result of her ordeal with the defendant, and it is attached hereto as Exhibit B.

The defendant's conduct is also exacerbated by the fact that it was not an isolated incident.  Rather, the defendant admitted that he was engaging in discussions with various adult women about working for him as prostitutes.  (Tr. 14.)  For example, the defendant has conceded that his discussions with Toni and Victim-1's Mother were about prostitution.  (Tr. 14-15.)  Furthermore, the defendant stated that he wanted Victim-1's mother to be "first in line" because she is "experienced n capable of leading the flock."  (Tr. 117-118).  The defendant's reference to "flock" indicates that he wanted many prostitutes working for him.  Indeed, in the defendant's playbook, the defendant wrote "Scout locations" which included Czech Republic, Hungary, Bulgaria, Romania, Germany, Brazil and Canada.  Ex. A at 15.  On the same page, the defendant wrote "Backpage.com, Craiglist.com, Angielist.com."  Ex. A at 15.  As the evidence at trial established, the defendant spoke with both Victim-1 and Victim-1's mother about placing ads on

Backpage for prostitutes. It is clear that the defendant ran a prostitution business, and was looking for opportunities to expand his business.

Finally, the nature and circumstances of the defendant's conduct are serious because the defendant injured one police officer in his attempt to evade law enforcement, and then blatantly lied to law enforcement about his conduct. At trial, NYPD Detective Sean Ryan testified that when he was trying to handcuff the defendant, the defendant lunged into another apartment and slammed the door to that apartment onto Detective Ryan's foot. (PSR ¶ 10). The defendant ran from police and injured a police officer in the process. Furthermore, the defendant told several lies to FBI Special Agent Conolly during his post-arrest statement. The defendant stated that he didn't cross state lines with Victim-1, which he later admitted was a lie when confronted. (PSR ¶ 18). The defendant also stated that he didn't know Victim-1's name, even though her name showed up in his phone. (PSR ¶ 18). The defendant stated that he met Victim-1 the night before his arrest in New York, which he also had to admit was a lie when confronted with FBI's contradictory evidence. (PSR ¶ 18). The defendant's actions in injuring a police officer when attempting to flee from arrest and then lying about his offense conduct to a federal agent even further aggravate the already serious nature and circumstances of the defendant's offenses.

**B.     The Defendant's History and Characteristics Justify a Guidelines Sentence.**

The defendant's history and characteristics justify a sentence within the Guidelines range. The defendant has led an unrepentant life of crime. The defendant has spent his adult life either committing crimes or in jail. Over a period of eight years, from when the defendant was 16 to when he was 24, the defendant accumulated eleven convictions. Significantly, the defendant's crimes have escalated over the years, as reflected by the seriousness of the instant offense and the defendant's prior felony controlled substance convictions. Moreover, the defendant's brazen

disregard for the judicial system is evidenced by the fact that of the defendant's eleven convictions, ten of those convictions occurred while the defendant was on probation or parole. In fact, the instant offense occurred while the defendant was on parole. Indeed, the defendant was paroled on October 14, 2011, and his criminal activities resumed the following month. (PSR p. 22). The defendant's lengthy and serious criminal history, as reflected by his having the highest criminal history category of VI and his qualification as a career offender, warrants a Guidelines sentence.

The defendant argues that his criminal history is overstated because the nature of his prior convictions is unrelated to the instant offense conduct. (Def. Mem. 6). The defendant is wrong. The defendant does not and cannot provide any support for his claim that prior convictions should be discounted if they are not of the same kind of offense as the instant offense of conviction. The defendant also argues that "the inevitability of Mr. Gilliam carrying a criminal history category unfairly punishes him for being a victim himself." (Def. Mem. 9.) As an initial matter, no one's criminal history is "inevitable," and the defendant's prior sentences punished him for his criminal conduct. Furthermore, the defendant's argument that he is a victim because of his family circumstances rings hollow considering that the defendant directly involved his own family members in the instant sex trafficking offense. At trial, Victim-1 testified that as soon as she and the defendant arrived in New York, they went to Brooklyn to meet the defendant's aunt, uncle and brother. (Tr. 273-274). The defendant's brother, the defendant's uncle, and the defendant talked to Victim-1 about creating an advertisement to prostitute Victim-1. (Tr. 274-275). From there, the defendant and Victim-1 went to the Bronx, where they met the defendant's other uncles, his mother and her friend, who gave Victim-1 what appeared to be marijuana and pills. (Tr. 276-279). The defendant and his mother also gave Victim-1 drugs, and

when Victim-1 woke up she was half naked and learned that the defendant had sex with her against her will when she was knocked out. (Tr. 287). The defendant is not a victim of his family circumstances; he is a predator who enlisted his own family members to join him in exploiting Victim-1 by discussing prostituting her and plying her with drugs so that the defendant could rape her. Significantly, the defendant has shown a complete lack of remorse for his criminal conduct. Moreover, the fact that the defendant is unwilling to accept responsibility for his egregious criminal conduct does not bode well for his rehabilitation and underscores the very real risk of recidivism he poses. In sum, the defendant's characteristics also warrant a Guidelines sentence.

**C.** **The Strong Need to Protect the Public from this Defendant and to Deter Him From Committing Future Sex Crimes Against Minors Warrants a Guidelines Sentence**

A significant sentence here is also necessary for specific deterrence. The defendant's longest previous sentences were 12 years' imprisonment, 6 years of which were suspended. Notwithstanding the imposition of these lengthy sentences, the defendant's criminal record makes plain that the sentences imposed in the past did not deter him from engaging in future criminal conduct. Indeed, it does not appear that the defendant has been deterred in the slightest by his previous encounters with the criminal justice system. And while the defendant's history suggests that even a lengthy period of imprisonment may not deter him from engaging in additional criminal conduct upon his release, a lengthy prison sentence will punish him for the instant serious offenses and will protect the public from the defendant while he is incarcerated.

**D.** **The Defendant's Conduct Justifies a More Substantial Sentence than the Fifteen Year Mandatory Minimum Sentence Sought by the Defendant**

For the reasons stated above, the defendant's conduct justifies a more substantial sentence than the mandatory minimum sentence of fifteen years' imprisonment that the

defendant seeks. If the defendant were to be sentenced to the mandatory fifteen year term of imprisonment for the sex trafficking offense using force, fraud and coercion, the defendant effectively would not be punished for the sex trafficking of a minor or having transported a minor across state lines for the purposes of prostitution. Because the fifteen year mandatory minimum is triggered by the defendant's sex trafficking use of force, fraud and coercion alone, the fact that his victim was also minor justifies a higher sentence than the mandatory minimum of fifteen years' imprisonment. In addition, the fifteen year mandatory minimum does not account for the defendant's extensive criminal history or the offense level enhancements that apply to his conduct.

The defendant argues that a mandatory minimum sentence of fifteen years' imprisonment is within the defendant's suggested Guidelines range of 151-188 months' imprisonment. (Def. Mem. 9.) The defendant's Guidelines range calculation is wholly unsupported by the facts in this case. The defendant arrives at an offense level 34 by not applying any enhancements to the defendant's offense level, even though as discussed above, there are two enhancements that clearly apply in this case. The defendant then asks the Court to simply eliminate the defendant's entire criminal history, even though he is at the highest criminal history category and qualifies a career offender. The defendant's request is absurd. There is absolutely no basis to treat this career offender defendant in Criminal History Category VI as though he were in Criminal History Category I; such a result would defy common sense and defeat the purpose of the Guidelines in accurately reflecting the defendant's criminal history. The defendant's Guidelines Range calculation is baseless, and should not be accepted by the Court.

**E.    The Defendant Should Be Ordered to Pay Mandatory Restitution to Victim-1**

The Government requests that the Court order the defendant to pay $2,100.00 in restitution to Victim-1.  The law mandates restitution in cases of peonage, slavery, and trafficking for the "full amount of the victim's losses," pursuant to Title 18, United States Code, Section 1593(b)(1).  The "full amount of the victim's losses" is defined as the sum of two components: (1) ill-gotten gains, plus (2) the full amount of the victim's losses, defined as, among other things, lost income.  See In re Sealed Case, 702 F.3d 59, 66 (D.C. Cir. 2012); see also 18 U.S.C. § 2259(b)(3) (incorporated by reference in 18 U.S.C. § 1593(b)(3)).  Furthermore, Title 18, United States Code, Section 1593(b)(3) expressly provides that the amount of restitution must include "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  See United States v. Mammedov, 304 Fed. Appx. 922, 927 (2d Cir. 2008).  The amount of restitution need not be proven with exactitude; rather the district court's duty is to estimate the amount of the victim's loss, based upon facts in the record.  See In re Sealed Case, 702 F.3d at 66.

The evidence at trial established that Victim-1 worked as a prostitute for the defendant in Maryland for five days, that she had roughly four-five clients per night, and that she earned roughly $300 per day, all of which she paid to the defendant.  (Tr. 250-257).  The evidence at trial also established that Victim-1 worked as a prostitute for the defendant in New York for two days.  On the first night in New York, Victim-1 worked as a prostitute until 1 or 2 a.m.  On the second day in New York, Victim-1 worked as a prostitute and had four clients.  Victim-1 paid all the money she earned to the defendant.  (Tr. 288-292.)  At no time did the defendant pay Victim-

1 for her work as a prostitute. BecauseVictim-1 worked for the defendant as a prostitute for a total of roughly seven days and earned roughly $300 per day, the value to the defendant of Victim-1's services would be $2,100.00. Thus, the evidence supports the amount of restitution requested.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Stipulated Guidelines Range of 360 months' to life imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
     November 27, 2013

Respectfully submitted,
PREET BHARARA
United States Attorney


By:      /s/
       Kristy J. Greenberg
       Natalie Lamarque
       Assistant United States Attorneys
       Tel.: (212) 637-2469/2206